**Nos. 24-1021, 24-1055**

IN THE

# United States Court of Appeals for the Federal Circuit

---

**FATE THERAPEUTICS, INC., WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,**
*Plaintiffs-Appellants*

v.

**SHORELINE BIOSCIENCES, INC.,**
*Defendant-Cross-Appellant*

---

On Appeal from the U.S. District Court for the Southern District of California,
The Honorable Marilyn L. Huff, Case No. 3:22-cv-00676-H-MSB

---

**CORRECTED OPENING BRIEF OF PLAINTIFFS-APPELLANTS FATE THERAPEUTICS, INC. AND WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH**

---

Andrew S. Ong
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
(650) 752-3100

Kevin P. Martin
Christopher J.C. Herbert
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

February 8, 2024

*Counsel for Plaintiffs-Appellants*

# REPRESENTATIVE CLAIMS-IN-SUIT

## Representative Method Claim

**U.S. Patent No. 8,940,536:**

1.    A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

## Representative Composition Claim

**U.S. Patent No. 8,071,369:**

1.    A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

# CERTIFICATE OF INTEREST

Counsel for Appellants, Kevin P. Martin, certifies the following:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Fate Therapeutics, Inc. and Whitehead Institute for Biomedical Research

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None/Not Applicable

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   None/Not Applicable

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   *Greenberg Traurig, LLP:* Aimee Housinger, Ben Witte, Brent Douglas Sokol, Danielle Zapata Mills, Giancarlo Luca Scaccia, Jeffrey Ray Colin, Lisa Christine McCurdy, Wen Xue

   *Duane Morris LLP:* Daniel Doft

   *Wright, L'Estrange & Ergastolo:* Joseph Thomas Ergastolo

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None/Not Applicable

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

February 8, 2024                        */s/ Kevin P. Martin*
                                   Kevin P. Martin

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.......................................................5

STATEMENT OF THE ISSUES............................................................5

STATEMENT OF THE CASE................................................................6

I.    The technology at issue relates to reprogramming adult somatic cells to give them qualities akin to embryonic stem cells.....................6

    A.    Adult somatic cells and embryonic stem cells differ in their ability to "differentiate" into other types of cells. ..............6

    B.    The prior art taught only methods of generating pluripotent cells that raised ethical concerns. ............................7

    C.    The inventors discover that transcription factor Oct4 makes somatic cells more susceptible to reprogramming. .........8

    D.    The patents-in-suit.................................................................11

II.    The parties Fate and Shoreline compete in the market for iPSCs. ...........................................................................................13

III.    Procedural history..............................................................................14

    A.    Fate files suit against Shoreline. ...............................................14

    B.    The district court construes the method claims to cover only SCNT and to require a rigidly distinct two-step process................................................................................15

    C.    The district court grants summary judgment to Shoreline. ......20

        1.    The district court enters summary judgment for Shoreline on Fate's claims under § 271(g)....................20

2.      The district court enters summary judgment for Shoreline on Fate's claims for induced infringement...................................................22

SUMMARY OF THE ARGUMENT ......................................................23

STANDARD OF REVIEW ...................................................................26

ARGUMENT .........................................................................................27

I.      The district court erred in its constructions of "reprogramming to a [pluripotent/less differentiated] state" and "makes the cell more susceptible to reprogramming."...............................................27

A.      The district court erred by limiting the scope of claims to SCNT.....................................................................................27

1.      The claim language is not limited to SCNT. .................28

2.      Nothing in the specification limits the claims to SCNT. ..........................................................................30

3.      Nothing in the prosecution history limits the claims to SCNT.............................................................35

B.      The district court erred in finding that the claims are limited to a rigidly divided two-step "priming" process. .........38

1.      The claim language does not support the district court's two-step construction...........................................38

2.      The prosecution history and specification do not support the district court's construction. ........................40

C.      The cases on which the district court relied are readily distinguishable. .........................................................45

II.     The district court erred in granting summary judgment of non-infringement to Shoreline.....................................................47

A.      The district court's grant of summary judgment relied on its incorrect claim construction..................................................47

B.      Fate presented substantial evidence that Shoreline's suppliers made their iPSCs using a two-step process..............49

C.      The district court erred in resolving a factual dispute as to when Lonza reprogrammed its iPSCs......................................51

D.      The district court erred in resolving a factual dispute as to whether Shoreline induced Thermo Fisher to infringe.............54

CONCLUSION ......................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Syntron Bioresearch, Inc.*,
334 F.3d 1343 (Fed. Cir. 2003) ..........................................................29

*Alcon Research Ltd. v. Barr Lab'ys, Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ..........................................................34

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014) ...........................................................45

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................27

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
750 F.2d 1569 (Fed. Cir. 1984) ..........................................................34

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020) .....................................................36, 42

*Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010) ..........................................................29

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013) .....................................................45, 46

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003) ..........................................................48

*Budde v. Harley-Davidson, Inc.*,
250 F.3d 1369 (Fed. Cir. 2001) ..........................................................29

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ..........................................................54

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
914 F.3d 1347 (Fed. Cir. 2019) ..........................................................26

*Epistar Corp. v. Int'l Trade Comm'n*,
566 F.3d 1321 (Fed. Cir. 2009) ..........................................................31

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
  29 F.4th 1365 (Fed. Cir. 2022) ............................................................36

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
  7 F.4th 1320 (Fed. Cir. 2021) ..............................................................54

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ...........................................................33

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004) ...........................................................31

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
  493 F.3d 1358 (Fed. Cir. 2007) ......................................................43, 44

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) .....................................................28, 32

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ...........................................................28

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  327 F.3d 1364 (Fed. Cir. 2003) ...........................................................39

*Iowa State Univ. Rsch. Found., Inc. v. Wiley Organics, Inc.*,
  125 F. App'x 291 (Fed. Cir. 2005) .......................................................44

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ........................................................31, 33

*Parkervision, Inc. v. Vidal*,
  88 F.4th 969 (Fed. Cir. 2023) ..............................................................30

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...........................................26

*Protect Our Communities Found. v. LaCounte*,
  939 F.3d 1029 (9th Cir. 2019) .............................................................26

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) ...........................................................31

*SandBox Logistics LLC v. Proppant Express Invs. LLC*,
   813 F. App'x 548 (Fed. Cir. 2020) ........................................................45, 46, 47

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) ............................................................54

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ............................................................33

*Thorner v. Sony Comput. Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................................................31

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ............................................................36

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) ............................................................26

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
   465 F.3d 1312 (Fed. Cir. 2006) ............................................................27

**Statutes**

28 U.S.C. § 1295 ....................................................................................5

28 U.S.C. §1331 .....................................................................................5

28 U.S.C. § 1338 ....................................................................................5

35 U.S.C. § 271 ................................................... 15, 20, 21, 22, 48, 51

**Other Authorities**

Federal Rule of Civil Procedure 56 .......................................................27

# GLOSSARY

| | |
|---|---|
| '369 patent | U.S. Patent No. 8,071,369 |
| '856 patent | U.S. Patent No. 8,932,856 |
| '797 patent | U.S. Patent No. 8,951,797 |
| '536 patent | U.S. Patent No. 8,940,536 |
| '490 patent | U.S. Patent No. 9,169,490 |
| '917 patent | U.S. Patent No. 10,457,917 |
| '744 patent | U.S. Patent No. 10,017,744 |
| CSO | Chief Science Officer |
| DOE | Doctrine of equivalents |
| ES cells | Embryonic stem cells |
| Fate | Fate Therapeutics, Inc. |
| iPSC | Induced pluripotent stem cell |
| Lonza | Lonza Walkersville, Inc. |
| Patents-in-suit | The '369 patent, '856 patent, '797 patent, '536 patent, '490 patent, '917 patent, and '744 patent |
| POSA | Person of skill in the art |
| SCNT | Somatic cell nuclear transfer |
| Shoreline | Shoreline Biosciences, Inc. |
| UCSD | University of California, San Diego |

## STATEMENT OF RELATED CASES

The following cases are related to these consolidated appeals, as defined by

Fed. Cir. R. 47.4(a)(5):

None.

## INTRODUCTION

The district court granted summary judgment of non-infringement to defendant Shoreline Biosciences and against plaintiff Fate Therapeutics based on errors in claim construction, including the adoption of constructions that were the *opposite* of how *both* of the parties said a POSA would understand the claims. This Court should reverse.

The patents-in-suit relate to methods for "reprogramming" adult "somatic" cells to a less "differentiated" state. The creation of less-differentiated cells, including induced pluripotent stem cells or iPSCs, through the reprogramming of adult cells has allowed researchers and doctors to pursue avenues of scientific investigation and medical treatment that previously would have required embryonic or fetal stem cells, with all of their associated ethical concerns. The inventors of the patents-in-suit, including a founder of Fate, discovered that adding "transcription factor" Oct4 to somatic cells would increase the efficiency of reprogramming. They obtained method patents claiming the use of exogenous Oct4 to make somatic cells "more susceptible" to reprogramming and composition patents claiming somatic cells modified with exogenous Oct4. The specification of the patents-in-suit contrasts reprogramming somatic cells from a prior art method of creating pluripotent cells—somatic cell nuclear transfer, or SCNT—in which a somatic cell is not itself reprogrammed, but instead has its nucleus transferred to an egg cell.

The district court's grant of summary judgment of non-infringement to Shoreline largely turned on claim construction. To start, the court held that the asserted method claims only cover the use of Oct4 to make SCNT more efficient, *not* to make reprogramming somatic cells more efficient. It did this by construing "reprogramming" to include SCNT and then construing "more susceptible to reprogramming" to mean an increase in "cloning efficiency," a metric *only* literally applicable to SCNT. But if there was one thing the parties agreed on, it was that a POSA would read the claims to apply to the reprogramming of somatic cells—the opposite of the court's construction.

In construing the claims' literal scope to be limited to SCNT, the district court committed textbook claim construction errors. It failed to give primacy to the claim language read as a whole, adopting a construction that renders the claims nonsensical on their face. It relied on the fact that only an SCNT experiment was described in the specification, when precedent is clear that a specification's disclosure of only a single embodiment does not limit the claims absent further disclaiming language of the kind missing here. Likewise, the court found prosecution history disclaimer in the absence of any clear and unmistakable statements disavowing use of the invention to make reprogramming more efficient. The court's erroneous claim construction was case dispositive with respect to literal infringement, as Shoreline uses iPSCs made by reprogramming somatic cells, not SCNT.

The district court, again relying on prosecution history disclaimer, also held that the method claims require a rigidly distinct two-step process, with Oct4 added and taking effect before any other step in reprogramming—such as the addition of other transcription factors—occurs.  But nothing that happened during prosecution remotely warrants that construction.  During prosecution, the applicants had submitted some claims covering a method of reprogramming somatic cells through the addition of Oct4 *alone*.  The examiner rejected those claims, explaining that the specification did not show that Oct4 *alone* could reprogram somatic cells, but instead that Oct4 could "prime" somatic cells for reprogramming.  The applicants responded by limiting their claims to "making the somatic cell more susceptible to reprogramming."  At no point did the examiner ever opine that Oct4 needed to be added to a somatic cell as a prior and entirely separate step from the addition of other transcription factors, and at no point did the applicants ever describe the claimed method that way.  To the contrary, certain claims expressly require additional transcription factors to be added as part of the claimed method.

Even if some two-step process is required, the district court still erred by granting summary judgment to Shoreline.  A reasonable jury could find that two steps were used to make Shoreline's iPSCs based on evidence that, even when Oct4 is added at the same time as other transcription factors, it is the Oct4 that takes effect first and makes it possible for the other transcription factors to play their part.  A

jury also could find two steps based on evidence that Oct4 performs its priming function while the cells are in one growth medium, and then reprogramming requires somatic cells to be moved to a second, different growth medium.

The district court committed one more error with respect to the method claims: finding, with respect to a particular accused line of iPSCs, that there was insufficient evidence that the claimed method was used after the January 13, 2015 issuance of the first method patent. Fate identified documentary evidence that the claimed method was used in late January 2015, whereas Shoreline had a mere declaration stating it happened in 2014. Resolving credibility issues in favor of Fate as the non-moving party, the district court should have denied summary judgment on this issue.

Finally, as relevant to both the asserted method and composition claims, the district court erred in holding that Fate lacked evidence that Shoreline had the intent to induce one of its suppliers to infringe. According to the district court, Shoreline may not have known that the supplier would use Oct4 to create the accused iPSCs. There was ample evidence, however, that Shoreline knew the supplier would necessarily employ Oct4, and the district court should not have resolved credibility determinations in favor of Shoreline at summary judgment.

For all these reasons, the Court should reverse the grant of summary judgment to Shoreline and remand for further proceedings.

4

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338.  That court entered judgment in Shoreline's favor on August 31, 2023, and Fate timely appealed on September 27, 2023.  Appx1-2; Appx173.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in construing the asserted method claims to apply only to SCNT and entering summary judgment of non-infringement on this basis.

2.    Whether the district court erred in construing the asserted method claims to require the addition of Oct4 prior to and separate from other transcription factors and entering summary judgment of non-infringement on this basis.

3.    Whether the district court erred in granting summary judgment of non-infringement with respect to the Lonza iPSC line on the disputed basis that the alleged infringing acts occurred before issuance of the first asserted method patent.

4.    Whether the district court erred in granting summary judgment of non-infringement to Shoreline on Fate's claims of induced infringement.

## STATEMENT OF THE CASE

**I.    The technology at issue relates to reprogramming adult somatic cells to give them qualities akin to embryonic stem cells.**

**A.    Adult somatic cells and embryonic stem cells differ in their ability to "differentiate" into other types of cells.**

Somatic cells are the most common cell type, making up all the organs and tissues in our bodies except for the germ cells—sperm and egg cells—involved in reproduction.  Appx11491-11492(¶24).  During human development, embryonic stem cells "differentiate" to become the various types of somatic cells, such as blood cells, nerve cells, and muscle cells.  Embryonic stem cells are considered "pluripotent" stem cells, referring to their ability to differentiate into *any* type of cell in the body.  Appx11493(¶28).  Adult stem cells, on the other hand, are considered "multipotent" stem cells because they have the ability to differentiate only into cell types of a *specific* tissue.  Appx11493-11494(¶29).  Pluripotent cells are deemed fully de-differentiated and multipotent cells are deemed partially differentiated.  Appx11494(¶30).

Because "pluripotent cells can become any type of cell in the body," they "can be used to replace cells and tissues that," for one reason or another, have been "lost or degenerated."  Appx3437(¶33); Appx11493(¶28).  Researchers and medical professionals therefore covet pluripotent cells as "valuable resource[s] for

developing or testing therapies" for, *inter alia*, "organ replacement[s]" and for "cell therapies" for the treatment of cancer.  Appx3437(¶33).

**B.**    **The prior art taught only methods of generating pluripotent cells that raised ethical concerns.**

Before the priority date, pluripotent human stem cells could be harvested from two sources:  (1) embryonic stem cells—cells derived directly from an embryo; and (2) embryonic germ cells—cells derived directly from the fetal tissue of aborted fetuses.  Appx2716.  Given their sources, both types of pluripotent stem cells were highly controversial.  *Id.*; Appx2972(¶43).

Pluripotent stem cells for other mammals also could be manufactured using somatic cells employing a process known as somatic cell nuclear transfer, or SCNT.  Appx2972-2973(¶44).  As the name suggests, SCNT involves transferring a somatic cell's nucleus into an egg cell, also known as an oocyte, that has had its own nucleus removed.  *Id.*  The oocyte with the somatic cell nucleus is then stimulated to divide and begin development to the blastocyst state, with an embryonic stem cell line, referred to under these circumstances as a "cloned" embryonic stem cell line, harvested from the blastocyst.  *Id.*  SCNT's reliance on blastocysts, however, made this process controversial as applied to humans too.    Appx2972(¶43); Appx8296(¶82).

Accordingly, as of 2003 there was a significant need in the art for methods of creating pluripotent human stem cells that did not require controversial sources of

material.  Appx2973(¶45).  Researchers were beginning to explore whether somatic cells could themselves be "reprogrammed" into a "less differentiated" state, avoiding the need to use embryonic or fetal cells, or oocytes.  Appx11494-11496(¶¶32-34).

### C. The inventors discover that transcription factor Oct4 makes somatic cells more susceptible to reprogramming.

The inventors of the patents-in-suit, Drs. Rudolf Jaenisch and Konrad Hochedlinger, are renowned stem cell researchers.  Dr. Jaenisch is known for creating the first transgenic mouse and has won the first Peter Gruber prize in Genetics (2001), the Robert Koch Prize for Excellence in Scientific Achievement (2002), and the Charles Rodolphe Bruphacher Foundation Cancer Award (2003).  Appx10130-10131(¶4); *see also* Appx2737 (Shoreline's expert, Dr. Snyder, testifying that "it was an oversight for [Dr. Jaenisch] to not have gotten the Nobel Prize").  As relevant here, Dr. Jaenisch received the prestigious Massry Prize in 2008 for his work in the field of iPSCs.  Appx10130(¶4).  Dr. Hochedlinger also has been recognized for his work, including receiving the NIH Director's Innovator Award in 2007 for "Reprogramming of somatic cells by defined factors" and the Scholar Award by the Sydney Kimmel Foundation for Cancer Research in 2007.  Appx10111(¶3).

Turning their focus to reprogramming, the inventors explored the use of transcription factors, which are proteins binding to specific DNA sequences that

regulate the expression of genes to give each cell type its characteristic properties. Appx11494(¶31). They discovered that, by overexpressing a transcription factor known as "Oct4" in a somatic cell, they could increase the yield of "ES cells," a term referring here to embryonic stem cells. Appx2716; Appx2725. This finding is demonstrated by a working example in the specification, in which the inventors disclosed that overexpression of Oct4 improved the efficiency of SCNT in generating ES cells by more than twofold, from 3% on average to 7% on average, and also increased the percentage of blastocyst formation. Appx2724-2725.

While that experiment involved SCNT, the patents' specification discloses that the experiment's results also mean that Oct4 will make somatic cells "more susceptible to reprogramming." Appx2725; *see also* Appx2724 ("Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment."). Fate's expert Dr. Plath, herself a renowned expert in the field,[1] explained that "[a] POSA would expect that the role of Oct4 in the Example of the Asserted Patents, involving reprogramming via SCNT, is the same as its role in transcription factor-based reprogramming because both processes require the opening of closed chromatin of somatic cells around

---

[1] Dr. Plath, a Professor of Biological Chemistry at UCLA, is a leader in the fields of stem cell biology, epigenetics, and gene regulation. Appx2961(¶4). She and her team are known worldwide for their research into the mechanisms underlying the reprogramming of somatic cells into iPSCs. Appx2965(¶18).

pluripotency genes before reprogramming can occur." Appx11500-11501(¶44); *see also* Appx2975(¶52) (Dr. Plath explaining that the SCNT experiment "provid[es] evidence that exogenously expressed Oct4 makes somatic cells more susceptible to reprogramming to a less differentiated state"); Appx10131-10132(¶8) (Dr. Jaenisch explaining that "[i]n both [direct reprogramming and SCNT], OCT4 must bind to DNA in the chromatin to unwind the DNA from associated histones and permit subsequent gene expression"); Appx10112(¶7) (Dr. Hochedlinger explaining "if one were to refer to the function of Oct4 in the SCNT experiment in the Asserted Patents as 'priming,' then Oct4 would serve the same function in a direct reprogramming process").

In terms of measuring the increased susceptibility of somatic cells to reprogramming, Dr. Plath explained that a POSA would understand that a somatic cell normally "has *no* susceptibility to reprogramming," and hence any "minor or major changes in the somatic cell which move the cell in the direction toward pluripotency" would indicate that it has been made "more susceptible to reprogramming." Appx2981-2982(¶67) (emphasis added). Such changes include "the expression of an endogenous pluripotency gene (*i.e.*, genes that are expressed primarily in pluripotent stem cells)"; "the presence of cell surface markers … or other cellular markers … indicative of reprogramming"; and "other pluripotency

characteristics such as ES cell-like growth rate and morphology." Appx2981-2984(¶¶67-70).

The inventors' discovery of the critical role exogenous Oct4 plays in making somatic cells more susceptible to reprogramming set the stage for the identification of additional transcription factors for use in reprogramming somatic cells. Appx2984-2985(¶¶73-79). In 2006, Dr. Shinya Yamanaka identified a "cocktail" of four transcription factors, including Oct4, which together reprogrammed somatic cells into pluripotent cells, an invention for which he won the Nobel Prize. Appx11496(¶35); Appx8293(¶78). Even today, Oct4 is considered the most critical transcription factor for producing high quality pluripotent stem cells and is used in all commercial methods for reprogramming somatic cells to iPSCs. Appx11500(¶41).

## D.   The patents-in-suit.

Following their invention in 2003, the inventors applied for and were awarded the patents-in-suit. The inventors' applications included some method claims covering "reprogramming a primary somatic cell" using exogenous Oct4. Appx2667. The examiner, however, rejected those claims, explaining that in her view the specification did not enable "a method of reprogramming a primary somatic cell to a less differentiated state" using Oct4 "alone." Appx1467-1468. In particular, the examiner noted that, in the SCNT experiment in the specification, Oct4 was used

*together* with other transcription factors in the oocyte. Appx1475-1477; Appx1479. The examiner repeated the point that the use of Oct4 "alone" or "solely" could not reprogram somatic cells numerous places in the prosecution history. *E.g.*, Appx1471-1473; Appx1478-1479.

The examiner recognized, however, that using Oct4 alone could result in an "additive" effect which made reprogramming more "efficient." Appx1466; Appx1479. And the examiner concluded that the application "provided specific guidance to a means of priming somatic cells for reprogramming." Appx1466-1467; *see also* Appx1470 ("The specification describes a method of priming a somatic cell for reprogramming by solely introducing Oct4[.]").

Therefore, in response to the examiner's grounds for rejection, the inventors amended most of their method claims to change from a method of "reprogramming" using Oct4 to a method of "making a primary somatic cell more susceptible to reprogramming" using Oct4. Appx1486 (cleaned up). They did not need to amend claims 1 and 2 of the '856 patent to adopt this approach, because those claims already included the "more susceptible" formulation. Appx3994; Appx3492.

Claim 1 of the '536 patent is representative of the method claims. It recites:

> A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid

> results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

Appx3086.  The applicants also received composition claims, of which claim 1 of the '369 patent is representative:  "A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence."  Appx3030.

The earliest of the method patents-in-suit issued on January 13, 2015.  Appx4-5.  The patents are owned by the Whitehead Institute at MIT, which exclusively licenses them to Fate.  Appx5.

## II.    The parties Fate and Shoreline compete in the market for iPSCs.

Fate is a clinical-stage biopharmaceutical company dedicated to the development of first-in-class cellular immunotherapies for patients with cancer, and is the exclusive licensee of the patents-in-suit.  Appx85; Appx4161(¶13); Appx4226; Appx11146.  Among its founders is Dr. Jaenisch, the inventor of the patents-in-suit.  Appx10130(¶1).  Fate's work entails using a proprietary iPSC product platform to produce homogeneous cell products that deliver more effective pharmacologic activity to cancer patients.  Appx4428.  This first-of-its-kind approach involves engineering human iPSCs to manufacture cell therapy products that can be delivered off-the-shelf for patient treatment.  *Id.*  Fate's iPSC platform was designed to overcome the problems associated with the production of cell therapies using patient- or donor-sourced cells.  *Id.*

Shoreline was founded in May 2020. Appx5927. Like Fate, Shoreline develops immunotherapies derived from iPSCs. Appx5967; Appx6066-6067; Appx 8273-8282(¶¶46-66). Shoreline describes its business as "developing specialized cells called natural killer cells," which it develops by "start[ing] with [iPSCs] and differentiat[ing] them into" natural killer cells. Appx2598. To pursue its business, Shoreline acquired iPSCs from five other companies including, as relevant to issues on this appeal, Lonza and Thermo Fisher. Appx112 n.12; Appx115; Appx5927.

One of Shoreline's founders and its former acting CSO is Dr. Daniel Kaufman, a professor at UCSD.[2] Dr. Kaufman specializes in iPSCs. *See* Appx11508-11509(¶59). At the same time he was founding Shoreline, Dr. Kaufman also was serving as a scientific advisor to Fate. Appx10784-10785(¶61). Indeed, Dr. Kaufman and his Shoreline co-founders often referred to Shoreline as "Fate 2.0." Appx11157.

## III.  Procedural history

### A.  Fate files suit against Shoreline.

On May 13, 2022, Fate filed this lawsuit against Shoreline, alleging that Shoreline was infringing the '369, '856, '797, '536, '490, and '917 patents under 35 U.S.C. §§ 271(a), 271(b), and 271(g). Appx190-217. On February 14, 2023, Fate

---

[2] Dr. Kaufman was a named defendant. On June 9, 2023, the district court granted Fate's unopposed motion to dismiss Dr. Kaufman from the case with prejudice. Appx5311-5312.

filed an amended complaint adding a claim for infringement of the '744 patent. Appx4216-4223.

Fate alleged that Shoreline infringed the asserted patents in three different ways.  First, Fate alleged that Shoreline directly infringed the asserted method patents under § 271(g) by purchasing and using iPSCs created by third parties using the patented methods.    Appx91-92;  Appx4190;  Appx4202;  Appx4213-4214; Appx4220-4221.  Second, Fate alleged that Shoreline violated § 271(b) by inducing third-party suppliers of iPSCs such as Thermo Fisher to infringe the asserted patents under § 271(g).    Appx113-115;  Appx4183;  Appx4189;  Appx4195;  Appx4201; Appx4207.  And third, Fate alleged that Shoreline directly infringed the asserted patents under § 271(a) by making, using, offering to sell, and/or selling, in the United States, or importing into the United States, iPSCs that infringed at least one claim of each asserted patent.    Appx118;  Appx4180;  Appx4185-4186;  Appx4192; Appx4197-4198; Appx4204; Appx4209.

## B.    The district court construes the method claims to cover only SCNT and to require a rigidly distinct two-step process.

On February 7, 2023, the district court issued its claim construction order.  As relevant to this appeal, the court construed "reprogramming to a [pluripotent/less differentiated] state" and "makes the cell more susceptible to reprogramming." Appx16-37.  While the court construed those terms separately, they appear together

in the method claims:   *e.g.*, "making a somatic cell more susceptible to reprogramming to … a less differentiated state." Appx3144.

1.     With respect to "reprogramming to a [pluripotent/less differentiated] state," one dispute between the parties was whether "reprogramming" should be limited to "direct reprogramming."  Shoreline argued that the word "direct" was necessary to exclude use of the claimed method in connection with SCNT, asserting that SCNT was excluded from the scope of "reprogramming" by the language of the claims, the specification, and the prosecution history.  Appx2607-2610.  Shoreline's expert Dr. Snyder supported that position, opining that "[t]he claim language of the asserted method claims … makes clear that the alleged invention was the [sic] making a somatic cell more susceptible to direct reprogramming to a less differentiated or pluripotent state, and not the use of the existing nuclear transfer technology." Appx3463(¶73).  In response, Fate agreed that the claims do not reach SCNT:   "Plaintiffs do not argue the Asserted Claims encompass SCNT as Defendants presuppose." Appx4827.  Fate instead opposed inclusion of the word "direct" in the claim construction on the basis it had no fixed meaning to a POSA and would be confusing. *E.g.*, *id*.

The district court, however, held that the claimed methods *do* apply to SCNT. Appx16-22.  In the course of doing so, the court also repeatedly hinted that the claimed methods *do not* apply to reprogramming somatic cells:  "the claims at issue

are not directed to methods of reprogramming a somatic cell." Appx22; *see also* Appx22 n.11 ("the method claims … are not directed to methods of reprogramming somatic cells").

2.    After first construing the claims to apply to SCNT, the district court then construed "makes the cell more susceptible to reprogramming" to *limit* the claims just to SCNT. Appx22-35. Fate had proposed that this term be construed to mean "improves the efficiency of reprogramming the cell." Appx22. In support, Fate pointed to the passage in the specification disclosing that, in the SCNT experiment, "blastocyst formation and ES cell derivation … is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts." Appx2696-2697; Appx2725. "This result," the specification states, "demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming." Appx2725. As recounted above, Fate's expert Dr. Plath explained how a POSA would determine whether the efficiency of reprogramming had been improved. *See supra*, pp. 10-11.

Shoreline, for its part, asserted that the term is indefinite, arguing that a POSA would not understand how to determine whether a somatic cell had been made more susceptible to reprogramming. Appx2611-2615. In the alternative, Shoreline argued that the term should be construed to mean "prime the cell for subsequent reprogramming." Appx2615-2618.

Once again, whatever their differences, both parties construed this claim language as relating to the reprogramming of somatic cells.

But on this issue too, the district court adopted a claim construction that was (in relevant part) proposed by neither party, because it limited the claims to SCNT. Specifically, while the court agreed with Fate that "makes the cell more susceptible to reprogramming" should mean an increase in "efficiency," the court then went far beyond what either party had proposed by limiting "efficiency" to "cloning efficiency." Appx25. In doing so, the court emphasized that cloning efficiency is the type of efficiency discussed in the specification's SCNT experiment and that cloning efficiency was discussed by the examiner and the applicants in the context of that experiment. Appx25-28.

The parties' experts had agreed, however, that cloning efficiency is a metric applicable only to SCNT, not reprogramming somatic cells. *E.g.*, Appx8304(¶92) (Shoreline's expert Dr. Snyder stating "Dr. Plath and I agree that improved cloning efficiency is directed to more efficient blastocyst formation and ES cell derivation, which are SCNT-specific results. There is no question that blastocyst formation and ES cell derivation never occur in iPSC reprogramming." (footnotes omitted)). The court's construction thus limited the literal scope of the claims to use of the claimed method in connection with SCNT.

3.    Having issued those two constructions effectively limiting the method claims to SCNT, the district court then addressed Shoreline's argument that "makes the cell more susceptible to reprogramming" should be read to mean "primes the cell for subsequent reprogramming."  Appx28-34.  The crux of the dispute here was whether Oct4 must make cells "more susceptible to reprogramming" *before* any part of the reprogramming begins; according to Shoreline, "[t]he reprogramming of the somatic cell to a pluripotent or less differentiated state must ... occur in a *subsequent* step that occurs after first priming the somatic cell for reprogramming."  Appx2617 (emphasis in original).  Shoreline argued that its proposed two-step construction was supported by the prosecution history of the '536 patent—specifically, by the examiner's use of the word "priming."  Appx2617-2618.

Fate contested Shoreline's proposed construction, noting that the dispute between the applicants and the examiner during prosecution had focused on whether Oct4 "alone" or "solely" would reprogram somatic cells, not whether Oct4 needed to be added and to take effect in a first step of reprogramming.  Appx4820-4821.

The district court agreed with Shoreline, finding that the applicants had disclaimed the use of Oct4 except to "prime" somatic cells for reprogramming.  Appx28-33.  The court also agreed with Shoreline that "priming" must occur as the first step in a two-step process, noting that the specification's SCNT experiment involved "induc[ing] Oct4 expression" in the cells before the nuclear transfer

occurred.   Appx33-34; *see also* Appx34 ("the specification, consistent with the examiner's description, describes it as a two-step process").

4.    Fate moved for reconsideration of the claim construction order, which the district court denied.  *See* Appx43-70.

### C.    The district court grants summary judgment to Shoreline.

On August 30, 2023, the district court granted Shoreline's motion for summary judgment of non-infringement.  Appx83-120.

### 1.    The district court enters summary judgment for Shoreline on Fate's claims under § 271(g).

The district court first addressed Fate's claims for direct infringement of the asserted method claims under § 271(g), which were based on Shoreline's purchase and use of iPSCs manufactured by third parties.  Based upon its claim construction, the court agreed with Shoreline that Fate could not prove direct infringement.

With respect to the "priming" issue, Shoreline argued that "the reprogramming processes used by the iPSC manufacturers at issue do not satisfy the relevant two-step requirement because … Oct4 is added with other transcription factors in one step to initiate the reprogramming process."  Appx93.  In response, Fate submitted evidence from Dr. Plath explaining that even if Oct4 is added at the same time as the other transcription factors, the Oct4 takes effect first and makes it possible for the other transcription factors to perform their functions.  Appx11498-11503(¶¶39-48).  Dr. Plath further explained that the Oct4 takes effect while the

somatic cells are present in one growth medium, then the cells are moved to a second growth medium for reprogramming, which shows that the Oct4 is "making the somatic cell more susceptible to reprogramming" in an initial step.  Appx1148-1149(¶¶39-40); Appx11502(¶¶46-47).

The district court ruled for Shoreline, explaining that Dr. Plath's evidence was irrelevant because "[t]he Court's claim construction specifically requires that the induction of Oct4 expression occur prior to *and be separate* from the reprogramming process."  Appx94 (emphasis added).  Based on evidence that Oct4 and the other transcription factors are added at the same time, the court held that Fate could not prove infringement.  Appx93-94.

With respect to the "cloning efficiency" requirement, Shoreline argued that it does not infringe because the accused cell lines were made through reprogramming somatic cells and, therefore, not by increasing the cells' "cloning efficiency."  Appx5938-5939.  Fate responded that this limitation is satisfied under the doctrine of equivalents.  Appx10085-10088.  The district court ruled for Shoreline on the DOE issue.  Appx104-105.  In this appeal Fate does not challenge the court's DOE decision, but only the court's "cloning efficiency" claim construction that made Fate's reliance on DOE necessary in the first place.

The district court also held, in a footnote, that Shoreline's purchase of iPSCs from Lonza did not infringe under § 271(g) because Lonza performed the claimed

method before the January 13, 2015 first issuance of an asserted method patent. Appx112-113 n.12. For this holding, the court relied on a declaration from Lonza's head of development averring that the reprogramming of its iPSCs was completed by October 2014 or earlier, while rejecting documentary evidence pointing to a late January 2015 manufacture date. *Id.*

**2. The district court enters summary judgment for Shoreline on Fate's claims for induced infringement.**

Finally, the district court entered summary judgment against Fate on its claims of induced infringement under § 271(b). With respect to the method claims, the court granted "summary judgment of Plaintiffs' induced infringement claims to the extent they are based on underlying acts of direct infringement under § 271(g)." Appx114. As for the asserted composition claims, Shoreline argued that Fate could not prove Shoreline's intent to induce infringement by Thermo Fisher because the record evidence showed that "[n]o one at Shoreline knew what methods or reprogramming factors" Thermo Fisher "had used to produce" the iPSCs as issue. Appx5950. Fate responded by pointing to evidence that Thermo Fisher used the "CytoTune 2.0 kit," which performs the asserted method claims through its use of Oct4. Appx10101-10102; Appx11512-11518 (¶¶65-75). While the court agreed that the "evidence … show[ed] that Shoreline knew that Thermo Fisher would use the CytoTune 2.0 kit," the court concluded there was insufficient evidence "that Shoreline knew of the precise processes utilized by the CytoTune 2.0 kit." Appx116.

Nor, in the court's view, was there any "showing that Shoreline ever instructed or directed Thermo Fisher to specifically use Oct4 during the manufacturing process for the iPSCs at issue." *Id.*

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's claim constructions and its grant of summary judgment of non-infringement to Shoreline.

I.    The district court erred in construing "reprogramming to a [pluripotent/less differentiated] state" and "makes the cell more susceptible to reprogramming."

A.    The court limited the claimed methods to SCNT—the opposite of how both of the parties agreed a POSA would have understood the claims.

1.    The court construed "more susceptible to reprogramming" to require an increase in "cloning efficiency," a metric literally applicable only to SCNT and not reprogramming somatic cells. But the claims on their face cover "making a primary somatic cell more susceptible to reprogramming to a less differentiated state," which to a POSA means reprogramming somatic cells. The court's construction fails to read the patents and claims as a whole and renders the claims nonsensical.

2.    The specification does not clearly and unambiguously limit the reach of the method claims to SCNT. The district court emphasized that the single working example related to SCNT, calling it the "preferred embodiment." But the

specification never referred to the SCNT experiment as the "preferred embodiment" and, regardless, precedent is clear that disclosed embodiments—even if there is only one—will not limit claim scope absent "words or expressions of manifest exclusion or restriction," which are absent here.

3.      During prosecution the applicants did not clearly and unambiguously disclaim using the claimed methods in connection with reprogramming somatic cells.  The examiner stated that the applicants had not shown that Oct4 "alone" was enough to reprogram somatic cells, in response to which the applicants amended the claims to "making the somatic cell *more susceptible* to reprogramming."  Neither the examiner nor the applicants ever stated that the claims were limited to SCNT.

B.      The district court erred by finding that the method claims are limited to a method of "priming" comprising a rigidly divided two-step process.

1.      The claim language does not require that Oct4 be added separate from other transcription factors.  The claims on their face only require "making the somatic cell more susceptible to reprogramming."  The plain and ordinary meaning of that language does not rule out adding Oct4 while other steps in reprogramming are also underway.

2.      The prosecution history and the specification do not support the district court's construction.  The court focused on the examiner's use of the word "priming," but the examiner never said that by "priming" she meant some rigid two-

step process.  Instead, the examiner only distinguished the use of Oct4 "alone" to reprogram somatic cells from the use of Oct4 to make reprogramming more efficient.  This prosecution history contains no clear and unambiguous disclaimer of adding Oct4 at the same time as other transcription factors.  Indeed, certain allowed claims *require* the presence of at least one other transcription factor involved in reprogramming as part of the claimed method.

II.    The district court erred by granting summary judgment of non-infringement to Shoreline.

A.    The court's grant of summary judgment of non-infringement of the asserted method claims was based on the court's incorrect claim constructions.  If the Court agrees with Fate regarding claim construction, then the Court should reverse the grant of summary judgment and remand for further proceedings.

B.    The evidence shows that a two-step "priming" process was used to make the accused iPSCs.  Even when Oct4 is added at the same time as other transcription factors, the Oct4 takes effect first and makes it possible for the other transcription factors to perform their functions.  Somatic cells also must be moved to a different growth medium for reprogramming after Oct4 has primed the cells.

C.    The district court should not have resolved a factual dispute as to whether Lonza reprogrammed its iPSCs after January 13, 2015, the earliest issuance date of an asserted method patent.  A reasonable jury could have concluded that

Lonza reprogrammed the iPSCs at issue after January 13, 2015, based on Lonza documentation stating that the iPSCs were manufactured on January 29, 2015.

D.    The district court should not have resolved a factual dispute as to whether Shoreline had the necessary intent to induce Thermo Fisher to infringe the asserted composition claims.  There was ample evidence showing that Shoreline told Thermo Fisher to use the CytoTune 2.0 kit and knew that the kit uses Oct4 to reprogram somatic cells.

## STANDARD OF REVIEW

"Claim construction is ultimately a question of law that this court reviews *de novo*." *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) (citation omitted).  "Claim construction requires a determination as to how a person of ordinary skill in the art would understand a claim term 'in the context of the entire patent, including the specification.'"  *Id.* (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).

This Court reviews a district court's grant of summary judgment under regional circuit law.  *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1359 (Fed. Cir. 2019).  In the Ninth Circuit, summary judgment is reviewed *de novo*. *Id.*; *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019).  Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## ARGUMENT

**I.    The district court erred in its constructions of "reprogramming to a [pluripotent/less differentiated] state" and "makes the cell more susceptible to reprogramming."**

The district court committed legal error when it construed the asserted method claims as limited to SCNT, and when it construed the claims to require a rigidly distinct two-step reprogramming process in which Oct4 is added to the somatic cells by itself, without any other transcription factor present.

### A.    The district court erred by limiting the scope of claims to SCNT.

The parties agreed on at least one thing:  a POSA would have understood the asserted method claims to relate to reprogramming somatic cells.  The district court's adoption of an SCNT-only construction was based on textbook legal errors.  While courts may adopt claim constructions not proposed by either party, that the district court's construction in this case was the *opposite* of how both of the parties and their experts thought a POSA would understand the claims should have served as a giant red flag that the court's construction was wrong.  *Cf. Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006) ("While we may have the authority to adopt claim constructions which have not been proposed by either party … we should be hesitant to do so.")

### 1.     The claim language is not limited to SCNT.

This Court time and again has reminded the district courts that "a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)).   Yet in this case the district court scarcely addressed the claim language at all, focusing instead on the prosecution history and specification.

The district court limited the claims to SCNT when it held that "makes the cell more susceptible to reprogramming" requires an improvement not in reprogramming efficiency (as Fate proposed) but instead in "cloning efficiency," a metric only literally applicable to SCNT.  *Supra*, pp. 16-18.  Yet here, the claim language makes clear that the claimed method concerns "making a primary somatic cell more susceptible to reprogramming to a less differentiated state," Appx86-87; Appx1486, not SCNT.  As Shoreline explained, "[i]n the claims, a somatic cell or primary somatic cell is what is being made more susceptible to reprogramming; the claims do not recite making an oocyte/egg or a somatic nucleus inserted into an egg cell more susceptible to reprogramming[.]"  Appx2609.  Fate did not disagree.

Shoreline went on to argue that the claims are indefinite because there was no known way of measuring increased somatic cells' susceptibility to reprogramming— because "cloning efficiency" only literally applies to SCNT. Appx2611-2622 (arguing that "improved blastocyst formation and ES cell derivation … are specific to SCNT"); *see also* Appx4756 (Shoreline arguing "Blastocyst formation is solely a measure of the efficiency of SCNT, and not a measure of reprogramming of a somatic cell to a pluripotent state"). Fate obviously disagreed with Shoreline's indefiniteness argument, but not because it believed the claims should be limited to improving cloning efficiency.

Because the claims on their face relate to reprogramming somatic cells, the district court's "cloning efficiency" construction runs afoul of bedrock rules of claim construction: that claims and patents must be read as a whole and construed where possible to avoid "facially nonsensical" and "internally inconsistent" results. *Abbott Lab'ys v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1351 (Fed. Cir. 2003) ("The usage of the disputed claim terms in the context of the claims as a whole … informs the proper construction of the terms"); *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001) ("In construing claim terms, it is necessary to consider the specification as a whole, and read all portions of the written description, if possible, in a manner that renders the patent internally consistent." (cleaned up)); *Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1255

(Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (cleaned up)).

Here, a POSA reading the claims and patents as a whole would have understood that the claimed methods relate to reprogramming somatic cells, which the specification *distinguishes* from SCNT. *Supra*, pp. 9-11. A POSA also would have understood that cloning efficiency is a metric only literally applicable to SCNT and not to reprogramming somatic cells. *Supra*, p. 18. A POSA therefore would not read "making somatic cells more susceptible to reprogramming" to mean an increase in cloning efficiency, because that would be "facially nonsensical." A POSA instead would look to measures of efficiency actually applicable to reprogramming somatic cells, as explicated by Dr. Plath. Appx2975-2984(¶¶52-70).

## 2. Nothing in the specification limits the claims to SCNT.

In finding that the claims are limited to cloning efficiency and therefore SCNT, the district court relied in part on the specification, reasoning that the only type of increased efficiency discussed is "cloning efficiency." *E.g.*, Appx26-28; Appx35; Appx37; Appx62 & nn.9-10.

But the applicants did not act as their own lexicographers by defining "making a primary somatic cell more susceptible to reprogramming" to mean only an increase in cloning efficiency. *See Parkervision, Inc. v. Vidal*, 88 F.4th 969, 975-76 (Fed. Cir. 2023) ("To act as its own lexicographer, a patentee must clearly set forth a

definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term."). Nor did the district court even assert lexicography.

To the extent the district court thought the specification's discussion of cloning efficiency was a disclaimer of measures of efficiency applicable to reprogramming somatic cells, that was error. "The standard for disavowal of claim scope is ... exacting." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). "To disavow claim scope, the specification must contain 'expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (quoting *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)). "Absent [such] a clear disavowal in the specification … the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004).

The district court ignored that legal principle in reasoning that the specification's discussion of the SCNT experiment limited the claims to improving cloning efficiency. There are no "words or expressions of manifest exclusion or restriction" in the specification demonstrating "a clear intention to limit the claim scope" to SCNT. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (citation omitted). To the contrary, the applicants *distinguished* their

invention from SCNT: "the methods of the present invention allow one to generate pluripotent [cells] *without* using embryos, oocytes, and/or nuclear transfer technology." Appx3022 (emphasis added). The specification is replete with statements that the inventors intended to broadly claim methods of reprogramming somatic cells. *See, e.g.*, Appx3021 ("The present invention provides engineered somatic cells"); *id.* ("The present invention also provides methods for reprogramming somatic cells to a less differentiated state"); Appx3024 (stating that "reprogramming" encompasses any "process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated."). The applicants certainly did not *limit* their invention to SCNT and improvements in cloning efficiency.

The district court emphasized at various points that the only "working example" and the "preferred embodiment" in the specification relates to SCNT, not reprogramming somatic cells. Appx17-19; Appx 24. That was error for two reasons. First, this Court has explained that "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova/Pure Water*, 381 F.3d at 1117 (internal quotation marks and citation omitted). Applying this principle, the Court has concluded time and again that, even if the specification describes only a single

embodiment, a court should not construe the patent claims to be limited to that embodiment absent a clear disavowal. *See, e.g.*, *Liebel-Flarsheim*, 358 F.3d at 906 ("this [C]ourt has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("'[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction"'" (*quoting Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

Based on this principle, even if the SCNT experiment were the sole disclosed embodiment, it would be error to limit the claims in light of that experiment, because there is no expressed intent in the specification to so constrain the claims. To the contrary, the specification describes numerous embodiments pertaining to reprogramming somatic cells as coming within the scope of "the present invention." For example, it recites that "[t]he present invention further provides methods for programming somatic cells to a less differentiated state," such that "[i]n one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state." Appx3022. The SCNT experiment, for its part, is never described as a "preferred embodiment." The specification states only that the SCNT

experiment is being provided "for purposes of illustration of certain aspects and embodiments of the present invention," and that is "not intended to limit the invention." *Id.*

Second, the district court's focus on the SCNT "working example" confuses concepts of enablement and claim construction. Even as to enablement—which, to be clear, is not at issue on this appeal—the court's reasoning ignores that actual reduction to practice is not required and prophetic examples can be enabling. *Alcon Research Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014) ("[i]t is well settled that an invention may be patented before it is actually reduced to practice"); *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1577 (Fed. Cir. 1984) ("Use of prophetic examples … does not automatically make a patent non-enabling."). Here, the examiner concluded that claims to a method of making somatic cells more susceptible to reprogramming were enabled, and Fate's expert Dr. Plath credibly opined that a POSA would understand that the SCNT experiment proved the utility of Oct4 for reprogramming somatic cells. Appx2975-2984(¶¶52-70); Appx5141-5147(¶¶8-11). No party argued that the claims should be limited to SCNT to avoid enablement concerns. It therefore was error for the district court to allow the specification's "working example" to dictate its claim construction.

As with the claim language, Shoreline did not argue that the specification limits the claims to SCNT to the exclusion of reprogramming somatic cells. Here too, Shoreline argued the very opposite, stating that "the shared specification of the Asserted Patents explicitly describes the 'reprogramming' of somatic cells as 'directly' reprogramming the cells to pluripotent cell," which would be accomplished "without the use of oocytes and nuclear transfer technology[.]" Appx2611-2612 (cleaned up). Putting a fine point on it, Shoreline asserted that "a POSA reading the specification would understand that … the methods of the present invention relates to methods of reprogramming somatic cells *without* … nuclear transfer technology[.]" Appx2610 (emphasis added; cleaned up). And Fate did not disagree. *Supra*, p. 16.

### 3.    Nothing in the prosecution history limits the claims to SCNT.

In effectively limiting the reach of the method claims to SCNT, the district court also misread the interplay between the examiner and the applicants during prosecution. Appx20 n.11 (court stating "it is clear from a review of the intrinsic record, particularly the prosecution history, that the method claims … are not directed to methods of reprogramming somatic cells").

Like specification disclaimer, prosecution history disclaimer is very difficult to establish. The party arguing for a disclaimer bears the burden of "proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to

one skilled in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1064 (Fed. Cir. 2016). This Court does "not apply the doctrine of prosecution history disclaimer where the alleged disavowal is less than clear." *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1348 (Fed. Cir. 2020). A purported disavowal is "less than clear" when the allegedly disclaiming passages are "ambiguous," *Aria Diagnostics, Inc. v. Sequenom*, Inc., 726 F.3d 1296, 1302 (Fed. Cir. 2013), or "amenable to multiple reasonable interpretations," *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022).

The prosecution history in this case does not clearly and unambiguously amount to a disclaimer of using the claimed method except to improve cloning efficiency in SCNT. To the extent the examiner and applicants discussed concepts relating to cloning efficiency, that was merely in the context of addressing the specification's SCNT experiment, which was itself not limiting for the reasons given above. *Supra*, pp. 30-35.

The district court's emphasis on the examiner's rejection of claims to "reprogramming" is even more misplaced. As recounted above, the examiner believed the applicants had failed to demonstrate that the addition of Oct4 "alone" would be sufficient to fully reprogram somatic cells into a less differentiated state. Some version of "alone" or "solely" appears numerous times in the examiner's office actions, making the examiner's focus abundantly clear. *E.g.*, Appx1469; Appx

1470; Appx1471; Appx1477; Appx1478-1479; Appx1481 (examiner noting, among other things, that the "specification … provided no evidence that alone the exogenous Oct4 in the cell is reprogramming the somatic cell"). The examiner did not, however, state that the claims as they had been amended to cover "making the cell more susceptible to reprogramming" were not enabled. Appx1465-1468. To the contrary, the examiner recognized that the application disclosed that Oct4 created an "additive" effect which made reprogramming more "efficient." Appx1466; Appx1479. In making those statements, the examiner did not state that by "reprogramming," what she really meant was SCNT and just SCNT. And the applicants certainly never said that.

Once again, not even Shoreline argued that the prosecution history amounted to a disclaimer of using the claimed method in connection with reprogramming somatic cells. Shoreline argued the opposite: after asserting that "a POSA would understand that the term 'reprogramming refers to 'directly reprogramming' using transcription factors and not to SCNT or other methods," Shoreline stated "[t]he prosecution history also supports Defendants' construction." Appx2613. And its expert agreed. Appx3464(¶77) (Dr. Snyder opining "[t]he prosecution history of the Asserted Patents also evidences that what the inventors were attempting to do was to directly reprogram a somatic cell into a less differentiated state or a pluripotent state").

37

\* \* \*

In summary, the district court went astray in construing the claims to require an increase in cloning efficiency, a concept directly applicable only to SCNT and not reprogramming somatic cells. This ruled out literal infringement by Shoreline, forcing Fate to argue DOE in opposition to Shoreline's motion for summary judgment. This Court should reverse the district court's claim construction limiting an increase in "efficiency" to only "cloning efficiency," which would allow Fate to argue literal infringement on remand.

### B. The district court erred in finding that the claims are limited to a rigidly divided two-step "priming" process.

In addition to construing the method claims to be effectively limited to SCNT, the district court also limited the method claims to "a method of 'priming' a somatic cell for reprogramming," in which Oct4 is added and makes somatic cells more susceptible to reprogramming before any other step in reprogramming—most importantly the addition of other transcription factors—occurs. Appx28-35; Appx53-65. This too was error.

### 1. The claim language does not support the district court's two-step construction.

Nothing on the face of the method claims requires Oct4 to be added first, separate and apart from the other transcription factors. The claims only require that the Oct4 "mak[e] the somatic cell more susceptible to reprogramming." No timing

element is implied by the claim language, except that the Oct4 must have its effect some time before reprogramming is complete. To give an analogy, an assailant might make someone who *already* is tottering "more susceptible to falling" by giving them a push. A push might also make a victim "more susceptible to falling" if delivered at the *same time* as another assailant's push. That other factors contributing to the victim's potential fall previously were, or simultaneously are, in play does not eliminate the push's impact. So too here, the claims are silent as to whether Oct4 must make a somatic cell "more susceptible to reprogramming" before any other part of reprogramming has occurred—whether Oct4 could be added at the same time as the other transcription factors used in reprogramming somatic cells, or even after the other transcription factors were added.

It matters too that the asserted claims are "comprising" claims, not "consisting" claims. As the Court knows, "[t]he transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003). In *Invitrogen*, for example, "Claim 1 use[d] the open-ended transition 'comprising' to introduce the recited steps" of growing E. coli cells. *Id.* The Court explained that "the claim signals to patent practitioners that claim 1 allows activity, even activity that produces E. coli cell growth, before the recited steps." *Id.* In the instant case, because the asserted method claims are "comprising" claims they allow additional

39

steps, such as the introduction of other transcription factors, to be performed in conjunction with the introduction of Oct4. The district court's construction, on the other hand, effectively and improperly converts the claims into closed-ended "consisting of" claims.

### 2. The prosecution history and specification do not support the district court's construction.

The district court's principal rationale for its construction was prosecution history disclaimer—the court pointed to the examiner's many uses of the word "priming," and concluded that "priming" must mean that Oct4 takes effect before any step in reprogramming occurs. *Supra*, pp. 18-19. But the examiner *never* explained that that was what she meant by "priming," nor that she believed the claims should be limited to such a method. It is clear from the prosecution history that the examiner was merely using "priming" to distinguish the use of Oct4 *alone* to reprogram somatic cells—which she thought the specification did not enable— from the use of Oct4 to make reprogramming somatic cells more efficient, which she thought was enabled. *Supra*, pp. 11-12. While the examiner repeatedly focused on the problems she saw with claiming Oct4 "alone" or "solely" Oct4 to reprogram somatic cells, *supra*, pp. 11-12, she never expressed concern with claiming the addition of Oct4 at the same time as other transcription factors.

Indeed, the district court's prosecution history disclaimer ruling never accounts for certain allowed claims of the asserted patents that expressly *require*

other transcription factors to be present while Oct4 is "making a somatic cell more susceptible to reprogramming." Sox-2 and Nanog are other transcription factors that can be used in reprogramming somatic cells. *E.g.*, Appx11494-11495(¶32). Claim 12 of the '536 patent covers a "method of making a somatic cell more susceptible to reprogramming" which requires *both* "(a) contacting the somatic cell" with Sox2 and "(b) introducing an exogenous nucleic acid encoding an Oct4 protein." Appx3086. Nothing in that claim counterintuitively requires that step "(b)" must precede and be complete before step "(a)." Claim 1 of the '744 patent calls for the introduction both of Oct4 *and* "an exogenously introduced polynucleic acid encoding Sox-2 or Nanog protein … wherein the exogenously introduced polynucleic acids"—plural—"result in making the somatic cell more susceptible to reprogramming to a less differentiated state." Appx3144. Claim 10 of the '917 patent likewise calls for the introduction of Sox-2 or Nanog as part of the claimed "method of making a somatic cell more susceptible to reprogramming." Appx3124. These claims demonstrate that neither the examiner who approved the claims nor the applicants understood "priming" inherently to require the introduction of Oct4 alone, to the exclusion of other transcription factors. Fate consistently raised this point below, yet the district court never addressed it. *See* Appx4825 (Fate responsive claim construction brief); Appx5134 (Fate motion for reconsideration).

As with the SCNT versus reprogramming somatic cells issue discussed above, *supra* pp. 25-37, the district court thought it significant that the examiner and applicants discussed the SCNT experiment disclosed in the specification, which involved two steps: first Oct4 was exogenously expressed in a somatic cell, then that cell's nucleus was transferred to an oocyte. Appx992-993; Appx33-34; Appx63-64. But for all the same reasons already given, the district court's approach to prosecution history was error on this issue too. That the SCNT experiment happened to involve Oct4 expression as an initial first step does not limit the scope of the claims, absent additional disclaiming statements that do not exist here. *Supra*, pp. 35-37. And to the extent the district court also relied on the SCNT experiment to find specification disclaimer, that reliance was misplaced for the same reason. *Supra*, pp. 30-35.

To cover the gap in the specification and prosecution history, Shoreline's expert opined that "priming" should have the same meaning as in painting and hydraulics, where a wall is "primed" before painting occurs and a well is "primed" before it is pumped. Appx3475 n.9. But Fate's expert explained that, unlike in those completely unrelated fields, priming "is not a term that is used in the field of reprograming somatic cells." Appx2992(¶87). The examiner's use of that term therefore cannot have been a "clear statement" to a POSA that "priming" necessarily means a distinct first step in reprogramming. *Cf. Baxalta*, 972 F.3d at 1348

42

(amendment to include a term "not … commonly used in the art" did not give rise to a "clear and unmistakable" disclaimer).

Perhaps for this reason, the district court foreswore any reliance on Shoreline's expert's opinion. Appx34-35 n.16. Instead, the court pointed to common dictionary definitions of "priming." Appx60-61. The court acknowledged, however, that "priming" can mean many things, including to "supply with an essential prerequisite (such as a hormone, nucleic acid, or antigen) for chemical or biological activity." *Id.* Under that definition, "priming" would not unambiguously foreclose a method of "supply[ing]" Oct4 as "an essential prerequisite" for reprogramming somatic cells at the same time that the other transcription factors are added—particularly given the evidence that, when Oct4 is added with other transcription factors, it is the Oct4 that takes effect first. *Infra*, pp. 49-51.

In any event, there is no evidence that the examiner or applicants had any of those dictionaries' definitions of "priming" in mind during prosecution. Again, the examiner and applicants were focused on something entirely different than the timing question: what could be accomplished using Oct4 "alone." At best for Shoreline the examiner's use of "priming" is ambiguous with respect to the timing question, which simply is not good enough for a disclaimer. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1365 (Fed. Cir. 2007) (where a

"passage is ambiguous … it does not constitute a sufficiently clear and deliberate statement to meet the high standard for finding a disclaimer of claim scope").

Finally, the district court's focus on dictionary definitions of "priming" was misguided for yet another reason: because the applicants amended their claims to cover a method of "making the somatic cell more susceptible to reprogramming," not to, *e.g.*, "priming the somatic cell for reprogramming." "Priming" is therefore not the proper subject of the claim construction inquiry. The district court considered it important that, in amending their claims, the applicants cited the examiner's rejections that included her "priming" explanation. Appx32. But because the examiner never stated that she viewed "priming" as requiring some rigidly separate two-step process, the applicants' citation to her "priming" statements in amending their claims to include different claim language should be doubly irrelevant. *See Honeywell*, 493 F.3d at 1365 (responsive statements to rejection did not "meet the high standard for finding a disclaimer of claim scope" where exchange was amenable to more than one interpretation); *Iowa State Univ. Rsch. Found., Inc. v. Wiley Organics, Inc.*, 125 F. App'x 291, 296 (Fed. Cir. 2005) ("examiner's statements and the inventors' subsequent response do not present a sufficiently clear definition of the claim terms … to merit limiting the claim scope").

### C.    The cases on which the district court relied are readily distinguishable.

The district court's approach to the prosecution history in this case was premised primarily on *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090 (Fed. Cir. 2013), and *SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x 548, 554 (Fed. Cir. 2020). Appx55-56 (district court stating in its motion for reconsideration decision that it "primarily relied" on *Biogen* and *SandBox* with respect to the priming issue). But as *Biogen* and *Sandbox* demonstrate, whether the prosecution history amounts to a disclaimer "[d]epend[s] on important details." *Ancora Techs., Inc. v. Apple, Inc*., 744 F.3d 732, 739 (Fed. Cir. 2014); *id.* ("disclaimer arose where the applicants 'let[] stand an examiner's narrow characterization of a claim term' and 'adopt[ed] ... that characterization to overcome the examiner's ... rejection'" (quoting *Biogen*, 713 F.3d at 1097 n.6)). Particularly, those cases demonstrate that, for an applicant's responsive amendments to amount to a clear and unmistakable disclaimer, an examiner must, in the first instance, clearly express a narrow view of what the specification enables. *See Biogen*, 713 F.3d at 1095 (applicant must "unequivocally and unambiguously disavow[] a certain meaning to obtain a patent" for disclaimer to apply).

In *Biogen*, for example, the Court addressed whether applicants claiming a method of using "anti-CD20 antibodies" to treat cancer had limited the term to only those "antibodies that bind to the same epitope" as Rituxan® (a specific anti-CD20

antibody referenced in the specification) "with similar affinity and specificity." 713 F.3d at 1092-1094. In holding that the applicants had so limited the term, the Court noted that the examiner initially rejected the claims because the specification enabled only Rituxan®, rather than "any and all anti-CD20 antibodies" binding to the same epitope—regardless of their affinity or specificity. *See id.* at 1093, 1095-1096. Instead of "challeng[ing] the examiner's understanding," the applicants "conceded that [those] other 'antibodies … might have different affinities'" and "limited their claims to antibodies similar to Rituxan®." *Id.* at 1096. From this series of events, the Court reasoned, "it [wa]s clear that [the applicants] were limiting their invention to what the examiner believed they enabled": "antibodies [with] similar specificity and affinity for" the same epitope as Rituxan®. *Id.*

Likewise, in *SandBox*, the Court considered whether the term "bottom" was limited to "bottom wall" in connection with patents concerning "storage container assemblies" allowing "product in one container [to] flow to … a lower container." 813 F. App'x 5 at 550. During prosecution, the examiner "twice rejected claims for 'omitting essential elements[,]' viz., '[t]he bottom wall on which the hatch [allowing material to flow from one container to the other] is mounted.'" *Id.* at 554. The applicant "did not challenge" the examiner's understanding that the "bottom wall" was essential, but instead amended the claims to reference a "bottom" and explained that, "although the claims 'were rejected on the basis [that] they lack[ed] essential

elements[,]' the claims were 'being amended to include a bottom.'" *Id.* The examiner then allowed the claims "at least in part on his understanding that [they] … were amended to include a 'bottom wall on which the hatch is mounted.'" *Id.* Relying on *Biogen*, the Court concluded that this sequence amounted to a disclaimer that "bottom" meant anything other than "bottom wall." *Id.* at 554-555.

Reading these cases together, the "important details" resulting in the disclaimers in those cases included the examiners' *clearly* expressed views of what the specifications narrowly enabled. For the reasons given above, such "important details" are lacking here. The examiner never stated that the specification only enabled claims to a method of making cells more susceptible to SCNT, as measured by increased cloning efficiency, and the applicants never agreed that their invention was so limited. And the examiner never stated that the specification only enabled claims in which Oct4 is added separate from the other transcription factors and primes the somatic cells before any step in their reprogramming occurs, and the applicants never agreed that their invention was so limited. The district court therefore erred by construing the claims to be so limited.

## II.    The district court erred in granting summary judgment of non-infringement to Shoreline.

### A.    The district court's grant of summary judgment relied on its incorrect claim construction.

The district court's grant of summary judgment of non-infringement of the

asserted method claims was based in the first instance on the court's incorrect claim constructions. In particular, the district court relied on its two-step "priming" construction to hold that: (1) Shoreline does not infringe the asserted method claims under § 271(g) because, in making the accused iPSCs, Oct4 was added at the same time as other transcription factors; and (2) Shoreline did not induce the third-party manufacturers to infringe the asserted method claims because there is no underlying infringement under § 271(g). Appx112; Appx114. The court also rejected Fate's DOE argument with respect to "cloning efficiency," which Fate only needed to make because the court had incorrectly construed the claims to require an increase in cloning efficiency. Appx95-96.

If this Court agrees with Fate on the claim construction issues, then the Court should reverse the grant of summary judgment and remand for further proceedings in accordance with the proper claim constructions. *See, e.g.*, *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1304 (Fed. Cir. 2003) ("Because the district court's construction of 'remote location' was erroneous and because the district court's grant of summary judgment in favor of Intuitive was predicated entirely on this erroneous construction, we reverse the judgment and remand the case to the district court for further proceedings consistent with this opinion.").

### B. Fate presented substantial evidence that Shoreline's suppliers made their iPSCs using a two-step process.

Even if the Court agrees with the district court that "makes the cell more susceptible to reprogramming" requires *some* two-step "priming" process, it still should reverse the grant of summary judgment. Unless the claims are construed to require adding Oct4 separate and apart from the other transcription factors—which is an entirely unsupported aspect of the district court's claim construction—then Fate presented substantial evidence from which a reasonable jury could have concluded that a two-step priming process was used to create the accused iPSCs.

Fate's expert Dr. Plath explained that Oct4 is a "pioneer transcription factor," meaning it binds to specific DNA sites that otherwise are closed to transcription factors, causing them to "open" and become accessible to other, non-pioneer transcription factors. Appx11497-11499(¶¶38-39). As she explained, "the pioneer factor activity of Oct4 plays a critical role" in reprogramming somatic cells because it "bind[s] to closed chomatin to enable opening of chromatin at critical sites so that pluripotency gene expression and reprogramming can subsequently occur." Appx11499(¶39). "Other transcription factors would not significantly contribute to reprogramming until after Oct4 binds to chromatin to prime the cell for subsequent reprogramming." Appx11502(¶47). Critically, in light of the district court's requirement of rigid separation between Oct4 and the other transcription factors, Dr. Plath further explained that:

it does not matter if other transcription factors are added contemporaneously with Oct4 or as part of the same plasmid encoding Oct4, as they will not significantly contribute to reprogramming until *after* Oct4 primes the cell for reprogramming by increasing chromatin accessibility.

Appx11529(¶101) (emphasis in original); *see also* Appx11521-11522(¶86) ("[S]omatic cells are not immediately reprogrammed to a pluripotent state when multiple transcription factors are added to a cell. Rather, the somatic cell must undergo changes triggered by Oct4[.]")  Nor does the presence of the other factors interfere with the ability of Oct4 to unlock closed chromatin, so there would have been no reason for the applicants even to want to exclude the presence of other transcription factors during priming. *See* Appx11522-11523(¶87) ("Oct4 will prime the somatic cell for subsequent reprogramming whether or not these other factors are present during priming.").

In addition to the "pioneer" role played by Oct4, Dr. Plath explained that for somatic cells to be reprogrammed, the cells also must be moved from the growth media in which the Oct4 primes the cells to a different growth media capable of supporting iPSCs.  Appx11502-11503(¶48) ("Many types of media exist because different types of cells have different metabolic and other requirements to survive. Somatic cells are generally maintained in different media than iPSCs and the induction of iPSCs requires an appropriate reprogramming medium.").  Dr. Plath walked through evidence describing the processes used to make the accused iPSCs,

indicating in every instance that, following priming by Oct4, the cells had been transferred to a different growth media for reprogramming. Appx11508(¶58); Appx11509-11510(¶60); Appx11510-11512(¶¶62-63); Appx11513-11514(¶¶66-68); Appx11518-11519(¶¶77-78); Appx11520-11521(¶85). She concluded that "[i]t is only after the somatic cells are transferred into this new medium that the pluripotent state is established via reprogramming." Appx11521-11522(¶86).

The district court brushed aside all this evidence of a two-step process on the basis that its "claim construction specifically requires that the induction of Oct4 expression occur prior to and *be separate from* the reprogramming process." Appx94 (emphasis added). Fate concedes that if the Oct4 cannot be added at the same time as other transcription factors, then it cannot show literal infringement of the method claims. But, for the reasons given above, the district court's claim construction on this point is clearly incorrect. Nothing in the claim language, the specification, or in the prosecution history forecloses adding Oct4 at the same time as the other transcription factors. *Supra*, pp. 38-44. The court therefore erred in rejecting Fate's evidence that a two-step "priming" process was used to create the accused iPSCs.

### C.    The district court erred in resolving a factual dispute as to when Lonza reprogrammed its iPSCs.

The district court erred in holding that Shoreline does not infringe under § 271(g) with respect to the line of iPSCs created by Lonza because those iPSCs

were primed with Oct4 after the January 13, 2015 issuance of the earliest asserted method patent. *See* Appx112 n.12. On the summary judgment standard, the district court should have credited Fate's documentary and expert opinion evidence demonstrating that Lonza performed the claimed method in late January 2015. Instead, the court improperly resolved a credibility dispute in Shoreline's favor.

Fate provided substantial evidence from which a reasonable jury could conclude that the Lonza iPSCs at issue were primed with Oct4 after January 13, 2015. For example, Lonza's packaging for the "TC1133" iPSC line provides a manufacture date of January 29, 2015. Appx112 n.12; Appx4683. Dr. Plath explained that, in Lonza's manufacturing process, "*[t]he priming with Oct4 lasted ~2 days*, during which the cells were left in the priming medium, Oct4 would have been expressed and would have carried out its function as a pioneer transcription factor by binding to chromatin to open the DNA and allow the other transcription factors to initiate gene expression necessary for subsequent reprogramming." Appx11511-11522(¶63) (emphasis added). Given this timing, a reasonable jury could have concluded that Oct4 was added two days before the reprogramming, such that priming of the Lonza iPSCs with Oct4 occurred on or about January 27, 2015, two weeks after January 13, 2015.

Consistent with the documentary evidence and Dr. Plath's testimony, Shoreline admitted in discovery that the Lonza line of iPSCs was manufactured in

January 2015. *See, e.g.*, Appx259(¶112). (Shoreline's counterclaims stating that "[t]he Lonza iPSCs were manufactured by Lonza in January 2015"); Appx4450(¶174); Appx4453(¶194); Appx4457(¶232); Appx4460(¶255); Appx4465(¶298); Appx4468(¶319). Shoreline's corporate representative, Dr. Edward Cherok, also submitted a declaration confirming that Lonza's TC-1133 "was reprogrammed from somatic cells by Lonza Walkersville, Inc. in 2015." Appx2581(¶5).

Despite this evidence, the district court held that the evidence showed that Oct4 was used to prime the Lonza cells before January 13, 2015. Appx112 n.12. The only piece of evidence the court cited was a declaration from a Lonza witness averring that the reprogramming for the Lonza iSPCs was completed by October 2014, based on a 2015 article titled "cGMP Manufactured Human Induced Pluripotent Stem Cells Are Available for Pre-Clinical and Clinical Applications." Appx 6137(¶9). That 2015 article, however, never references the specific iPSC line at issue in this case—TC1133. Appx6221-6233. Instead, the article discusses engineering runs to produce several iPSC clones, two of which were selected and banked—"[c]lone A (product no. CTI-1134, lot no. 50-001-02A) … and clone D (product no. CTI-1134, lot no. 50-001-02D)." Appx6227-6228. These product and lot numbers do not match those for TC1133, which is product no. CTI-1139, lot no. 50-001-21. Appx4683. Based on this and the other evidence discussed above, a

reasonable jury could have rejected the witness's testimony. It therefore was error for the district court to grant summary judgment to Shoreline on this issue.

> **D.** **The district court erred in resolving a factual dispute as to whether Shoreline induced Thermo Fisher to infringe.**

Finally, the district court erred by granting summary judgment to Shoreline on Fate's claim that Shoreline induced Thermo Fisher to infringe the asserted composition claims around December 2021.

To establish induced infringement, a plaintiff must show "that the defendant possessed specific intent to encourage another's infringement." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)). This, in turn, "requires a plaintiff to show 'that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.'" *Id.* (citation omitted). "[D]irect evidence" of intent "is not required." *Id.* (internal quotation marks omitted); *see TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020) ("The intent standard focuses on, and can be met by proof of, the defendant's subjective state of mind, whether actual knowledge or the subjective beliefs (coupled with action to avoid learning more) that characterizes willful blindness").

In this case, the evidence showed that in July 2021 Shoreline emailed Thermo Fisher a scientific article entitled "An analysis of monocytes and dendritic cells

differentiated from human peripheral blood monocyte-derived induced pluripotent stem cells," explaining in the cover email "We came across a paper using CytoTune 2.0 to generate iPSCs from PB monocytes." Appx115-116; Appx10707. Two weeks later, Thermo Fisher asked Shoreline for information on "protocols on growth condition for the monocytes," reattaching the same article Shoreline had sent it. Appx116; Appx10827-10828(¶124). In response, Shoreline told Thermo Fisher that the protocols disclosed in the article would be "ok to use … for our project." Appx116; Appx10827-10828(¶124). This demonstrates that Shoreline encouraged Thermo Fisher to use the CytoTune 2.0 kit.

There also was evidence that Oct4 is *necessarily* used by the CytoTune 2.0 kit, not just that its use is "possible," as the district court reasoned. Appx117. Dr. Plath, for example, explained that *all* commercially-available iPSCs are made by introducing exogenous Oct4 during the reprogramming process, Appx7353(¶109); Appx7519-7521(¶¶567–570), such that Shoreline either knew or would have needed to turn a blind eye to the fact that Oct4 is used in the CytoTune 2.0 kit. Testimony from Shoreline witnesses confirmed Dr. Plath's opinion. For example, Dr. Kaufman, Shoreline's acting CSO, previously had used the CytoTune 2.0 reprogramming kit and so knew how the kit worked. Appx117; Appx10336-10337.

The district court rejected the import of this evidence, explaining that "this evidence at best shows that Defendant knew that Thermo Fisher would use the

CytoTune 2.0 kit to manufacture the iPSCs at issue," not that the CytoTune kit would employ Oct4. Appx116. But that is not the only reasonable interpretation of this evidence. A jury could conclude that the only reason Shoreline felt comfortable telling Thermo Fisher that the CytoTune 2.0 kit is "ok to use … for our project" is because Shoreline knew how the kit worked. And because Shoreline was a very small company at the time, *e.g.*, Appx11278; Appx11279; Appx11282, a jury could conclude that Shoreline, through its acting CSO Dr. Kaufman, knew that the process used by Thermo Fisher would employ Oct4.

Accordingly, this issue too should have been left for a jury to decide. The district court should not have decided credibility issues in Shoreline's favor, and its grant of summary judgment to Shoreline should be reversed.

## CONCLUSION

For the reasons set forth above, the Court should overturn the district court's claim constructions and grant of summary judgment of non-infringement in Shoreline's favor, and the case should be remanded for further proceedings.

February 8, 2024

Respectfully submitted,

 /s/ *Kevin P. Martin*

Andrew S. Ong

Kevin P. Martin

GOODWIN PROCTER LLP

Christopher J.C. Herbert

601 Marshall Street

GOODWIN PROCTER LLP

Redwood City, CA 94063

100 Northern Avenue

(650) 752-3100

Boston, MA 02210

(617) 570-1000

*Counsel for Plaintiffs-Appellants*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

Final Judgment, Dkt. No. 391 (Aug. 31, 2023) ............................................. Appx1-2

Claim Construction Order, Dkt. No. 208 (Feb. 28, 2023) .......................... Appx3-42

Order Denying Plaintiffs' Motions for Reconsideration, Dkt. No. 255
    (Apr. 19, 2023) ........................................................................................ Appx43-82

Order (1) Granting Defendant's Motion for Summary Judgment; and
    (2) Denying Plaintiffs' Motion for Partial Summary Judgment as
    Moot, Dkt. No. 390 (Aug. 30, 2023) ................................................. Appx83-120

U.S. Patent No. 8,071,369 ................................................................. Appx3016-3031

U.S. Patent No. 8,932,856 ................................................................. Appx3032-3049

U.S. Patent No. 8,951,797 ................................................................. Appx3050-3069

U.S. Patent No. 8,940,536 ................................................................. Appx3070-3088

U.S. Patent No. 9,169,490 ................................................................. Appx3089-3105

U.S. Patent No. 10,457,917 ............................................................... Appx3106-3125

U.S. Patent No. 10,017,744 ............................................................... Appx3126-3145



# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

See attached

|                                    |
|                                    |
|                          **Plaintiff,** |
|                   **V.**           |
| See attached                       |
|                                    |
|                         **Defendant.** |

Civil Action No.   22-cv-00676-H-MSB

## JUDGMENT IN A CIVIL CASE

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

For the reasons above, the Court grants Shoreline's motion for summary judgment of non-infringement, and the Court denies Plaintiffs' motion for partial summary judgment as moot. Judgment is entered in favor of Defendant Shoreline and against Plaintiffs Fate and Whitehead. Case closed.

**Date:**          8/31/23

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By:  s/  M. Williams

M. Williams, Deputy

**Appx1**

# United States District Court
## SOUTHERN DISTRICT OF CALIFORNIA

(ATTACHMENT)

Civil Action No.  22-cv-00676-H-MSB

Fate Therapeutics, Inc.; Whitehead Institute for Biomedical Research,
Plantiffs
v.
Shoreline Biosciences, Inc.; Dan S. Kaufman,
Defendants

_____

Shoreline Biosciences, Inc.; Dan S. Kaufman
Counter Claimants
v.
Fate Therapeutics, Inc.; Whitehead Institute for Biomedical Research

_____

Lonza Walkersville, Inc.
Amicus

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13

| | |
|---|---|
| FATE THERAPEUTICS, INC.; and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | Case No.: 22-cv-00676-H-MSB |
| Plaintiffs, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| SHORELINE BIOSCIENCES, INC.; and DAN S. KAUFMAN, | |
| Defendants. | |

14
15
16
17
18
19
20

In the present action, Plaintiffs Fate Therapeutics, Inc. ("Fate") and Whitehead Institute for Biomedical Research ("Whitehead") assert claims for patent infringement against Defendants Shoreline Biosciences, Inc. ("Shoreline") and Dan S. Kaufman, alleging claims for infringement of U.S. Patent Nos. 8,071,369 ("the '369 Patent"), 8,932,856 ("the '856 Patent"), 8,951,797 ("the '797 Patent"), 8,940,536 ("the '536 Patent"), 9,169,490 ("the '490 Patent"), U.S. Patent No. 10,017,744 ("the '744 Patent"), and 10,457,917 ("the '917 Patent") (collectively, "the asserted patents"). (Doc. No. 162, Supp. FAC ¶¶ 157-414.) On January 6, 2023, the parties filed their amended joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2. (Doc. No. 113.) On February 7, 2023, the parties each filed their opening claim

21
22
23
24
25
26
27
28

1

22-cv-00676-H-MSB

construction briefs. (Doc. Nos. 149, 150, 151.) On February 17, 2023, the parties each filed their responsive claim construction briefs. (Doc. Nos. 178, 179, 180.) On February 22, 2023, the Court issued a tentative claim construction order. (Doc. No. 192.)

The Court held a claim construction hearing on February 27, 2023. Jonathan D. Ball, Rose C. Prey, Giancarlo L. Scaccia, Danielle M. Zapata, and Joseph T. Ergastolo appeared for Plaintiffs. Eric M. Acker, Drew A. Hillier, and Sarah J. Vandervalk appeared for Defendant Shoreline. Sudip Kundu and Nicol Malick appeared for Defendant Kaufman. After considering the parties' briefs, the parties' arguments at the hearing, and all relevant information, the Court issues the following claim construction order.

### Background

In the present action, Plaintiffs allege that Defendants infringe the asserted patents under 35 U.S.C. § 271(a) and 35 U.S.C. § 271(b) and that Defendants infringe the asserted method patents under 35 U.S.C. § 271(g).[1] (See Doc. No. 162, Supp. FAC ¶¶ 157-414.) Specifically, Plaintiffs allege that Defendants, individually and acting in concert, make, use, sell, offer for sale, and/or import induced pluripotent stem cells ("iPSCs") that infringe one or more claims of the asserted patents.[2] (Id. ¶ 140; see, e.g., id. ¶¶ 162 ("Defendants' use of their 'iPSC-derived cell therapy manufacturing platform' infringed at least claim 1 of the '369 Patent."), 212 ("iPSCs used by Defendants to make at least the iPSC-derived

---

[1]    The asserted method patents are the '856 Patent, the '536 Patent, the '744 Patent, and the '917 Patent.

[2]    Induced pluripotent stem cells ("iPSCs") "are pluripotent stem cells generated from somatic cells by reprogramming." (Doc. 162, Supp. FAC ¶ 31; see Doc. No. 184, Answer to Supp. FAC ¶ 31; see also Doc. No. 151-14, Plath Decl. ¶ 59; Doc. No. 152, Snyder Decl. ¶ 43.) "Four specific genes—cMYC, OCT3/4, SOX2 and KLF4—encoding transcription factors play a role in converting or reprogramming somatic cells into pluripotent stem cells." (Doc. 162, Supp. FAC ¶ 32; see Doc. No. 184, Answer to Supp. FAC ¶ 32; Doc. No. 204, Answer to Supp. FAC ¶ 32; see also Doc. No. 184, Counterclaims ¶ 43 ("iPSCs are generated in culture from somatic cells through the introduction of reprogramming factors that transform a somatic cell into a pluripotent state."); Doc. No. 152, Snyder Decl. ¶¶ 41, 43.)

2

**Appx4**

natural kill (NK) cell platforms are made by a process that comprises at least each step of claim 1 of the '856 Patent.").)

Plaintiff Whitehead is the owner via assignment of the patents-in-suit.  See U.S. Patent No. 8,071,369, at [73] (issued Dec. 6, 2011); U.S. Patent No. 8,932,856, at [73] (issued Jan. 13, 2015); U.S. Patent No. 8,951,797, at [73] (issued Feb. 10, 2015); U.S. Patent No. 8,940,536, at [73] (issued Jan. 27, 2015); U.S. Patent No. 9,169,490, at [73] (issued Oct. 27, 2015); U.S. Patent No. 10,017,744, at [73] (issued Jul. 10, 2018); U.S. Patent No. 10,457,917, at [73] (issued Oct. 29, 2019).  Plaintiffs allege that Fate is the exclusive licensee of the patents-in-suit.  (Doc. No. 162, Supp. FAC ¶¶ 16, 19.)

The '369 Patent is entitled "Compositions for reprogramming somatic cells" and was issued on December 6, 2011.  '369 Patent at [45], [54].  The '856 Patent is entitled "Methods for reprogramming somatic cells" and was issued on January 13, 2015.  '856 Patent at [45], [54].   The '797 Patent is entitled "Compositions for identifying reprogramming factors" and was issued on February 10, 2015.  '797 Patent at [45], [54].  The '536 Patent is entitled "Methods for making somatic cells more susceptible to reprogramming" and was issued on January 27, 2015.  '536 Patent at [45], [54].  The '490 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 27, 2015.   '490 Patent at [45], [54].   The '744 Patent is entitled "Methods for reprogramming somatic cells" and was issued on Jul. 10, 2018.  '744 Patent at [45], [54]. The '917 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 29, 2019.  '917 Patent at [45], [54].

The asserted patents are all related and all share a common specification.[3]  (See Doc. No. 149 at 5 & n.2; Doc. No. 151 at 2 & n.2 (agreeing that the asserted patents all share the same specification); see also Doc. No. 162, Supp. FAC ¶ 132).)   The shared specification states that the disclosed invention is directed to "methods for reprogramming

---

[3]     The Court will cite to the '369 Patent's specification as the "shared specification" of the asserted patents.

somatic cells to a less differentiated state." '369 Patent col. 2 ll. 24-25; see also id. at [57] ("The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells.").

Independent claim 1 of the '369 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

'369 Patent col. 20 ll. 40-43.

Independent claim 1 of the '856 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.

Independent claim 1 of the '797 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding Oct 4, wherein the exogenously introduced nucleic acid increases Oct4 expression in the cell.

'797 Patent col. 20 ll. 40-43.

Independent claim 1 of the '536 Patent claims:

A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'536 Patent col. 20 ll. 37-44.

Independent claim 1 of the '490 Patent claims:

A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 expression comparable to the amount of Oct4 expression in an embryonic stem cell.

**Appx6**

22-cv-00676-H-MSB

'490 Patent col. 20 ll. 39-41.

Independent claim 1 of the '744 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising:

> obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein;

> wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'744 Patent col. 21 ll. 14-23.

Independent claim 1 of the '917 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming; and wherein the exogenous nucleic acid is transiently transfected into the somatic cell.

'917 Patent col. 21 ll. 16-24.

On May 13, 2022, Plaintiffs filed a complaint against Defendants, alleging claims for infringement of the '369 Patent, the '856 Patent, the '797 Patent, the '536 Patent, the '490 Patent, and the '917 Patent. (Doc. No. 1, Compl. ¶¶ 66-236.) On August 12, 2022, the Court issued a scheduling order. (Doc. No. 51.)

On December 5, 2022, the parties filed their joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2. (Doc. No. 90.) On January 3, 2023, Plaintiffs filed a first amended complaint against Defendants, adding a claim for infringement of the '744 Patent. (Doc. No. 112, FAC ¶¶ 375-414.) On January 6, 2023, the parties filed an amended joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2. (Doc. No. 113.) On January 10, 2023, the Court issued an amended scheduling order. (Doc. No. 115.) On February 14, 2023, Plaintiffs filed a supplemental first amended complaint – the operative complaint. (Doc.

No. 162, Supp. FAC.)  On February 17 and 23, 2023, Defendants filed answers and counterclaims to Plaintiffs' supplemental first amended complaint.  (Doc. Nos. 184, 204.)

By the present claim construction briefs, the parties agree to the proper construction for two claim terms, and the parties request that the Court construe six disputed claim terms from the asserted patents.  (See Doc. Nos. 149, 150, 151, 178, 179, 180; see also Doc. No. 113-1, Ex. A; Doc. No. 113-7, Ex. D.)

## Discussion

## I.  Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 326 (2015); Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  Teva, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"

Appx8

Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'" Id. (quoting Innova, 381 F.3d at 1116); see Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims. See Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim language itself'"). The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term. See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc). Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution

history may be considered if it is in evidence. <u>Phillips</u>, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." <u>Id.</u> "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." <u>Id.</u> "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." <u>Id.</u>

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. <u>See</u> <u>Vitronics</u>, 90 F.3d at 1583; <u>Teva</u>, 574 U.S. at 331; <u>see also</u> <u>Seabed Geosolutions (US) Inc. v. Magseis FF LLC</u>, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" <u>Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.</u>, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting <u>Phillips</u>, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. <u>Phillips</u>, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" <u>Genuine Enabling Tech. LLC v. Nintendo Co.</u>, 29 F.4th 1365, 1373 (Fed. Cir. 2022); <u>see also</u> <u>Summit 6, LLC v. Samsung Elecs. Co.</u>, 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." <u>Teva</u>, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." <u>O2 Micro</u>, 521 F.3d at 1362; <u>see also</u> <u>Eon Corp. IP</u>

Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'").  In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies.  O2 Micro, 521 F.3d at 1360; Phillips, 415 F.3d at 1314.  But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  O2 Micro, 521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute.  Id. at 1362; Eon, 815 F.3d at 1318.

## II.    Agreed Upon Claim Terms

### 1.    "primary somatic cell"

In their amended joint claim construction worksheet, the parties agree that the claim term "primary somatic cell" should be construed as "non-immortalized somatic cell." (Doc. No. 113-7, Ex. D at 37-42.)  The parties' joint proposed construction for this claim term is well supported by the shared specification.  See '369 Patent col. 5 ll. 63-66 ("The somatic cells in the invention may be primary cells or immortalized cells.  Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal . . . .").  As such, the Court construes the claim term "primary somatic cell" as "non-immortalized somatic cell."  See Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee . . . .  In such cases, the inventor's lexicography governs."); Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1329 (Fed. Cir. 2009) (explaining that a patentee acts as his own lexicographer when the patentee "'clearly set[s] forth a definition of the disputed claim term in either the specification or prosecution history'"); see, e.g., Biogen MA Inc. v. EMD Serano, Inc., 976 F.3d 1326, 1336 (Fed. Cir. 2020).

/ / /

/ / /

2. <u>"candidate agent of interest with respect to its potential to reprogram a somatic cell"</u>

In their amended joint claim construction worksheet, the parties agree that the claim term "candidate agent of interest with respect to its potential to reprogram a somatic cell" should be construed as "a candidate agent of interest with respect to its potential to reprogram a somatic cell, including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins." (Doc. No. 113-7, Ex. D at 16-24.) The parties' joint proposed construction for this claim term is well supported by the shared specification. <u>See</u> '369 Patent col. 11 ll. 51-67, col. 12 ll. 1-8. As such, the Court construes the claim term "candidate agent of interest with respect to its potential to reprogram a somatic cell" as "a candidate agent of interest with respect to its potential to reprogram a somatic cell, including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins."

## III. Disputed Claim Terms

A. <u>"less differentiated state"</u>

Plaintiffs propose that the claim term "less differentiated state" be construed as "a state in which the differentiation status of the cell has moved along a continuum of differentiation states toward a pluripotent state." (Doc. No. 151 at 16.) Defendants propose that the claim term be construed as "a state where the cell has the potential to differentiate into more types of cells compared to its prior state." (Doc. No. 149 at 21.) Here, the parties dispute whether the term "less differentiated state" requires that the state being one where the cell has the potential to differentiate into more types of cells compared to its prior state

(e.g., from unipotent to multipotent or from multipotent to pluripotent) or whether the state is simply one where the differentiation status of the cell has moved along a continuum toward a pluripotent state.

The Court begins its analysis of the parties' dispute by reviewing the intrinsic record. The shared specification sets forth the meaning of the term "less differentiated state" within the context of the claimed invention. The specification explains:

> Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differentiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

'369 Patent col. 7 ll. 55-67, col. 8 ll. 1-8. Here, the specification describes the differentiation status of cells as a "continuous spectrum," and that "reprogramming" encompasses "any movement" of the differentiation status of a cell along that spectrum. Id. By using the phrase "continuous spectrum," the specification describes "differentiation status" as being a connected, unbroken range of states.[4] And, by describing the claim term

---

[4]     The Court notes that the common meaning of the word "continuous" is "connected, unbroken." OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/40280?redirectedFrom=continuous#eid (defining "continuous" as "[c]haracterized by continuity; extending in space without interruption of substance; having no interstices or breaks; having its parts in immediate connection; connected, unbroken"); see also MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/continuous

"less differentiated state" as being related to any movement along that continuum of differentiation status, Plaintiffs' proposed construction aligns with the specification's description of the terms differentiation status and less differentiated state. As such, Plaintiffs' proposed construction is well supported by the specification. See Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee . . . . In such cases, the inventor's lexicography governs."); Edwards Lifesciences, 582 F.3d at 1329 (explaining that a patentee acts as his own lexicographer when the patentee "'clearly set[s] forth a definition of the disputed claim term in either the specification or prosecution history'"); see, e.g., Biogen, 976 F.3d at 1336.

Defendants argue that this same passage in the shared specification supports their proposed construction. (Doc. No. 149 at 21-22; Doc. No. 178 at 10.) The Court disagrees. By requiring that the "less differentiated state" be a state where the cell has the potential to differentiate into more types of cells compared to its prior state (e.g., unipotent to multipotent), Defendants fails to adhere to the specification's description of the differentiation status of cells as being a "continuous spectrum" of states. Moreover, to support their proposed construction, Defendants only rely on examples and preferred embodiments described in the specification. (See Doc. No. 149 at 22; Doc. No. 178 at 10.) "[C]laims should not be limited 'to preferred embodiments or specific examples in the specification.'" VLSI Tech. LLC v. Intel Corp., 53 F.4th 646, 652 (Fed. Cir. 2022) (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1328 (Fed. Cir. 2002)); see also Dealertrack, 674 F.3d at 1327 ("It is improper to read limitations from a preferred

---

(defining "continuous" as "marked by uninterrupted extension in space, time, or sequence"). And the common meaning of the word "spectrum" is "a range of different positions." CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/spectrum (defining "spectrum" as "a range of different positions, opinions, etc. between two extreme points"); OXFORD ENGLISH DICTIONARY, (defining "spectrum" as "[t]he entire range or extent of something, arranged by degree, quality, etc."); see also MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/spectrum (defining "spectrum" as "a continuous sequence or range").

22-cv-00676-H-MSB

embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").  Here, there is no clear indication in the specification that the claims should be limited to those specific examples.  To the contrary, the specification describes the differentiation status of cells as a "continuous spectrum." '369 Patent col. 7 ll. 55.  As such, the shared specification does not support Defendants' proposed construction.

Turning to the prosecution history, the prosecution history also supports Plaintiffs' proposed construction for the claim term "less differentiated state."  During prosecution of the '856 Patent, the examiner stated: "according to the specification, the breadth of the claims encompass reprogramming to a partially less differentiated state, such as a multipotent cell, a full differentiated state, such as [a] pluripotent cell, and anywhere in between."  (Doc. No. 113-2, Ex. B-11 at 7; see also Doc. No. 113-5, Ex. B-31 at 10 ("Applicant refers to the teachings of the specification which teaches that the invention encompasses any shift along the continuous spectrum of differentiation status as long as it is in the direction of less differentiated . . . .").)  See 3M Innovative Properties Co. v. Tredegar Corp., 725 F.3d 1315, 1332 (Fed. Cir. 2013) (explaining that an examiner's statement during prosecution of the patent can be "representative of how one of skill in the art would understand the term").  As such, Plaintiffs' proposed construction for this claim term is well supported by the intrinsic record, including both the specification and the prosecution history.[5]

---

[5]     The Court rejects Defendants' contention that the prosecution history supports their proposed construction.  (See Doc. No. 149 at 23.)  To support their assertion, Defendants rely on the following statement from the examiner: "[T]he breadth of 'reprogramming' without specifying a particular differentiation status encompasses transdifferentiation, reprogramming the[sic] a less differentiated state, including unipotent, multipotent, pluripotent, and totipotent."  (Doc. No. 113-2, Ex. B-13 at 3.)  This language is insufficient to support Defendants' proposed construction.  Here, the examiner uses open-ended language in explaining that "a less differentiated state" includes unipotent, multipotent, pluripotent, and totipotent states.  The examiner does not state that it only includes those four specific states.

22-cv-00676-H-MSB

In sum, the Court adopts Plaintiffs' proposed construction for this claim term, and the Court rejects Defendants' proposed construction. The Court construes the claim term "less differentiated state" as "a state in which the differentiation status of the cell has moved along a continuum of differentiation states toward a pluripotent state."

B.   "reprogramming to a [pluripotent/less differentiated] state"

Plaintiffs contend that the claim term "reprogramming to a [pluripotent/less differentiated] state" need not be construed, and, instead, the term should be given its plain and ordinary meaning. (Doc. No. 151 at 18.) Defendants propose that the claim term be construed as "directly reprogramming to a [pluripotent/less differentiated] state." (Doc. No. 149 at 10.)

Here, the parties dispute whether the asserted claims at issue are limited to "direct reprogramming." Defendants contend that the "reprogramming" claimed in the asserted claims is "direct" reprogramming (i.e., reprogramming without the use of embryos, oocytes and/or nuclear transfer technology),[6] and Plaintiffs dispute Defendants' contention.[7] (See

---

[6]   The Court notes that Defendants' interpretation of the meaning of the phrase "directly reprogramming" is consistent with how the shared specification defines "reprogramming . . . directly." See, e.g., '369 Patent col. 3 ll. 65-67 ("It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology."); see also Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee . . . ."). (See also Doc. No. 113-5, Ex. B-31 at 5 (examiner stating "the art at the time was not developed to the point of demonstrating any methods of direct reprogramming with pluripotency factors, let alone, solely the use of Oct4").) As such, the Court rejects Plaintiffs' assertion that Defendants' use of the phrase "directly reprogramming" would inject unnecessary ambiguity into the claims. (See Doc. No. 151 at 18-19.) Nevertheless, even though the specification supports Defendants' interpretation of the meaning of the phrase "directly reprogramming," that does not resolve the current claim construction issue as to whether the asserted claims should be limited to direct reprogramming.

[7]   In their responsive claim construction briefs, Plaintiffs clarify that they do not argue that the asserted claims encompass somatic cell nuclear transfer ("SCNT"); rather, Plaintiffs disagree that the word "directly" should be read into the claim language. (Doc. No. 179 at 9 & n.7.)

Doc. No. 149 at 10-13; Doc. No. 151 at 18-19; Doc. No. 179 at 9.)

The Court begins its analysis of the parties' dispute by reviewing the claim language. The claim language at issue merely uses the term "reprogramming." It does not contain the words "direct" or "directly." For example, independent claim 1 of the '856 Patent claims: "A method of making a somatic cell more susceptible to reprogramming to a pluripotent state . . . . wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state." '856 Patent col. 20 ll. 38-44; see also, e.g., '917 Patent col. 21 ll. 16-23 ("A method of making a somatic cell more susceptible to reprogramming to a less differentiated state . . . wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming . . . ."). As such, the claim language does not support Defendants' proposed construction.

Defendants contend that the claim language supports their proposed construction because the claim language states that a "somatic cell" or a "primary somatic cell" is what is being made more susceptible to reprogramming, and the claim language does not recite making a somatic cell nucleus inserted into an egg more susceptible to reprogramming. (Doc. No. 149 at 12; see also Doc. No. 18 at 3-4.) The Court rejects this argument. Defendants' argument is based on their assumption that the patentees would not use the terms "somatic cell" or "primary somatic cell"[8] when referring to a method involving reprogramming via nuclear transfer technology, such as SCNT, and, instead, the patentees would use a term like "somatic cell nucleus inserted into an egg." Defendants' assumption is not supported by a review of the intrinsic record. The parties agree that the sole working example in the specification, Example 1, is "a SCNT experiment." (Doc. No. 149 at 6; Doc. No. 151 at 6.) When describing the result of that SCNT experiment, the specification states: "This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming." '369 Patent col. 19 ll.

---

[8]     The Court construes the claim term "primary somatic cell" as "non-immortalized somatic cell" based on the parties' joint proposed construction. (Doc. No. 113-7 at 37-42.)

32-34.   Here, the specification uses the term "somatic cells" when referring to reprogramming via nuclear transfer technology, specifically SCNT.[9]   In addition, in explaining the process of SCNT, the specification explains that SCNT involves a normal egg with its nucleus removed (i.e., an "enucleated egg") and a "donor diploid somatic cell." *Id.* at col. 1 ll. 48-50.  (See also Doc. No. 152, Snyder Decl. ¶ 35 (explaining SCNT); Doc. No. 151-14, Plath Decl. ¶ 62 (explaining nuclear transfer/nuclear cloning).)  Further, during the prosecution of the asserted patents, the examiner also used the term "somatic cell[s]" when referring to reprogramming via nuclear transfer.  (See Doc. No. 113-5, Ex. B-31 at 5 ("At the time of the invention, the sole means of reprogramming a somatic cell known in the art was via nuclear transfer or somatic cell fusion with an ES cell." (citation omitted)), 8 ("This demonstrates, as consist[ent] with the prior art, that nuclear transfer itself reprograms somatic cells.").)   As such, Defendants' assumption is erroneous and not supported by the intrinsic record.

Indeed, a review of the shared specification demonstrates that Defendants' proposed construction should be rejected.  Defendants contend that "direct reprogramming" means reprogramming without the use of embryos, oocytes, and/or nuclear transfer technology.  (See Doc. No. 149 at 10-13.)  As Defendants acknowledge, the only working example provided in the specification, Example 1, is an SCNT experiment.  See '369 Patent col. 18 ll. 54-56, col. 19 ll. 22-34, Table 1 (describing "Nuclear Transfer Experiment").  (See Doc. No 149 at 6.)  Because Defendants' proposed construction would limit the claims at issue to "direct reprogramming" (thereby, excluding use of nuclear transfer technology, including SCNT), Defendants' proposed construction would exclude the preferred embodiment described in Example 1 from the scope of the claims.  "'A claim construction

---

[9]   Indeed, in describing the SCNT "nuclear transfer experiment," the shared specification explains that "[n]uclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene."  '369 Patent col. 19 ll. 23-25.  The specification expressly lists "fibroblasts" as one of the types of "[m]ammalian somatic cells useful in the present invention."  Id. col. 6 ll. 6-15.

that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support.'" Kaufman v. Microsoft Corp., 34 F.4th 1360, 1372 (Fed. Cir. 2022) (quoting Epos Technologies Ltd. v. Pegasus Technologies Ltd., 766 F.3d 1338, 1347 (Fed. Cir. 2014)); see Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1364 (Fed. Cir. 2019) ("[A] claim construction that excludes the preferred embodiment is highly disfavored."); Immunex Corp. v. Sanofi-Aventis U.S. LLC, 977 F.3d 1212, 1220 (Fed. Cir. 2020) ("'[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment.'" (quoting Nobel Biocare Servs. AG v. Instradent USA, Inc., 903 F.3d 1365, 1381 (Fed. Cir. 2018)). Indeed, Defendants' proposed construction excludes not only a preferred embodiment; it excludes the only working preferred embodiment described in the shared specification. As such, the specification strongly supports rejecting Defendants' proposal requiring that the claims be limited to direct reprogramming.

Defendants contend that the shared specification supports their proposed construction. (Doc. No. 149 at 10-12; Doc. No. 178 at 2-3.) The Court disagrees. In an attempt to support their proposed construction, Defendants rely on the following passage in the specification:

> Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. . . . . Second, the methods of the present invention allow one to generate pluripotent without using embryos, oocytes and/or nuclear transfer technology.

'369 Patent col. 4 ll. 21-32. The Court acknowledges that the Federal Circuit has explained in many cases that: "When a patentee 'describes the features of the 'present invention' as a whole,' he implicitly alerts the reader that 'this description limits the scope of the invention.'" Luminara Worldwide, LLC v. Liown Elecs. Co., 814 F.3d 1343, 1353 (Fed. Cir. 2016) (quoting Regents of Univ. of Minnesota v. AGA Med. Corp., 717 F.3d 929, 936 (Fed. Cir. 2013)); accord Pacing Techs., LLC v. Garmin Int'l, Inc., 778 F.3d 1021, 1025 (Fed. Cir. 2015); Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1308

22-cv-00676-H-MSB

(Fed. Cir. 2007); see Techtronic Indus. Co. v. Int'l Trade Comm'n, 944 F.3d 901, 907 (Fed. Cir. 2019).  But there are two problems with Defendants' reliance on this passage in the specification.  First, the passage uses permissive language in explaining that the methods of the present invention "allow" for one to generate pluripotent cells by somatic cell reprogramming without using embryos, oocytes and/or nuclear transfer technology.  The language at issue does not require that the claimed reprogramming must be done without the use of embryos, oocytes and/or nuclear transfer technology.

Further, the passage at issue does not appear to be even applicable to the claims at issue.  Although the passage at issue is describing "the present invention," it is describing the present invention within the context of "methods" for "[g]enerating pluripotent or multipotent cells by somatic cell reprogramming."  '369 Patent col. 4 ll. 21-22.  The claims at issue are not directed to methods for reprogramming a somatic cell.  As both parties concede, the patentees attempted to obtain claims directed to "reprogramming a somatic cell," but those claims were rejected by the examiner for lack of enablement.  (See Doc. No. 149 at 7-8; Doc. No. 151 at 6; see, e.g., Doc. No. 113-5, Ex. B-31 at 2-16; Doc. No. 113-3, Ex. B-23; Doc. No. 113-4, Ex. B-28.)  In contrast, the claims at issue merely encompass "making a somatic cell more susceptible to reprogramming."[10]  '856 Patent col. 20 ll. 38-39; accord '536 Patent col. 20 ll. 37-44; '744 Patent col. 21 ll. 14-23; '917 Patent col. 21 ll. 16-24.  (See also Doc. No. 113-5, Ex. B-32.)

Defendants also attempt to support their proposed construction by relying on the shared specification's discussion of the prior art in the "Background of the Invention"

---

[10]    For this same reason, the Court rejects Defendants' reliance on the prosecution history to support their proposed construction.  (See Doc. No. 149 at 12-13.)  At most, the cited prosecution history shows that the patentees attempted to obtain claims directed to methods for reprogramming a primary somatic cell.  (See Doc. No. 113-5, Ex. B-31 at 3-5.)  But this is of no consequence because those claims were rejected by the examiner for lack of enablement, (see id. at 2-16), and the claims currently before the Court are different claims with a different scope.  (See id. at 5 ("the specification . . . actually teaches an invention of a total different scope").)

section.  In the "Background of the Invention" section, the shared specification explains that four prior art methods exist for obtaining pluripotent stem cells (also referred to in the specification as "ES cells").  See '369 Patent col. 1 ll. 39-67, col. 2 ll. 1-3.  One of the four methods is "somatic cell nuclear transfer (SCNT)."  Id. at col. 1 ll. 46-48.  The specification then goes on to explain with respect to these four prior art methods:

> [A]ll presently available methods depend on controversial sources— embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species.  The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application.
>
> There is thus a great demand for alternative methods of generating pluripotent cells.

Id. at col. 2 ll. 4-13.  In the "Detailed Description of the Invention" section, the specification reiterates this point and explains:

> Presently, human ES cells or ES-like cells can only be generated from controversial sources.  It would be useful to reprogram somatic cells directly into pluripotent cells.  Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology.  It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

Id. at col. 3 ll. 60-67.

The Federal Circuit has explained that a patentee may disavow claim scope "when the specification distinguishes or disparages prior art."  See Poly-Am., L.P. v. API Indus., Inc., 839 F.3d 1131, 1136 (Fed. Cir. 2016); Techtronic, 944 F.3d at 906; Openwave, 808 F.3d at 513–17.  "To find disavowal of claim scope through disparagement of a particular feature," a court should ask "whether 'the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal.'"  Openwave, 808 F.3d at 513. In the cited passages, the shared specification disparages the prior art methods for obtaining pluripotent stem cells, including SCNT and nuclear transfer technology, and the specification explains, therefore, that it would be useful to directly reprogram somatic cells

into pluripotent stem cells without the use of nuclear transfer technology.  Nevertheless, the Court finds this language insufficient to constitute a disclaimer that would support Defendants' proposed construction because, as previously explained, the claims at issue are not directed to methods of reprogramming a somatic cell, and the only working example provided in the specification utilizes SCNT.[11]  In sum, the shared specification does not support Defendants' proposed construction.

Finally, to support their proposed construction, Defendants rely on extrinsic evidence.  (See Doc. No. 149 at 13.)  The cited extrinsic evidence is not persuasive.  At most, the extrinsic evidence demonstrates that there is a difference between directly reprogramming somatic cells into pluripotent cells and SCNT.  (See Doc. No. 152-3, Snyder Decl. Ex. 18 at 409.)  But this is of no consequence because the claimed "reprogramming" in the claims at issue is not limited to direct reprogramming.

In the sum, the Court rejects Defendants' proposed construction.  The Court gives the claim term "reprogramming to a [pluripotent/less differentiated] state state" its plain and ordinary meaning, and the Court declines to construe the claim term.

C.   "makes the cell more susceptible to reprogramming"

Plaintiffs propose that the claim term "makes the cell more susceptible to reprogramming" be construed as "improves the efficiency of reprogramming the cell." (Doc. No. 151 at 10.)  Defendants argue that the claim term "makes the cell more

---

[11]   The Court notes that if the claims at issue were directed to methods of reprogramming somatic cells, then the specification's discussion of the methods of "the present invention" combined with its disparagement of the prior art would likely constitute disclaimers of claim scope.  But it is clear from a review of the intrinsic record, particularly the prosecution history, that the method claims at issue are of a different scope and are not directed to methods of reprogramming somatic cells.  (See, e.g., Doc. No. 113-5, Ex. B-31 at 5 ("[T]he specification fails to enable a method of reprogramming a cell to a less differentiated state by introduction of Oct4 because the specification fails to provide specific guidance to such embodiments and actually teaches an invention of a total different scope.").)  As such, the purported disclaimers identified in the specification are inapplicable to the claims at issue.

**Appx22**

1   susceptible to reprogramming" renders independent claim 1 of the '856 Patent and
2   independent claim 1 of the '917 Patent invalid for indefiniteness. (Doc. No. 149 at 14.)  In
3   the alternative, Defendants propose that the claim term be construed as "primes the cell for
4   subsequent reprogramming." (Id.)

5        The Court finds it appropriate to first address the parties' competing proposed
6   constructions for this claim term prior to addressing Defendants' indefiniteness arguments.
7   By presenting the Court with competing proposed constructions, it is clear that the parties
8   dispute the proper scope of this claim term.  To analyze indefiniteness, the Court must
9   determine whether the claim "language, when read in light of the specification and the
10  prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art
11  about the scope of the invention.'" Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364,
12  1369–70 (Fed. Cir. 2014) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898,
13  901 (2014)); see Infinity Computer Prod., Inc. v. Oki Data Americas, Inc., 987 F.3d 1053,
14  1059 (Fed. Cir. 2021) ("'[W]e look to the patent record—the claims, specification, and
15  prosecution history—to ascertain if they convey to one of skill in the art with reasonable
16  certainty the scope of the invention claimed.'" (quoting Teva Pharms. USA, Inc. v. Sandoz,
17  Inc., 789 F.3d 1335, 1341 (Fed. Cir. 2015))).  As such, in order to properly analyze
18  Defendants' indefiniteness challenge, the Court must first assess the proper scope of the
19  claim term at issue and thereby, in turn, the scope of the invention claimed.

20       With respect to this claim term, the parties dispute whether the claim term "makes
21  the cell more susceptible to reprogramming" means improving the efficiency of
22  reprogramming the cell or whether it is means priming the cell for subsequent
23  reprogramming.  The Court begin its review of the parties' dispute by analyzing the claim
24  language.  Here, the claim language does not resolve the parties' dispute.  The claim
25  language at issue simply states that the claimed method "makes the cell more susceptible
26  to reprogramming to a pluripotent state" or a less differentiated state.  '865 Patent col. 20
27  ll. 38-44; '917 Patent col. 21 ll. 16-17.  The claim language says nothing about efficiency
28  or priming.  For example, independent claim 1 of the '856 Patent claims:

> A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.  As such, the claim language does not resolve the parties' dispute.

Turning to the specification, Plaintiffs contend that the shared specification supports their proposed construction because the specification equates making a cell "more susceptible" to reprogramming with improving the "efficiency" of reprogramming.  (Doc. No. 151 at 10; Doc. No. 179 at 1-2.)  The shared specification contains the term "more susceptible to reprogramming" only twice – once in the title of Example 1 and once in the body of Example 1.  (See Doc. No. 151 at 11 (stating that Example 1 in the specification "is the only place the term appears in the Specification" (emphasis removed)).)  The title of the sole working example contained in the shared specification is "Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment."  '369 Patent col. 18 ll. 54-56.  The working example provides in the section titled "C. Nuclear Transfer Experiment:"

> Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene.  Dox induction was for 24 hours prior to nuclear transfer.  Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002).  As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts.  This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

'369 Patent col. 19 ll. 23-34; accord id. at col. 19 ll. 64-66.

Plaintiffs argue that this passage in the specification supports their proposed construction because it "unequivocally equates" making a cell "more susceptible" to reprogramming with improving the "efficiency" of reprogramming.  (Doc. No. 151 at 10-

11; Doc. No. 179 at 1.)  Although the Court agrees with Plaintiffs that in this passage, the specification equates making a cell "more susceptible" to reprogramming with improving "efficiency," Plaintiffs fail to properly acknowledge the type of "efficiency" that is being discussed in this passage.  This passage only discusses "efficiency" within the context of nuclear transfer reprogramming.  See '369 Patent col. 18 ll. 54-56, col. 19 ll. 22-34.  (See Doc. No. 151 at 6 (conceding that Example 1 is "a SCNT experiment"); see also Doc. No. 151-14, Plath Decl. ¶ 87 ("in the context of somatic cell nuclear transfer").)  Further, the specific type of efficiency referenced in the specification is "blastocyst formation and ES cell derivation" efficiency.  See '369 Patent col. 19 ll. 29-30, col. 19 ll. 64-66.  (See also Doc. No. 151-14, Plath Decl. ¶¶ 52 ("As shown in Table 1, blastocyst formation and embryonic (ES) cell derivation are more efficient from Oct4 induced fibroblasts than from uninduced fibroblast . . . ."), 66 ("A POSA would further look to the data in Table 1, and see that the experiments show, higher blastocyst formation and embryonic stem cell derivation efficiency (or more efficient reprogramming) . . . ."), 62 (explaining that "measures of successful reprogramming by somatic cell nuclear transfer include: (i) the proportion of enucleated oocytes (eggs) carrying the transferred somatic cell nucleus that develop to the blastocyst stage, [and] (ii) the proportion of transferred oocytes giving rise to an ES cell line").)  Plaintiffs' proposed construction is flawed because it fails to properly describe the type of "efficiency" referred to in the shared specification.[12]

Plaintiffs make a similar error in relying on the prosecution history.  Plaintiffs contend that the prosecution history demonstrates that the examiner understood that the specification equates making a cell "more susceptible" to reprogramming with improving

---

[12]     Plaintiffs contend that when the shared specification is referring to efficiency it is using the term more broadly to refer to any enhancement to the reprogramming process. The Court disagrees.  In the passages identified by Plaintiffs, the only efficiency described by the specification is "blastocyst formation and ES cell derivation" efficiency.  '369 Patent col. 19 ll. 29-31, col. 19 ll. 65-66.  Plaintiffs have failed to identify any passage in the specification describing any other type of efficiency.

**Appx25**

the "efficiency" of reprogramming.  (Doc. No. 179 at 1-2 (citing Doc. No. 151-36, Ex. V at 4); Doc. No. 151 at 11 (citing Doc. No. 113-5, Ex. B-31 at 3-4).)  But Plaintiffs again fail to properly acknowledge the type of "efficiency" that is being described.  In the relevant prosecution history, the examiner states that the specification "teaches that on average blastocyst formation and ES cell derivation is more efficient when Oct4 induced fibroblasts are used as compared to un-induced fibroblasts."  (Doc. No. 113-5, Ex. B-31 at 3.)  The examiner then goes on to describe this efficiency as being "nuclear transfer cloning efficiency."  The examiner states: "the experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."  (Id. at 8 ("[T]hey demonstrate that cloning efficiency is increased by induced expression of Oct4 in the donor fibroblast cells.  Cloning efficiency is determined with nuclear transfer units."); see also Doc. No. 151-14, Plath Decl. ¶ 62 (referring to "nuclear transfer" as "nuclear cloning").)  The examiner further states:

> Applicant is over-extrapolating the findings of the nuclear transfer experiment.  It is acknowledged that the nuclear transfer experiments with nuclei from manipulated fibroblasts are intended to assess reprogramming and that the measured parameter of reprogramming is clone efficiency.  The measurement of cloning efficiency is informative in regards to reprogramming in that it elucidates the ability of the nuclear transfer unit comprising a somatic nuclei to gain pluripotency.  It is not informative into all the factors of nuclear transfer that induce reprogramming to the pluripotent state because these factors are not being tested separately but at a whole in this type of experimental model. . . .  Given that reprogramming is going to occur in the nuclear transfer experiments regardless of exogenous Oct4 expression, the nuclear transfer experimental model is only informative to the impact of Oct4 exogenous expression on the degree of cloning efficiency or the degree of reprogramming completeness or effectiveness upon the number of reprogrammed fibroblast nuclei, not the ability of Oct4 alone to reprogram a fibroblast nuclei as Applicants suggest.

(Doc. No. 113-5, Ex. B-31 at 12-13.)[13]   As such, similar to the Court's review of the specification, the Court agrees with Plaintiffs that the prosecution history demonstrates that making a cell "more susceptible" to reprogramming corresponds with improving "efficiency," but Plaintiffs fail to properly consider the type of "efficiency" that is being discussed.  Consistent with the specification, the only type of efficiency discussed in the prosecution history is "cloning efficiency" – "blastocyst formation and ES cell derivation"

---

[13]      In their briefing, Plaintiffs cite this same passage and contend that the examiner acknowledged that the SCNT experiment in the specification was "intended to assess reprogramming" and the results were "informative" with respect to "'direct' reprogramming (as Defendants use the term)."  (Doc. No. 179 at 7 ("During prosecution, the examiner also acknowledged that the SCNT experiment was 'intended to assess reprogramming' and that the results are 'informative in regards to reprogramming.'"), 9 n.7 ("[T]he Examiner recognized that the SCNT experiment was 'informative' with respect to 'direct' reprogramming (as Defendants use the term) . . . .").)  The Court does not find Plaintiffs' selective quotations of isolated statements from the examiner persuasive as Plaintiffs again fail to provide important surrounding context to those statements.  As shown above, the examiner does state that the nuclear transfer experiments in the shared specification "are intended to assess reprogramming," but the examiner then goes on to state that "the measured parameter of reprogramming is cloning efficiency" (i.e., nuclear transfer cloning efficiency).  (Doc. No. 113-5, Ex. B-31 at 12-13 ("[t]he measurement of cloning efficiency is informative in regards to reprogramming"); see also id. at 8 ("the experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency").)  Further, it is clear from a review of the office action at issue that when the examiner is referring to "reprogramming," the examiner is referring to "reprogramming" broadly – including both direct reprogramming (as defined by Defendants and the shared specification) and nuclear transfer reprogramming – and not just to direct reprogramming.  (See, e.g., id. at 5 ("At the time of the invention, the sole means of reprogramming a somatic cell known in the art was via nuclear transfer or somatic cell fusion with an ES cell." (citation omitted)), 8 ("This demonstrates, as consist[ent] with the prior art, that nuclear transfer itself reprograms somatic cells. . . . [A]ny reprogramming abilities of Oct4 are confounded by the known effect of nuclear transfer reprogramming.  The art and the applicant's own experiments demonstrate that reprogramming is occurring by the process of nuclear transfer."), 13 ("reprogramming is going to occur in the nuclear transfer experiments regardless of exogenous Oct4 expression"); see also id. at 5-6 (explaining that at the time of the invention, direct reprogramming had not yet been developed).)

1   efficiency.[14]

2          In sum, a review of the intrinsic record shows that it does not fully support Plaintiffs'

3   proposed construction for this claim term.  Although the Court agrees with Plaintiffs that

4   the specification and the prosecution history equate the term making a cell "more

5   susceptible" to reprogramming with improving "efficiency," they only do so with respect

6   to a certain type of efficiency.  Plaintiffs' proposed construction is improper because it fails

7   to accurately characterize the described "efficiency."  As such, the Court will include a

8   modified version of Plaintiffs' proposed construction in the Court's construction for this

9   claim term construing the term in part as improves "cloning efficiency."

10         Turning to Defendants' proposed construction, Defendants argue that this same

11  prosecution history related to the prosecution of the '536 Patent supports their proposed

12  construction.  (Doc. No 149 at 18-20; Doc. No. 178 at 7-9.)  "Prosecution disclaimer

13  'preclud[es] patentees from recapturing through claim interpretation specific meanings

14  disclaimed during prosecution.'"  Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1359

15  (Fed. Cir. 2017) (quoting Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323 (Fed.

16  Cir. 2003)).  "[T]he doctrine of prosecution disclaimer ensures that claims are not

17  'construed one way in order to obtain their allowance and in a different way against accused

18  infringers.'"  Id. at 1360 (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570,

19  1576 (Fed. Cir. 1995)).

20         "'Prosecution disclaimer can arise from both claim amendments and arguments.'"

21  Traxcell Techs., LLC v. Nokia Sols. & Networks Oy, 15 F.4th 1136, 1141 (Fed. Cir. 2021)

22  (quoting SpeedTrack, Inc. v. Amazon.com, 998 F.3d 1373, 1379 (Fed. Cir. 2021)); see

23  Aylus, 856 F.3d at 1359 ("Such disclaimer can occur through amendment or argument.").

24  Prosecution disclaimer "attaches if a patentee 'has unequivocally disavowed a certain

25  meaning to obtain [a] patent' in a way that is 'clear and unmistakable.'"  Traxcell, 15 F.4th

26

27  _____

28  [14]    Plaintiffs have failed to identify any passage in the prosecution history – or anywhere
        else in the intrinsic record – describing any other type of efficiency.

**Appx28**

22-cv-00676-H-MSB

at 1141 (quoting <u>Omega</u>, 334 F.3d at 1323); <u>see also</u> <u>Computer Docking Station Corp. v.</u> <u>Dell, Inc.</u>, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply to an ambiguous disavowal.").  "While disavowal must be clear and unequivocal, it need not be explicit."  <u>Poly-Am.</u>, 839 F.3d at 1136; <u>see</u> <u>Techtronic</u>, 944 F.3d at 907 ("A disavowal must be clear, but it need not be explicit.").  "'The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art.'"  <u>Genuine</u> <u>Enabling Tech.</u>, 29 F.4th at 1374.

During the prosecution of the '536 Patent, the patentees attempted to obtain method claims encompassing "a method of reprogramming a primary somatic cell to a less differentiated state." (Doc. No. 152-4, Snyder Decl. Ex. 27 at 508-09.)  In an office action dated April 11, 2014, the examiner rejected these claims under 35 U.S.C. § 112 ¶ 1 for failure to comply with the enablement requirement. (Doc. No. 113-5 Ex. B-31 at 1-16; <u>see</u> <u>also</u> Doc. No. 113-3, Ex. B-23; Doc. No. 113-4, Ex. B-28.)  In providing the basis for these enablement rejections, the examiner explained:

> The specification provides specific guidance to the production of a transgenic mouse comprising in its genome an inducible exogenous Oct4 gene.  The specification provides specific guidance to the isolation of fibroblasts from said transgenic mouse and inducing Oct4 expression in said fibroblasts by treatment with deoxycycline.  The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and then transferred into enucleated oocytes to produce nuclear transfer units.  The specification teaches that the nuclear transfer units were cultured to the blastocyst stage and ES cell were derived from the nuclear transfer units.  The specification further teaches that on average blastocyst formation and ES cell derivation is more efficient when Oct4 induced fibroblasts are used as compared to un-induced fibroblasts.  The specification thus concludes that inducing Oct4 expression in somatic cells makes these cells more susceptible to reprogramming.

> While the specification provides specific guidance to a means of <u>priming</u> somatic cells for reprogramming, the specification fails to provide any guidance to a method that predictably reprograms primary somatic cells to a less differentiated state by solely introducing a nucleic acid encoding Oct4 to said somatic cell or by solely introducing an Oct4 protein into said somatic

22-cv-00676-H-MSB

cell.  The specification fails to assess the differentiation status of the somatic cells after induction of Oct4 but before reprogramming the somatic cell by nuclear transfer.  As such, the specification has provided no evidence that alone the exogenous Oct4 in the cell is reprogramming the somatic cell to a less differentiated state.  The specification further fails to provide any teaching to the narrower embodiments of the claims encompassing introduction of Oct4 into an adult stem cell, such as hematopoietic stem cells, neural stem cells, or mesenchymal stem cells.  As such, the specification fails to demonstrate that introduction of Oct4 into such adult stem cells or any cells will predictably result in a less differentiated state as the claims require.

Thus, the specification fails to enable the instant claims because the invention disclosed by the specification is not commensurate in scope with the method of the claims. . . .

The specification provides specific guidance to a method of priming a somatic cell for reprogramming by introducing Oct4 activity into said somatic cell.  This cannot properly be interpreted as commensurate in scope with a method of reprogramming a somatic cell by solely introducing Oct4 because the specification fails to teach that Oct4 alone reprograms a cell.  As such, the specification fails to enable a method of reprogramming a cell to a less differentiated state by introduction of Oct4 because the specification fails to provide specific guidance to such embodiments and actually teaches an invention of a total different scope.

(Id. at 3-5 (emphasis in original) (citations omitted); see also id. at 7 ("[T]he specification describes a method of priming a somatic cell for reprogramming by solely introducing Oct4.").)  Here, in analyzing enablement, the examiner explained the scope of the invention disclosed in the shared specification and explained why that scope did not encompass a method of reprogramming a somatic cell to a less differentiated state by introduction of Oct4 alone.

In response to the examiner's enablement rejections, the patentees amended the claims at issue to now claim a method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state.  (Doc. No. 113-5, Ex. B-32; see also Doc. No. 151 at 6.)  For example, the patentees amended claim 1 as follows:

1.    (Currently amended) A method of making ~~reprogramming~~ a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein

22-cv-00676-H-MSB

operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making ~~reprogramming~~ the somatic cell more susceptible to reprogramming to a less differentiated state.

(Doc. No. 113-5, Ex. B-32 at 2 (underlining and strike outs in original).)  In providing these amendments, the patentees did not dispute the examiner's characterizations of the scope of the invention disclosed in the specification.  Rather, the patentees stated with respect to enablement:

Applicants submit that the presently claimed subject matter is enabled by the as-filed specification, as acknowledged by the Office in the Actions mailed August 20, 2013, and April 11, 2014.  *See* Office Action mailed April 11, 2014, last sentence of second paragraph of page 3, paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7.

Accordingly, this basis for rejection is now moot and properly withdraw.

(Id. at 5.)  The examiner allowed the claims as amended.  (See Doc. No. 113-5, Ex. B-33.)

The Federal Circuit has found this sequence of events sufficient to constitute prosecution disclaimer.  See, e.g., Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1096 (Fed. Cir. 2013); Ancora Techs., Inc. v. Apple, Inc., 744 F.3d 732, 739 (Fed. Cir. 2014); SandBox Logistics LLC v. Proppant Express Invs. LLC, 813 F. App'x 548, 554 (Fed. Cir. 2020).  For example, in Biogen, during the prosecution of the asserted patent, the examiner rejected all of the pending claims for lack of enablement as they encompassed "'any and all anti-CD20 antibodies.'"  713 F.3d at 1095–96.  In providing these rejections, the examiner explained that the specification was enabling for "Rituxan®, rituximab, and 2B8–MX–DTPA," but it was not enabling for other anti-CD20 antibodies.  See id. at 1096. In response to these rejections, rather than challenging the examiner's understanding of the crucial terms, the applicants argued that the specification was enabling for anti-CD20 antibodies with similar affinity and specificity as Rituxan®.  Id.  The Federal Circuit explained: "While the applicants may not have repeated the examiner's language *verbatim et literatim*, it is clear that they were limiting their invention to what the examiner believed they enabled: antibodies that have a similar specificity and affinity for the specific epitope

to which Rituxan® binds." <u>Id.</u>  The Federal Circuit held that this constituted a clear and unmistakable prosecution disclaimer.  <u>See id.</u>  The Federal Circuit explained:

> While disavowing statements must be "so clear as to show reasonable clarity and deliberateness," this requirement does not require the applicant to parrot back language used by the examiner when clearly and deliberately responding to a particular grounds for rejection.  If an applicant chooses, she can challenge an examiner's characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner's characterization.

<u>Id.</u> (quoting <u>Omega</u>, 334 F.3d at 1325); <u>see also, e.g.</u>, <u>SandBox</u>, 813 F. App'x at 554 (finding prosecution disclaimer supported construing the term "bottom" as "bottom wall" where examiner considered a "bottom wall" to be essential based on the disclosures in the specification, applicants amended the claims to include "a bottom," and applicants failed to challenge the examiner's understanding of the claims); <u>Oy v. Verizon Servs. Corp.</u>, No. CV 12-715-CJB, 2014 WL 7385615, at *12 (D. Del. Dec. 23, 2014).

The circumstances in this case are analogous to <u>Biogen</u> and <u>Sandbox</u>.  Here, the examiner rejected the claims for lack of enablement and explained to the patentees what the examiner considered to be the proper scope of the invention disclosed in the specification, including the examiner's view that the specification provides specific guidance to a method of "priming" a somatic cell for reprogramming by introducing Oct4.  (<u>See</u> Doc. No. 113-5, Ex. B-31 at 3, 4, 7.)  In response to the examiners' rejections, the patentees amended the claims and did not dispute the examiner's characterizations of the disclosures contained in the specification.  Indeed, to support enablement of the amended claims, the patentees expressly and specifically cited to every instance where the examiner characterized the specification as disclosing a method of "priming" a somatic cell for reprogramming.  (<u>Compare</u> Doc. No. 113-5, Ex. B-32 at 5 (citing April 11, 2014 office action at "paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7") <u>with</u> Doc. No. 113-5, Ex. B-31 at 3, 4, 7.)  As such, under <u>Biogen</u> and <u>SandBox</u>, this constitutes prosecution disclaimer, and, as a result, the claims at issue are limited to a method of "priming" a somatic cell for reprogramming.  <u>See SandBox</u>, 813

**Appx32**

F. App'x at 554 ("SandBox's failure to challenge the Examiner's understanding amounts to a disclaimer."); <u>Biogen</u>, 713 F.3d at 1095–96 ("If an applicant chooses, she can challenge an examiner's characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner's characterization."); <u>see also</u> <u>TorPharm, Inc. v. Ranbaxy Pharm., Inc.</u>, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("[I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where the patentee narrows his or her claims by amendment[.]" (internal citation omitted)).

Plaintiffs argue that Defendants' proposed construction is improper because it construes the word "priming" used by the examiner as a two-step process in which the Oct4 is introduced as an antecedent step. (Doc. No. 151 at 12-13; Doc. No. 179 at 2-3.) Plaintiffs argue that the relevant portions of the prosecution history do not suggest that the examiner was contemplating that "priming" entails some sort of pre-conditioning step; Plaintiffs argue, to the contrary, that the examiner recognized that Example 1 in the specification shows that Oct4 was present as an "additive factor." (<u>Id.</u> (citing Doc. 113-5, Ex. B-31 at 3-4, 16).) The Court rejects this argument as Plaintiffs again fail to read the examiner's statements within their proper context. As Plaintiffs acknowledge, when the examiner discusses the "addition of exogenous Oct4 as an additive factor to reprogramming," the examiner is discussing it within the context of Example 1 in the specification – the SCNT experiment – which Plaintiffs acknowledge is only place in the specification where the term at issue appears. (<u>See id.</u> at 11-12.) With respect to that experiment, the specification explains: "Dox induction was for 24 hours prior to nuclear transfer." '369 Patent col. 19 ll. 25. (<u>See also</u> Doc. No. 113-3, Ex. B-23 at 3 ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were first treated with DOX to induce Oct4 expression and then use[d] in nuclear transfer."); Doc. No. 113-2, Ex. B-11 at 4; ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and then

transferred into enucleated oocytes to produce [] nuclear transfer units."); Doc. No. 113-5, Ex. B-31 at 3 (same).)  Thus, the specification, consistent with the examiner's description, describes it as a two-step process.[15]   As such, Defendants' alternative proposed construction is well supported by the intrinsic record – specifically the specification and the prosecution disclaimer in the prosecution history, and, as such, the Court adopts the proposed construction.[16]

---

[15]   At the claim construction hearing, Plaintiffs challenged the Court's citation to this passage in the shared specification as support for the notion that "priming" entails introducing Oct4 as an antecedent step prior to the subsequent step of reprogramming.  The Court notes that in presenting this challenge and explaining the experiment described in Example 1 of the specification, Plaintiffs stated at the hearing:  "A POSA understands that it was to make sure over that 24-hour period that the expression of the transgene has enough time to generate Oct4 so that in this subsequent step Oct4 was being put together with the oocyte.").  Feb. 27, 2023 Hearing; see also id. ("they wanted to make sure that that cell had Oct4 in it at the time that they combined it with the oocyte").  As such, Plaintiffs' own description of the experiment described it as a two-step process where the experimenters made sure that Oct4 was present in the somatic cell prior to the subsequent step of combining it with the oocyte (i.e., prior to nuclear transfer reprogramming).  Indeed, Plaintiffs even used the phrase "subsequent step" in their explanation.  Id.

[16]   Plaintiffs also argue that Defendants' proposed construction should be rejected in light of the shared specification's discussion of "embodiments in which multiple pluripotency genes are introduced into a somatic cell 'as part of a cDNA expression library.'"  (Doc. No. 179 at 3 (citing '369 Patent col. 9 ll. 40-48).)  The Court does not find Plaintiffs' reliance on this passage in the specification persuasive.  This passage is from a section of the specification describing "Method for Reprogramming Somatic Cells."  '369 Patent col. 7 ll. 34.  As Plaintiffs acknowledge, the claims at issue are not directed to methods for reprogramming a somatic cell.  (See Doc. No. 151 at 6; see also Doc. No. 113-5, Ex. B-31 at 5 ("[T]he specification . . . actually teaches an invention of a total different scope.").)

     In addition, Plaintiffs criticize Shoreline's expert Dr. Snyder for attempting to analogize the examiner's use of the word "priming" to priming a pump or priming a wall for painting.  (Doc. No. 179 at 2; Doc. No. 151 at 11-12.)  The Court makes clear that it adopts Defendants' proposed construction for this claim term because it is well supported by the intrinsic record – the shared specification and the prosecution history including the prosecution disclaimer.  In adopting Defendants' proposed construction, the Court does not

In sum, the Court adopts a modified version of Plaintiffs' proposed construction for this claim term, and the Court adopts Defendants' alternative proposed construction for this claim term. The Court construes the claim term "makes the cell more susceptible to reprogramming" as "primes the cell to improve the cloning efficiency of the subsequent reprogramming." Further, in their briefing, the parties agree that the claim terms "making the somatic cell more susceptible to reprogramming" and "make the cell more susceptible to reprogramming" should be construed consistent with the Court's construction for the term "makes the cell more susceptible to reprogramming." (See Doc. No. 149 at 14; Doc. No. 151 at 10 n.7.) As such, the Court also construes the claim term "making the somatic cell more susceptible to reprogramming" as "priming the somatic cell to improve the cloning efficiency of the subsequent reprogramming," and the Court construes the claim term "makes the cell more susceptible to reprogramming" as "prime the cell to improve the cloning efficiency of the subsequent reprogramming."

Turning to Defendants' indefiniteness challenge, Defendants argue that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" renders the asserted claims at issue invalid for indefiniteness. (Doc. No. 149 at 14-18.) "Definiteness is a statutory requirement for patentability." Niazi, 30 F.4th at 1346. Under 35 U.S.C. § 112(b), a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C. § 112(b).

"A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" Interval Licensing, 766 F.3d at 1369–70 (quoting Nautilus, 572 U.S. at 901); see Infinity Computer, 987 F.3d at 1059. This "reasonable certainty" standard

---

rely on any of Dr. Snyder's opinions or testimony. As such, Plaintiffs' challenges to Dr. Snyder's testimony are moot.

"reflects a 'delicate balance' between 'the inherent limitations of language' and providing 'clear notice of what is claimed.'" <u>Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n</u>, 936 F.3d 1353, 1359 (Fed. Cir. 2019). "Th[e] standard 'mandates clarity, while recognizing that absolute precision is unattainable.'" <u>Nevro Corp. v. Bos. Sci. Corp.</u>, 955 F.3d 35, 39 (Fed. Cir. 2020) (quoting <u>Nautilus</u>, 572 U.S. at 910); <u>see also</u> <u>BASF Corp. v. Johnson Matthey Inc.</u>, 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("'Reasonable certainty' does not require 'absolute or mathematical precision.'").

"General principles of claim construction apply to indefiniteness allegations." <u>HZNP Medicines LLC v. Actavis Lab'ys UT, Inc.</u>, 940 F.3d 680, 688 (Fed. Cir. 2019). The party asserting indefiniteness bears "the burden of proving indefiniteness by clear and convincing evidence." <u>BASF</u>, 875 F.3d at 1365 (citing <u>Biosig Instruments, Inc. v. Nautilus, Inc.</u>, 783 F.3d 1374, 1377 (Fed. Cir. 2015)); <u>see also</u> <u>Microsoft Corp. v. i4i Ltd. P'ship</u>, 564 U.S. 91, 95 (2011) (holding that 35 U.S.C. § 282 "requires an invalidity defense to be proved by clear and convincing evidence").

Defendants first argue that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" is indefinite because the specification fails to adequately explain to a POSITA how to assess whether a somatic cell has been made "more susceptible to reprogramming" without using oocytes or nuclear transfer technology (as contemplated by the inventors). (Doc. No. 149 at 14-16; Doc. No. 178 at 4-5.) This argument is based on Defendants' contention that the claims at issue do not encompass the use of nuclear transfer technology. The Court has rejected this argument. <u>See</u> <u>supra</u>. As such, the Court rejects Defendants' indefiniteness challenge to the extent it is based on Defendant's rejected contention that the use of nuclear transfer technology is outside the scope of the asserted claims at issue.

Defendants argue that the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" is indefinite because Plaintiffs' proposed construction defining the term as improving the efficiency of reprogramming is itself indefinite and ambiguous. (Doc. No. 149 at 15-16.) The Court has rejected Plaintiffs' proposed

construction for this claim term.  See supra.  As such, the Court rejects Defendants'
indefiniteness challenge to the extent it is based on the Court's adoption of Plaintiffs'
proposed construction.  Further, the Court rejects Defendants' contention that the word
"efficiency" is ambiguous in the context of the asserted patents.  The shared specification
and the prosecution history explain that the "efficiency" at issue is "blastocyst formation
and ES cell derivation" efficiency – cloning efficiency.  See '369 Patent col. 19 ll. 29-30,
col. 19 ll. 64-66.  (See also Doc. No. 113-2, Ex. B-11 at 4 ("The specification further
teaches that on average blastocyst formation and ES cell derivation is more efficient when
Oct4 induced fibroblasts are used as compared to un-induced fibroblasts."); Doc. No. 113-
5, Ex. B-31 at 3 (same), 8 ("The difference seen was a degree of clone production
efficiency, with exogeneous Oct4 increasing the number of clones produced").)
Defendants fail to adequately explain how a POSITA would be confused by this
explanation provided in the intrinsic record.

Finally, Defendants' indefiniteness argument is flawed because it does not account
for the Court's construction of this claim term, construing the term as "[primes / priming /
prime] the [somatic] cell to improve the cloning efficiency of the subsequent
reprogramming."  Because an indefiniteness challenge must account for the scope of the
invention claimed, Defendants' indefiniteness challenge must account for the Court's
construction of this claim term.  See Nautilus, 572 U.S. at 901; Interval Licensing, 766
F.3d at 1369–70; Infinity Computer, 987 F.3d at 1059.  In sum, Defendants have failed to
demonstrate that the claim term "[makes / making / make] the [somatic] cell more
susceptible to reprogramming" is indefinite at this stage in the proceedings.[17]

---

[17]    In the parties' joint claim construction hearing statement, Defendant Shoreline states
that it "reserves the right to argue that [the] Asserted Claims are invalid under 35 U.S.C. §
112(b) . . . based upon information learned through the course of fact discovery and/or
developed through expert discovery."  (Doc. No. 90 at 5-6 n.1.)  The Court acknowledges
that in rejecting Defendants' indefiniteness challenge in this claim construction order, the
Court is not entering a judgment against Defendants on their indefiniteness counterclaims
or defenses.  See DNA Genotek Inc. v. Spectrum Sols. L.L.C., No. 321CV00516RSHDDL,

**Appx37**

22-cv-00676-H-MSB

1          D.    <u>"Oct4" / "Oct 4"</u>

2          Plaintiffs contend that the claim term "Oct4"/"Oct 4" need not be construed, and,

3  instead, the term should be given its plain and ordinary meaning.  (Doc. No. 151 at 19.)

4  Defendants propose that the term be construed as "Oct4 from any species."  (Doc. No. 149

5  at 23.)  In their responsive claim construction brief, Plaintiffs refer to a "compromise

6  construction" that they proposed, requesting that the term be construed as "Oct4, from any

7  suitable species."  (Doc. No. 179 at 10 n.8.)

8          To support their proposed construction, Defendants contend that the asserted claims

9  are not limited to mammalian somatic cells.  (Doc. No. 149 at 23-24.)  But Defendants'

10  contention is directly contradicted by the shared specification.  The specification states:

11  "The somatic cells in the present invention are mammalian cells, such as, for example,

12  human cells or mouse cells."  '369 Patent col. 6 ll. 1-2; <u>see also</u> <u>id.</u> at col. 6 ll. 7-8

13  ("Mammalian somatic cells useful in the present invention include . . . .").  By using the

14  phrase "the present invention" in this passage, the specification makes clear that the

15  invention claimed in the asserted patents is limited to mammalian somatic cells.  <u>See</u>

16  <u>Luminara</u>, 814 F.3d at 1353 ("When a patentee 'describes the features of the "present

17  invention" as a whole,' he implicitly alerts the reader that 'this description limits the scope

18  of the invention.'" (quoting <u>Regents of Univ. of Minnesota</u>, 717 F.3d at 936)); <u>Pacing</u>, 778

19  F.3d at 1025; <u>see also</u> <u>Poly-Am.</u>, 839 F.3d at 1136 ("[A]n inventor may disavow claims

20  lacking a particular feature when the specification describes "the present invention" as

21  having that feature."); <u>Techtronic</u>, 944 F.3d at 907 ("It is axiomatic that, where the

22

23          ————————————

24  2022 WL 17331255, at *10 n.7 (S.D. Cal. Nov. 29, 2022).  Nevertheless, the Federal
Circuit has explained that "[g]eneral principles of claim construction apply to

25  indefiniteness allegations." <u>HZNP Medicines</u>, 940 F.3d at 688.  And the Federal Circuit
has also held that a "district court's claim construction" is "law of the case for purposes of

26  the trial." <u>Andersen Corp. v. Fiber Composites, LLC</u>, 474 F.3d 1361, 1371 n.2 (Fed. Cir.

27  2007).  As such, any future indefiniteness challenge in this case must adhere to the holdings
in this claim construction order.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Exergen</u>, 575 F.3d at 1321 ("No party

28  may contradict the court's construction . . . .").

**Appx38**

22-cv-00676-H-MSB

specification 'describes "the present invention" as having [a] feature,' that representation may disavow contrary embodiments.")

Defendants note that independent claim 10 of the '917 Patent recites, among other things, "a somatic cell," and that dependent claim 14 depends from claim 10 and further recites "wherein the somatic cell is a mammalian cell." (Doc. No. 149 at 24.) '917 Patent col. 22 ll. 6, 26-27. In light of this claim language, Defendants argue that, under the doctrine of claim differentiation, the asserted claims should not be limited to mammalian somatic cells because the "somatic cell" in independent claim 10 must be broader than just mammalian cells. (Doc. No. 149 at 24; Doc. No. 178 at 10.) The Court disagrees. "The doctrine of claim differentiation is 'based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" Starhome GmbH v. AT & T Mobility LLC, 743 F.3d 849, 857 (Fed. Cir. 2014) (quoting Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971–72 (Fed. Cir. 1999)); see also World Class Tech. Corp. v. Ormco Corp., 769 F.3d 1120, 1125 (Fed. Cir. 2014) ("The doctrine of claim differentiation creates a presumption that distinct claims, particularly an independent claim and its dependent claim, have different scopes."). The Federal Circuit has explained that the doctrine of claim differentiation "is 'not a hard and fast rule.'" Littelfuse, Inc. v. Mersen USA EP Corp., 29 F.4th 1376, 1380 (Fed. Cir. 2022) (quoting Seachange Int'l, Inc. v. C–COR, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005)). "Indeed, any presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history." Id. (internal quotation marks omitted) (quoting Retractable Techs., Inc. v. Becton, Dickinson, and Co., 653 F.3d 1296, 1305 (Fed. Cir. 2011)); see Howmedica Osteonics Corp. v. Zimmer, Inc., 822 F.3d 1312, 1323 (Fed. Cir. 2016). Here, the clear language in the specification limiting the claimed invention to mammalian somatic cells is sufficient to rebut any presumption created by the doctrine of claim differentiation. See id.; see also Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1302 (Fed. Cir. 1999) ("[T]he doctrine of claim differentiation does not serve to broaden claims beyond their meaning in

22-cv-00676-H-MSB

light of the specification and does not override clear statements of scope in the specification and the prosecution history." (citation omitted).)

To support their proposed construction, Defendants also rely on extrinsic evidence, specifically a declaration from Shoreline's expert. (See Doc. No. 149 at 23 (citing Doc. No. 152, Snyder Decl. ¶¶ 102-06).)  But "[e]xtrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" Summit 6, 802 F.3d at 1290 (quoting Phillips, 415 F.3d at 1324); see also Seabed Geosolutions, 8 F.4th at 1287 ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence.").  As such, Defendants cannot use expert testimony to contradict the clear statements in the specification limiting the asserted claims to mammalian somatic cells. See id.; see also Genuine Enabling Tech., 29 F.4th at 1373 ("[E]xpert testimony may not be used to diverge significantly from the intrinsic record.").

In sum, the Court rejects Defendants' proposed construction for the term "Oct4"/"Oct 4," and the Court adopts Plaintiffs' alternative proposed construction for the claim term.  As such, the Court construes the claim term "Oct4"/"Oct 4" as "Oct4 from any suitable species."

E.  "candidate agent of interest"

Plaintiffs propose the claim term "candidate agent of interest" from claim 8 of the '797 Patent be construed as "an exogenous nucleic acid encoding Nanog and/or Sox-2 protein." (Doc. No. 151 at 22.)  Defendants propose that the claim term "candidate agent of interest" from claim 8 of the '797 Patent be construed as "a candidate agent including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins." (Doc. No. 149 at 24.)

Although Plaintiffs initially disputed Defendants' proposed construction for this claim term, Plaintiffs state in their responsive claim construction brief that they agree to

22-cv-00676-H-MSB

adopt Defendants' proposed construction. (Doc. No. 179 at 1 n.1; <u>see also</u> Doc. No. 113-7, Ex. D at 16-24.) As such, the Court construes the term "candidate agent of interest" in claim 8 of the '797 Patent as "a candidate agent including naturally arising, recombinant, synthetic, designed, chemically modified, or isolated compounds, including organic compounds, biomolecules, peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids, oligonucleotides, oligopeptides, bacterial extracts, fungal extracts, plant extracts, animal extracts, chromatin remodeling proteins, and pluripotency proteins."

    F.   <u>"somatic cell"</u>

Plaintiffs propose that the claim term "somatic cell" be construed as "any mammalian cell of meso, endo, ectodermal lineage, whether native or engineered, including cells such as adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, other muscle cells, hematopoietic stem cells, neural stem cells, mesenchymal stem cells, and engineered somatic cells, but excluding pluripotent and germ cells." (Doc. No. 151 at 20-21.) Defendants propose that the claim term be construed as "any of the body cells except the reproductive (germ) cells." (Doc. No. 149 at 25.)

Although Plaintiffs initially disputed Defendants' proposed construction for the claim term "somatic cell," Plaintiffs state in their claim construction briefing that they agree to adopt Defendants' proposed construction.[18] (Doc. No. 151 at 21; Doc. No. 179 at 1 n.1; <u>see also</u> Doc. No. 151-14, Plath Decl. ¶ 34 ("Somatic cells make up all the organs and tissues in the body of a human being, except for the germ cells (sperm, oocytes) which

---

[18]    In their briefing, Plaintiffs explain that they initially disputed Defendants' proposed construction based on a potential ambiguity as to the meaning of "body cells," but that this potential ambiguity was clarified during a deposition of Shoreline's expert. (Doc. No. 151 at 21.)

**Appx41**

are involved in reproduction.").)  As such, the Court construes the claim term "somatic cell" as "any of the body cells except the reproductive (germ) cells."

## Conclusion

For the above reasons, the Court hereby adopts the constructions set forth above.[19]

**IT IS SO ORDERED.**

DATED: February 28, 2023

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[19]    The Court notes that on February 17, 2023, Plaintiffs filed a motion to strike certain clarifications identified in the errata to the deposition of Shoreline's technical expert, Dr. Snyder.  (Doc. No. 177.)  The Court's claim construction order does not cite to or rely on any testimony from Dr. Snyder's deposition.  As such, the analysis in this claim construction order is not implicated by the pending motion to strike.

**Appx42**

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

FATE THERAPEUTICS, INC.; and
WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH,

                          Plaintiffs,

v.

SHORELINE BIOSCIENCES, INC.; and
DAN S. KAUFMAN,

                          Defendants.

Case No.: 22-cv-00676-H-MSB

**ORDER DENYING PLAINTIFFS' MOTIONS FOR RECONSIDERATION**

[Doc. Nos. 228, 231, 232.]

On March 28, 2023, Plaintiffs Fate Therapeutics, Inc. ("Fate") and Whitehead Institute for Biomedical Research ("Whitehead") filed three motions for reconsideration of orders that the Court entered on February 28, 2023. (Doc. Nos. 228, 231, 232.) On March 29, 2023, the Court took the motions under submission. (Doc. No. 233.) On April 11, 2023, Defendants Shoreline Biosciences, Inc. ("Shoreline") and Dan S. Kaufman filed their responses in opposition to Plaintiffs' motions for reconsideration. (Doc. Nos. 241, 242, 243, 244, 245, 246, 247.) On April 18, 2023, Plaintiffs filed their replies. (Doc. Nos. 250, 251, 252.) For the reasons below, the Court denies Plaintiffs' motions for reconsideration.

/ / /

/ / /

**Background**

In the present action, Plaintiffs assert claims for patent infringement under 35 U.S.C. §§ 271(a), (b), and (g) against Defendants Shoreline and Dan S. Kaufman, alleging claims for infringement of U.S. Patent Nos. 8,071,369 ("the '369 Patent"), 8,932,856 ("the '856 Patent"), 8,951,797 ("the '797 Patent"), 8,940,536 ("the '536 Patent"), 9,169,490 ("the '490 Patent"), 10,457,917 ("the '917 Patent"), and 10,017,744 ("the '744 Patent") (collectively, "the asserted patents"). (Doc. No. 162, Supp. FAC ¶¶ 157-414.) Specifically, Plaintiffs allege that Defendants, individually and acting in concert, make, use, sell, offer for sale, and/or import induced pluripotent stem cells ("iPSCs") that infringe one or more claims of the asserted patents.[1] (Id. ¶ 140; see, e.g., id. ¶¶ 162 ("Defendants' use of their 'iPSC-derived cell therapy manufacturing platform' infringe[] at least claim 1 of the '369 Patent."), 212 ("iPSCs used by Defendants to make at least the iPSC-derived natural kill (NK) cell platforms are made by a process that comprises at least each step of claim 1 of the '856 Patent.").)

Plaintiff Whitehead is the owner via assignment of the asserted patents. See U.S. Patent No. 8,071,369, at [73] (issued Dec. 6, 2011); U.S. Patent No. 8,932,856, at [73] (issued Jan. 13, 2015); U.S. Patent No. 8,951,797, at [73] (issued Feb. 10, 2015); U.S. Patent No. 8,940,536, at [73] (issued Jan. 27, 2015); U.S. Patent No. 9,169,490, at [73] (issued Oct. 27, 2015); U.S. Patent No. 10,017,744, at [73] (issued Jul. 10, 2018); U.S. Patent No. 10,457,917, at [73] (issued Oct. 29, 2019). Plaintiffs allege that Fate is the

---

[1]     Induced pluripotent stem cells ("iPSCs") "are pluripotent stem cells generated from somatic cells by reprogramming." (Doc. 162, Supp. FAC ¶ 31; see Doc. No. 184, Answer to Supp. FAC ¶ 31; see also Doc. No. 151-14, Plath Decl. ¶ 59; Doc. No. 152, Snyder Decl. ¶ 43.) "Four specific genes—cMYC, OCT3/4, SOX2 and KLF4—encoding transcription factors play a role in converting or reprogramming somatic cells into pluripotent stem cells." (Doc. 162, Supp. FAC ¶ 32; see Doc. No. 184, Answer to Supp. FAC ¶ 32; Doc. No. 204, Answer to Supp. FAC ¶ 32; see also Doc. No. 184, Counterclaims ¶ 43 ("iPSCs are generated in culture from somatic cells through the introduction of reprogramming factors that transform a somatic cell into a pluripotent state."); Doc. No. 152, Snyder Decl. ¶¶ 41, 43.)

2

**Appx44**

exclusive licensee of the asserted patents.  (Doc. No. 162, Supp. FAC ¶¶ 16, 19.)

The '369 Patent is entitled "Compositions for reprogramming somatic cells" and was issued on December 6, 2011.  '369 Patent at [45], [54].  The '856 Patent is entitled "Methods for reprogramming somatic cells" and was issued on January 13, 2015.  '856 Patent at [45], [54].  The '797 Patent is entitled "Compositions for identifying reprogramming factors" and was issued on February 10, 2015.  '797 Patent at [45], [54].  The '536 Patent is entitled "Methods for making somatic cells more susceptible to reprogramming" and was issued on January 27, 2015.  '536 Patent at [45], [54].  The '490 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 27, 2015.  '490 Patent at [45], [54].  The '744 Patent is entitled "Methods for reprogramming somatic cells" and was issued on Jul. 10, 2018.  '744 Patent at [45], [54].  The '917 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 29, 2019.  '917 Patent at [45], [54].

The asserted patents are all related and all share a common specification.[2]  (See Doc. No. 149 at 5 & n.2; Doc. No. 151 at 2 & n.2 (agreeing that the asserted patents all share the same specification); see also Doc. No. 162, Supp. FAC ¶ 132.)  The shared specification states that the disclosed invention is directed to "methods for reprogramming somatic cells to a less differentiated state."  '369 Patent col. 2 ll. 24-25; see also id. at [57] ("The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells.").

Independent claim 1 of the '369 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

'369 Patent col. 20 ll. 40-43.

Independent claim 1 of the '856 Patent claims:

---

[2]     The Court will cite to the '369 Patent's specification as the "shared specification" of the asserted patents.

22-cv-00676-H-MSB

A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.

Independent claim 1 of the '797 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding Oct 4, wherein the exogenously introduced nucleic acid increases Oct4 expression in the cell.

'797 Patent col. 20 ll. 40-43.

Independent claim 1 of the '536 Patent claims:

A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'536 Patent col. 20 ll. 37-44.

Independent claim 1 of the '490 Patent claims:

A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 expression comparable to the amount of Oct4 expression in an embryonic stem cell.

'490 Patent col. 20 ll. 39-41.

Independent claim 1 of the '744 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising:

obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein;

wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state.

4

**Appx46**

22-cv-00676-H-MSB

'744 Patent col. 21 ll. 14-23.

Independent claim 1 of the '917 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming; and wherein the exogenous nucleic acid is transiently transfected into the somatic cell.

'917 Patent col. 21 ll. 16-24.

On May 13, 2022, Plaintiffs filed a complaint against Defendants, alleging claims for infringement of the '369 Patent, the '856 Patent, the '797 Patent, the '536 Patent, the '490 Patent, and the '917 Patent. (Doc. No. 1, Compl. ¶¶ 66-236.) On August 12, 2022, the Court issued a scheduling order. (Doc. No. 51.) On January 3, 2023, Plaintiffs filed a first amended complaint against Defendants, adding a claim for infringement of the '744 Patent. (Doc. No. 112, FAC ¶¶ 375-414.) On January 10, 2023, the Court issued an amended scheduling order. (Doc. No. 115.)

On February 14, 2023, Plaintiffs filed a supplemental first amended complaint – the operative complaint. (Doc. No. 162, Supp. FAC.) On February 17 and 23, 2023, Defendants filed answers and counterclaims to Plaintiffs' supplemental first amended complaint. (Doc. Nos. 184, 199.)

On February 28, 2023, (1) the Court issued a claim construction order construing agreed up and disputed claim terms from the asserted patents; (2) the Court issued an order denying Plaintiffs' motion to compel without prejudice; and (3) the Court denied as moot Defendants' motion to strike certain clarifications identified in the errata to the deposition of Defendant Shoreline Biosciences, Inc.'s expert Dr. Evan Snyder. (Doc. Nos. 208, 209, 210.) On March 27, 2023, the Court denied Shoreline's motion for partial summary judgment. (Doc. No. 226.) On March 30, 2023, the Court denied Defendants' partial motion to dismiss Plaintiffs' supplemental first amended complaint. (Doc. No. 234.)

By the present motion, Plaintiff moves for reconsideration of the Court's three

February 28, 2023 orders.  (Doc. Nos. 228-1, 231-1, 232-1.)  Specifically, Plaintiffs move for reconsideration of: (1) the Court's construction of the claim term "makes the cell more susceptible to reprogramming" contained in the Court's February 28, 2023 claim construction order (Doc. No. 232-1 at 1, 4, 12); (2) the Court's February 28, 2023 order denying Plaintiffs' motion to compel certain damages-related discovery without prejudice (Doc. No. 228-1 at 4-5, 18); and (3) the Court's February 28, 2023 order denying Plaintiffs' motion to strike as moot.  (Doc. No. 231-1 at 1, 4.)

## Discussion

## I.    Legal Standards Governing a Motion for Reconsideration

A motion for reconsideration in a patent case is governed by the law of the regional circuit, here, the Ninth Circuit.  See Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1379 (Fed. Cir. 2010).  Under Ninth Circuit law, a district court has inherent jurisdiction to modify, alter, or revoke a prior order.  United States v. Martin, 226 F.3d 1042, 1049 (9th Cir. 2000).  "Reconsideration [of a prior order] is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  School Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993); accord Smith v. Clark Cnty. Sch. Dist., 727 F.3d 950, 955 (9th Cir. 2013).

Reconsideration of a prior order is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."  Carroll v. Nakatani, 342 F.3d 934, 945 (9th Cir. 2003); accord Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 858–59 (9th Cir. 2022); see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir. 2009) ("'[A] motion for reconsideration should not be granted, absent highly unusual circumstances . . . .'");  Raiser v. San Diego Cnty., No. 19-CV-00751-GPC, 2021 WL 4751199, at *1 (S.D. Cal. Oct. 12, 2021) ("Motions for reconsideration are disfavored and should only be granted in narrow instances.").  A motion for reconsideration may not be used to relitigate old matters, or to raise arguments or present evidence for the first time that reasonably could have been raised earlier in the

litigation.  <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 486 n.5 (2008); <u>see</u> <u>Berman</u>, 30 F.4th at 859 ("Reconsideration motions may not be used to raise new arguments or introduce new evidence if, with reasonable diligence, the arguments and evidence could have been presented during consideration of the original ruling." (citing <u>Kona Enterprises, Inc. v. Estate of Bishop</u>, 229 F.3d 877, 890 (9th Cir. 2000)); <u>Williams v. Cnty. of San Diego</u>, 542 F. Supp. 3d 1070, 1071 (S.D. Cal. 2021) ("A motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before.").  "'A motion to reconsider is not another opportunity for the losing party to make its strongest case, reassert arguments, or revamp previously unmeritorious arguments.'" <u>Raiser</u>, 2021 WL 4751199, at *1; <u>see also</u> <u>Kilbourne v. Coca-Cola Co.</u>, No. 14CV984-MMA (BGS), 2015 WL 10943610, at *2 (S.D. Cal. Sept. 11, 2015) ("'[M]otions for reconsideration are not the proper vehicles for rehashing old arguments and are not intended to give an unhappy litigant one additional chance to sway the judge.'").  "A party seeking reconsideration must show more than a disagreement with the Court's decision." <u>United States v. Westlands Water Dist.</u>, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001); <u>accord</u> <u>Williams</u>, 542 F. Supp. 3d at 1071.

## II.    Plaintiffs' Motion for Reconsideration of the Court's February 28, 2023 Claim Construction Order

Plaintiffs move for reconsideration of the Court's February 28, 2023 claim construction order.  (Doc. No. 232-1.)  Specifically, Plaintiffs request that the Court reconsider its construction of the claim term "makes the cell more susceptible to reprogramming."  (<u>Id.</u> at 1, 4, 12.)  In response, Defendants argue that Plaintiffs' motion should be denied because Plaintiffs improperly seek to relitigate claim construction and Plaintiffs' arguments also fail on the merits in view of the intrinsic record.  (Doc. No. 241 at 1, 3-14.)

### A.    Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  <u>Teva Pharms. USA, Inc. v. Sandoz, Inc.</u>, 574 U.S. 318, 326 (2015); <u>Markman v. Westview Instruments, Inc.</u>,

517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  Teva, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"  Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'"  Id. (quoting Innova, 381 F.3d at 1116); see Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim

language itself'").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").  "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude.  That is the function and purpose of claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc).  Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence.  Phillips, 415 F.3d at 1317.  The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." Id.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Id.  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.  In addition, a court should also consult the prosecution history "so that the court can exclude any interpretation that was disclaimed during prosecution." Sorensen v. Int'l Trade Comm'n, 427 F.3d 1375, 1378 (Fed. Cir.

22-cv-00676-H-MSB

2005) (citing <u>Phillips</u>, 415 F.3d at 1317).

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. <u>See</u> <u>Vitronics</u>, 90 F.3d at 1583; <u>Teva</u>, 574 U.S. at 331; <u>see also</u> <u>Seabed Geosolutions (US) Inc. v. Magseis FF LLC</u>, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" <u>Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.</u>, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting <u>Phillips</u>, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. <u>Phillips</u>, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" <u>Genuine Enabling Tech. LLC v. Nintendo Co.</u>, 29 F.4th 1365, 1373 (Fed. Cir. 2022); <u>see also</u> <u>Summit 6, LLC v. Samsung Elecs. Co.</u>, 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." <u>Teva</u>, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." <u>O2 Micro</u>, 521 F.3d at 1362; <u>see also</u> <u>Eon Corp. IP Holdings v. Silver Spring Networks</u>, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'"). In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. <u>O2 Micro</u>, 521 F.3d at 1360; <u>Phillips</u>, 415 F.3d at 1314. But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary'

meaning does not resolve the parties' dispute." O2 Micro, 521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute.  Id. at 1362; Eon, 815 F.3d at 1318.

B.    Analysis

Plaintiffs request that the Court reconsider its construction of the claim term "makes the cell more susceptible to reprogramming."  (Doc. No. 232-1 at 1, 4, 12.)  In the Court's February 28, 2023 claim construction order, the Court construed the claim term "makes the cell more susceptible to reprogramming" as "primes the cell to improve the cloning efficiency of the subsequent reprogramming."  (Doc. No. 208 at 33.)  Plaintiffs argue that the Court should reconsider its construction of this claim term because the Court's construction is clearly erroneous and/or manifestly unjust.  (Doc. No. 232-1 at 5.)

Plaintiffs' motion is an attempt to reargue and relitigate the proper construction of the claim term "makes the cell more susceptible to reprogramming."  Plaintiffs' motion does not identify any new arguments or new evidence that could not have previously been presented to the Court during the claim construction phase of this case.  Rather, in the motion, Plaintiffs simply disagree with the Court's construction of the claim term "makes the cell more susceptible to reprogramming," and Plaintiffs attempt to re-argue the proper construction of that claim term based on revised and new arguments that could have been presented earlier.  This is improper, and this alone provides a sufficient basis to deny Plaintiffs' motion for reconsideration.  See Exxon Shipping, 554 U.S. at 486 n.5; Berman, 30 F.4th at 859; Williams, 542 F. Supp. 3d at 1071; Westlands Water Dist., 134 F. Supp. 2d at 1131; Raiser, 2021 WL 4751199, at *1.

Plaintiffs' attempt to relitigate claim construction is particularly improper here as Plaintiffs were given a full and fair opportunity to litigate the proper construction of the term "makes the cell more susceptible to reprogramming" during the claim construction phase of the case.  Claim construction in this case was performed pursuant to the Court's Patent Local Rules which provide for: the exchange of preliminary claim constructions and responsive claim constructions; the identification of extrinsic evidence; the filing of a joint

claim construction statement, chart, and worksheet; claim construction discovery; and the filing of opening and responsive claim construction briefs.  See S.D. Cal. Pat. L.R. 4.1-4.4. Further, although not required to do so, on February 22, 2023, the Court issued a 39-page tentative claim construction order – a full five days before the claim construction hearing in this case. (Doc. No. 192.)  The Court's tentative claim construction order contained not only all of the Court's tentative claim constructions; the tentative order also contained full analyses in support of those tentative constructions and any potential alternative constructions that the Court was considering.  (See id.)  The Court's tentative claim construction order contained 14 pages of analysis regarding the proper construction of the claim term "makes the cell more susceptible for reprogramming." (See id. at 20-34.)  The Court then held a claim construction hearing on February 27, 2023, providing the parties a full opportunity to argue before the Court their claim construction positions in light of the Court's analyses and tentative constructions.  (Doc. No. 205.)  At the hearing, the Court permitted the parties to use voluminous slide decks as part of their arguments to the Court, and the Court considered all the arguments and materials presented in those slides.[3]  And the only term argued at the hearing was the term "makes the cell more susceptible to reprogramming."  After considering all of the parties' arguments in their briefing and at the hearing and after considering the relevant portions of the record, the Court issued its February 28, 2023 claim construction order.  Under these circumstances, it is improper for Plaintiffs to seek a re-do and attempt to relitigate claim construction through this motion for reconsideration.

Plaintiffs note that the Federal Circuit has held that district courts may engage in rolling claim construction.  (Doc. No. 232-1 at 4-5.)  The Federal Circuit has recognized that "'district courts may engage in a rolling claim construction, in which the court revisits

---

[3]     The Court acknowledges that at the February 27, 2023 hearing, Plaintiffs' slides only addressed the pending motion for summary judgment.  But that was due to Plaintiffs' own choice to not prepare and present slides in support their claim construction arguments.

12

**Appx54**

and alters its interpretation of the claim terms as its understanding of the technology evolves.'" <u>Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.</u>, 599 F.3d 1308, 1316 (Fed. Cir. 2010); <u>accord</u> <u>Conoco, Inc. v. Energy & Env't Int'l, L.C.</u>, 460 F.3d 1349, 1359 (Fed. Cir. 2006). In addition, the Federal Circuit has explained that "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions . . . to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact." <u>In re Papst Licensing Digit. Camera Pat. Litig.</u>, 778 F.3d 1255, 1261 (Fed. Cir. 2015) (citing <u>O2 Micro</u>, 521 F.3d at 1359; <u>Pfizer, Inc. v. Teva Pharm., USA, Inc.</u>, 429 F.3d 1364, 1377 (Fed. Cir. 2005)). But this is not a situation where the Court's understanding of the relevant technology or the scope of the parties' dispute has evolved in light of subsequent arguments or evidence presented by the parties at summary judgment or at trial. This is a situation where one side, Plaintiffs, simply disagrees with the Court's claim construction order and seeks to reargue claim construction. This is not a proper basis for a motion for reconsideration. <u>See</u> <u>Exxon Shipping</u>, 554 U.S. at 486 n.5; <u>Berman</u>, 30 F.4th at 859; <u>Williams</u>, 542 F. Supp. 3d at 1071; <u>Westlands Water Dist.</u>, 134 F. Supp. 2d at 1131; <u>Raiser</u>, 2021 WL 4751199, at *1. As such, the Court denies Plaintiffs' motion for reconsideration on the grounds that it is an improper attempt to relitigate claim construction. <u>See</u> <u>id.</u>; <u>see, e.g.</u>, <u>Regents of Univ. of California v. Affymetrix, Inc.</u>, No. 17-CV-01394-H-NLS, 2018 WL 5617866, at *2 (S.D. Cal. Oct. 30, 2018) (denying motion for reconsideration of claim construction order where the motion was an improper attempt to reargue and relitigate claim construction).

Moreover, even if the Court were to consider the substantive arguments in the motion for reconsideration, Plaintiffs have not identified any error in the Court's construction of the claim term "makes the cell more susceptible to reprogramming," let alone clear error. Plaintiffs contend that the Court erred in finding a prosecution disclaimer. (Doc. No. 232-1 at 5-9; Doc. No. 250 at 1-3.) In construing the relevant claim term, the Court engaged in a detailed analysis of the prosecution history, found a prosecution disclaimer, and held that, as a result of that disclaimer, "the claims at issue are

limited to a method of 'priming' a somatic cell for reprogramming." (Doc. No. 208 at 30.) In reaching this holding, the Court primarily relied on the Federal Circuit's decisions in Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090 (Fed. Cir. 2013), and SandBox Logistics LLC v. Proppant Express Invs. LLC, 813 F. App'x 548 (Fed. Cir. 2020).[4] Plaintiffs have not identified any error in the Court's finding of a prosecution disclaimer.

Plaintiffs argue that the Court's finding of prosecution disclaimer was erroneous because "the Court incorrectly focused on what the Applicant did ***not*** say in response to an enablement rejection instead of what Applicant did say." (Doc. No. 232-1 at 6-7 (emphasis in original).)  Plaintiffs note that it is the applicant, not the examiner, who disclaims claim scope. (Id. at 7 (citing Innova/Pure Water, 381 F.3d at 1124; 3M Innovative Properties Co. v. Tredegar Corp., 725 F.3d 1315, 1332 (Fed. Cir. 2013)).)  See Arendi S.A.R.L. v. Google LLC, 882 F.3d 1132, 1135 (Fed. Cir. 2018) ("[I]t is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims.'" (quoting Sorensen, 427 F.3d at 1379))).  Plaintiffs' argument fails as it is based on a mischaracterization of the Court's analysis.  In finding a prosecution disclaimer, the Court not only relied on the examiner's enablement rejection; the examiner's statements in support of that rejection; and the applicant's amendments to the claims at issue in response to that rejection, the Court also relied on the applicant's express and affirmative citation to every instance in the April 11, 2014 office action where the examiner characterized the specification as disclosing a method of "priming" a somatic cell for reprogramming in an effort to support enablement of the amended claims.  (See Doc. No. 208 at 27-31; compare Doc. No. 113-5, Ex. B-32 at 5 (citing April 11, 2014 office action at "paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7") with Doc. No. 113-5, Ex. B-31 at 3, 4, 7).)  As such, the Court's finding of prosecution disclaimer focused

---

[4]     The Court also relied on the Federal Circuit's decisions in Ancora Techs., Inc. v. Apple, Inc., 744 F.3d 732, 739 (Fed. Cir. 2014), and TorPharm, Inc. v. Ranbaxy Pharm., Inc., 336 F.3d 1322, 1330 (Fed. Cir. 2003), and the district court decision in Oy v. Verizon Servs. Corp., No. CV 12-715-CJB, 2014 WL 7385615, at *12 (D. Del. Dec. 23, 2014).

on and relied on what applicant affirmatively said to the PTO through its citations.

Further, in Biogen, the Federal Circuit explained: "While disavowing statements must be 'so clear as to show reasonable clarity and deliberateness,' this requirement does not require the applicant to parrot back language used by the examiner when clearly and deliberately responding to a particular ground[] for rejection.  If an applicant chooses, she can challenge an examiner's characterization in order to avoid any chance for disclaimer, but the applicants in this case did not directly challenge the examiner's characterization." 713 F.3d at 1096 (quoting Omega Eng'g, Inc, v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003), and citing TorPharm, 336 F.3d at 1330); see also TorPharm, 336 F.3d at 1330 ("Whether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation, for there a court may need to ascertain exactly what subject matter was actually examined and allowed by the PTO. . . . Accordingly, in ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.  Such acquiescence may be found where the patentee narrows his or her claims by amendment or lets stand an examiner's restrictive interpretation of a claim." (citing Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 978–79 (Fed. Cir. 1999))); SandBox, 813 F. App'x at 554 ("SandBox's failure to challenge the Examiner's understanding amounts to a disclaimer."). Plaintiffs do not identify any passage in the intrinsic record where the applicant directly challenged the examiner's characterization of the specification as disclosing a method of "priming" a somatic cell for reprogramming.  Rather, the prosecution history contains affirmative citations by the applicant to that characterization by the examiner to support the patentability of the claims at issue.[5]

---

[5]    In reaching its holding in Biogen, the Federal Circuit expressly addressed the principle that it is applicant, not the examiner, who must disclaim claim scope, and the Federal Circuit explained:

> We are mindful that "it is the applicant, not the examiner, who must give up
> or disclaim subject matter that would otherwise fall within the scope of the

1    Plaintiffs assert that the applicant "did not simply 'cite[] to every instance where the

2    examiner characterized the specification as disclosing a method of 'priming' a somatic cell

3    for reprogramming' to thereby equate 'priming' with 'making a cell more susceptible to

4    reprogramming.'" (Doc. No. 232-1 at 7 (quoting Doc. No. 208 at 30).)  Plaintiffs note that

5    the applicant also cited to the examiner's acknowledgement "that the specification

6    'concludes that inducing Oct4 expression in somatic cells makes these cells more

7    susceptible to reprogramming.'" (Id. (comparing Doc. No. 113-5, Ex. B-32 at 5 with Doc.

8    No. 113-5, Ex. B-31 at 3).)  Plaintiffs contend that, in light of this, a plausible reading of

9    the prosecution history is "that 'priming' is an example of making a cell more susceptible

10   to reprogramming and that the claims may encompass, but are not limited to, 'priming.'"

11   (Id. at 7; see Doc. No. 250 at 2.)  The Court does not find this argument persuasive.  If the

12

13   ───────────────

14        claims."  Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381
        F.3d 1111, 1124 (Fed. Cir. 2004).  This case, however, differs markedly from
15       those frequently raising this admonition.  Those cases typically involve an
        applicant standing silent when confronted by statements made by the
16       examiner during prosecution, most often in the examiner's Statement of
        Reasons for Allowance.  See, e.g., Salazar v. Procter & Gamble Co., 414 F.3d
17       1342, 1345–47 (Fed. Cir. 2005); ACCO Brands, Inc. v. Micro Sec. Devices,
        Inc., 346 F.3d 1075, 1079 (Fed. Cir. 2003).  This case deals not only with
18       applicants letting stand an examiner's narrow characterization of a claim term,
        but also their adoption of that characterization to overcome the examiner's
19       enablement rejection.  Thus, the acquiescence cases are inapposite.  See
        TorPharm, 336 F.3d at 1330 ("[T]he public is entitled to equate an inventor's
20       acquiescence to the examiner's narrow view of patentable subject matter with
        abandonment of the rest.").
21

22   Biogen, 713 F.3d at 1097 n.6.  As in Biogen, "[t]his case deals not only with applicants

23   letting stand an examiner's narrow characterization of a claim term, but also their

24   [affirmative] adoption of that characterization to overcome the examiner's enablement

25   rejection."  Id.  As such, Plaintiffs' reliance on Innova/Pure Water and 3M is misplaced.

26   In addition, 3M is also easily distinguishable from the present case because in 3M the

27   accused infringer did not even assert that there was a prosecution disclaimer.  See 725 F.3d

28   at 1332 ("[Defendant] neither argues nor provides evidence of a disclaimer in the original

     prosecution or the reexamination.").

applicant was not equating "priming" with "making a cell more susceptible to reprogramming," then there would have been no need to cite to all three passages in the office action discussing "priming" to support the patentability of the amended claims. The applicant would have only needed to cite to the single passage where the examiner discusses the specification's conclusion that inducing Oct4 expression makes cells more susceptible to reprogramming. But that is not what happened. The applicant cited to all three of the examiner's statements characterizing the disclosed invention as a method of "priming," and the public and the Court are entitled to rely on those affirmative representations by the applicant regarding the scope of its invention. See DNA Genotek Inc. v. Spectrum Sols. L.L.C., No. 321CV00516RSHDDL, 2022 WL 17331255, at *21 (S.D. Cal. Nov. 29, 2022) ("The Federal Circuit has explained that the public and the Court are 'entitled to take the patentee at his word' regarding the scope of its invention." (quoting Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1350 (Fed. Cir. 2004); Honeywell Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006)); see also Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1360 (Fed. Cir. 2017) (explaining that claims should not be "'construed one way in order to obtain their allowance and in a different way against accused infringers'"). "While the applicants may not have repeated the examiner's language *verbatim et literatim*, it is clear that they were limiting their invention to what the examiner believed they enabled," Biogen, 713 F.3d at 1096, which here is a method of "priming" a somatic cell for reprogramming. (See Doc. No. 113-5, Ex. B-31 at 3-4, 7.)

Plaintiffs note that when the applicant amended the claims, the applicant explicitly chose not to include "priming" in the claim language, and, instead, the claims were amended to recite different language. (Doc. No. 232-1 at 7; Doc. No. 250 at 3.) This argument is not persuasive as it fails to meaningfully distinguish the present case from the Federal Circuit's decision in SandBox. In SandBox, the applicant explicitly amended the claims to recite a "bottom," and the applicant did not use the word "wall" in the amended claim language. See 813 F. App'x at 554. Nevertheless, in light of the relevant prosecution history, the Federal Circuit found a prosecution disclaimer and affirmed the district court's

construction of the term "bottom" as "bottom wall."  See id. at 554–55; see also Traxcell Techs., LLC v. Nokia Sols. & Networks Oy, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("'Prosecution disclaimer can arise from both claim amendments and arguments.'").

Plaintiffs also assert: "[T]he Court erred in importing an order of steps requirement ('subsequent reprogramming') based on disclaimer because the examiner's rejection and comments did not relate in any way to when Oct-4 is introduced to the cell in relation to when reprogramming occurs." (Doc. No. 232-1 at 8.)  Plaintiffs assert that "[t]here can be can be no clear and unmistakable disclaimer because the examiner never rejected the claims or made any comments related to the order of steps, nor did the applicant amend claims or make any argument to overcome such a rejection."  (Id. (citing Grober v. Mako Prods., Inc., 686 F.3d 1335, 1342 (Fed. Cir. 2012)); see Doc. No. 250 at 3-4.)  The Court rejects this argument as it is not based on an accurate characterization of the intrinsic record.  Specifically, it is inaccurate to state that the examiner and the applicant never made any comments related to the order of steps.  In the April 11, 2014 office action, the examiner characterized the specification as disclosing a method of "priming [a] somatic cell[] for reprogramming" three times, and when the applicant amended the claims, the applicant affirmatively cited to all three of those passages discussing "priming."  (See Doc. No. 113-5, Ex. B-31 at 3, 4, 7; Doc. No. 113-5, Ex. B-32 at 5.)  The common meaning of the verb "priming" is "[t]o make ready, prepare."  THE AMERICAN HERITAGE COLLEGE DICTIONARY at 1086 (3d ed. 1997); see also OXFORD LEARNER'S DICTIONARIES, https://www.oxfordlearnersdictionaries.com/us/    definition/american_english/prime_3 (defining the verb "prime" as "prime something to make something ready for use or action"), DICTIONARY.COM, https://www.dictionary. com/browse/prime (defining verb "prime" as "to prepare or make ready for a particular purpose or operation"); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/prime (defining the verb "prime" as "to supply with an essential prerequisite (such as a hormone, nucleic acid,

22-cv-00676-H-MSB

or antigen) for chemical or biological activity").[6]  Thus, that the examiner was describing a two-step process where you have an initial preparation step and then a subsequent "reprogramming" step is inherent in the examiner's use of the verb "priming" in the passages at issue.[7, 8]  And, again, the applicant expressly cited to all of those passages to support the patentability of the amended claims.

Plaintiffs continue to argue that the examiner merely found that the example in the specification showed that Oct-4 achieved an "additive" effect for reprogramming when other factors were also "present" in the oocyte; rather than some two-step process.  (Doc. No. 232-1 at 8 (citing Doc. No. 151-6, Ex. 5 at 16); Doc. No. 250 at 2; see also Doc. No.

---

[6]     The common meaning of the noun "prerequisite" is "something that is" "[r]equired or necessary as a prior condition."  THE AMERICAN HERITAGE COLLEGE DICTIONARY at 1081; see also OXFORD LEARNER'S DICTIONARIES https://www.oxfordlearnersdictionaries. com/us/definition/english/prerequisite_2 (defining the noun "prerequisite" as "something that must exist or happen before something else can happen or be done").

[7]     Claim construction discovery in this case is closed and has been since January 24, 2023.  (See Doc. No. 115 at 3.)  Plaintiffs have been on notice of Defendants' contention that the term at issue means "primes the cell for subsequent reprogramming" since at least December 5, 2022 when the parties filed their joint claim construction chart.  (See Doc. No. 90-1 at 22.)  Yet Plaintiffs chose to not provide the Court with any definitions of the verb "prime" or "priming" during claim construction.

[8]     Plaintiffs assert that "the most plausible reading of the prosecution history is that the Examiner was equating 'prim[ing]' with enhancing efficiency of reprogramming."  (Doc. No. 232-1 at 9.)  The correct, clear, and unambiguous reading of the prosecution history is that when the examiner uses the word "priming," she is referring to the two-step process described in the working example of the specification – the working example in the specification that both Plaintiffs' counsel and Plaintiffs' expert describe as an SCNT experiment involving a two-step process.  (See Doc. No. 218 at 12, 30; Doc. No. 232-3, Plath Decl. ¶¶ 8-9.)  In the April 11, 2014 office action, in the entire paragraph immediately preceding the first time the examiner uses the verb "priming," the examiner describes "the specific guidance" that the specification provides and entirely focuses on the working example of the specification and describes it as a two-step process.  (See Doc. No. 113-5, Ex. B-31 at 3 ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and *then* transferred into enucleated oocytes to produce[] nuclear transfer units." (emphasis added)).)

22-cv-00676-H-MSB

151 at 12-13; Doc. No. 179 at 2-3.)  The Court rejected this argument in the claim construction order, (see Doc. No. 208 at 31-32), and the Court again rejects this argument here.  By making this argument, Plaintiffs essentially request that the Court solely focus on the examiner's single statement regarding "Oct4 as an additive factor to reprogramming" and ignore the examiner's other multiple statements characterizing the specification as disclosing a method of "priming" a cell for reprogramming.  The Court declines to focus on that single statement out of context.  In evaluating prosecution disclaimer, the Court must read the examiner's statements in the "context" of "the full prosecution history." Biogen, 713 F.3d at 1096; see also CardSoft, (assignment for the Benefit of Creditors), LLC v. VeriFone, Inc., 807 F.3d 1346, 1350 (Fed. Cir. 2015) (explaining that claim terms are read "'in the context of the entire patent,' including the specification and the prosecution history" (quoting Phillips, 415 F.3d at 1313)).  Thus, the Court must consider all relevant statements in the prosecution history, and, importantly, it is not as if these statements are inconsistent with each other.  These statements are easily combined to reflect the examiner's understanding that the specification discloses a method of "priming" a somatic cell for reprogramming where the initial Oct-4 "priming" (i.e., the preparation/ conditioning) step provides an "additive factor" to the subsequent reprogramming step.[9]

---

[9]    The Court also notes that these statements when combined with others also reflect that the "additive factor" that the examiner is referring to is "enhanc[ing] nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."  (Doc. No. 113-5, Ex. B-31 at 8 ("[T]he experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."), 13 ("[T]he nuclear transfer experimental model is only informative to the impact of Oct4 exogenous expression on the degree of cloning efficiency or the degree reprogramming completeness or effectiveness upon the number of reprogrammed fibroblast nuclei."); see also Doc. No. 151-10, Ex. 9 at pp. 160 ("improving the efficiency of somatic cloning"), 178 ("improve cloning efficiency")).  In their motion for reconsideration, Plaintiffs assert that the Court's claim construction analysis improperly relies on "isolated statements" from the prosecution history.  (Doc. No. 232-1 at 1, 6.)  As shown by the above, it is the Court's analysis that seeks to interpret the claims within the "context" of "the full prosecution history."  See Biogen, 713 F.3d at 1096.  And it is

22-cv-00676-H-MSB

Plaintiffs also assert: "The Court . . . found support for the order of steps in the somatic cell nuclear transfer ('SCNT') experiment in the patent Example even though the record was devoid of evidence that a person of ordinary skill in the art ('POSA') would understand the Example in the same manner." (Doc. No. 232-1 at 1; see also id. at 9-11.) First, Plaintiffs are wrong, and the record was not devoid of evidence regarding how a POSITA would understand the SCNT experiment in the specification. The intrinsic record contains a September 19, 2011 office action, where the examiner explained: "The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were *first* treated with DOX to induce Oct4 expression *and then* use[d] in nuclear transfer." (Doc. No. 113-3, Ex. B-23 at 3 (emphasis added).) The intrinsic record also contains an August 20, 2013 office action and an April 11, 2014 office action, where in both the examiner explained: "The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and *then* transferred into enucleated oocytes to produce[] nuclear transfer units." (Doc. No. 113-2, Ex. B-11 at 4 (emphasis added); Doc. No. 113-5, Ex. B-31 at 3.) The Court relied on these statements and expressly cited to them in the Court's claim construction order. (See Doc. No. 208 at 31-32.) Statements by an examiner during the prosecution of a patent are evidence of how a POSITA would understand the invention.[10]

---

Plaintiffs who attempt rely on "isolated statements" from the prosecution history while entirely ignoring many others.

[10]     The prosecution history also contains statements from the inventors of the asserted patents describing the SCNT experiment as a two-step process, where the somatic donor nucleus is conditioned/modified (i.e., primed) "prior to" nuclear transfer. (See Doc. No. 151-10, Ex. 9 at pp. 160 ("[P]rimary somatic cells . . were . . . treated with Dox for 48 hours *prior to* nuclear transfer to transiently induce ectopic expression of Oct4." (emphasis added)), 168 (explaining that Oct-4 inducible mice were generated "[t]o modify the somatic donor nucleus *prior to* nuclear transfer in an effort facilitate epigenetic reprogramming and cloning efficiency" (emphasis added)), 169 ("The Oct4 inducible mouse strain will be used in an attempt to 'condition' a somatic donor nucleus so as to facilitate nuclear reprogramming and increase nuclear cloning efficiency.").) In so doing, the inventors also specifically explained that the duration of the DOX treatment has a material effect on

See 3M, 725 F.3d at 1332 (explaining that statements by an examiner during prosecution of a patent can be "representative of how one of skill in the art would understand the term"); Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1347 (Fed. Cir. 2005) ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."); Nitride Semiconductors Co. v. Lite-On Tech. Corp., No. W-21-CV-00183-ADA, 2022 WL 17347782, at *8 (W.D. Tex. Nov. 30, 2022) ("Examiner's prosecution statements are evidence of how the POSITA would understand this term.").

Second, the Court's construction of this claim term was also based on Plaintiffs' own explanation at the hearing of how a POSITA would understand the SCNT experiment. (See Doc. No. 108 at 32 n.15.) At the February 27, 2023 hearing, Plaintiffs explained the SCNT experiment in the specification as a two-step process where the experimenters first made sure that the "cell had Oct4 in it," and the experimenters then combined that cell with the oocyte in a "subsequent step" to perform the nuclear transfer and reprogram the cell. (See Doc. No. 218 at 30 ("A POSA understands that it was to make sure over that 24-hour period that the expression of the trans gene had enough time to generate Oct4 so that in this subsequent step, Oct4 was being put together with the oocyte."), 12 ("they wanted to make sure that that cell had Oct4 in it at the time that they combined it with the -- the oocyte"); see also id. at 3-4 (explaining that SCNT reprogramming happens when the somatic cell is

_____

"[o]ptimal gene activation levels." (See id. at pp. 173 ("Activation of the target gene will be accomplished by treating the animals or explanted fibroblasts with DOX . . . . Optimal gene activation levels will be achieved by altering *time* and treatment concentration of the drug." (emphasis added)), 178 ("[I]mportant parameters of this procedure such as concentration of DOX and *duration* of treatment have not yet been optimized." (emphasis added)).) The Federal Circuit has explained: "although inventor testimony cannot change the scope of the claims from their meaning at the time of invention, '[a]n inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims.'" Bradium Techs. LLC v. Iancu, 923 F.3d 1032, 1044 (Fed. Cir. 2019) (quoting Voice Techs. Grp., Inc. v. VMC Sys., Inc., 164 F.3d 605, 615 (Fed. Cir. 1999)).

22-cv-00676-H-MSB

fused with an egg cell that has had its genetic material removed, subsequently forming "a clone blastocyst").)   Further, even if the Court were to consider the declaration from Plaintiffs' expert submitted along with their motion for reconsideration, the declaration is consistent with that explanation and also describes it as a two-step process.[11]   (See Doc. No. 232-3, Plath Decl. ¶ 8 ("The expression was induced *prior to* fusion with the oocyte to ensure that Oct-4 was present at the time the nucleus was fused with the oocyte . . . ." (emphasis added)), ¶ 9 ("[I]t was necessary in that particular experiment to induce Oct-4 for several hours *prior to* the fusion because the expression of Oct-4 from the transgene is not immediate." (emphasis added)).)

Plaintiffs further assert: "It was also clear error to include the limitation 'improve cloning efficiency' in this construction because the specification is unambiguously directed to improving the efficiency of ES cell generation generally and makes no mention of 'cloning efficiency.'" (Doc. No. 232-1 at 1; see id. at 11; Doc. No. 250 at 4-6.)   In response, Defendants argue: "Plaintiffs asked for inclusion of 'efficiency' during claim construction, but, as the Court made clear, ignored what type of 'efficiency' the specification disclosed. Having requested 'efficiency' as part of [its proposed] construction, Plaintiffs should not now be heard to object that the Court clarified their own proposed added limitation." (Doc. No. 241 at 12 (citation omitted).)   The Court agrees with Defendants.

At claim construction, Plaintiffs directed the Court to statements in the specification

---

[11]   The Court also notes that Plaintiffs' counsel's and Plaintiffs' expert's explanation of the SCNT experiment in the specification is also consistent with the common meaning of the verb "prime."   Both Plaintiffs' counsel and Plaintiffs' expert describe the SCNT experiment as a process where the cell was primed (i.e., prepared/conditioned) by inducing Oct4 expression "prior to" the "subsequent step" of nuclear transfer/fusion (i.e., nuclear transfer reprogramming).   (Doc. No. 218 at 30; Doc. No. 232-3, Plath Decl. ¶¶ 8, 9.)   And that is consistent with how the examiner and the inventors described the SCNT experiment. (See Doc. No. 113-3, Ex. B-23 at 3 ("The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were *first* treated with DOX to induce Oct4 expression *and then* use[d] in nuclear transfer." (emphasis added)); Doc. No. 113-5, Ex. B-31 at 3; Doc. No. 151-10, Ex. 9 at pp. 160-61, 168-69, 173, 178.)

and the prosecution history discussing "efficiency," and Plaintiffs asserted that the claim term "makes the cell more susceptible to reprogramming" should be interpreted based on those passages.  (See Doc. No. 151 at 10-11; Doc. No. 179 at 1-2.)  As explained in the claim construction order, Plaintiffs failed to read those statements in their proper context.  (See Doc. No. 208 at 22-26.)  And Plaintiffs continue to fail to read those statements in their proper context.

Contrary to Plaintiffs' assertions, those passages do not discuss improving the efficiency of ES cell generation generally.  Rather, every statement in the specification and the prosecution history regarding efficiency identified by Plaintiffs describes either "blastocyst formation and ES cell derivation" efficiency, "nuclear transfer cloning efficiency," or "cloning efficiency."  See '369 Patent col. 19 ll. 29-30, col. 19 ll. 64-66.  (See Doc. No. 113-5, Ex. B-31 at 3-4, 8, 12-13; see also Doc. No. 208 at 22-26; Doc. No. 151-14, Plath Decl. ¶ 52 (Plaintiffs' expert testifying: "As shown in Table 1, blastocyst formation and embryonic (ES) cell derivation are more efficient from Oct4 induced fibroblasts than from uninduced fibroblast . . . .").)  In addition, the prosecution history contains a declaration under 37 C.F.R. § 1.131 from the inventors of the asserted patents, Drs. Jaenisch and Hochedlinger.  (Doc. No. 151-10, Ex. 9.)  Applicant submitted this § 1.131 declaration to the PTO in an effort to support enablement of the method claims at issue in the examiner's April 11, 2014 office action.[12]  (See Doc. No. 113-4, Ex. B-29 at 5-7.)  In the declaration, the inventors describe the SCNT experiment referenced in the specification as being related to "improving the efficiency of somatic cloning" and "to assess reprogramming by cloning efficiency."  (Doc. No. 151-10, Ex. 9 at p. 160; see also id. at pp. 165 ("improve cloning efficiency"), 168 ("improve cloning efficiency"), 169

---

[12]    Plaintiffs note that the declaration was provided in response to an enablement rejection, not a prior art rejection.  (Doc. No. 250 at 4.)  Regardless of whether it was in response to an enablement rejection or a prior art rejection, the declaration at issue was submitted to the PTO in an effort to demonstrate the patentability of the claims at issue.  (See Doc. No. 113-4, Ex. B-29 at 5-7.)

22-cv-00676-H-MSB

("increase nuclear cloning efficiency"), 171 ("Development of clones is inefficient"), 171 ("the efficiency of somatic cloning might be substantially improved"), 171 ("improve the efficiency of nuclear cloning"), 175 ("[c]loning efficiency will be tested"), 178 ("improve nuclear cloning efficiency"), 178 ("improve cloning efficiency"), 178 ("increase overall cloning efficiency").) See Phillips, 415 F.3d at 1317 ("[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent."); see, e.g., Bradium, 923 F.3d at 1044 (affirming claim construction that was "consistent with the testimony of the inventor").

At the claim construction hearing, Plaintiffs conceded that the words "blastocyst" and "cloning" "are unique to SCNT."[13]  (Doc. No. 218 at 18 ("[T]he problem that we have with the Court's tentative constructions is that they read into the claim -- some of them seem to recognize this concept of improved efficiency, but they read into the claims words . . . that are unique to SCNT, things like blastocyst or cloning . . . ."); see also id. at 17 (explaining that "blastocyst formation" is "specific to the particular technique . . . SCNT").) And, as the Court explained to Plaintiffs in the claim construction order, context matters. See Phillips, 415 F.3d at 1313; CardSoft, 807 F.3d at 1350; Biogen, 713 F.3d at 1096.  That the efficiency at issue was consistently described in the intrinsic record within the specific context of SCNT is important because both the specification of the asserted patents and Plaintiffs' own presentation at the February 27, 2023 hearing make clear that SCNT is very

---

[13]    Consistent with Plaintiffs' representation at the hearing that "cloning" is unique to SCNT, the examiner used the phrases "nuclear transfer cloning efficiency" and "cloning efficiency" interchangeably. (Compare Doc. No. 113-5, Ex. B-31 at 8 ("cloning efficiency is increased") with id. at 8 ("enhances nuclear transfer cloning efficiency").)  In addition, the inventors of the asserted patents used the phrases "nuclear cloning efficiency" and "cloning efficiency" interchangeably.  (Compare Doc. No. 151-10, Ex. 9 at p. 168 ("improve cloning efficiency"); with id. at p. 169 ("increase nuclear cloning efficiency"); compare id. at p. 178 ("improve nuclear cloning efficiency") with id. at p. 178 ("improve cloning efficiency").)

22-cv-00676-H-MSB

different than direct reprogramming.[14]  See '369 Patent col. 1 ll. 46-55, col. 2 ll. 4-13, col. 3 ll. 60-67, col. 4 ll. 30-32.  (See Doc. No. 218 at 3-6 (explaining the differences between SCNT and direct reprogramming and asserting that "[d]irect reprogramming is a different technique").)[15]

Plaintiffs argue that the Court erred in including "cloning efficiency" in its claim construction because it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.  (Doc. No. 232-1 at 11; Doc. No. 250 at 5.)  The Federal Circuit has held in many cases that "'it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication

---

[14]     The Court notes that Plaintiffs have not identified any passage in the intrinsic record where "efficiency" is discussed in the context of direct reprogramming.

[15]     For example, Plaintiffs described SCNT as "an old technique for reprogramming" that is an "incredibly difficult challenging technical technique that can only be done by a handful of labs in the world."  (Doc. No. 218 at 3.)  Plaintiffs then described the technique of SCNT as taking "a somatic cell" and either: (1) taking the nucleus out of that somatic cell and "put[ting] it into an egg cell" that has had its "genetic material removed;" or (2) taking "the entire somatic cell" and "fus[ing] it together with an egg cell" that has had its genetic material removed.  (Id.)  Either method then "creates, in effect, a fertilized egg cell."  (Id. at 4.)  See also '369 Patent col. 1 ll. 46-55, col. 2 ll. 4-11(describing the technique of SCNT and referring to it as a method that "depend[s] on controversial sources" such as "embryos (either created naturally or via cloning)").

Plaintiffs contrasted that technique with "[d]irect reprogramming" which according to Plaintiffs has "much more commercial appeal and universal applicability."  (Doc. No. 218 at 4.)  Plaintiffs described the technique of direct reprogramming as including the following steps: taking somatic cells and inserting DNA that encodes certain proteins "collectively called the Yamanaka factors;" then allowing the cells "to express the[] transcription factors in [a] first step;" then transferring the cells into "a priming medium;" and then "transfer[ring] them to the reprogramming step where the mediums change."  (Id. at 5.)  See also '369 Patent col. 3 ll. 60-67 (describing "directly" reprogramming as reprogramming that does not use "oocytes and nuclear transfer technology" and does not use "controversial sources").

**Appx68**

in the intrinsic record that the patentee intended the claims to be so limited.'" <u>Dealertrack</u>, 674 F.3d at 1327; <u>accord</u> <u>Openwave</u>, 808 F.3d at 514.  But the Court again notes that it was Plaintiffs that asserted that the claim term "makes the cell more susceptible to reprogramming" should be interpreted based on passages in the specification and the prosecution history discussing "efficiency." (<u>See</u> Doc. No. 151 at 10-11; Doc. No. 179 at 1-2.)  The claims at issue do not contain the phrase "improve the efficiency."  <u>See</u> '865 Patent col. 20 ll. 38-44; '917 Patent col. 21 ll. 16-17.  As such, by proposing their construction for this claim term, Plaintiffs sought to read in an "improve the efficiency" limitation from the specification and prosecution history into the claims, meaning that Plaintiffs recognized that this was an appropriate situation to read in material from the specification and prosecution history into the claims.  However, Plaintiffs did not receive the precise "efficiency" limitation that they wanted when the Court construed the claim term because the intrinsic record did not provide support for such a broad limitation.  Rather, the intrinsic record only supported the inclusion of an "efficiency" limitation related to "blastocyst formation and ES cell derivation" efficiency, "nuclear transfer cloning efficiency," and "cloning efficiency," which are all specific to SCNT.[16]  As such, narrowing Plaintiffs' proposed construction to only encompass "cloning efficiency" was necessary to tether the claims to what the intrinsic record indicates the inventors actually invented.[17]  <u>See</u> <u>Medicines Co. v. Mylan, Inc.</u>, 853 F.3d 1296, 1309 (Fed. Cir. 2017)

---

[16]   That the Court lists these out as three efficiencies should not be taken to imply that they are indeed three different types of efficiencies.  Indeed, as noted elsewhere, both the examiner and the inventors used the phrases "nuclear [transfer] cloning efficiency" and "cloning efficiency" interchangeably.  (<u>See, e.g.</u>, Doc. No. 113-5, Ex. B-31 at 8; Doc. No. 151-10, Ex. 9 at p. 168-69, 178.)

[17]   In their motion for reconsideration, Plaintiffs take issue with the fact that the specific phrase "cloning efficiency" is not expressly contained in the specification.  (<u>See</u> Doc. No. 232-1 at 11; Doc. No. 250 at 4-5.)  As explained above and in the February 28, 2023 claim construction order, the phrase "cloning efficiency" is contained throughout the relevant prosecution history.  Further, in the Court's tentative claim construction order, the Court also proposed construing the claim term "as improves higher blastocyst formation and

1   ("[C]onstruing 'efficiently mixing' to incorporate the efficient mixing conditions of

2   Example 5 is necessary to 'tether the claims to what the specification[] indicate[s] the

3   inventor actually invented.'" (quoting <u>Retractable Techs., Inc. v. Becton, Dickinson & Co.</u>,

4   653 F.3d 1296, 1305 (Fed. Cir. 2011))).  As such, Plaintiffs have failed to demonstrate any

5   error in the Court's inclusion of the phrase "improve cloning efficiency" in its construction

6   for the term "makes the cell more susceptible to reprogramming."

7        In sum, Plaintiffs' motion for reconsideration is improper and fails to present any

8   basis for the Court to alter its construction of the claim term "makes the cell more

9   susceptible to reprogramming."    Plaintiffs' disagreement with the Court's claim

10  construction is not a basis for a motion for reconsideration.  <u>See</u> <u>Williams</u>, 542 F. Supp. 3d

11  at 1071; <u>Westlands Water Dist.</u>, 134 F. Supp. 2d at 1131; <u>Raiser</u>, 2021 WL 4751199, at *1;

12  <u>Kilbourne</u>, 2015 WL 10943610, at *2; <u>Regents of Univ. of Cal.</u>, 2018 WL 5617866, at *2.

13  As such, the Court denies Plaintiffs' motions for reconsideration of the Court's February

14  28, 2023 claim construction order.

15  **III.  Plaintiffs' Motion for Reconsideration of the Court's February 28, 2023**

16       **Discovery Order**

17       Plaintiffs move for reconsideration of the Court's February 28, 2023 order denying

18  their motion to compel without prejudice.  (Doc. No. 228-1 at 4-5, 18.)  Specifically,

19  Plaintiffs request that the Court reconsider its denial of Plaintiffs' requests for certain

20  damages-related discovery.  (<u>Id.</u> at 4, 11-18.)  In response, Defendants argue that Plaintiffs'

21  motion should be denied because the Court correctly denied Plaintiffs' overbroad discovery

22  requests in an attempt to support a baseless damages model.  (Doc. No. 242 at 1, 2-5.)

23

24  embryonic stem cell derivation efficiency."  (Doc. No. 192 at 25 n.13.)  This alternative

25  proposed construction was derived directly from the specification's discussion of

26  "blastocyst formation and ES cell derivation" efficiency.  '369 Patent col. 19 ll. 29-30, col.

27  19 ll. 64-66.  But at the February 27, 2023 claim construction hearing, Plaintiffs did not

28  express a preference for that proposed construction over the one the Court adopted and

    included in its construction for the claim term "makes the cell more susceptible to

    reprogramming."

Federal Rule of Civil Procedure 26(b)(1) provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). "'The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" Thai v. Cnty. of Los Angeles, No. 15CV583-WQH (NLS), 2022 WL 2873214, at *1 (S.D. Cal. July 21, 2022) (quoting Roberts v. Clark Cty. Sch. Dist., 312 F.R.D. 594, 603 (D. Nev. 2016)). "The fundamental principle of amended Rule 26(b)(1) is 'that lawyers must size and shape their discovery requests to the requisites of a case.' Both discovery and Rule 26 are intended to provide parties with 'efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery.'" Id. (quoting Roberts, 312 F.R.D. at 603); accord Lin v. Suavei, Inc., No. 3:20-CV-862-L-AHG, 2021 WL 6077621, at *1 (S.D. Cal. Dec. 23, 2021). "District courts have broad discretion in determining relevancy for discovery purposes." Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 635 (9th Cir. 2005); see also Laub v. U.S. Dep't of Interior, 342 F.3d 1080, 1093 (9th Cir. 2003) ("A district court is vested with broad discretion to permit or deny discovery.").

"'The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections.'" Williams v. Cnty. of San Diego, No. 17CV00815MMAJLB, 2019 WL 2330227, at *3 (S.D. Cal. May 31, 2019) (quoting Bryant v. Ochoa, No. 07cv200 JM (PCL), 2009 WL 1390794, at *1 (S.D. Cal. May 14, 2009)); accord Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer,

22-cv-00676-H-MSB

285 F.R.D. 481, 485 (N.D. Cal. 2012).

Plaintiffs argue that the Court erred in holding that its damages-related discovery requests were too broad. (Doc. No. 228-1 at 4.) Plaintiffs argue that the Court's holding was "clearly erroneous and/or manifestly unjust because it was not informed by Plaintiffs' damages contentions or any explanation by Plaintiffs as to how the requested information is relevant to the issues in the case." (Id. at 4, 11-12; see Doc. No. 252 at 1.) But in making this argument, Plaintiffs fail to consider that at the time the Court ruled on Plaintiffs' motion to compel, the Court had Plaintiffs' current infringement contentions (the January 4, 2023 infringement contentions), Plaintiffs' presentation and arguments at the February 27, 2023 hearing, and the Court's February 28, 2023 claim construction order. In light of these filings, Plaintiffs' damages-related discovery request was too broad, and Plaintiffs failed to make a sufficient showing of relevance.

The importance of the Court's claim construction order on the discovery issues in this case was explained in the Court's February 28, 2023 discovery order. (Doc. No. 209.) The Court explained:

> Once a district court has construed the relevant claim terms, and unless altered by that district court, those claim constructions are law of the case for purposes of trial. See Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009); Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1371 n.2 (Fed. Cir. 2007). No party may contradict the court's claim constructions. Exergen, 575 F.3d at 1321. As such, Plaintiffs' discovery requests in this case must be commensurate in scope with the scope of the asserted claims as construed by the Court. See, e.g., CellCast Techs., LLC v. United States, 152 Fed. Cl. 414, 432 (2021) ("A claim construction order heavily impacts, if not determines, the scope of the parties' discovery."); In re Papst Licensing GmbH & Co. KG Litig., 273 F.R.D. 339, 345 (D.D.C. 2011) ("'Limitations on the scope of discovery may be appropriate where the court already has construed the patent claims. Regardless of the timing of the claim construction, however, the parties should be prohibited from offering alternative constructions throughout the litigation and thereby expanding the scope of discovery.'"); Intervet, Inc. v. Merial Ltd., 252 F.R.D. 47, 50 (D.D.C. 2008).

(Id. at 2.) Plaintiffs' motion for reconsideration does not challenge this portion of the

**Appx72**

22-cv-00676-H-MSB

Court's February 28, 2023 order.  (See generally Doc. No. 228-1; Doc. No. 252.)

The Court's claim construction order impacted the scope of the damages-related discovery that Plaintiffs were requesting.  Plaintiffs explain that the requested damages-related discovery is based on Plaintiffs' damages contention that it is entitled to a reasonable royalty in the form of a lump-sum payment "'reflecting the value to Shoreline of using iPSCs at the time of first (or each) infringement.'"  (Doc. No. 228-1 at 6 (quoting Doc. No. 238, Ex. 2 at p. 12)); see also Doc. No. 238, Ex. 3 at pp. 28-29, Doc. No. 163.) Plaintiffs further contend: "In other words, because Shoreline can only exist based on its infringement of the Asserted Patents, a reasonable royalty to compensate Fate Therapeutics would be equal to some or all the financing Shoreline has or will receive as a result of Defendants' unauthorized exploitation of the Asserted Patents."  (Doc. No. 238, Ex. 2 at 10.)

"Upon a finding of infringement, [a] patentee is entitled to 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.'"  AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1329–30 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284).  "The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'"  VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009)); see Apple Inc. v. Wi-LAN Inc., 25 F.4th 960, 971 (Fed. Cir. 2022).

A reasonable royalty may be either a lump-sum payment or a running royalty payment.  See VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014); Pelican Int'l, Inc. v. Hobie Cat Co., No. 320CV02390RSHMSB, 2023 WL 2130379, at *21 (S.D. Cal. Feb. 10, 2023); DataQuill Ltd. v. High Tech Computer Corp., 887 F. Supp. 2d 999, 1020 (S.D. Cal. 2011).  "A lump-sum license is an up-front payment in full for the invention that involves uncertainty about 'whether the technology is commercially

successful or even used.'" DataQuill, 887 F. Supp. 2d at 1020 (quoting Lucent, 580 F.3d at 1326).

"A reasonable royalty analysis requires that 'the trial court . . . carefully tie proof of damages to the claimed invention's footprint in the market place.'" Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC, 879 F.3d 1332, 1350 (Fed. Cir. 2018) (quoting ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010)); accord VirnetX, 767 F.3d at 1327; LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012); see also AstraZeneca, 782 F.3d at 1344 ("[T]he royalty due for patent infringement should be the value of what was taken—the value of the use of the patented technology."). "[D]amages must be based on the scope of infringement." Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1321 (Fed. Cir. 2014); see Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd., 909 F.3d 398, 411 (Fed. Cir. 2018) ("A reasonable royalty 'cannot include activities that do not constitute patent infringement, as patent damages are limited to those "adequate to compensate for the infringement."'" (quoting AstraZeneca, 782 F.3d 1343)); see also LaserDynamics, 694 F.3d at 67 ("A damages theory must be based on 'sound economic and factual predicates.'").

As such, any damages-related discovery in this case must be commensurate with the scope of the claimed invention as construed by the Court and the scope of the asserted infringement. At the time the Court ruled on the Plaintiffs' motion to compel, the Court had received and reviewed Plaintiffs' January 4, 2023 infringement contentions, but those contentions did not incorporate or align with the Court's claim constructions. (See Doc. No. 197.) Nor could they since the contentions were generated prior to the Court issuing its claim construction order on February 28, 2023. (See Doc. No. 208.) Absent infringement contentions that aligned with the Court's claim constructions or a similar showing, Plaintiffs failed to provide a sufficient basis as to the relevance of the discovery

sought.[18] Cf. Phigenix, Inc. v. Genentech, Inc., 783 F. App'x 1014, 1018 (Fed. Cir. 2019) (explaining that Patent Local Rules "confin[e] discovery and trial preparation to information that is pertinent to the theories of the case"); Ameranth, Inc. v. Pizza Hut, Inc., No. 12CV1627 JLS NLS, 2013 WL 3894880, at *2 (S.D. Cal. July 26, 2013) (explaining that infringement contentions "'shape discovery'" (quoting Apple Inc. v. Samsung Elecs. Co., No. 12-CV-0630-LHK PSG, 2013 WL 3246094, at *3 (N.D. Cal. June 26, 2013)); Pelican Int'l, Inc. v. Hobie Cat Co., No. 320CV02390RSHMSB, 2023 WL 2127995, at *2 (S.D. Cal. Feb. 10, 2023) (explaining that the disclosures required by the Court's Patent Local Rules "'provide structure to discovery'" (quoting Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC, 411 F. Supp. 3d 975, 981 (N.D. Cal. 2019))).

Moreover, even if Plaintiffs had provided the Court with infringement contentions that aligned with the Court's claim constructions, Plaintiffs would have still failed to meet their burden to demonstrate that they are entitled to the broad damages-related discovery

---

[18]     Plaintiffs' failure to provide the Court with infringement contentions that align with the Court's claim construction is not insignificant here. Plaintiffs assert that they are entitled to damages "'reflecting the value to Shoreline of using iPSCs.'" (Doc. No. 228-1 at 6 (quoting Doc. No. 238, Ex. 2 at 10).) In this action, Plaintiffs allege that Shoreline's use of iPSCs infringes the asserted method patents under 35 U.S.C. § 271(g). (Doc. No. 162, Supp. FAC ¶¶ 211-14, 283-86, 356-59, 396-99.) All of the asserted method patents contain the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming." '856 Patent col. 20 ll. 38-39; '536 Patent col. 20 ll. 37-38; '744 Patent col. 21 ll. 14-15; '917 Patent col. 21 ll. 16-17, col. 22 ll. 6-7. The Court has construed the claim term "[makes / making / make] the [somatic] cell more susceptible to reprogramming" as "[primes / priming / prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming." (Doc. No. 208 at 33.)

Plaintiffs have failed to adequately explain to the Court how Shoreline's alleged use of iPSCs is within the scope of the asserted method claims as construed by the Court. Plaintiffs have explained to the Court that iPSCs are made via direct reprogramming. (See Doc. No. 162, Supp. FAC ¶¶ 31-32; Doc. No. 218 at 4-6.) Plaintiffs have also explained to the Court that the "cloning" is "unique to SCNT." (Doc. No. 218 at 18.) Plaintiffs have also explained to the Court that SCNT is "different" than direct reprogramming. (Id. at 4.) Further, the Court notes that Plaintiffs' January 4, 2023 infringement contentions made no reference to any alleged use by Defendants of SCNT. (See generally Doc. No. 197.)

that they were seeking in the February 16, 2023 joint filing. To support the relevance of its discovery requests, Plaintiffs cite to the Federal Circuit's decision in <u>Interactive Pictures Corp. v. Infinite Pictures, Inc.</u>, 274 F.3d 1371 (Fed. Cir. 2001), and <u>Roche Prods. v. Bolar Pharm. Co.</u>, 733 F.2d 858, 866 (Fed. Cir. 1984). (Doc. No. 228-1 at 15-16.) In <u>Interactive Pictures</u>, the Federal Circuit recognized that a reasonable royalty award of damages may be "premised on a lump sum royalty payment based on an infringer's expected sales." 274 F.3d at 1384. The Federal Circuit, thus, held that a business plan and projections for future sales from two months before infringement began was relevant to the hypothetical negotiation in the case. <u>See id.</u> at 1385; <u>see also</u> <u>Enplas</u>, 909 F.3d at 412 ("a jury may award a lump-sum, paid-in-full royalty . . . [b]ut that lump-sum must be based on an estimate of the extent of future sales of accused products" (citing <u>Lucent</u>, 580 F.3d at 1325)); <u>Summit 6</u>, 802 F.3d at 1296 (explaining that a method for estimating a reasonable royalty could utilize "focusing on the infringer's projections of profit for the infringing product" (citing <u>Lucent</u>, 580 F.3d at 1324)); <u>Lucent</u>, 580 F.3d at 1327 ("Parties agreeing to a lump-sum royalty agreement may, during the license negotiation, consider the expected or estimated usage (or, for devices, production) of a given invention, assuming proof is presented to support the expectation, because the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump-sum payment. Conversely, a minimally used feature, with all else being equal, will usually command a lower lump-sum payment.").

But, in the February 16, 2023 joint filing, Plaintiffs were not merely seeking discovery limited to business plans and projections of future sales/profits/usage of the allegedly infringing products. (<u>See</u> Doc. No. 163.) Rather, in the filing, Plaintiffs broadly requested "documents concerning [Shoreline's] valuation [and] investors."[19] (<u>Id.</u>) Further,

---

[19] Plaintiffs' reply brief contends that in the discovery requests at issue, they were merely seeking "Shoreline's own documents and communications provided to its investors that concern Shoreline's projected profits, projected market share, business and development plans, consumer demand, and other financial-related analyses in order to

in the February 16, 2023 joint filing, Plaintiffs specifically requested that the Court compel Shoreline to produce documents responsive to Plaintiffs' RFP Nos. 14 and 53, (id.), and Plaintiffs provided those RFPs to the Court. (Doc. No. 193-1, Ex. 1.) RFP No. 14 broadly requests: "All documents relating to or constituting communications with actual or prospective investors regarding SHORELINE." (Id. at 14.) RFP No. 53 requests: "All documents concerning any potential or actual investment, collaboration, or partnership with SHORELINE since January 1, 2020." (Id. at 19.) Those requests broadly seek all documents related to or concerning any investments in Shoreline and any partnership with Shoreline. The Federal Circuit's decisions in Interactive Pictures, Roche, Enplas, Summit 6, and Lucent do not provide support for such broad requests.[20] As such, the Court properly denied Plaintiffs' motion to compel as overbroad.

To support its discovery requests, Plaintiffs also cite to the decisions in Grain Processing Corp. v. Am. Maize-Prod. Co., 185 F.3d 1341 (Fed. Cir. 1999), and BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc., 687 F. Supp. 134 (S.D.N.Y. 1988). (See Doc. No. 228-1 at 16.) But Grain Processing and BIC are both decisions analyzing a lost profits theory of damages. See Grain Processing, 185 F.3d at 1349-53; BIC, 687 F. Supp. at 136-38. Here, Plaintiffs' discovery requests are based on a reasonable royalty theory of damages. (See Doc. No. 228-1 at 5-7.) A reasonable royalty theory of damages is not the same as a lost profits theory of damages. The Federal Circuit's decision in Grain Processing recognizes this. In Grain Processing, the Federal Circuit explained that § 284

procure investments." (Doc. No. 252 at 2; see id. at 1.) The Court notes that nothing in the February 16, 2023 joint filing says "projected profits," "projected market share," "business and development plans," "consumer demand," or "other financial-related analyses." (See Doc. No. 163.) Instead, the joint filing specifically says "valuation" and "investors." (Id.) If Plaintiffs wanted, for example, documents regarding Shoreline's "projected profits," then they should have said so in the February 16, 2023 joint filing.

[20] The Federal Circuit's decision in Roche simply recognizes that in some circumstances, monetary damages for a relatively brief period of infringement can still be "substantial." 733 F.2d at 866.

**Appx77**

"sets the floor for 'damages adequate to compensate for the infringement' as 'a reasonable royalty.'" 185 F.3d at 1352. But in order to be entitled to lost profits damages, a patentee must demonstrate "'but for' causation." Id. at 1353; see Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 875 F.3d 1369, 1380 (Fed. Cir. 2017) ("To recover lost profits, the patentee bears the burden of proof to show a 'reasonable probability that, 'but for' infringement, it would have made the sales that were made by the infringer.'"). Plaintiffs do not represent that they are seeking lost profits in this case or that they are prepared to demonstrate "but for" causation. As such, Plaintiffs' reliance on Grain Processing and BIC is misplaced.[21] See AstraZeneca AB, 782 F.3d at 1334 & n.3 (explaining that an argument that "would have been relevant in [a] lost profits case" was not relevant to the "reasonable royalty theory of damages" in the case).

Finally, in an effort to support their discovery requests, Plaintiffs provide the Court with their damages contentions, and the Court has reviewed them. In those contentions, Plaintiffs assert that in this case they would be entitled to a reasonable royalty "equal to some or all the financing Shoreline has or will receive as a result of Defendants' unauthorized exploitation of the Asserted Patents. Such damages would be based on how much outside investment Defendants received or will receive . . . ." (Doc. No. 238, Ex. 2 at p. 12; see also Doc. No. 238, Ex. 3 at p. 29 ("[A] potential reasonable royalty to compensate Plaintiffs would be equal to an amount based on the financing Shoreline has or will receive as a result of Defendants' unauthorized exploitation of the Asserted Patents."), p. 31 (asserting that "incremental benefits" "may be in the form of increased valuations [and] funding").) Plaintiffs contend: "Further discovery is necessary to understand how much outside investment Defendants received or will receive and what portion of that investment Fate Therapeutics is entitled to based on Defendants'

---

[21] Indeed, in their motion for reconsideration, Plaintiffs recognize that cases involving lost profits theories of damages are distinguishable from reasonable royalty cases. (See Doc. No. 228-1 at 16 ("DSU is readily distinguishable because that case concerned a lost profits theory of damages, not a reasonable royalty.").)

infringement."  (Doc. No. 238, Ex. 2 at p. 11; <u>see also</u> Doc. No. 238, Ex. 3 at p. 29.)  In their damages contentions and their motion for reconsideration, Plaintiffs provide no legal authority demonstrating that this is a cognizable theory of damages in a patent case. Plaintiffs do not cite to a single case holding that a patentee can be entitled to a portion of an accused infringer's financing/outside investments under a reasonable royalty theory of damages.  And Plaintiffs do not cite to a single case holding that an accused infringer's financing/investments or valuations can be relevant to a reasonable royalty analysis in any way.  As the party seeking the discovery, Plaintiffs bear the burden of demonstrating the relevance of the discovery sought.  <u>Williams</u>, 2019 WL 2330227, at *3.  Plaintiffs have failed to meet that burden.[22]

In sum, Plaintiffs have failed to identify any error in the Court's February 28, 2023 order denying their motion to compel without prejudice.[23]  As such, the Court denies Plaintiffs' motion for reconsideration of the Court's February 28, 2023 order denying their motion to compel without prejudice.

Further, the Court notes that the motion to compel was denied without prejudice,

---

[22]   Plaintiffs assert that they "should not be required to prove their damages theory before they can receive documents" identified as relevant in their damages contentions. (Doc. No. 228-1 at 15.)  The Court agrees that Plaintiffs should not be required to prove their damages theory at the discovery stage of the case.  However, requiring that Plaintiffs provide some legal authority demonstrating that their theory of damages is cognizable and demonstrating the relevance of the discovery sought is not making Plaintiffs "prove their damages theory."  If Plaintiffs want the requested damages-related discovery, then they need to provide the Court with some legal authority demonstrating its relevance.

[23]   Plaintiffs also assert that the Court erred in the February 28, 2023 discovery order by relying on case law related to the admissibility of evidence.  (Doc. No. 228-1 at 4, 12-16.)  Federal Rule of Civil Procedure 26(b)(1) provides: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Nevertheless, Rule 26(b)(1) also expressly provides that in determining the appropriate "scope of discovery," a court may consider "the importance of the discovery in resolving the issues." <u>Id.</u>  If discovery is ultimately going to be inadmissible, then that has an effect on its "importance" in the case.  Thus, it is still a factor in evaluating proportionality.

22-cv-00676-H-MSB

meaning that Plaintiffs were free to re-raise the issue with the Court if they narrowed their request or if subsequent developments gave them a basis to renew their motion to compel with the Court.[24]  But the Court also notes that if a party in this case seeks to renew a motion to compel in light of subsequent developments or a narrowed request, then both parties need to follow the procedures for raising discovery issues to this Court set forth in Paragraph 1 of the Court's January 10, 2023 amended scheduling order.  (See Doc. No. 115 at 3.)

## IV.  Plaintiffs' Motion for Reconsideration of the Court's February 28, 2023 Order Denying Plaintiffs' Motion to Strike

Plaintiffs move for reconsideration of the Court's February 28, 2023 order denying Plaintiffs' motion to strike as moot.  (Doc. No. 231-1 at 1, 4.)  In response, Defendants argue that Plaintiffs' motion should be denied because Plaintiffs fail to set forth any basis for reconsideration of the order.  (Doc. No. 242 at 1-2.)

During the claim construction phase of this case, Plaintiffs deposed Defendants' technical expert, Dr. Snyder.  (See Doc. No. 177-2, Prey Decl. Ex. A.)  Following his deposition, Dr. Snyder provided an errata sheet to his deposition.  (See Doc. No. 177-4, Prey Decl. Ex. C.)  On February 17, 2023, Plaintiffs filed a motion to strike certain clarifications identified in the errata to Dr. Snyder's deposition.  (Doc. No. 177.)

On February 22, 2023, the Court issued a tentative claim construction order.  (Doc. No. 192.)  In the tentative claim construction order, the Court acknowledged Plaintiffs' pending motion to strike, and the Court explained to the parties:  "The Court's tentative claim construction order does not cite to or rely on any testimony from Dr. Snyder's deposition. As such, the analysis in this tentative claim construction order is not implicated by the pending motion to strike."  (Id. at 39 n.18.)

---

[24]  Indeed, as shown by the above analysis, for example, the Court would have considered a properly presented request for Shoreline's "projected profits."  But that is not what Plaintiffs requested in the February 16, 2023 joint filing.  (See Doc. No. 163.)

On February 24, 2023, Shoreline filed a response in opposition to Plaintiffs' motion to strike. (Doc. No. 202.) In the opposition, Shoreline argued:

> There is also no reason to strike Dr. Snyder's errata because, as the Court recognized in its Tentative Claim Construction Order, the errata does not impact the Court's claim construction analysis. Dkt. No. 192 at 39 n.18. Thus, the concern in <u>Hambleton</u> that errata could be used to impact the outcome of a dispute does not justify striking the errata and makes Plaintiffs' motion moot.

(<u>Id.</u> at 8.)

On February 27, 2023, the Court held a claim construction hearing. (<u>See</u> Doc. No. 218.) At the February 27, 2023 hearing, the Court asked the parties: "If the Court doesn't rely on his deposition testimony [in the claim construction order], isn't the motion to strike moot?" (<u>Id.</u> at 29.) At the time, Defendants were arguing, and Defendants asserted that, in that situation, the motion to strike would be moot. (<u>Id.</u>) Shortly thereafter, the Court permitted Plaintiffs to respond to Defendants' arguments, and Plaintiffs did not address or contest Defendants' assertion that the motion to strike would be moot if the Court did not rely on Dr. Snyder's deposition testimony. (<u>See id.</u> at 29-32.)

Following the claim construction hearing, on February 28, 2023, the Court issued its claim construction order. (Doc. No. 208.) In the claim construction order, the Court again acknowledged the pending motion to strike, and the Court explained: "The Court's claim construction order does not cite to or rely on any testimony from Dr. Snyder's deposition. As such, the analysis in this claim construction order is not implicated by the pending motion to strike." (<u>Id.</u> at 40 n.19.) In light of this and Plaintiffs' acquiescence at the claim construction hearing on the mootness issue, the Court denied Plaintiffs' motion to strike as moot. (Doc. No. 210.)

In their motion for reconsideration, Plaintiffs do not identify any clear error by the Court in denying the motion to strike as moot. If Plaintiffs thought the motion to strike was not going to be mooted by the Court's claim construction order, then they should have said so at the February 27, 2023 hearing in response to the Court's direct question on that issue – not via a motion for reconsideration filed four weeks later. As such, the Court

denies Plaintiffs' motion for reconsideration of the Court's February 28, 2023 order denies Plaintiffs' motion to strike as moot.[25, 26]

<div align="center">

**<u>Conclusion</u>**

</div>

For the reasons above, the Court denies Plaintiffs' motions for reconsideration.

**IT IS SO ORDERED.**

DATED: April 19, 2023

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[25]    In their reply brief, Plaintiffs for the first time request that the Court strike the declaration from Dr. Snyder that was attached to Shoreline's opposition to Plaintiffs' motion to strike. (Doc. No. 251 at 2 n.2.) "Issues raised for the first time in [a] reply brief are waived." <u>Bazuaye v. I.N.S.</u>, 79 F.3d 118, 120 (9th Cir. 1996); <u>United States v. Gianelli</u>, 543 F.3d 1178, 1184 (9th Cir. 2008) ("arguments raised for the first time in a reply brief are generally considered waived"). As such, Plaintiffs' request to strike Dr. Snyder's declaration is waived, and the Court denies it.

[26]    Plaintiffs attached to one of their motions for reconsideration a declaration from their technical expert, Dr. Plath. (Doc. No. 232-3, Plath Decl.; <u>see also</u> Doc. No. 232-1 at 9.) Defendants argue that Dr. Plath's declaration should be stricken. (Doc. No. 241 at 3, 10-11.) The Court agrees that it was improper for Plaintiffs to attach this declaration to their motion for reconsideration because it is untimely claim construction discovery in violation of the deadline set forth in the Court's January 10, 2023 scheduling order. (<u>See</u> Doc. No. 115 at 3 (citing S.D. Cal. Pat. L.R. 4.3).) <u>See</u> Fed. R. Civ. P. 26(a)(2)(D) (stating that expert disclosures must be made "at the times and in the sequence that the court orders"). Nevertheless, the Court has denied the relevant motion for reconsideration. As such, the Court denies Defendants' motion to strike Dr. Plath's declaration as moot.

<div align="center">

40

**Appx82**

</div>

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11 FATE THERAPEUTICS, INC.; and | Case No.: 22-cv-00676-H-MSB |
| 12 WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, | **ORDER:** |
| 13          Plaintiffs, | **(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY** |
| 14 v. | **JUDGMENT; AND** |
| 15 SHORELINE BIOSCIENCES, INC., | |
| 16          Defendant. | [Doc. No. 290.] |
| 17 | |
| 18 | **(2) DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS MOOT** |
| 19 | |
| 20 | [Doc. No. 289.] |

21
22      On July 14, 2023, Defendant Shoreline Biosciences, Inc. ("Shoreline") filed a
23 motion for summary judgment, and Plaintiffs Fate Therapeutics, Inc. ("Fate") and
24 Whitehead Institute for Biomedical Research ("Whitehead") filed a motion for partial
25 summary judgment.  (Doc. Nos. 289, 290.)  On July 28, 2023, the parties filed their
26 respective responses in opposition.  (Doc. Nos. 307, 312.)  On August 4, 2023, the parties
27 filed their respective replies.  (Doc. Nos. 335, 340.)
28      The Court held a hearing on the matter on August 28, 2023.  Jonathan D. Ball, Rose

C. Prey, Giancarlo L. Scaccia, Danielle M. Zapata, Joseph T. Ergastolo, Jeffrey R. Colin, Ben Witte, Aimee Housinger, and Wen Xue appeared for Plaintiffs. Eric M. Acker, Michael A. Jacobs, Drew A. Hillier, and Regan Rundio appeared for Defendant Shoreline. For the reasons below, the Court grants Shoreline's motion for summary judgment, and the Court denies Plaintiffs' motion for partial summary judgment as moot.

## **Background**

In the present action, Plaintiffs assert claims for patent infringement under 35 U.S.C. §§ 271(a), (b), and (g) against Defendant Shoreline, alleging claims for infringement of U.S. Patent Nos. 8,071,369 ("the '369 Patent"), 8,932,856 ("the '856 Patent"), 8,951,797 ("the '797 Patent"), 8,940,536 ("the '536 Patent"), 9,169,490 ("the '490 Patent"), 10,457,917 ("the '917 Patent"), and 10,017,744 ("the '744 Patent") (collectively, "the asserted patents"). (Doc. No. 162, Supp. FAC ¶¶ 157-414.) Specifically, Plaintiffs allege that Shoreline makes, uses, sells, offers for sale, and/or imports induced pluripotent stem cells ("iPSCs") that infringe one or more claims of the asserted patents.[1, 2] (Id. ¶ 140; see, e.g., id. ¶¶ 162 ("Defendants' use of their 'iPSC-derived cell therapy manufacturing platform' infringed at least claim 1 of the '369 Patent."), 212 ("iPSCs used by Defendants to make at least the iPSC-derived natural kill (NK) cell platforms are made by a process

---

[1] Induced pluripotent stem cells ("iPSCs") "are pluripotent stem cells generated from somatic cells by reprogramming." (Doc. 162, Supp. FAC ¶ 31; see Doc. No. 184, Answer to Supp. FAC ¶ 31; see also Doc. No. 151-14, Plath Decl. ¶ 59; Doc. No. 152, Snyder Decl. ¶ 43.) "Four specific genes—cMYC, OCT3/4, SOX2 and KLF4—encoding transcription factors play a role in converting or reprogramming somatic cells into pluripotent stem cells." (Doc. 162, Supp. FAC ¶ 32; see Doc. No. 184, Answer to Supp. FAC ¶ 32; Doc. No. 199, Answer to Supp. FAC ¶ 32; see also Doc. No. 184, Counterclaims ¶ 43 ("iPSCs are generated in culture from somatic cells through the introduction of reprogramming factors that transform a somatic cell into a pluripotent state."); Doc. No. 152, Snyder Decl. ¶¶ 41, 43.)

[2] The asserted claims in this action are: claims 1-6, 8 and 9 of the '369 Patent; claims 1-7 of the '856 Patent; claims 1-6 and 8 of the '797 Patent; claims 1-10 and 12-17 of the '536 Patent; claims 1-6 and 8-10 of the '490 Patent; claims 1-18 of the '917 Patent; and claims 1-3 and 5-9 of the '744 Patent. (Doc. No. 354-7, Plath Decl. ¶ 1.)

**Appx84**

that comprises at least each step of claim 1 of the '856 Patent.").)

Plaintiff Whitehead is the owner via assignment of the patents-in-suit.  See U.S. Patent No. 8,071,369, at [73] (issued Dec. 6, 2011); U.S. Patent No. 8,932,856, at [73] (issued Jan. 13, 2015); U.S. Patent No. 8,951,797, at [73] (issued Feb. 10, 2015); U.S. Patent No. 8,940,536, at [73] (issued Jan. 27, 2015); U.S. Patent No. 9,169,490, at [73] (issued Oct. 27, 2015); U.S. Patent No. 10,017,744, at [73] (issued Jul. 10, 2018); U.S. Patent No. 10,457,917, at [73] (issued Oct. 29, 2019).  Plaintiffs allege that Fate is the exclusive licensee of the asserted patents.  (Doc. No. 162, Supp. FAC ¶¶ 16, 19.)

The '369 Patent is entitled "Compositions for reprogramming somatic cells" and was issued on December 6, 2011.  '369 Patent at [45], [54].  The '856 Patent is entitled "Methods for reprogramming somatic cells" and was issued on January 13, 2015.  '856 Patent at [45], [54].  The '797 Patent is entitled "Compositions for identifying reprogramming factors" and was issued on February 10, 2015.  '797 Patent at [45], [54]. The '536 Patent is entitled "Methods for making somatic cells more susceptible to reprogramming" and was issued on January 27, 2015.  '536 Patent at [45], [54].  The '490 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 27, 2015.  '490 Patent at [45], [54].   The '744 Patent is entitled "Methods for reprogramming somatic cells" and was issued on Jul. 10, 2018.  '744 Patent at [45], [54]. The '917 Patent is entitled "Methods for reprogramming somatic cells" and was issued on October 29, 2019.  '917 Patent at [45], [54].

The asserted patents are all related and all share a common specification.[3]  (See Doc. No. 149 at 5 & n.2; Doc. No. 151 at 2 & n.2 (the parties agreeing that the asserted patents all share the same specification); see also Doc. No. 162, Supp. FAC ¶ 132.)  The shared specification states that the disclosed invention is directed to "methods for reprogramming somatic cells to a less differentiated state."  '369 Patent col. 2 ll. 24-25; see also id. at [57]

---

[3]     The Court will cite to the '369 Patent's specification as the "shared specification" of the asserted patents.

**Appx85**

("The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells.").

The asserted composition patents are the '369 Patent, the '797 Patent, and the '490 Patent.  Independent claim 1 of the '369 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

'369 Patent col. 20 ll. 40-43.

Independent claim 1 of the '797 Patent claims:

A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding Oct 4, wherein the exogenously introduced nucleic acid increases Oct4 expression in the cell.

'797 Patent col. 20 ll. 40-43.

Independent claim 1 of the '490 Patent claims:

A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 expression comparable to the amount of Oct4 expression in an embryonic stem cell.

'490 Patent col. 20 ll. 39-41.

The asserted method patents are the '856 Patent, the '536 Patent, the '744 Patent, and the '917 Patent.  Independent claim 1 of the '856 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

'856 Patent col. 20 ll. 38-44.

Independent claim 1 of the '536 Patent claims:

A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more

4

susceptible to reprogramming to a less differentiated state.

'536 Patent col. 20 ll. 37-44.

Independent claim 1 of the '744 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising:

obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein;

wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state.

'744 Patent col. 21 ll. 14-23.

Independent claim 1 of the '917 Patent claims:

A method of making a somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming; and wherein the exogenous nucleic acid is transiently transfected into the somatic cell.

'917 Patent col. 21 ll. 16-24.

On May 13, 2022, Plaintiffs filed a complaint against Defendants Shoreline and Dan S. Kaufman, alleging claims for infringement of the '369 Patent, the '856 Patent, the '797 Patent, the '536 Patent, the '490 Patent, and the '917 Patent. (Doc. No. 1, Compl. ¶¶ 66-236.) On August 12, 2022, the Court issued a scheduling order. (Doc. No. 51.) On January 3, 2023, Plaintiffs filed a first amended complaint against Defendants, adding a claim for infringement of the '744 Patent. (Doc. No. 112, FAC ¶¶ 375-414.) On January 10, 2023, the Court issued an amended scheduling order. (Doc. No. 115.)

On February 14, 2023, Plaintiffs filed a supplemental first amended complaint – the operative complaint. (Doc. No. 162, Supp. FAC.) On February 17 and 23, 2023, Defendants filed answers and counterclaims to Plaintiffs' supplemental first amended complaint. (Doc. Nos. 184, 199.)

On February 28, 2023, the Court issued a claim construction order construing agreed up and disputed claim terms from the asserted patents.[4]  (Doc. No. 208.)  On March 27, 2023, the Court denied Shoreline's motion for partial summary judgment.  (Doc. No. 226.)  On March 30, 2023, the Court denied Defendants' partial motion to dismiss Plaintiffs' supplemental first amended complaint.  (Doc. No. 234.)  On June 9, 2023, the Court dismissed Defendant Kaufman from the action with prejudice pursuant to Plaintiffs' motion.  (Doc. No. 273.)

By the present motions for summary judgment, Defendant Shorelines moves for summary judgment of all of Plaintiffs' claims for patent infringement – Plaintiffs' claims for direct infringement under 35 U.S.C. § 271(g); Plaintiffs' claims for induced infringement under § 271(b); and Plaintiffs' claims for direct infringement under § 271(a).  (Doc. No. 354 at 1-2.)  In addition, Plaintiffs move for partial summary judgment of: (1) the underlying direct infringement of the '369 Patent by ThermoFisher in support of their claim for induced infringement under § 271(b); and (2) of certain affirmative defenses and certain counterclaims that the asserted method claims are invalid under 35 U.S.C. §§ 101, 102, and 103.  (Doc. No. 352-14 at 1-2, 7-15.)

## Discussion

## I.  Legal Standards

### A.  Legal Standards Governing Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Material facts are facts that, under the governing substantive law, may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient

---

[4]    On April 19, 2023, the Court denied Plaintiffs' motion for reconsideration of the Court's claim construction order.  (Doc. No. 255.)

evidence for a reasonable jury to return a verdict for the non-moving party. Id. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. Celotex, 477 U.S. at 323. A moving party without the ultimate burden of proof at trial can satisfy its burden in two ways: (1) by presenting "evidence negating an essential element of the nonmoving party's claim or defense;" or (2) by demonstrating "that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party establishes the absence of a genuine dispute as to any material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the court may consider other materials in the record not cited to by the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); see also Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010) ("[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact.'").

B.   Legal Standards Governing Patent Infringement

A patent infringement analysis proceeds in two steps. Niazi Licensing Corp. v. St. Jude Med. S.C., Inc., 30 F.4th 1339, 1350 (Fed. Cir. 2022); JVW Enterprises, Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1329 (Fed. Cir. 2005). In the first step, the court construes the asserted claims as a matter of law. See Niazi, 30 F.4th at 1351; JVW, 424 F.3d at 1329. In the second step, the factfinder compares the properly construed claims to the allegedly infringing device (for an apparatus claim) or the allegedly infringing act (for a method claim). See id.

"'The patentee bears the burden of proving infringement by a preponderance of the evidence.'" Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1314 (Fed. Cir. 2011); see Medtronic, Inc. v. Mirowski Fam. Ventures, LLC, 571 U.S. 191, 193 (2014) ("A patentee ordinarily bears the burden of proving infringement."). "To prove infringement, the plaintiff bears the burden of proof to show the presence of every element or its equivalent in the accused device [or process]." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1301 (Fed. Cir. 2011); accord Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1378 (Fed. Cir. 2011).

Under the doctrine of equivalents, "a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner–Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997); accord Eagle Pharms. Inc. v. Slayback Pharma LLC, 958 F.3d 1171, 1175 (Fed. Cir. 2020). The Federal Circuit "applies two articulations of the test for equivalence." Voda v. Cordis Corp., 536 F.3d 1311, 1326 (Fed. Cir. 2008) (citing Warner–Jenkinson, 520 U.S. at 21); see UCB, Inc. v. Watson Lab'ys Inc., 927 F.3d 1272, 1284 (Fed. Cir. 2019). Under the insubstantial differences test, "'[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial.'" UCB, 927 F.3d at 1284 (quoting Voda, 536 F.3d at 1326). "Alternatively, under the function-way-result test, an element in the accused device is

equivalent to a claim limitation if it 'performs substantially the same function in substantially the same way to obtain substantially the same result.'" Voda, 536 F.3d at 1326 (quoting Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1209–10 (Fed. Cir. 2001)); see Ajinomoto Co. v. Int'l Trade Comm'n, 932 F.3d 1342, 1356 (Fed. Cir. 2019). "Regardless how the equivalence test is articulated, 'the doctrine of equivalents must be applied to individual limitations of the claim, not to the invention as a whole.'" Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1357 (Fed. Cir. 2012) (quoting Warner–Jenkinson, 520 U.S. at 29).

"'Infringement, whether literal or under the doctrine of equivalents, is a question of fact.'" Advanced Steel Recovery, LLC v. X-Body Equip., Inc., 808 F.3d 1313, 1317 (Fed. Cir. 2015) (quoting Absolute Software, Inc. v. Stealth Signal, Inc., 659 F.3d 1121, 1129–30 (Fed. Cir. 2011)). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." Advanced Steel, 808 F.3d at 1317; see EMD Millipore Corp. v. AllPure Techs., Inc., 768 F.3d 1196, 1201 (Fed. Cir. 2014).

## II.   Plaintiffs' Claims for Direct Infringement Under 35 U.S.C. § 271(g)

In the operative complaint, Plaintiffs allege that Shoreline infringes the asserted method patents – the '856 Patent, the '536 Patent, the '744 Patent, and the '917 Patent – under 35 U.S.C. § 271(g). (Doc. No. 162, Supp. FAC ¶¶ 211-14, 283-86, 356-59, 396-99.) Shoreline moves for summary judgment that it does not infringe the asserted method patents under § 271(g) by using the accused iPSCs. (Doc. No. 351 at 8-23.)

Section 271(g) of the Patent Act provides:

Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for

infringement on account of the importation or other use, offer to sell, or sale of that product.  A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—

(1) it is materially changed by subsequent processes; or

(2) it becomes a trivial and nonessential component of another product.

35 U.S.C. § 271(g).  By its terms, "Section 271(g) prohibits the unauthorized importation into the United States, or sale or use within the United States, of a 'product which is made by a process patented in the United States.'"  Momenta Pharms., Inc. v. Teva Pharms. USA Inc., 809 F.3d 610, 615 (Fed. Cir. 2015) (quoting 35 U.S.C. § 271(g)) (emphasis removed); see Syngenta Crop Prot., LLC v. Willowood, LLC, 944 F.3d 1344, 1359 (Fed. Cir. 2019) (Section 271(g) "makes clear that the acts that give rise to liability under § 271(g) are the importation, offer for sale, sale, or use within this country of a product that was made by a process patented in the United States.").

Plaintiffs' claim for infringement under § 271(g) against Shoreline is based on Shoreline's purchase and use of certain iPSCs that were manufactured by third parties.  (See Doc. No. 162, Supp. FAC ¶¶ 211-14, 283-86, 356-59, 396-99; Doc. No. 354-24, Plath Expert Report ¶¶ 56-566.)  Shoreline argues that it does not infringe the asserted method claims because the accused iPSCs were not made using the required two-step "priming" process, and they were not made using somatic cell nuclear transfer ("SCNT").  (Doc. No. 351 at 8.)  All of the asserted method claims include within the claimed method the step of "[makes/making/make] the [somatic] cell more susceptible to reprogramming."  '856 Patent col. 20 ll. 43-44; '536 Patent col. 20 ll. 42-44, col. 20 ll. 61-63, col. 21 ll. 13-14; '744 Patent col. 21 ll. 22-23; '917 Patent col. 21 ll. 22-23, col. 22 ll. 12-13.  In the claim construction order, the Court construed that claim term as "[primes/priming/prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming."[5]  (Doc. No. 208 at 33.)

---

[5]     The Court subsequently denied Plaintiffs' motion for reconsideration of this claim construction.  (Doc. No. 255 at 11-28.)

22-cv-00676-H-MSB

The Court's claim construction for the claim term is two-part. First, as explained in the February 28, 2023 claim construction order and the April 19, 2023 order denying Plaintiffs' motion for reconsideration, the Court's claim construction requires a two-step process where there is an initial or antecedent "priming" step then a "subsequent reprogramming step." (See id. at 31-32; Doc. No. 255 at 18-23.) Second, the Court's claim construction requires that the "priming" step improve the "cloning efficiency" of the subsequent reprogramming step. (Doc. No. 208 at 22-26; Doc. No. 255 at 23-28.) Shoreline argues that the accused processes used to manufacture the iPSCs at issue do not satisfy either of these requirements contained in the Court's claim construction. (Doc. No. 351 at 8.) The Court addresses those two requirements in turn below.

A. The Two-Step Process of "Priming" and then "Reprogramming"

Shoreline argues that it does not infringe the asserted method claims under § 271(g) because no accused iPSC line was made using the two-step process required by the Court's claim construction. (Doc. No. 351 at 11.) In setting forth the relevant claim construction, the Court explained that the asserted method claims require a two-step process where there is an initial or antecedent "priming" step involving the induction of Oct4 expression and then a "subsequent reprogramming step." (See Doc. No. 208 at 31-32; Doc. No. 255 at 18-23.)

Shoreline argues that the reprogramming processes used by the iPSC manufacturers at issue do not satisfy the relevant two-step requirement because, in the processes at issue, Oct4 is added with other transcription factors in one step to initiate the reprogramming process. (Doc. No. 351 at 11-13.) In response, Plaintiffs argue that Shoreline's contention is merely semantic and without merit. (Doc. No. 354 at 10.) But in making this argument, Plaintiffs concede that Oct4 is used during the overall reprogramming processes at issue. (See Doc. No. 354 at 10 ("The reprogramming process still entails two steps: Oct4 first primes the somatic cell genome for subsequent reprogramming independent of the other transcription factors.").) Indeed, consistent with this, Plaintiffs' technical expert Dr. Plath describes the process of making iPSCs as a "two-step reprogramming process." (Doc. No.

354-7, Plath Decl. at pp. 23 ("1. Yamanaka's two-step reprogramming process"), 24 ("Dr. Kaufman's Articles Describe a Two-Step Reprogramming Process"), 26 ("Lonza's Infringing Two-Step Reprogramming Process"), 28 ("ThermoFisher's Infringing Two-Step Process").) Indeed, during her deposition, Dr. Plath explained that what she considered to be the "priming" step of the direct reprogramming process "is an essential step of the entire process" and "is the initial step of reprogramming." (Doc. No. 351-11, Plath Depo. at 430; see also Doc. No. 351-23, Plath Expert Report ¶¶ 223, 443, 490.)

In light of these concessions by Plaintiffs and their expert Dr. Plath, Plaintiffs cannot demonstrate that the iPSC reprogramming processes at issue satisfy the Court's claim construction for the relevant claim term. The Court's claim construction specifically requires that the induction of Oct4 expression occur prior to and be separate from the reprogramming process. (See Doc. No. 208 at 31-32; Doc. No. 255 at 18-23.) Plaintiffs and their expert concede that in the direct reprogramming processes at issue the induction of Oct4 occurs during the reprogramming process and is the initial step of the reprogramming process. As such, Plaintiffs cannot demonstrate infringement of the asserted method claims under § 271(g) as a matter of law. See Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1358 (Fed. Cir. 2012) ("'If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.'"); see also Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1363 (Fed. Cir. 2019) (explaining that a district court need not "credit an expert's testimony" regarding infringement when it is "clearly foreclosed by the district court's claim construction").[6]

Plaintiffs assert that infringement can be demonstrated because the direct reprogramming process entails two steps. (Doc. No. 354 at 10.) Plaintiffs further argue that whether one refers to "priming" with Oct4 as part of an overall process of

---

[6] Plaintiffs do not assert a theory of infringement under the doctrine of equivalents as to the two-step requirement portion of the Court's claim construction. (See Doc. No. 354 at 18 ("Plaintiffs rely on DOE only for the 'cloning efficiency' portion of the Court's construction of 'makes a cell more susceptible to reprogramming.'").)

22-cv-00676-H-MSB

reprogramming or refers to only the step after "priming" with Oct4 as reprogramming is "trivial" and "merely semantic."  (Id.; see also Doc. No. 354-7, Plath Decl. ¶ 45 ("Whether the entire two-step process or only the second step is styled 'reprogramming' is inconsequential . . . .").)  The Court disagrees.  A proper literal infringement analysis involves a comparison of the properly construes claims to the allegedly infringing process.  See Niazi, 30 F.4th at 1351; JVW, 424 F.3d at 1329.  Under that analysis, the precise meaning of words and the precise scope of the claims matter.  Under the Court's claim construction for the relevant claim term, the precise scope of the asserted method claims is that the relevant "priming" step must occur "prior to" the reprogramming step.  It does not matter that the direct reprogramming process overall can be described as a two-step process.  If the purported "priming" step occurs during the reprogramming processes – as Plaintiffs and their expert concede –, then the processes do not satisfy the Court's claim construction of the relevant claim term, meaning there is no literal infringement as a matter of law.

In sum, the accused direct reprogramming processes at issue do not satisfy the Court's claim construction for the claim term "[makes/making/make] the [somatic] cell more susceptible to reprogramming," and, therefore, Plaintiffs cannot establish infringement of the asserted method claims under § 271(g) as a matter of law.  As a result, Shoreline is entitled to summary judgment of Plaintiffs' § 271(g) claims for patent infringement.  See Presidio, 702 F.3d at 1358.

B.     "[primes/priming/prime] . . . to improve . . . cloning efficiency"

Shoreline also argues that it does not infringe the asserted method claims under § 271(g) because none of the accused cell lines were made by priming a somatic cell to improve "cloning efficiency."  (Doc. No. 351 at 13-21.)  In response, Plaintiffs argue that Defendants' motion for summary judgment on this ground should be denied because the "cloning efficiency" limitation contained in the Court's claim construction for the relevant claim term can be satisfied under the doctrine of equivalents.  (Doc. No. 354 at 12-27.)

As an initial matter, the Court rejects Plaintiffs' attempt to isolate the phrase "cloning

22-cv-00676-H-MSB

efficiency" and analyze infringement under the doctrine of equivalents as to only that specific phrase. The Supreme Court and the Federal Circuit have explained that "'the doctrine of equivalents must be applied to individual limitations of the claim.'" <u>Mirror Worlds</u>, 692 F.3d at 1357 (quoting <u>Warner–Jenkinson</u>, 520 U.S. at 29). Here, the relevant limitation is "[primes/priming/prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming." (Doc. No. 208 at 33.) It is not simply the phrase "cloning efficiency." As such, the Court will apply the doctrine of equivalents to that limitation as a whole.[7]

> i. <u>Exclusion From Scope of the Claims</u>

Shoreline argues that Plaintiffs' theory of infringement under the doctrine of equivalents fails as a matter of law because Plaintiffs cannot recapture subject matter that the Court has specifically held to be outside the scope of the claims. (Doc. No. 351 at 14-15.) The Court agrees.

The Federal Circuit has explained that the "the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." <u>Dolly, Inc. v. Spalding & Evenflo Companies, Inc.</u>, 16 F.3d 394, 400 (Fed. Cir. 1994); <u>accord</u> <u>Enzo Biochem Inc v. Applera Corp.</u>, 702 F. App'x 971, 977 (Fed. Cir. 2017). At claim construction, the parties thoroughly litigated the issue of whether the claim limitation at issue encompasses direct reprogramming. Indeed, this issue was directly addressed not only at the claim construction hearing but also through Plaintiffs' subsequent motion for reconsideration.

In both the claim construction order and the order denying Plaintiffs' motion for reconsideration, the Court specifically held that direct reprogramming is excluded from the scope of the claim term "[makes/making/make] the [somatic] cell more susceptible to

---

[7] At the summary judgment hearing, Plaintiffs stated that they did not think that it would matter if the Court analyzed infringement under the doctrine of equivalents using the broader limitation. (Doc. No. 385 at 34-35.)

reprogramming."  Indeed, in the April 19, 2023, order denying Plaintiffs' motion for reconsideration, the Court expressly held that the scope of the claims only encompassed "blastocyst formation and ES cell derivation" efficiency, "nuclear transfer cloning efficiency," and "cloning efficiency," which "are all specific to SCNT." (Doc. No. 255 at 27.)   And the Court expressly rejected Plaintiffs' contention that the claims could encompass "the efficiency of ES cell generation generally," which would include direct reprogramming processes.  (Id. at 23-26.)  The Court explained: "That the efficiency at issue was consistently described in the intrinsic record within the specific context of SCNT is important because both the specification of the asserted patents and Plaintiffs' own presentation at the February 27, 2023 [claim construction] hearing make clear that SCNT is very different than direct reprogramming."  (Id. at 25-26 (citing '369 Patent col. 1 ll. 46-55, col. 2 ll. 4-13, col. 3 ll. 60-67, col. 4 ll. 30-32; Doc. No. 218 at 3-6).)  In other words, both the specification of the asserted patents and Plaintiffs' presentation at the claim construction hearing make clear that using Oct4 during the direct reprogramming process is not equivalent to using Oct4 to prime a cell for subsequent SCNT reprogramming. Because the Court specifically held that direct reprogramming processes are excluded from the scope of the claims at issue, Plaintiffs cannot rely on the doctrine of equivalents to recapture that claim scope as a matter of law.  See Dolly, 16 F.3d at 400; Enzo, 702 F. App'x at 977.

Plaintiffs contend that the Federal Circuit cases cited above are inapplicable here because they merely "stand for the proposition that a patentee cannot resort to DOE to encompass a feature that is the opposite of the recited limitation."  (Doc. No. 354 at 12 (emphasis removed).)   The Court rejects Plaintiffs' erroneous attempt to narrow the holdings in Dolly and Enzo.  There is no discussion in either Dolly or Enzo regarding whether the accused product included a feature that is the "opposite" of the recited limitation.  Indeed, the word "opposite" is not even contained in either of those decisions. See generally Dolly, 16 F.3d at 396-400; Enzo, 702 F. App'x at 972-77.  Rather, those two decisions broadly hold that "the concept of equivalency cannot embrace a structure that is

specifically excluded from the scope of the claims." <u>Dolly</u>, 16 F.3d at 400; <u>accord</u> <u>Enzo</u>, 702 F. App'x at 977. As such, the Court rejects Plaintiffs' attempt to distinguish or narrow the holdings in <u>Dolly</u> and <u>Enzo</u>.[8]

Plaintiffs assert that the Federal Circuit has explained that subject matter is not "specifically excluded" from coverage under the doctrine of equivalents unless its inclusion is somehow inconsistent with the language of the claim. (Doc. No. 354 at 14 (citing <u>Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.</u>, 149 F.3d 1309, 1317 (Fed. Cir. 1998)).) <u>See also</u> <u>Augme Techs., Inc. v. Yahoo! Inc.</u>, 755 F.3d 1326, 1335 (Fed. Cir. 2014) ("[W]e have found 'specific exclusion' where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation."). The Court reiterates that both the specification of the asserted patents and Plaintiffs' own presentation at the claim construction hearing make clear that using Oct4 to prime a cell for the SCNT process is very different than using Oct4 during the direct reprogramming process. (<u>See</u> Doc. No. 205 at 25-26.) And it would be inconsistent with those statements in the specification and those prior statements made by Plaintiffs to permit the accused directed reprogramming processes to be equivalent to priming a cell to improve the cloning efficiency of the subsequent SCNT process as required by the Court's claim construction. In sum, Plaintiffs' theory of infringement under the doctrine of equivalents fails as a matter of law because the Court has expressly held that direct reprogramming methods are excluded from the scope of the asserted method claims.

/ / /

/ / /

_____

[8] Plaintiffs also note that the Federal Circuit's decision in <u>Enzo</u> is non-precedential. (Doc. No. 354 at 12.) The Court acknowledges that <u>Enzo</u> is an unpublished non-precedential decision from the Federal Circuit. But that is of no consequence because the Court may still rely on it as persuasive authority, and the Court finds the decision to be persuasive. In addition, the Court's analysis also relies on the Federal Circuit's decision in <u>Dolly</u>, which is a published opinion that is binding authority on this Court.

ii.     Prosecution History Estoppel

Shoreline also argues that Plaintiffs' theory of infringement under the doctrine of equivalents arguments is foreclosed by prosecution history estoppel. (Doc. No. 351 at 15-17.) In response, Plaintiffs argue that prosecution history estoppel does not bar their doctrine of equivalents arguments. (Doc. No. 354 at 15-19.)

"'Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution.'" Pharma Tech Sols., Inc. v. LifeScan, Inc., 942 F.3d 1372, 1380 (Fed. Cir. 2019) (quoting Trading Techs. Int'l, Inc. v. Open E Cry, LLC, 728 F.3d 1309, 1322 (Fed. Cir. 2013)); see Traxcell Techs., LLC v. Nokia Sols. & Networks Oy, 15 F.4th 1136, 1145 (Fed. Cir. 2021) ("If a patentee surrenders some scope during prosecution, that territory isn't available later as a doctrine-of-equivalents battleground."). Prosecution history estoppel can occur in two ways: either (1) by making a narrowing amendment to the claim ("amendment-based estoppel") or (2) by surrendering claim scope through argument to the patent examiner ("argument-based estoppel"). Pharma Tech, 942 F.3d at 1380. "The relevant inquiry is 'whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter.'" Traxcell, 15 F.4th at 1146 (quoting Amgen Inc. v. Coherus BioSciences Inc., 931 F.3d 1154, 1159 (Fed. Cir. 2019)).

"A narrowing amendment is presumed to be a surrender of all equivalents within 'the territory between the original claim and the amended claim.'" Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc., 967 F.3d 1353, 1364 (Fed. Cir. 2020) (quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 728 (2002)). "This presumption can be overcome if the patentee can show that one of the following 'exceptions' to prosecution history estoppel applies: (1) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; (2) the equivalent was unforeseeable at the time of the application; or (3) there was some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent." Id.

The Federal Circuit has explained that a court should "'review[] a patent family's entire prosecution history when applying . . . prosecution history estoppel.'" In re McDonald, 43 F.4th 1340, 1347 (Fed. Cir. 2022) (quoting MBO Lab'ys, Inc. v. Becton, Dickinson & Co., 602 F.3d 1306, 1318 (Fed. Cir. 2010)) ("'Because the rule against recapture and prosecution history estoppel both protect the public's interest in relying on a patent's prosecution history, we think equity requires a review of a patent family's prosecution history to protect against recapture in a reissue patent.'"). "Whether prosecution-history estoppel applies is a question of law." Traxcell, 15 F.4th at 1146.

As detailed in the Court's February 28, 2023 claim construction order, during the prosecution of the '536 Patent, the patentees attempted to obtain method claims encompassing "a method of reprogramming a primary somatic cell to a less differentiated state." (Doc. No. 152-4, Snyder Decl. Ex. 27 at 508-09; see also Doc. No. 208 at 27-29.) In an office action dated April 11, 2014, the examiner rejected these claims under 35 U.S.C. § 112 ¶ 1 for failure to comply with the enablement requirement. (Doc. No. 113-5, Ex. B-31 at 1-16; see also Doc. No. 113-3, Ex. B-23; Doc. No. 113-4, Ex. B-28.)  In providing the basis for these enablement rejections, the examiner explained:

> The specification provides specific guidance to the production of a transgenic mouse comprising in its genome an inducible exogenous Oct4 gene.  The specification provides specific guidance to the isolation of fibroblasts from said transgenic mouse and inducing Oct4 expression in said fibroblasts by treatment with deoxycycline.  The specification provides specific guidance to nuclear transfer experiments, wherein said fibroblasts were treated with DOX to induce Oct4 expression and then transferred into enucleated oocytes to produce nuclear transfer units.  The specification teaches that the nuclear transfer units were cultured to the blastocyst stage and ES cell were derived from the nuclear transfer units.  The specification further teaches that on average blastocyst formation and ES cell derivation is more efficient when Oct4 induced fibroblasts are used as compared to un-induced fibroblasts.  The specification thus concludes that inducing Oct4 expression in somatic cells makes these cells more susceptible to reprogramming.

> While the specification provides specific guidance to a means of priming somatic cells for reprogramming, the specification fails to provide any guidance to a method that predictably reprograms primary somatic cells

to a less differentiated state by solely introducing a nucleic acid encoding Oct4 to said somatic cell or by solely introducing an Oct4 protein into said somatic cell.  The specification fails to assess the differentiation status of the somatic cells after induction of Oct4 but before reprogramming the somatic cell by nuclear transfer.  As such, the specification has provided no evidence that alone the exogenous Oct4 in the cell is reprogramming the somatic cell to a less differentiated state.  The specification further fails to provide any teaching to the narrower embodiments of the claims encompassing introduction of Oct4 into an adult stem cell, such as hematopoietic stem cells, neural stem cells, or mesenchymal stem cells.  As such, the specification fails to demonstrate that introduction of Oct4 into such adult stem cells or any cells will predictably result in a less differentiated state as the claims require.

Thus, the specification fails to enable the instant claims because the invention disclosed by the specification is not commensurate in scope with the method of the claims. . . .

The specification provides specific guidance to a method of priming a somatic cell for reprogramming by introducing Oct4 activity into said somatic cell.  This cannot properly be interpreted as commensurate in scope with a method of reprogramming a somatic cell by solely introducing Oct4 because the specification fails to teach that Oct4 alone reprograms a cell.  As such, the specification fails to enable a method of reprogramming a cell to a less differentiated state by introduction of Oct4 because the specification fails to provide specific guidance to such embodiments and actually teaches an invention of a total different scope.

(Doc. No. 113-5, Ex. B-31 at 3-5 (emphasis in original) (citations omitted); see also id. at 7 ("[T]he specification describes a method of priming a somatic cell for reprogramming by solely introducing Oct4.").)  Here, in analyzing enablement, the examiner explained the scope of the invention disclosed in the shared specification and explained why that scope did not encompass a method of reprogramming a somatic cell to a less differentiated state by introduction of Oct4 alone.

In response to the examiner's enablement rejections, the patentees amended the claims at issue to claim a method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state. (Doc. No. 113-5, Ex. B-32; see also Doc. No. 151 at 6.)  For example, the patentees amended claim 1 of the application as follows:

1.      (Currently amended) A method of making ~~reprogramming~~ a primary

somatic cell <u>more susceptible to reprogramming</u> to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in <u>making</u> ~~reprogramming~~ the somatic cell <u>more susceptible to reprogramming</u> to a less differentiated state.

(Doc. No. 113-5, Ex. B-32 at 2 (underlining and strike outs in original).)  In providing these amendments, the patentees did not dispute the examiner's characterizations of the scope of the invention disclosed in the specification.  Rather, the patentees stated with respect to enablement:

Applicants submit that the presently claimed subject matter is enabled by the as-filed specification, as acknowledged by the Office in the Actions mailed August 20, 2013, and April 11, 2014.  *See* Office Action mailed April 11, 2014, last sentence of second paragraph of page 3, paragraph bridging pages 3-4, paragraph bridging pages 4-5, and first full paragraph of page 7.

Accordingly, this basis for rejection is now moot and properly withdraw.

(Id. at 5.)  The examiner allowed the claims as amended.  (See Doc. No. 113-5, Ex. B-33.)

In the claim construction order, the Court held that the above amendments and correspondence with the examiner constitute a prosecution disclaimer, and the Court held that, as a result of that disclaimer, "the claims at issue are limited to a method of 'priming' a somatic cell for reprogramming."  (Doc. No. 208 at 30 (citing <u>Biogen Idec, Inc. v. GlaxoSmithKline LLC</u>, 713 F.3d 1090 (Fed. Cir. 2013); <u>SandBox Logistics LLC v. Proppant Express Invs. LLC</u>, 813 F. App'x 548 (Fed. Cir. 2020)).  These amendments and disclaimer are also relevant to the Court's analysis of prosecution history estoppel.

Because the patentees amended the claims at issue in light of the examiner's enablement rejection, there is a presumption that the patentees surrendered "all equivalents within 'the territory between the original claim and the amended claim.'"  <u>Bio-Rad</u>, 967 F.3d at 1364 (quoting <u>Festo</u>, 535 U.S. at 728).  The original claim at issue encompassed reprogramming generally, including direct reprogramming.  (See Doc. No. 385 at 33 (Plaintiffs explaining: "Professor Jaenisch was attempting to get a claim that covered direct

reprogramming. And, to be clear, it's going to cover any form of reprogramming, direct or SCNT. He was trying to get a claim that was going to cover reprogramming using exogenous Oct4."), 65-66.) But that claim was rejected by the examiner on enablement grounds. Indeed, the examiner specifically stated that "the art at the time [of the invention] was not developed to the point of demonstrating any methods of direct reprogramming with pluripotency factors, let alone, solely the use of Oct4." (Doc. No. 113-5, Ex. B-31 at 5.) The claims as amended were narrowed to only encompass a two-step method of priming a cell to improve the cloning efficiency of the subsequent reprogramming step. (See Doc. No. 208 at 22-26, 31-32; Doc. No. 255 at 18-28.) As such, there is a presumption that by amending the claims in the above manner, the patentees surrendered any equivalent related to direct reprogramming, including any method of purportedly priming a cell to improve the efficiency of direct reprogramming.

Plaintiffs argue that Shoreline's prosecution history estoppel argument fails because the rationale for the amendments at issue only bore a tangential relation to the equivalent in question. (Doc. No. 354 at 16-19.) The presumption that a patentee has surrendered all equivalents within the territory of the original claim and the amended claims can be overcome if the patentee can show that "the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question." Bio-Rad, 967 F.3d at 1364. This criterion asks, in other words, "whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1369 (Fed. Cir. 2003). The inquiry "focuses on the patentee's objectively apparent reason for the narrowing amendment." Id. Plaintiffs cannot make the required showing for demonstrating a tangential relation.

Plaintiffs assert that the examiner's rejection focused on the lack of enablement for reprogramming with Oct4 alone. (Doc. No. 354 at 17.) Although the Court agrees with Plaintiffs that this was one of the issues that the examiner focused on in making her enablement rejection, it was not the only issue. The examiner also focused on the fact that "the art at the time [of the invention] was not developed to the point of demonstrating any

**Appx103**

methods of direct reprogramming with pluripotency factors, let alone, solely the use of Oct4." (Doc. No. 113-5, Ex. B-31 at 5.)  In addition, the narrowing amendments at issue were made in acquiescence to the examiner's repeated characterizations of the specification as disclosing only a method of "priming" a somatic cell to improve the cloning efficiency of the subsequent SCNT reprogramming.  (See id. at 4 ("The specification provides specific guidance to a method of priming a somatic cell for reprogramming by introducing Oct4 activity into said somatic cell"), 7 ("The specification describes a method of priming a somatic cell for reprogramming by solely using Oct4"), 8 ("[T]he experiments described in the specification . . . solely demonstrate[] that addition of Oct4 expression enhances nuclear transfer cloning efficiency and nuclear transfer's reprogramming process."), 13 ("[T]he nuclear transfer experimental model is only informative to the impact of Oct4 exogenous expression on the degree of cloning efficiency or the degree reprogramming completeness or effectiveness upon the number of reprogrammed fibroblast nuclei."); see also Doc. No. 255 at 18-28.)  Because the equivalent in question is an attempt to expand the claim beyond SCNT and cloning efficiency and to instead encompass a method of using Oct4 during the direct reprogramming process, it is directly related to the narrowing amendments and the prosecution history at issue.  As a result, prosecution history estoppel applies and bars Plaintiffs' theory of infringement under the doctrine of equivalents as to the "[makes/making/make] the [somatic] cell more susceptible to reprogramming" claim limitation.

Plaintiffs argue that Shoreline's prosecution history estoppel argument is faulty because Shoreline ignores that the earlier-issued '856 Patent always included the "making a cell more susceptible to reprogramming" limitation.  (Doc. No. 354 at 15.)  Plaintiffs further state that Shoreline's motion fails to explain how the amendments in the later '536 Patent estop Plaintiff from relying on the doctrine of equivalents for the '856 Patent.  (Id.) That the claims of the '856 patent were never amended and issued before the '536 Patent is of no consequence.  The Federal Circuit has explained that a court should review "'a

patent family's entire prosecution history'" when applying prosecution history estoppel.[9] McDonald, 43 F.4th at 1347 (quoting MBO, 602 F.3d at 1318); see also, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1350 (Fed. Cir. 2004) (applying the prosecution history of one patent to an earlier issued related patent).  The '856 Patent and the '536 Patent are part of the same patent family.  (See Doc. No. 162, Supp. FAC ¶ 132 ("The Asserted Patents are related, share a common specification, and claim priority to at least November 26, 2003."); Doc. No. 354-24, Ex. 37, Plath Expert Report ¶ 36 ("I understand that each of the Patents-in-Suit claim priority to provisional application No. 60/525,612, filed on November 26, 2003 and provisional application No. 60/530,042, filed on December 13, 2003.").)  As such, the '536 Patent's prosecution history is relevant to the '856 Patent, and, thus, prosecution history estoppel applies to the '856 Patent.  See McDonald, 43 F.4th at 1347.

In sum, prosecution history estoppel applies and bars Plaintiffs' theory of infringement under the doctrine of equivalents as to the "[primes/priming/prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming" claim limitation.  As such, this is an additional reason why Plaintiffs' claim for infringement under the doctrine of equivalents fails as a matter of law.

/ / /

/ / /

———————————

[9]     Plaintiffs note that the Federal Circuit has explained that "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."  Elkay, 192 F.3d at 980.  (See Doc. No. 354 at 15-16.)  Although this is a correct statement of the law, Plaintiffs fail to acknowledge that there is nothing in Elkay stating that the prosecution history regarding a certain limitation only applies to subsequently issued patents.  There is nothing in Elkay stating that the prosecution history cannot also apply to earlier issued patents if they contain the same limitation at issue.  Both the Federal Circuit's decisions in McDonald and MBO state that "'a patent family's entire prosecution history'" is relevant in applying prosecution history estoppel.  McDonald, 43 F.4th at 1347 (quoting MBO, 602 F.3d at 1318).

**Appx105**

### iii.   Insubstantial Differences Test

Shoreline argues that Plaintiffs cannot satisfy the insubstantial differences test to support their theory of infringement under the doctrine of equivalents. (Doc. No. 351 at 17-18.)   Specifically, Shoreline argues that Plaintiffs cannot satisfy the insubstantial differences test because it is undisputed that SCNT and iPSC direct reprogramming are substantially different processes. (Id.)  In response, Plaintiffs contend that Shoreline's argument is improper because it focuses on the differences between SCNT and direct reprogramming techniques as opposed to specifically on the differences between "direct reprogramming efficiency" and "SCNT cloning efficiency." (Doc. No. 354 at 19.)

Under the insubstantial differences test, an element in an accused method "'is equivalent to a claim limitation if the only differences between the two are insubstantial.'" UCB, 927 F.3d at 1284.  Plaintiffs assert that they can satisfy the insubstantial differences test because "the efficiencies of SCNT and direct reprogramming are identical in that both are measures of the yield of pluripotent stem cells from somatic cells." (Doc. No. 354 at 19-20 (citing Doc. No. 313-4, Ex. 8, Plath Decl. ¶ 23; Doc. No. 354-7, Plath Decl. ¶ 55).)

Again, the Court rejects Plaintiffs' attempt to isolate the phrase "cloning efficiency" and divorce that phrase from the rest of the Court's claim construction for the relevant claim limitation.  The relevant limitation for the purposes of evaluating the doctrine of equivalents and the insubstantial differences test is "[primes/priming/prime] the [somatic] cell to improve the cloning efficiency of the subsequent reprogramming." (Doc. No. 208 at 33.)

The specification of the asserted patents notes that there are important differences between using Oct4 to prime a cell for subsequent SCNT reprogramming – as claimed in the method claims at issue – and using Oct4 in direct reprogramming processes. See '856 Patent col. 2 ll. 4-13 (explaining that SCNT depends on "controversial sources" that have "greatly compromised and slowed the study of such cells and their application" and that there is "a great demand for alternative methods of generating pluripotent cells," such as direct reprogramming); see also id. col. 3 ll. 61-67 ("It would be useful to reprogram

somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.").) Indeed, at the claim construction hearing, Plaintiffs themselves described many important differences between using Oct4 to prime a cell for subsequent SCNT reprogramming and using Oct4 in the direct reprogramming process. (See Doc. No. 218 at 3-6.) For example, Plaintiffs described SCNT as "an old technique for reprogramming" that is an "incredibly difficult challenging technical technique that can only be done by a handful of labs in the world." (Doc. No. 218 at 3.) Plaintiffs contrasted that technique with "[d]irect reprogramming" which according to Plaintiffs has "much more commercial appeal and universal applicability."[10] (Doc. No. 218 at 4.) In light of these undisputed statements in the specification and the statements made by Plaintiffs at the claim construction hearing, no reasonable jury could find that the accused processes satisfy the insubstantial differences test.

/ / /

---

[10]    At the claim construction hearing, Plaintiffs also described the technique of SCNT as taking "a somatic cell" and either: (1) taking the nucleus out of that somatic cell and "put[ting] it into an egg cell" that has had its "genetic material removed;" or (2) taking "the entire somatic cell" and "fus[ing] it together with an egg cell" that has had its genetic material removed. (Id.) Either method then "creates, in effect, a fertilized egg cell." (Id. at 4.) See also '369 Patent col. 1 ll. 46-55, col. 2 ll. 4-11 (describing the technique of SCNT and referring to it as a method that "depend[s] on controversial sources" such as "embryos (either created naturally or via cloning)").

    In contrast, Plaintiffs described the technique of direct reprogramming as including the following steps: taking somatic cells and inserting DNA that encodes certain proteins "collectively called the Yamanaka factors;" then allowing the cells "to express the[] transcription factors in [a] first step;" then transferring the cells into "a priming medium;" and then "transfer[ring] them to the reprogramming step where the mediums change." (Id. at 5.) See also '369 Patent col. 3 ll. 60-67 (describing "directly" reprogramming as reprogramming that does not use "oocytes and nuclear transfer technology" and does not use "controversial sources").

1          iv.    Function-Way-Results Test

2          Shoreline argues that Plaintiffs cannot satisfy the function-way-results test because

3    the function, way, and result of improving reprogramming efficiency for SCNT versus

4    iPSC reprogramming are substantially different.  (Doc. No. 351 at 18-21.)

5          Under the function-way-result test, a process "that does not literally satisfy a claim

6    limitation may nevertheless infringe 'if it performs substantially the same function in

7    substantially the same way to obtain the same result.'"  Ajinomoto, 932 F.3d at 1356

8    (quoting Duncan Parking, 914 F.3d at 1362).

9          As for the "function" part of the test, Plaintiffs and their expert assert that Oct4

10   operates on a somatic cell nucleus in the same way during direct reprogramming as it does

11   in the SCNT experiment in the specification of the asserted patents.  (Doc. No. 354 at 21-

12   22.)  But based on Plaintiffs' own assertions, priming with Oct4 provides a different

13   function in the direct reprogramming process than it does in the SCNT process.

14         Plaintiffs and their expert assert that Oct4 is "essential," "critical," and "necessary"

15   to the direct reprogramming process.  (See Doc. No. 354 at 18 n.10 (asserting that Oct4 is

16   "critical and necessary" to the overall direct reprogramming process for making iPSCs),

17   23-24; Doc. No. 351-11, Plath Depo. at 430 (testifying that Oct4 "is an essential step of the

18   entire [direct reprogramming] process"); Doc. No. 354-7, Plath Decl. ¶¶ 35, 112-24 (testing

19   showing that direct reprogramming was unsuccessful without the inclusion of Oct4); Doc.

20   No. 354-24, Plath Expert Report ¶¶ 567-69.)  Indeed, at the summary judgment hearing,

21   Plaintiffs responded to the question of whether Oct4 is essential to the direct

22   reprogramming process: "[T]he answer is emphatically yes.  Oct4 is required for

23   reprogramming.  Priming with Oct4, as this Court has construed it, is required for direct

24   reprogramming."  (Doc. No. 385 at 28.)

25         In contrast, the intrinsic record of the asserted patents, including the specification

26   and the prosecution history, make clear that Oct4 is not essential to the SCNT process and

27   instead is merely an "additive factor" to the SCNT process that improves "nuclear transfer

28   cloning efficiency."  During the prosecution history of the asserted method patents, the

22-cv-00676-H-MSB

examiner explained:

> In regards to Oct4, one must remember that the results of the nuclear transfer experiments [in the specification] demonstrate that regardless of exogenous Oct4 induction (i.e. in both fibroblast nuclei induced to express the exogenous Oct[4] and the fibroblast lacking such induction) the nuclear transfer units comprising fibroblast nucleic produce clones (i.e. reprogram the fibroblast nuclei). This is important to remember because it demonstrates that regardless of exogenous Oct[4] expression <u>reprogramming is occurring</u> in both nuclear transfer units with fibroblasts nuclei exogenously expressing Oct4 and nuclear transfer unit with fibroblast nuclei lacking endogenous expression of Oct4. As such, the measure of cloning efficiency between the two groups is solely able to measure changes in the completeness of reprogramming or changes in the reprogrammed nuclear transfer units because regardless of Oct4 some degree of reprogramming occurs due to present[*sic*] of the fibroblast nuclei in a nuclear transfer unit. Given that reprogramming is going to occur in the nuclear transfer experiments regardless of exogenous Oct4 expression, the nuclear transfer experimental model is only informative to the impact of Oct4 exogenous expression on the degree of cloning efficiency or the degree of reprogramming completeness or effectiveness upon the number of reprogrammed fibroblast nuclei, not the ability of Oct4 alone to reprogram a fibroblast nuclei as Applicant suggests.

(Doc. No. 113-5, Ex. B-31 at 13; <u>see also</u> <u>id.</u> at 8 ("The art and Applicant's own experiments demonstrate that reprogramming is occurring by the process nuclear transfer. As such, the experiments described in the specification provided limited information to the degree that exogenous Oct4 itself is able to reprogram and solely demonstrates that addition of Oct4 expression enhances nuclear transfer's reprogramming process."). Consistent with this, the specification of the asserted method patents explains that SCNT is a method for creating pluripotent ES cells, and the specification discloses that the addition of Oct4 only made the process more "efficient." <u>See</u> '856 Patent col. 1, ll. 46-55, col. 19, ll. 21-33 (Table 1). Indeed, at the summary judgment hearing, Plaintiffs conceded that "reprogramming occurs anyway in somatic cell nuclear transfer." (Doc. No. 385 at 29.) As such, it is undisputed that the use of Oct4 serves a substantially different function in the accused direct reprogramming processes compared to the claimed SCNT process.

   As for the "way" part of the test, it is also undisputed that the accused direct

22-cv-00676-H-MSB

reprogramming processes use Oct4 in a different way than the claimed SCNT process.  As explained earlier, Plaintiffs and their expert Dr. Plath concede that Oct4 is part of the direct reprogramming process with Dr. Plath conceding that it is used as "the initial step" of the direct reprogramming process.  (Doc. No. 351-11, Plath Depo. at 430; see Doc. No. 354 at 10 ("The reprogramming process still entails two steps: Oct4 first primes the somatic cell genome for subsequent reprogramming independent of the other transcription factors."); see also Doc. No. 354-7, Plath Decl. at pp. 23, 24, 26.)  In contrast, the claimed SCNT process encompasses a two-step method where there is an initial priming step involving the use of Oct4 and then a subsequent SCNT reprogramming step.  (See Doc. No. 208 at 22-26, 31-32; Doc. No. 255 at 18-28.)  As such, it is undisputed that the accused direct reprogramming processes and the claimed SCNT process use Oct4 in substantially different ways.

As for the "results" part of the test, it is undisputed that the two processes at issue produce different results.  The specification of the asserted patents explains that the results of the claimed process is increased "blastocyst formation and ES cell derivation."  '856 Patent col. 19 l. 28.  It is undisputed that the accused direct reprogramming processes do not "result" in increased blastocyst formation and ES cell derivation.  At the claim construction hearing, Plaintiffs explained that "blastocyst formation" is "specific" to SCNT.  (Doc. No. 218 at 17 (explaining that "blastocyst formation" is "specific to the particular technique . . . SCNT"); see also id. at 18 ("[T]he problem that we have with the Court's tentative constructions is that they read into the claim -- some of them seem to recognize this concept of improved efficiency, but they read into the claims words . . . that are unique to SCNT, things like blastocyst or cloning . . . .").)  Further, at the summary judgment hearing, Plaintiffs conceded that direct reprogramming does not result in increased blastocyst formation.  (Doc. No. 385 at 36-37.)  In addition, it is undisputed that ES cells are not the same as iPSC cells.  (See Doc. No. 354 at 20 (conceding that "SCNT generates ES cells, while direct reprogramming generates iPSCs").)  In their briefing, Plaintiffs assert that although they are different, ES cells are "functionally identical" to

22-cv-00676-H-MSB

iPSC cells.  (Id. at 22.)  But that assertion is directly contradicted by statements in the asserted patents' specification, which explains that there are important differences between ES cells generated from "controversial sources," such as SCNT, and cells that are generated through direct reprogramming.  See '856 Patent col. 2 ll. 4-13, col. 3 ll. 61-67.  As such, it is undisputed that the use of Oct4 in the claimed SCNT process produces substantially different "results" compared to the use of Oct4 in the accused direct reprogramming processes.[11]

In sum, the undisputed evidence in the record demonstrates that the claimed SCNT process and the accused direct reprogramming processes utilize Oct4 for different functions, in different ways, and with different results.  As such, no reasonable jury could find that Plaintiffs have satisfied the function-way-results test for the claim limitation "[makes/making/make] the [somatic] cell more susceptible to reprogramming."

C.    Conclusion

For the foregoing reasons, no reasonable jury could conclude that the accused direct reprogramming processes satisfy the Court's claim construction for the term "[makes/making/make] the [somatic] cell more susceptible to reprogramming," whether under a literal infringement analysis or a doctrine of equivalents analysis.  Thus, Plaintiffs' claims for patent infringement under § 271(g) fail.  As a result, the Court grants Shoreline's motion for summary judgment of Plaintiffs' claims for patent infringement under

---

[11]    The Court notes that even if it were to accept Plaintiffs' contention that the relevant claim limitation is the phrase "cloning efficiency" by itself, Plaintiffs would still be unable to satisfy the function-way-results test.  Even when focused on just "cloning efficiency," it is undisputed that the two processes at issue produce different results (i.e., increased blastocyst formation and ES cells versus iPSC cells).

In addition, even if "cloning efficiency" is examined by itself, Plaintiffs also cannot satisfy the insubstantial differences test for the same reasons.  The specification of the asserted patents itself makes clear that there are substantial differences between ES cells and iPSC cells.  See '856 Patent col. 2 ll. 4-13, col. 3 ll. 61-67.  And Plaintiffs have conceded that direct reprogramming does not result in increased blastocyst formation. (Doc. No. 385 at 36-37.)

22-cv-00676-H-MSB

§271(g).[12]

---

[12]    In its motion for summary judgment, Shoreline also argues that it is entitled to summary judgment of Plaintiffs' § 271(g) claims because the subsequent iPSC reprogramming by the third parties at issue materially changes of the results of those methods, precluding infringement under § 271(g)(1). (Doc. No. 351 at 21-23.) In addition, Shoreline argues that it does not infringe under § 271(g) as to the FCDI and ASC iPSC lines because Plaintiffs cannot show that the claimed methods were carried out after the issuance of the asserted method patents. (Id. at 8-10.) Because the Court grants summary judgment of Plaintiffs' claims for patent infringement under §271(g) for the reasons above, the Court declines to address these additional grounds for summary judgment of those claims.

Nevertheless, the Court briefly addresses Shoreline's argument that it does not infringe the asserted method patents under § 271(g) as to the Lonza line of iPSCs because Plaintiffs cannot show that the claimed methods were carried out after the issuance of the asserted method patents. (See Doc. No. 351 at 8-10.) In order for there to be infringement under § 271(g), the product at issue must have been manufactured "by a process patented in the United States." 35 U.S.C. § 271(g). If the asserted patent was not in existence at the relevant time of the manufacturing, then the product at issue was not made via a patented process. See Gustafson, Inc. v. Intersystems Indus. Prod., Inc., 897 F.2d 508, 510 (Fed. Cir. 1990) ("It is obvious that a party cannot be held liable for 'infringement' . . . of a nonexistent patent, i.e., no damages are payable on products manufactured and sold before the patent issued.").

The earliest issued asserted method patent in this case – the '856 Patent – was issued on January 13, 2023. '856 Patent at [45]; see also '536 Patent at [45]; '744 Patent at [45]; '917 Patent at [45]. As such, in order for there to be infringement under § 271(g), Plaintiffs must demonstrate that for the iPSCs at issue, Lonza "primed" the cells with Oct4 on January 13, 2023 or later. The Court agrees with Shoreline that Plaintiffs have not made that showing. Rather, the only evidence in the record shows that Oct4 was used by Lonza during the manufacturing of the iPSCs at issue by October 2014 or earlier. (See Doc. No. 351-10, Ex. 9 at p. 182, Baghbaderani Supp. Decl. ¶ 9; id. at pp. 270-271; id. at p. 310.)

Plaintiffs note that there is evidence in the record stating the iPSCs at issue were reprogramed in 2015 and that the manufacturing date of the iPSCs is January 29, 2015. (Doc. No. 354 at 2-3 (citing Doc. No. 68-1, Ex. T; Doc. No. 68, Counterclaims ¶ 112; Doc. No. 354-10, Ex. 2, Cherok Decl. ¶ 5); see also Doc. No. 385 at 24-27.) But this is of no consequence. The asserted method patents do not claim a method of reprogramming a cell or a method of making iPSCs. (See Doc. No. 208 at 18 (citing Doc. No. 149 at 7-8; Doc. No. 151 at 6; Doc. No. 113-5, Ex. B-31 at 2-16; Doc. No. 113-3, Ex. B-23; Doc. No. 113-4, Ex. B-28); see also Doc. No. 385 at 66 (Plaintiffs conceding: "We can't claim that we

30

**Appx112**

## III.   Plaintiffs' Claims for Induced Infringement Under 35 U.S.C. § 271(b)

In the operative complaint, Plaintiffs allege claims for induced infringement of the asserted patents under 35 U.S.C. § 271(b) against Shoreline.  (Doc. No. 162, Supp. FAC ¶¶ 172-75, 207-10, 244-47, 279-82, 317-20, 352-55, 392-95.)   Shoreline moves for summary judgment of Plaintiffs' claims for induced infringement.  (Doc. No. 351 at 23-27.)  Specifically, Shoreline argues that it cannot be liable for induced infringement because Plaintiffs cannot demonstrate any underlying act of direct infringement with respect to the asserted method claims.  (Id. at 24.)  In addition, Shoreline argues that it cannot be liable for induced infringement because it did not know how the iPSCs were created by the third-party manufacturers at issue.  (Id. at 24-25.)

Under 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  Liability for induced infringement under § 271(b) must be predicated on an underlying act of direct infringement.  Eli Lilly & Co. v. Teva Parenteral Medicines, Inc., 845 F.3d 1357, 1363–64 (Fed. Cir. 2017); see Nalco Co. v. Chem-Mod, LLC, 883 F.3d 1337, 1355 (Fed. Cir. 2018) ("'It is axiomatic that [t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'" (quoting In re Bill of Lading Transmission & Processing Sys. Pat. Litig., 681 F.3d 1323, 1333 (Fed. Cir. 2012))).

"The patentee must also show that the alleged infringer possessed the requisite intent to induce infringement, which [the Federal Circuit] ha[s] held requires that the alleged infringer 'knew or should have known his actions would induce actual infringements." Eli Lilly, 845 F.3d at 1364 (quoting DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1304 (Fed.

have a method of direct reprogramming.").)   As such, the relevant time period for determining infringement under § 271(g) as to the asserted method patents is not when the iPSCs at issue were manufactured or when reprogramming was completed by.  Rather, it is when Oct4 was specifically used during the manufacturing process.  The only evidence in the record shows that Oct4 was used prior to 2015.  As such, this is an additional reason why Shoreline is entitled to summary judgment of no infringement under § 271(g) as to the Lonza line of iPSCs.

Appx113

Cir. 2006) (en banc)). Mere knowledge of the possibility of infringement by others is insufficient; "specific intent and action to induce infringement must be shown." <u>HZNP Medicines LLC v. Actavis Lab'ys UT, Inc.</u>, 940 F.3d 680, 702 (Fed. Cir. 2019); <u>see Warner–Lambert Co. v. Apotex Corp.</u>, 316 F.3d 1348, 1364 (Fed. Cir. 2003). "Inducement can be found where there is '[e]vidence of active steps taken to encourage direct infringement,' which can in turn be found in 'advertising an infringing use or instructing how to engage in an infringing use.'" <u>Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.</u>, 785 F.3d 625, 630–31 (Fed. Cir. 2015) (quoting <u>Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 936 (2005)). "But such instructions need to evidence 'intent to *encourage* infringement.'" <u>Id.</u> at 631 (emphasis in original) (quoting <u>Vita–Mix Corp. v. Basic Holding, Inc.</u>, 581 F.3d 1317, 1329 (Fed. Cir. 2009)).

### A. Inducement to Infringe Under § 271(g)

To support their claims for induced infringement, Plaintiffs assert that Shoreline induced the third-party iPSC suppliers to infringe under § 271(g). (Doc. No. 354 at 28; <u>see also</u> Doc. No. 354-245, Ex. 37, Plath Expert Report ¶¶ 574-91.) The Court has granted summary judgment of Plaintiffs' § 271(g) claims and held that no reasonable jury could find that the accused iPSC direct manufacturing processes at issue satisfy the Court's claim construction for the term "[makes/making/make] the [somatic] cell more susceptible to reprogramming." (<u>See</u> <u>supra</u> Section II.) As such, this theory of induced infringement fails because there is no underlying direct infringement under § 271(g). <u>See</u> <u>Eli Lilly</u>, 845 F.3d at 1363–64 ("liability for induced infringement under § 271(b) 'must be predicated on direct infringement'"); <u>Nalco</u>, 883 F.3d at 1355 ("'It is axiomatic that [t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'" (quoting <u>Bill of Lading</u>, 681 F.3d at 1333)). As such, the Court grants summary judgment of Plaintiffs' induced infringement claims to the extent they are based on underlying acts of direct infringement under § 271(g).

/ / /

/ / /

1

   B.  <u>Induced Infringement by Thermo Fisher</u>

2       In support of their claims for induced infringement, Plaintiffs also assert that

3  Shoreline induced Thermo Fisher Scientific ("Thermo Fisher") to infringe the asserted

4  composition patents.  (Doc. No. 354 at 28; <u>see also</u> Doc. No. 354-245, Ex. 37, Plath Expert

5  Report ¶¶ 592-666.)  Shoreline argues that it is entitled to summary judgment of these

6  induced infringement claims because Plaintiffs' evidence does not raise a triable issue of

7  fact as to Shoreline's knowledge of Thermo Fisher's manufacturing process.  (Doc. No.

8  351 at 24-25.)

9       In December 2021, Shoreline obtained four iPSC lines from Thermo Fisher.  (Doc.

10 No. 351 at 5; <u>see</u> Doc. No. 354-22, Ex. 35.)  Shoreline provided Thermo Fisher with two

11 types of somatic cells, and Thermo Fisher reprogrammed the cells into the four iPSC lines.

12 (<u>See</u> Doc. No. 351 at 5; Doc. No. 354-29, Ex. 42 at Rogge Depo. at 32, 37; Doc. No. 354-

13 24, Plath Expert Report ¶¶ 123-26.)  This was a standard service that Thermo Fisher offered

14 to anyone.  (Doc. No. 351-16, Ex. 15, Rogge Depo at 103; <u>see</u> Doc. No. 385 at 15, 38.)

15 The four iPSC lines were created using Thermo Fisher's commercially available CytoTune

16 2.0 kit.  (<u>See</u> Doc. No. 351 at 5; Doc. No. 354-24, Plath Expert Report ¶¶ 124, 127-63.)

17 Plaintiffs' expert Dr. Plath opines that Thermo Fisher's manufacturing of the iPSCs at issue

18 via the CytoTune 2.0 kit infringes the asserted composition patents.  (<u>See</u> Doc. No. 354-

19 24, Ex. 37, Plath Expert Report ¶¶ 592-666.)

20      Plaintiffs assert that Shoreline possessed the requisite knowledge for induced

21 infringement because Shoreline knew of and instructed Thermo Fisher's manufacturing of

22 iPSCs using the CytoTune 2.0 kit from the cells that Shoreline provided.  (Doc. No. 354 at

23 29.)  The evidence in the record shows that during the purchasing process, on July 7, 2021,

24 Mr. Huafeng Wang of Shoreline emailed Thermo Fisher and provided Thermo Fisher with

25 a paper entitled Hiramatsu et al., "An analysis of monocytes and dendritic cells

26 differentiated from human peripheral blood monocyte-derived induced pluripotent stem

27 cells," <em>Med. Mol Morphol</em>. ("Hiramatsu").  (Doc. No. 354-22, Ex. 35 at p. 742.)  In the

28 email, Mr. Wang stated: "We came across a paper using CytoTune 2.0 to generate iPSCs

22-cv-00676-H-MSB

from PB monocytes.  It is attached here." (<u>Id.</u>)  In one sentence of the ten-page paper, Hiramatsu briefly discloses that "[c]ells were infected with the commercial Sendai virus vector CytoTune®-iPS 2.0 L" on culture day 2.  (<u>Id.</u> (citing TFS_FATE_000238).)  On July 21, 2021, Thermo Fisher request some information from Shoreline on "protocols on growth condition for the monocytes" and attached the Hiramatsu paper.  (Doc. No. 354-24, Ex. 37, Plath Expert Report ¶ 124 (citing TFS_FATE_000136).)  In response, Shoreline told Thermo Fisher that the Hiramatsu paper would be "ok to use . . . for our project." (<u>Id.</u> (citing TFS_FATE_000134).)

Viewing this evidence in the light most favorable to Plaintiffs, this evidence at best shows that Shoreline knew that Thermo Fisher would use the CytoTune 2.0 kit to manufacture the iPSCs at issue.  But this evidence does not show that Shoreline knew of the precise processes utilized by the CytoTune 2.0 kit, and there is no evidence in the record showing that Shoreline ever instructed or directed Thermo Fisher to specifically use Oct4 during the manufacturing process for the iPSCs at issue.[13]  Indeed, the unrebutted evidence in the record demonstrates that the relevant actors at Shoreline did not know what the CytoTune 2.0 kit is or how it works.  (<u>See</u> Doc. No. 351-13, Ex. 12, Rodgers Depo. at 200-201, 204 ("I do not know anything about the CytoTune 2.0 kit . . . ."); Doc. No. 351-3, Ex. 2, Cherok Depo. at 236-37, 336.)  And, at the summary judgment hearing, Plaintiffs conceded that the Hiramatsu paper does not "specifically say Oct4." (Doc. No. 385 at 52.)  Further, the unrebutted evidence demonstrates that Shoreline did not know what reprogramming factors Thermo Fisher was going to use to manufacture the iPSC line at

---

[13]    It is important that there is no evidence in the record demonstrating that Shoreline specifically instructed or directed Thermo Fisher to use Oct4.  As Plaintiffs conceded at the hearing, the asserted composition patents do not claim a method of direct reprogramming.  (Doc. No. 385 at 40.)  Rather, they merely claim a somatic cell that has exogenous Oct4.  (<u>Id.</u> at 40-41.)  As such, in order for Plaintiffs to demonstrate the requisite intent for their claims of induced infringement, they must specifically show that Shoreline took active steps to encourage the use of Oct4 with a somatic cell during the manufacturing process at issue.  <u>See</u> <u>Takeda</u>, 785 F.3d at 630–31.

34

**Appx116**

issue, and Shoreline did not give Thermo Fisher any direction of how to perform the reprogramming.  (See Doc. No. 351-13, Ex. 12, Rodgers Depo. at 126, 129, 202-04; Doc. No. 351-3, Ex. 2, Cherok Depo. at 239, 336; Doc. No. 351-16, Ex. 15, Rogge Depo at 39-40, 103.)  Plaintiffs have not provided the Court with any evidence to the contrary.  As such, the undisputed evidence in the record demonstrates that Shoreline did not know what specific process or reprogramming factors Thermo Fisher was going to use to manufacture the iPSC line at issue.  Thus, the evidence in the record is insufficient to demonstrate that Shoreline encouraged or had intent to encourage Thermo Fisher's alleged infringement of the asserted composition patents.  See Takeda, 785 F.3d at 630–31.

Plaintiffs assert that there is evidence in the record showing that prior to Shoreline soliciting and purchasing the infringing iPSCs from Thermo Fisher, Dr. Kaufman used the CytoTune 2.0 reprogramming kit and, thus, knew the reprogramming process entailed by that kit.  (Doc. No. 354 at 29 (citing Doc. No. 354-15, Kaufman Depo. at 81-86; Doc. No. 319-1, Ex. 45).  But, even assuming this is true, this fact is of no consequence because Plaintiffs do not identify any evidence in the record showing that Dr. Kaufman had any involvement in the solicitation and purchase of the iPSCs at issue from Thermo Fisher.  (See also Doc. No. 385 at 39.)  As such, Kaufman's potential knowledge of the CytoTune 2.0 reprogramming process cannot be utilized to demonstrate that Shoreline induced Thermo Fisher to infringe the asserted composition patents.

Plaintiffs also note that their technical expert, Dr. Plath, has explained that all commercially available iPSCs, including those acquired by Shoreline, are made by introducing exogenous Oct4 during the reprogramming process.  (Doc. No. 354 at 29 (citing Doc. No. 354-24, Ex. 37, Plath Expert Report ¶¶ 109, 567-70).)  But, at most, this evidence demonstrates that Shoreline knew that it possible that Thermo Fisher might use Oct4 during the iPSC manufacturing process.  "[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."  Warner–Lambert, 316 F.3d at 1364; see Takeda, 785 F.3d at 630–31.  Again, there is no evidence in the record demonstrating that Shoreline ever instructed,

directed, or encouraged Thermo Fisher to specifically use Oct4 during the manufacturing process for the iPSCs at issue.  As such, the evidence in the record is insufficient to demonstrate intent to induce infringement.  See <u>Takeda</u>, 785 F.3d at 630–31.

In sum, Plaintiffs have failed to present sufficient evidence to raise a triable issue of fact as to the required intent by Shoreline to support a claim for induced infringement based on Thermo Fisher's manufacturing of the iPSCs at issue.  <u>See, e.g.</u>, <u>Gammino v. Cellco P'ship</u>, 527 F. Supp. 2d 395, 399 (E.D. Pa. 2007) (granting summary judgment of induced infringement claims and noting "nothing in this record suggests that [defendant] specifically intended for the local providers to infringe [plaintiff]'s patents.  Rather, the evidence indicates that [defendant] merely purchased call-blocking features in the normal course of trade and left it to the providers of those features to ensure that their methods complied with the patent laws").  As such, the Court grants summary judgment of Plaintiffs' claims for induced infringement under § 271(b).

## IV.   Plaintiffs' Claims for Direct Infringement Under 35 U.S.C. § 271(a)

In the operative complaint, Plaintiffs allege that Shoreline directly infringes the asserted patents under 35 U.S.C. § 271(a).  (Doc. No. 162, Supp. FAC ¶¶ 159-69, 192-204, 232-41, 264-76, 304-14, 337-49, 377-89.)  Shoreline moves for summary judgment that it does not directly infringe the asserted patents under § 271(a).  (Doc. No. 351 at 27-28.)  Specifically, Shoreline argues that it is entitled to summary judgment of Plaintiffs' § 271(a) claims because it is undisputed that Shorelines does not reprogram somatic cells to iPSCs, does not use iPSCs made by the claimed methods, and does not make or use the claimed compositions.  (<u>Id.</u> at 27.)

In response, Plaintiffs assert that based on Shoreline's representations above, "there is no activity to accuse of direct infringement."  (Doc. No. 354 at 32-33; <u>see</u> Doc. No. 385 at 22, 41.)  Plaintiffs argue, therefore, there is nothing to adjudicate, and the Court should deny Shoreline's motion for summary judgment of the direct infringement claims under § 271(a) as moot.  (<u>Id.</u>)  As such, the Court denies Shoreline's motion for summary judgment of Plaintiffs' claims for direct infringement under § 271(a) as moot.

22-cv-00676-H-MSB

## V.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment regarding the underlying direct infringement of the '369 Patent by ThermoFisher in support of their claim for induced infringement under § 271(b). (Doc. No. 352-14 at 1, 7-8.)  In addition, Plaintiffs move for summary judgment of certain affirmative defenses and certain counterclaims that the asserted method claims are invalid under 35 U.S.C. §§ 101, 102, and 103. (Id. at 1-2, 8-15.)

The Court has granted Defendants' motion for summary judgment of all of Plaintiffs' claims for patent infringement in this action, including Plaintiffs' claims for induced infringement under § 271(b). (See supra.) As a result, Plaintiffs' motion for partial summary judgment is now moot, and the Court denies the motion as moot.

/ / /

/ / /

/ / /

## **Conclusion**

For the reasons above, the Court grants Shoreline's motion for summary judgment of non-infringement,[14] and the Court denies Plaintiffs' motion for partial summary judgment as moot.  The Clerk of Court is directed to enter a judgment in favor of Defendant Shoreline and against Plaintiffs Fate and Whitehead and close the case.[15]

**IT IS SO ORDERED.**

DATED: August 30, 2023

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[14]     In its motion, Shoreline also argues that the Court should grant summary judgment of non-infringement for its use of the Lonza iPSC line because Shoreline's use of the Lonza line falls within the safe harbor for activities reasonably related to FDA regulatory submissions.  (Doc. No. 351 at 28-30.)  Because the Court grants Shoreline's motion for summary judgment of non-infringement for the reasons above, the Court declines to address this additional basis for summary judgment by Shoreline.

[15]     Along with their motions for summary judgment, Shoreline filed a Daubert motion to exclude the expert report of Plaintiffs' damages expert Dr. Michael C. Keeley, and Plaintiffs filed: (1) a motion to strike a certain witness, Dr. Behnam Ahmadian Baghbaderani; (2) a Daubert motion to exclude the opinions of Shoreline's invalidity expert Dr. Martin F. Pera; (4) a Daubert motion to exclude the opinions of Shoreline's technical expert Dr. Evan Y. Snyder; and (5) a Daubert motion to exclude portions of the expert report of Shoreline's damages expert Mr. Schoettelkotte.  (Doc. Nos. 280, 281, 287, 288, 291.)  In light of the Court's entry of a judgment in this action in favor of Shoreline and against Plaintiffs, the Court denies these five motions as moot.  In addition, the Court notes that this order does not cite to or rely on any of the testimony or opinions challenged in those Daubert motions and the motion to strike.

**Appx120**

22-cv-00676-H-MSB

# EXHIBIT A



US008071369B2

(12) **United States Patent**
Jaenisch et al.

(10) Patent No.: **US 8,071,369 B2**
(45) Date of Patent: ***Dec. 6, 2011**

(54) **COMPOSITIONS FOR REPROGRAMMING SOMATIC CELLS**

(75) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/703,015**

(22) Filed: **Feb. 9, 2010**

(65) **Prior Publication Data**

US 2010/0221827 A1      Sep. 2, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530,042, filed on Dec. 15, 2003.

(51) **Int. Cl.**
*C12N 5/00*      (2006.01)
*C12N 5/07*      (2006.01)

(52) **U.S. Cl.** .......................... **435/325**; 435/354; 435/366

(58) **Field of Classification Search** ................. 435/325, 435/354, 366
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,824,837 | A | 10/1998 | Chen et al. | |
| 7,682,828 | B2 | 3/2010 | Jaenisch et al. | |
| 7,687,266 | B2 * | 3/2010 | Chambers et al. | 435/455 |
| 2002/0168660 | A1 | 11/2002 | Chen et al. | |
| 2004/0137460 | A1 | 7/2004 | Yamanaka et al. | |
| 2006/0084172 | A1 * | 4/2006 | Muller et al. | 435/455 |
| 2010/0144031 | A1 | 6/2010 | Jaenisch et al. | |

FOREIGN PATENT DOCUMENTS

| WO | WO 99/55841 | 11/1999 |
|---|---|---|
| WO | WO 02/097090 | 12/2002 |

OTHER PUBLICATIONS

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001. <​/info/scireport/2001report>. Chapter 4: The Adult Stem Cell. pp. 23-42.*

Chambers et al., "Functional Expression Cloning of Nanog, a Pluripotency Sustaining Factor in Embryonic Stem Cells," *Cell* 113:843-655 (2003).
Hansis et al., "Analysis of Oct.-4 expression and ploidy in individual human blastomeres," *Molecular Human Reproduction*, 7: 155-161 (2001).
Mitsui et al., "The Homeoprotein Nanog is Required for Maintenance of Pluripotency in Mouse Epiblast and ES Cells," *Cell*, 113: 631-642 (2003).
Mountford et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression," *Proceedings of the National Academy of Sciences*, 91: 4303-4307 (1994).
Niwa et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells," *Nature Genetics*, 24: 372-376 (2000).
Ramalho-Santos et al., "'Stemness' Transcriptional Profiling of Embryonic and Adult Stem Cells," *Science*, 298: 597-800 (2002).
Tada et al., "Nuclear Reprogramming of Somatic Cells by in Vitro Hybridization with ES cells," *Current Biology*, 11 1553-1558 (2001).
BLAST Alignment SEQ ID 16 (ECAT4), Apr. 28, 2011.
Final Office Action for U.S. Appl. No. 12/708,061, mailed Jul. 14, 2011.
Ben-Shushan et al., "Extinction of Oct-3/4 gene expression in embryonal carcinoma x fibroblast somatic cell hybrids is accompanied by changes in the methylation status, chromatin structure, and transcriptional activity of the Oct-3/4 upstream region," Molecular and Cellular Biology 13(2):891-901 (1993).
Bronson et al., "Single-copy transgenic mice with chosen-site integration," Proc. Natl. Acad. Sci. USA 93:9067-9072 (1996).
Buske et al., "Overexpression of HOXA10 perturbs human lymphomyelopoiesis in vitro and in vivo," Blood 97(8):2286-2292 (2001).
Chambers et al., "Functional expression cloning of nanog, a pluripotency sustaining factor in embryonic stem cells," Cell 113:643-655 (2003).
Daniels et al., "Analysis of Gene Transcription in Bovine Nuclear Transfer Embryos Reconstructed with Granulosa Cell Nuclei," Biology of Reproduction 63:1034-1040 (2000).
Gossen et al., "Transcriptional activation by tetracyclines in mammalian cells," Science 268(5218):1766-1769 (1995).
Helgason et al., "Overexpression of HOXB4 enhances the hematopoietic potential of embryonic stem cells differentiated in vitro," Blood 87(7):2740-2749 (1996).
Hochedlinger et al., "Monoclonal mice generated by nuclear transfer from mature B and T donor cells," Nature 415:1035-1038 (2002).
Hochedlinger et al., "Nuclear transplantation, embryonic stem cells, and the potential for cell therapy," The New England Journal of Medicine 349(3):275-286 (2003).

(Continued)

*Primary Examiner* — Marcia S Noble
(74) *Attorney, Agent, or Firm* — Morse, Barnes-Brown & Pendleton, PC; Lisa M. Treannie, Esq.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**9 Claims, 2 Drawing Sheets**

**EXHIBIT A**
**PAGE 57**

WHI_00011934

**Appx3017**

US 8,071,369 B2

Page 2

OTHER PUBLICATIONS

Jaenisch et al., "Nuclear cloning, stem cells, and genomic reprogramming," Cloning and Stem Cells 4(4):389-396 (2002).

Kaufman et al., "Hematopoietic colony-forming cells derived from human embryonic stem cells," PNAS 98(19) :10716-10721 (2001).

Kyba et al., "HoxB4 confers definitive lymphoid-myeloid engraftment potential on embryonic stem cell and yolk sac hematopoietic progenitors," Cell 109:29-37 (2002).

Lenardo et al., "Repression of the IgH Enhancer in Teratocarcinoma Cells Associated with a Novel Octamer Factor," Science, New Series 243(4890):544-546 (1989).

Matsuoka et al., "Generation of definitive hematopoietic stem cells from murine early yolk sac and paraaortic splanchnopleures by aorta-gonad-mesonephros region-derived stromal cells," Blood 98(1):6-12 (2001).

McWhir et al., "Selective ablation of differentiated cells permits isolation of embryonic stem cell lines from murine embryos with a non-permissive genetic background," Nature Genetics 14:223-226 (1996).

Mitsui et al., "The homeoprotein nanog is required for maintenance of pluripotency in mouse epiblast in ES cells." Cell 113:631-642 (2003).

Mountford et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression," Proceedings of the National Academy of Sciences 91:4303-4307 0994).

Munsie et al., "Transgenic strategy for demonstrating nuclear reprogramming in the mouse," Cloning Stem Cells 4(2):121-130 (2002).

Naito et al., Journal of Reproduction and Fertility 113:137-143 (1998).

Niwa et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells," Nature Genetics 24:372-376 2000.

Peled et al., "Dependence of human stem cell engraftment and repopulation of NOD/SCID mice on CXCR4," Science 283:845-848 (1999).

Pesce et al., "Oct-4: Gatekeeper in the beginnings of mammalian development," Stem Cells 19:271-278 (2001).

Tada et al., "Nuclear reprogramming of somatic cells by in vitro hybridization with ES cells," Current Biology 11:1553-1558 (2001).

Yeom et al., "Germline regulatory element of Oct-4 specific for the totipotent cycle of embryonal cells." Development 122:881-897 (1996).

Yoshimizu et al., "Germline-specific expression of the Oct-4/green fluorescent protein (GFP) transgene in mice," Development, Growth & Differentiation 41:675-684 (1999).

Zakhartchenko et al., "Adult cloning in cattle: potential of nuclei from a permanent cell line and from primary cultures," Molecular Reproduction and Development 54:264-272 (1999).

Zambrowicz et al., "Disruption of overlapping transcripts in the ROSA βgeo 26 gene trap strain leads to widespread expression of β-galactosidase in mouse embryos and hematopoietic cells," Proc. Natl. Acad. Sci. USA 94:3789-3794 (1987).

Sox2. print out from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/12714098?ordinalp...ntrez.Sequence.Sequence_ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Nanog. Printout from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/153791181?ordinalp...netrez.Sequence.Sequence_ResultsPanel.Sequence_RVDocSum p1-6, printed Apr. 7, 2009.

* cited by examiner

**EXHIBIT A**
**PAGE 58**

WHI_00011935

# Figure 1. Inducible *Oct4* allele



WHI_00011936



Figure 2. The system works...

ES cells

fibroblast cells - DOX

fibroblast cells + DOX

*Oct-4* RNA

Oct-4 protein

EXHIBIT A
PAGE 60

WHI_00011937

US 8,071,369 B2

| 1 | 2 |

**COMPOSITIONS FOR REPROGRAMMING
SOMATIC CELLS**

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application is a continuation of U.S. application Ser.
No. 10/997,146, filed Nov. 24, 2004, now U.S. Pat. No.7,682,
828 which claims the benefit of U.S. Provisional Application
No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional
Application No. 60/530,042, filed Dec. 15, 2003, the speci-
fications of which are incorporated herein by reference in
their entirety.

GOVERNMENT FUNDING

The invention described herein was supported, in whole or
in part, by Grant R37 CA84198 from the National Institutes
of Health. The United States government has certain rights in
the invention.

BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate
into the full range of daughter cells having distinctly different
morphological, cytological or functional phenotypes unique
to a specific tissue. By contrast, descendants of pluripotent
cells are restricted progressively in their differentiation
potential, with some cells having only one fate. Pluripotent
cells have extraordinary scientific and therapeutic potential,
as they can be differentiated along the desired differentiation
pathway in a precisely controlled manner and used in cell-
based therapy.

Two categories of pluripotent stem cells are known to date:
embryonic stem cells and embryonic germ cells. Embryonic
stem cells are pluripotent stem cells that are derived directly
from an embryo. Embryonic germ cells are pluripotent stem
cells that are derived directly from the fetal tissue of aborted
fetuses. For purposes of simplicity, embryonic stem cells and
embryonic germ cells will be collectively referred to as "ES"
cells herein.

ES cells are presently obtained via several methods. In a
first method, an ES cell line is derived from the inner cell mass
of a normal embryos in the blastocyst stage (See U.S. Pat. No.
6,200.806, Thompson, J. A. et al. Science, 282:1145-7, 1998
and Hogan et al., 2003). A second method for creating pluri-
potent ES cells utilizes the technique of somatic cell nuclear
transfer (SCNT). In this technique, the nucleus is removed
from a normal egg, thus removing the genetic material. Next,
a donor diploid somatic cell is placed next to the enucleated
egg and the two cells are fused, or the nucleus is introduced
directly into the oocyte by micromanipulation. The fused cell
has the potential to develop into a viable embryo, which may
then be sacrificed to remove that portion of the embryo con-
taining the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is trans-
planted into an entirely enucleated animal oocyte of a species
different from the donor cell (referred to herein as animal
stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. appli-
cation Ser. No. 20010012513 (2001). The resultant chimeric
cells are used for the production of pluripotent ES cells, in
particular human-like pluripotent ES cells. One disadvantage
of this technique is that these chimeric cells may contain
unknown non-human viruses and still contain the mitochon-
dria of the animal species. Thus, there would be substantial
risks of immune rejection if such cells were used in cell
transplantation therapies.

In a fourth method, ES cells can be isolated from the
primordial germ cells found in the genital ridges of post-
implanted embryos.

As described above, all presently available methods
depend on controversial sources—embryos (either created
naturally or via cloning), fetal tissue and via the mixing of
materials of multiple species. The controversy surrounding
the sources for such cells, according to many leading scien-
tists and public and private organizations including the NIH,
has greatly compromised and slowed the study of such cells
and their application

There is thus a great demand for alternative methods of
generating pluripotent cells.

SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in
which one or more endogenous pluripotency gene(s) is oper-
ably linked to a selectable marker in such a manner that the
expression of the selectable marker substantially matches the
expression of the endogenous pluripotency gene to which the
marker is linked. The invention also provides transgenic mice
containing these engineered somatic cells.

The present invention also provides methods for repro-
gramming somatic cells to a less differentiated state. In the
methods, engineered somatic cells of the invention are treated
with an agent. Cells that express the selectable marker are
then selected, and assessed for pluripotency characteristics.
The treatment with an agent may be contacting the cells with
an agent which alters chromatin structure, or may be trans-
fecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identi-
fying an agent that reprograms somatic cells to a less differ-
entiated state. In the methods, the engineered somatic cells
described above are contacted with a candidate agent. Cells
that express the selectable marker are then selected, and
assessed for pluripotency characteristics. The presence of at
least a subset of pluripotency characteristics indicates that the
agent is capable of reprogramming somatic cells to a less-
differentiated state. The agents identified by the present
invention can then by used to reprogram somatic cells by
contacting somatic cells with the agents.

The present invention also provides methods for identify-
ing a gene that causes the expression of at least one endog-
enous pluripotency gene in somatic cells. In the methods, the
engineered somatic cells are transfected with a cDNA library
prepared from a pluripotent cell, such as an ES cell. The cells
that express the appropriate selectable marker are then
selected, and the expression of the appropriate endogenous
pluripotency gene is examined. The expression of an endog-
enous pluripotency gene indicates that the cDNA encodes a
protein whose expression in the cell results in, directly or
indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating
a condition in an individual in need of such treatment. In
certain embodiments, somatic cells are obtained from the
individual and reprogrammed by the methods of the invention
under conditions suitable for the cells to develop into cells of
a desired cell type. The reprogrammed cells of a desired cell
type are then harvested and introduced into the individual to
treat the condition. In certain further embodiments, the
somatic cells obtained from the individual contains a muta-
tion in one or more genes. In these instances, the methods are
modified so that the somatic cells obtained from the indi-
vidual are first treated to restore the one or more normal
gene(s) to the cells such that the resulting cells carry the
normal endogenous gene, which are then introduced into the

**EXHIBIT A
PAGE 61**

WHI_00011938

US 8,071,369 B2

**3**

individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such as a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts an inducible Oct4 allele.

FIG. **2** shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

### DETAILED DESCRIPTION OF THE INVENTION

#### Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

**4**

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene provides one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluripotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. For example, multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5fl, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-.differentiation (Nichols et al., 1998, Cell 95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):293-300.

**EXHIBIT A**
**PAGE 62**

WHI_00011939

US 8,071,369 B2

5

Engineered Somatic Cells and Transgenic Mice Comprising Such Cells

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred to in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match", it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the desired endogenous pluripotency gene, downstream from the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

6

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The desired ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced into cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian

**EXHIBIT A**
**PAGE 63**

WHI_00011940

7

cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, as used herein, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt), dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differ-

8

entiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness."

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristic that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 1 5 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152:212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595; Dahlstrand et al., 1992, J.

Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1998, Blood 91:2625-22626), the transcription factor Tcf-4 (Korinek et al, 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1 566-1 572), and the transcription factor Cdx1 (Duprey et al., 1988, Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-1 8).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular

**EXHIBIT A**
**PAGE 64**

WHI_00011941

US 8,071,369 B2

9                                                          10

signature", or "stemness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358 (1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensible for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997) The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA, the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; *Gene Expression Technology: Methods in Enzymology*, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Lee et al. P.N.A.S. USA (1988), 85, 1204-1208; (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated cDNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Thus, in one embodiment, the present invention provides mice and somatic cells carrying at least one pluripotency gene expressed as a transgene under an inducible promoter. It is possible that somatic cells with such inducible pluripotency transgene(s) are more prone to be reprogrammed.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to

**EXHIBIT A**
**PAGE 65**

WHI_00011942

US 8,071,369 B2

11

select for all the selectable markers linked to the various endogenous pluripotency genes.

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatic structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol. Chem. 277: 34521-30, 2002; and Bergman and Mostoslavsky, Biol. Chem. 1990. Thus, DNA methylation inhibitors and histone deacetyation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate agents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal

12

extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVERSet. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacetyation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, FoxD3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

Reprogrammed Somatic Cells and These Uses

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so produced by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell

**EXHIBIT A**
**PAGE 66**

WHI_00011943

US 8,071,369 B2

13

type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condition. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferral of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-x1 might be useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and

14

culturing such cells under conditions which favor differentiation, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neuroectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngenic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital system, such as the bladder, clitoris, corpus cavernosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Atala, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, poly-

**EXHIBIT A**
**PAGE 67**

WHI_00011944

US 8,071,369 B2

15

orthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786,217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor maybe introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunningan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for G1n6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or non-neural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139:39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations in ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., heniatopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

16

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the TK gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon gancyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoeitic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

Furthermore, the RPSCs produced according to the invention maybe introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced, by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices.

Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine,

**EXHIBIT A**
**PAGE 68**

WHI_00011945

US 8,071,369 B2

17

ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,997, 5,627,059, 5,631,153, and 6,204,061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired characteristics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In the second method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The

18

expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press, Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

EXAMPLE

Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5' end and a SV40 polyA tail (SV40-pA) at its 3' end. The second integration vector, tetracycline activator integration vector, contains a

EXHIBIT A
PAGE 69

WHI_00011946

US 8,071,369 B2

19

mutant form of tetracycline activator, M2-rtTA, which is more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracycline activator integration vector are introduced into the Collagen locus and the Rosa26 locus respectively via site-specific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complementation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-inducible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expression level in fibroblasts treated with doxycycline is comparable to the Oct4 expression level in ES cells, and undetectable in fibroblasts not treated with doxycycline. The expression results demonstrate that the inducible Oct4 transgene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

In vitro development of clones derived from Oct4-induced fibroblasts

| Expt. | Oct4 | eggs w/ PN | Blastocysts (% PN) | | ES lines (% PN) | |
|-------|------|------------|--------------------|--|-----------------|--|
| #1 | – | 22 | 5 (23%) | } 19% | 0 (0%) | } 3% |
| #2 | – | 35 | 5 (14%) | | 2 (6%) | |
| #3 | + | 37 | 10 (27%) | } 24% | 2 (5%) | } 7% |
| #4 | + | 47 | 10 (21%) | | 4 (9%) | |

PN . . . ProNucleus formation

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, Nature, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

20

REFERENCES

Avilion, J., et al. Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells, Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 7650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. II., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci. USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger 5, Baron U, Thellmann M, Hasan M T, Bujard II, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-dependent transcriptional activators: novel mutations yield expanded range and sensitivity.
William R. L., et al., Nature 336: 684-687 (1988)
Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J., Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. Am. New York Acad. Sci. 580, 81-87
Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA bgeo 26 gene trap strain leads to widespread expression of b-galatosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

1. A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence.

2. The composition of claim 1, wherein the isolated primary somatic cell is a mammalian cell.

3. The composition of claim 2, wherein the isolated primary somatic cell is a human cell or a mouse cell.

4. The composition of claim 2, wherein the isolated primary somatic cell is an adult stem cell.

5. The composition of claim 4, wherein the adult stem cell is selected from the group consisting of: a hematopoietic stem cell, a neural stem cell, and a mesenchymal stem cell.

6. The composition of claim 1, further comprising a candidate agent of interest with respect to its potential to reprogram a somatic cell.

7. The composition of claim 6, wherein the agent is a DNA methylation inhibitor, a histone deacetylase inhibitor or PD098059.

8. The composition according to claim 6, wherein the agent is Sox-2.

9. The composition of claim 1, wherein the isolated primary somatic cell does not comprise a selectable marker integrated into an endogenous locus of a pluripotency gene.

\* \* \* \* \*

**EXHIBIT A**
**PAGE 70**

WHI_00011947

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,071,369 B2                              Page 1 of 1
APPLICATION NO. : 12/703015
DATED            : December 6, 2011
INVENTOR(S)      : Rudolf Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 15 through Line 20, please delete:
"GOVERNMENTAL FUNDING
The invention described herein was supported, in whole or in part, by Grant R37 CA84198
from the National Institutes of Health. The United States government has certain rights in the
invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

# EXHIBIT A
# PAGE 71

WHI_00011948

Appx3031

# EXHIBIT B



US008932856B2

(12) **United States Patent** (10) Patent No.: **US 8,932,856 B2**
Jaenisch et al. (45) Date of Patent: ***Jan. 13, 2015**

(54) **METHODS FOR REPROGRAMMING SOMATIC CELLS**

(71) Applicant: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

(72) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/646,444**

(22) Filed: **Oct. 5, 2012**

(65) **Prior Publication Data**

US 2013/0102080 A1 Apr. 25, 2013

**Related U.S. Application Data**

(60) Continuation of application No. 12/703,061, filed on Feb. 9, 2010, which is a division of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530,042, filed on Dec. 15, 2003.

(51) **Int. Cl.**
| *C12N 5/00* | (2006.01) |
| *C12N 15/85* | (2006.01) |
| *A01K 67/027* | (2006.01) |
| *C07K 14/47* | (2006.01) |
| *C12N 15/877* | (2010.01) |
| *C12N 5/074* | (2010.01) |

(52) **U.S. Cl.**
CPC ............ *C12N 15/85* (2013.01); *A01K 67/0273* (2013.01); *A01K 67/0275* (2013.01); *C07K 14/4702* (2013.01); *C12N 15/8509* (2013.01); *C12N 15/8775* (2013.01); *C12N 5/0696* (2013.01); *A01K 2217/05* (2013.01); *A01K 2227/105* (2013.01); *C12N 2830/003* (2013.01); *C12N 2830/006* (2013.01)
USPC .......................................... 435/377; 435/325

(58) **Field of Classification Search**
USPC ................................................. 435/377, 325
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,824,837 | A | 10/1998 | Chen et al. |
| 5,843,780 | A | 12/1998 | Thomson |
| 6,200,806 | B1 | 3/2001 | Thomson |
| 7,015,037 | B1 | 3/2006 | Furcht et al. |
| 7,524,677 | B2 * | 4/2009 | Stockman Campbell et al. ............................ 435/325 |
| 7,601,699 | B2 | 10/2009 | Eilertsen |
| 7,682,828 | B2 | 3/2010 | Jaenisch et al. |
| 7,687,266 | B2 | 3/2010 | Chambers et al. |
| 8,071,369 | B2 | 12/2011 | Jaenisch et al. |
| 2002/0168660 | A1 | 11/2002 | Chen et al. |
| 2004/0137460 | A1 | 7/2004 | Yamanaka et al. |
| 2006/0084172 | A1 | 4/2006 | Muller et al. |
| 2007/0033447 | A1 | 2/2007 | Eilertsen |
| 2008/0066197 | A1 | 3/2008 | Ying et al. |
| 2008/0280362 | A1 | 11/2008 | Jaenisch et al. |
| 2009/0047263 | A1 | 2/2009 | Yamanaka et al. |
| 2009/0068742 | A1 | 3/2009 | Yamanaka |
| 2009/0227032 | A1 | 9/2009 | Yamanaka et al. |
| 2010/0062533 | A1 | 3/2010 | Yamanaka |
| 2010/0144031 | A1 | 6/2010 | Jaenisch et al. |
| 2010/0221827 | A1 | 9/2010 | Jaenisch et al. |
| 2010/0310525 | A1 | 12/2010 | Chevalier et al. |
| 2011/0076678 | A1 | 3/2011 | Jaenisch et al. |
| 2012/0028821 | A1 | 2/2012 | Jaenisch et al. |
| 2012/0034192 | A1 | 2/2012 | Young et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101855350 | 10/2010 |
| EP | 1 970 446 | 9/2008 |
| WO | WO 99/55841 | 11/1999 |
| WO | WO 00/27995 | 5/2000 |
| WO | WO 02/097090 | 12/2002 |
| WO | WO 2005/080598 | 9/2005 |
| WO | WO 2005/090557 | 9/2005 |
| WO | WO 2007/069666 A1 | 6/2007 |
| WO | WO 2008/001391 A2 | 1/2008 |
| WO | WO 2008/118820 | 10/2008 |
| WO | WO 2008/124133 A1 | 10/2008 |
| WO | WO 2009/117439 A2 | 9/2009 |

(Continued)

OTHER PUBLICATIONS

Tada et al. Current Biology 11:1553-1558.*
PubMed Oct4 gene, Printout from www.ncbi.nlm.nih.gov/nuccore/NM_013633.3, pp. 1-12, Sep. 19, 2013.
Palmqvist, et al., "Correlation of Murine Embryonic Stem Cell Gene Expression Profiles with Functional Measures of Pluripotency", Stem Cells, 23:663-680 (2005).
Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", Science, 318:1917-1920 (2007).
Sox2 cDNA, printout from http://ncbi.nih.gov/nuccor/BC057574.1, pp. 1-13 (2013).
Oct4 cDNA, printout from http://ncbi.nih.gov/nuccor/BC117437.1, pp. 1-10 (2013).
Non-Final Office Action for U.S. Appl. No. 13/646,430, mailed Sep. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed Sep. 23, 2013.
Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed Oct. 2, 2013.

(Continued)

*Primary Examiner* — Marcia S Noble

(74) *Attorney, Agent, or Firm* — Lisa M. Warren, Esq.; Morse, Barnes-Brown & Pendleton, P.C.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**8 Claims, 2 Drawing Sheets**

## US 8,932,856 B2
Page 2

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | WO 2009/133971 | | 11/2009 |
| WO | WO 2009/152529 | A2 | 12/2009 |
| WO | WO 2010/033920 | A2 | 3/2010 |

OTHER PUBLICATIONS

Non-Final Office Action for U.S. Appl. No. 13/646,411, mailed Oct. 31, 2013.
Aoi, et al., "Generation of Pluripotent Stem Cells from Adult Mouse Liver and Stomach Cells", *Science*, 321: 699-702 (2008).
Avilion, et al., "Multipotent cell lineages in early mouse development depend on SOX2 function", *Genes & Development*, 17:126-140 (2003).
Ben-Shushan, et al., "Extinction of Oct-3/4 gene expression in embryonal carcinoma x fibroblast somatic cell hybrids is accompanied by changes in the methylation status, chromatin structure, and transcriptional activity of the Oct-3/4 upstream region", *Molecular and Cellular Biology*, 13(2):891-901 (1993).
Bortvin, et al., "Incomplete Reactivation of Oct4-related in Mouse Embryos Cloned from Somatic Nuclei", *Development*, 130:1673-1680 (2003).
Boyer, et al., "Polycomb complexes repress developmental regulators in murine embryonic stem cells", *Nature*, 441(7091):349-353 (2006).
Brambrink, et al., "Sequential Expression of Pluripotency Markers During Direct Reprogramming of Mouse Somatic Cells", *Cell Stem Cell*, 2(2): 151-159 (2008).
Bronson, et al., "Single-copy transgenic mice with chosen-site integration", *Proc. Natl. Acad. Sci. USA*, 93:9067-9072 (1996).
Bru, et al., "Rapid induction of pluripotency genes after exposure of human somatic cells to mouse ES cell extracts", *Experimental Cell Research*, 314:2634-2642 (2008).
Buske, et al., "Overexpression of HOXA10 perturbs human lymphomyelopoiesis in vitro and in vivo", *Blood*, 97(8):2286-2292 (2001).
Carey, et al., "Reprogramming of murine and human somatic cells using a single polycistronic vector", *Proceedings of the National Academy of Science*, 106:157-162 (2009).
Chambers, et al., "Functional expression cloning of nanog, a pluripotency sustaining factor in embryonic stem cells", *Cell*, 113:643-655 (2003).
Chen, et al., "Establishment and Maintenance of Genomic Methylation Patterns in Mouse Embryonic Stem Cells by Dnmt3a and Dnmt3b", *Molecular and Cellular Biology*, 23(16):5594-5605 (2003).
Daniels, et al., "Analysis of Gene Transcription in Bovine Nuclear Transfer Embryos Reconstructed with Granulosa Cell Nuclei", *Biology of Reproduction*, 63:1034-1040 (2000).
Eminli, et al., "Reprogramming of Neural Progenitor Cells into iPS Cells in the Absence of Exogenous Sox2 Expression", *Stem Cells*, 26:2467-2474 (2008).
Gossen, et al., "Transcriptional activation of tetracyclines in mammalian cells", *Science*, 268(5218):1766-1769 (1995).
Greiner, et al., "Identification of a specific inhibitor of the histone methyltransferase SU(VAR)3-9", *Nature Chemical Biology*, 1:143-145 (2005).
Hanna, et al. "Direct reprogramming of terminally differentiated mature B lymphocytes to pluripotency", *Cell* 133, 250-264 (2008).
Hansis, et al., "Analysis of Oct-4 expression and ploidy in individual human blastomeres", *Molecular Human Reproduction*, 7: 155-161 (2001).
Hasegawa, et al., "Efficient multicistronic expression of a transgene in human embryonic stem cells." *Stem Cells*, 25(7): 1707-1712 (2007).
Helgason, et al., "Overexpression of HOXB4 enhances the hematopoietic potential of embryonic stem cells differentiated in vitro", *Blood*, 87(7):2740-2749 (1996).
Ho, et al., "Synthetic Protein Transduction Domains: Enhanced Transduction Potential in Vitro and in Vivo," Cancer Research, 61: 474-477 (2001).

Hochedlinger, et al., "Monoclonal mice generated by nuclear transfer from mature B and T donor cells", *Nature*, 415:1035-1038 (2002).
Hochedlinger, et al., "Nuclear transplantation, embryonic stem cells, and the potential for cell therapy", *The New England Journal of Medicine*, 349(3):275-286 (2003).
Ihle, et al., "STATs: Signal Transducers and Activators of Transcription", Cell, 84: 331-334 (1996).
Jackson-Grusby, et al., "Loss of Genomic Methylation Cases p53-Dependent Apoptosis and Epigenetic Deregulation", *Nature Genetics*, 27: 31-39 (2001).
Jaenisch, Rudolf, Abstract "*In vitro reprogramming of somatic cells into pluripotent ES-like cells*", National Institutes of Health Grant No. 5 R37 HD045022-06, Funding Date 2008.
Jaenisch, Rudolf, Abstract "*Nuclear Closing and the Reprogramming of the Genome*" National Institutes of Health Grant No. 5 R37 HD045022-01 through 5 R37 HD045022-05, Funding Dates 2003 through 2007.
Jaenisch, Rudolf, Abstract "*Genomic Imprinting and the Cloning of Mice*" National Institutes of Health Grant No. 5 R01 CA084198-01 through 5R01 CA084198-09, Funding Dates 2000 through 2008.
Jaenisch, Rudolf, Abstract "*Epigenetics, stem cells, and cancer*" National Institutes of Health Grant Nos. 5 RO1 CA087869-06 through 5 RO1 CA087869-08, Funding Dates 2006 through 2008.
Jaenisch, Rudolf, Abstract "*DNA Methylation, Gene Regulation, and Cancer*" National Institutes of Health Grant Nos. 5 RO1 CA87869-01 through 5 RO1 CA087869-05, Funding Dates 2001 through 2005.
Jaenisch, et al., "Nuclear cloning, stem cells, and genomic reprogramming", *Cloning and Stem Cells*, 4(4):389-396 (2002).
Jaenisch & Young, "Stem Cells, the Molecular Circuitry of Pluripotency and Nuclear Reprogramming", *Cell*, 132:567-582 (2008).
Kaufman, et al., "Hematopoietic colony-forming cells derived from human embryonic stem cells", *PNAS*, 98(19):10716-10721 (2001).
Kubicek, et al., "Reversal of H3K9me2 by a small-molecule inhibitor for the G9a histone methyltransferase", *Molecular Cel*, 25(3):473-81 (2007).
Kyba et al., "HoxB4 confers definitive lymphoid-myeloid engraftment potential on embryonic stem cell and yolk sac hematopoietic progenitors", *Cell*,109:29-37 (2002).
Leonardo et al., "Repression of the IgH Enhancer in Teratocarcinoma Cells Associated with a Novel Octamer Factor", *Science*, New Series, 243(4890):544-546 (1989).
Li, et al., "Murine embryonic stem cell differentiation is prompted by SOCS-3 and inhibited by the zinc finger transcription factor Klf4", *Blood*, 105:635-637 (2005).
Loh, et al., "The Oct4 and Nanog transcription network regulates pluripotency in mouse embryonic stem cells", *Nature Genetics*, 38(4): 431-440 (2006).
Lowry, et al. Generation of human induced pluripotent stem cells from dermal fibroblasts. "*PNAS*", 105(8):2883-2888 (2008).
Ma, et al., "G9a and Jhdma2a Regulate Embryonic Stem Cell Fusion-Induced Reprogramming of Adult Neural Stem Cells", *Stem Cells*, 26(8): 2131-2141 (2008).
Matsuoka, et al., "Generation of definitive hematopoietic stem cells from murine early yolk sac and paraaortic splanchnopleures by aorta-gonad-mesonephros region-derived stromal cells", *Blood*, 98(1):6-12 (2001).
McWhir, et al., "Selective ablation of differentiated cells permits isolation of embryonic stem cell lines from murine embryos with a non-permissive genetic background", *Nature Genetics*, 14:223-226 (1996).
Mitsui et al., "The Homeoprotein Nanog is Required for Maintenance of Pluripotency in Mouse Epiblast and ES Cells", *Cell*, 113: 631-642 (2003).
Mountford, et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression", *Proceedings of the National Academy of Sciences*, 91: 4303-4307 (1994).
Munsie, et al., "Transgenic strategy for demonstrating nuclear reprogramming in the mouse", *Cloning Stem Cells*, 4(2):121-130 (2002).
Naito, et al., Journal of Reproduction and Fertility 113:137-143 (1998).

**EXHIBIT B**
**PAGE 73**

WHI_00011950

**US 8,932,856 B2**

Page 3

(56) **References Cited**

OTHER PUBLICATIONS

Nichols. et al., "Formation of Pluripotent Stem Cells in the Mamma-lian Embryo on the POU Transcription Factor Oct4", *Cell*, 95: 379-391 (1998).

Niwa, et al., "Quantitative expression of Oct-3/4 defines differentia-tion, dedifferentiation or self-renewal of ES cells", *Nature Genetics*, 24: 372-376 (2000).

Okita, et al., "Generation of Mouse Induced Pluripotent Stem Cells Without Viral Vectors", *Science*, 322:949-953 (2008).

Peled, et al., "Dependence of human stem cell engraftment and repopulation of NOD/SCID mice on CXCR4", *Science*, 283:845-848 (1999).

Pesce, et al., "Oct-4: Gatekeeper in the beginnings of mammalian development", *Stem Cells*, 19:271-278 (2001).

Qi, et al., "The magic of four: induction of pluripotent stem cells from somatic cells by Oct4, Sox2, Myc and Klf4", *Cell Research*, 17:578-580 (2007).

Radcliffe, et al., "Multiple gene products from a single vector: 'self-cleaving' 2A peptides", *Gene Therapy*, 11:1673-1674 (2004).

Ramalho-Santos, et al., "Stemness: Transcriptional Profiling of Embryonic and Adult Stem Cells", *Science*, 298: 597-600 (2002).

Ryan, et al., "Cleavage of foot-and-mouth disease virus polyprotein is mediated by residues located within a 19 amino acid sequence", *Journal of General Virology*, 72:2727-2732 (1991).

Savarese, et al., "Hematopoietic Precursor Cells Transiently Rees-tablish Permissiveness for X Inactivation", *Molecular and Cellular Biology*, 26(19): 7167-7177 (2006).

Sells, et al. "Delivery of Protein into Cells Using Polycationic Liposomes," *BioTechniques* 19(1):72-78 (1995).

Shields, et al., "Identification of Characterization of a Gene Encoding a Gut-Enriched Kruppel-like Factor Expressed during Growth Arrest", *Journal of Biological Chemistry*, 271(33):20009-20017 (1996).

Stacey, et al., "Microinjection of Transforming *ras* Protein Induces *c-fos* Expression," *Molecular and Cellular Biology*, 7(1): 523-527 (1987).

Stadfeld, et al., "Reprogramming of Pancreatic β Cells into Induced Pluripotent Stem Cells", *Current Biology*, 18:890-894 (2008).

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001, <!info/scireport/2001report>, Chapter 4: The Adult Stem Cell. pp. 23-42.

Tada, et al., "Nuclear Reprogramming of Somatic Cells by In Vitro Hybridization with ES cells", *Current Biology*, 11: 1553-1558 (2001).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Adult Human Fibroblasts by Defined Factors", *Cell*, 131, 861-872 (2007).

Takahashi, et al., "Induction of Puripotent Stem Cells from Mouse Embryonic and Adult Fibroblast Cultures by Defined Factors", *Cell*, 126: 663-676 (2006).

Thomson, et al., "Embryonic Stem Cell Lines Derived from Human Blastocysts", *Science*, 282, 1145-1147 (1998).

Wadia, et al., "Protein Transduction Technology," *Analytical Biotechnology*, 13: 52-56 (2002).

Wernig, et al., "A drug-inducible transgenic system for direct repro-gramming of mutiple somatic cell types", *Nature Biotechnology*, 26(8):916-924 (2008).

Wernig, et al., "In vitro reprogramming of fibroblasts into pluripotent ES-cell-like state", *Nature*, 448: 318-324 (2007).

Wernig, et al., "Neurons derived from reprogrammed fibroblasts functionally integrate into the fetal brain and improve symptoms of rats with Parkinson's disease", *PNAS*, 105(15):5856-5861 (2008).

Yamanaka, et al., "Strategies and New Developments in the Genera-tion of Patient-Specific Pluripotent Stem Cells", *Cell Stem Cell*, 1: 39-49 (2007).

Yeom et al., "Germline regulatory element of Oct-4 specific for the totipotent cycle of embryonal cells", *Development*, 122:881-897 (1996).

Ying, et al., "BMP induction of Id proteins supresses differentiation and sustains embryonic stem cell self-renewal in collaboration with STAT3", *Cell*, 115: 281-292 (2003).

Yoshimizu, et al., "Germline-specific expression of the Oct-4/green flourescent protein (GFP) transgene in mice", *Development, Growth & Differentiation*, 41:675-684 (1999).

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 5 RO1 HG002668-04A1 through 5 RO1 HG002668-05, Funding Dates 2007 through 2008.

Young, Richard, Abstract "Transcriptional Regulatory Network in Living Cells" National Institutes of Health Grant No. 5 RO1 HG002668-01 through 5 RO1 HG002668-03S1, Funding Dates 2003 through 2006.

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", *Science*. 318:(5858):1917-20 (2007).

Zakhartchenko, et al. "Adult cloning in cattle: potential of nuclei from a permanent cell line and from primary cultures", *Molecular Reproduction and Development*, 54:264-272 (1999).

Zambrowicz, et al., "Disruption of overlapping transcripts in the ROSA βgeo 26 gene trap strain leads to widespread expression of β-galactosidase in mouse embryos and hematopoietic cells", *Proc. Natl. Acad. Sci. USA*, 94:3789-3794 (1987).

Zhou, et al., "Generation of Induced Pluripotent Stem Cells Using Recombinant Proteins", *Cell Stem Cell*, 4:381-384 (2009).

BLAST Alignment SEQ ID 16 (ECAT4).

Sox2. print out from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/127140985?ordinalp...ntrez.Sequence.Sequence ResultsPanel.Se-quence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Nanog. Printout from Pubmed http://www.ncbi.nlm.nih.gov/nuc-core/153791181?ordinalp...ntrez.Sequence.Sequence_ ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Scholer, et al., "New type of POU domain in germ line-specific protein Oct-4". Letters to Nature, 344:435-439 (1990).

Bilic, et al., "Concise Review: Induced Pluripotent Stem Cells Versus Embryonic Stem Cells: Close Enough or Yet Too Far Apart?", *Stem Cells*, 30:33-41(2012).

Chin, et al., "Induced Pluripotent Stem Cells and Embryonic Stem Cells and Distinguished by Gene Expression Signatures", *Cell Stem Cell*, 5:111-123(2009).

Chin, et al., "Molecular Analyses of Human Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Cell Stem Cell*, 7(2):263-269(2010).

Munoz, et al., "The Quantitative Proteomes of Human-Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Molecular Sys-tems Biology*, 7(550): 1-13(2011).

Polouliakh, et al., "Reprogramming Resistant Genes: In-Depth Com-parison of Gene-Expressions Among iPS, ES, and somatic cells", *Frontiers in Physiology*, 4(7):1-9(2013).

Meissner, et al., "Direct Reprogramming of genetically unmodified fibroblasts into pluripotent stem cells", *Nature Biotechnology*, 25(10): 1177-1181 (2007).

Strelchenko, et al. "Reprogramming of human somatic cells by embryonic stem cell cryoplast", *Reprod. Biomed Online*, 12(1): 107-111 (2006).

Cowan, et al., "Nuclear Reprogramming of Somatic Cells After Fusion with Human Ebryonic Stem Cells", *Science*, 309:1369-1373 (2005).

Laiosa, et al., "Reprogramming of Committed T Cell Progenitors to Macrophages and Dendritic Cells by C/EBPα and PU.1 Transcription Factors", *Immunity*, 25: 731-744 (2006).

Ait-Si-Ali, et al., "A Suv39h-dependent mechanism for silencing S-phase genes in differentiating but not in cycling cells", *EMBO Journal*, 23:605-615 (2004).

Maherali, et al., "Directly Reprogrammed Fibroblasts Show Global Epigenetic Remodeling and Widespread Tissue Contribution", Cell Stem Cell, 1:55-70(2007).

Sarraf, et al., "Methyl-CpG Binding Protein MBD1 Couples Histone H3 Methylation at Lysine 9 by SETDB1 to DNA Replication and Chromatin Assembly", Molecular Cell, 15:595-604 (2004).

International Search Report for International Application PCT/US08/04516, dated Sep. 10, 2008.

International Search Report for International Application PCT/US2009/047423, dated May 3, 2010.

International Search Report for International Application PCT/US2009/057662, dated Jun. 30, 2010.

**EXHIBIT B**
**PAGE 74**

## US 8,932,856 B2
Page 4

(56)  **References Cited**

OTHER PUBLICATIONS

Supplementary European Search Report for Application No. EP 08742630.0, dated Mar. 25, 2010.
Supplementary European Search Report for Application No. EP 09763816, dated Nov. 29, 2012.
Partial European Search Report for Application No. EP12003893, dated Jun. 24, 2013.
Non-Final Office Action for U.S. Appl. No. 10/997,146, mailed Nov. 3, 2006.
Final Office Action for U.S. Appl. No. 10/997,146, mailed Aug. 14, 2007.
Non-Final Office Action for U.S. Appl. No. 10/997,146, mailed Jul. 22, 2008.
Non-Final Office Action for U.S. Appl. No. 10/997,146, mailed Apr. 9, 2009.
Non-Final Office Action for U.S. Appl. No. 12/703,015, mailed Oct. 28, 2010.
Final Office Action for U.S. Appl. No. 12/703,015. mailed Jul. 8, 2011.
Non-Final Office Action for U.S. Appl. No. 12/703,061, mailed Oct. 28, 2010.
Final Office Action for U.S. Appl. No. 12/703,061, mailed Jul. 14, 2011.
Non-Final Office Action for U.S. Appl. No. 12/703,061, mailed Sep. 19, 2011.
Notice of Allowance for U.S. Appl. No. 10/997,146, mailed Jan. 26, 2010.
Notice of Allowance for U.S. Appl. No. 12/703,015, mailed Sep. 16, 2011.
Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed May 9, 2012.
Final Office Action for U.S. Appl. No. 12/595,041, mailed Dec. 7, 2012.
Non-Final Office Action for U.S. Appl. No. 13/646,411, mailed Feb. 27, 2013.
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed May 15, 2013.
Non-Final Office Action for U.S. Appl. No. 12/703,061, mailed Aug. 20, 2013.

Chinnasamy, et al., "Multicistronic lentiviral vectors containing the FMDV 2A cleavage factor demonstrate robust expression of encoded genes at limiting MOI", *Virology Journal*, 3: 14-29 (2006).
Okita, et al., "Generation of germline-competent induced pluripotent stem cells", *Nature*, 448: 313-318 (2007).
Feldman, et al., "G9a-mediated irreversible epigenetic inactivation of Oct-3/4 during early embryogenesis", *Nature Cell Biology*, 455: 627-633 (2008).
Zhou, et al., "In vivo reprogramming of adult pancreatic exocrine cells to b-cells", *Nature*, 455: 627-633 (2008).
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed Jan. 2, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, mailed Jan. 3, 2014.
Final Office Action for U.S. Appl. No. 12/997,815, mailed Jul. 15, 2014.
Silva, et al., "Nanog promotes transfer of pluripotency after cell fusion", *Nature*, 441: 997-1001 (2006).
Shi, et al., "Dynamic Regulation of Histone Lysine Methylation by Demethylases", *Molecular Cell*, 25: 1-14 (2007).
Final Office Action for U.S. Appl. No. 13/119,891, mailed Aug. 18, 2014.
Nakagawa, et al., "Generation of induced pluripotent stem cells without Myc from mouse and human fibroblasts", *Nature Biotechnology*, 26(1): 101-106 (2008).
Final Office Action for U.S. Appl. No. 13/646,411, mailed May 9, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed May 27, 2014.
Final Office Action for U.S. Appl. No. 12/595,041, mailed May 30, 2014.
Final Office Action for U.S. Appl. No. 13/646,430, mailed Apr. 1, 2014.
Final Office Action for U.S. Appl. No. 13/646,420, mailed Apr. 2, 2014.
Final Office Action for U.S. Appl. No. 12/703,061, mailed Apr. 11, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,420, dated Sep. 17, 2014.
Notice of Allowance for U.S. Appl. No. 12/703,061, dated Nov. 7, 2014.

* cited by examiner

# Figure 1. Inducible *Oct4* allele



WHI_00011953



Figure 2. The system works...

US 8,932,856 B2

1

# METHODS FOR REPROGRAMMING SOMATIC CELLS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/703,061, filed Feb. 9, 2010, which is a divisional of U.S. application Ser. No. 10/997,146, filed Nov. 24, 2004 (U.S. Pat. No. 7,682,828), which claims the benefit of U.S. Provisional Application No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional Application No. 60/530,042, filed Dec. 15, 2003, the specifications of which are incorporated herein by reference in their entirety.

## GOVERNMENTAL FUNDING

This invention was made with government support under R37 CA84198 awarded by the National Institutes of Health. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate into the full range of daughter cells having distinctly different morphological, cytological or functional phenotypes unique to a specific tissue. By contrast, descendants of pluripotent cells are restricted progressively in their differentiation potential, with some cells having only one fate. Pluripotent cells have extraordinary scientific and therapeutic potential, as they can be differentiated along the desired differentiation pathway in a precisely controlled manner and used in cell-based therapy.

Two categories of pluripotent stem cells are known to date: embryonic stem cells and embryonic germ cells. Embryonic stem cells are pluripotent stem cells that are derived directly from an embryo. Embryonic germ cells are pluripotent stem cells that are derived directly from the fetal tissue of aborted fetuses. For purposes of simplicity, embryonic stem cells and embryonic germ cells will be collectively referred to as "ES" cells herein.

ES cells are presently obtained via several methods. In a first method, an ES cell line is derived from the inner cell mass of a normal embryos in the blastocyst stage (See U.S. Pat. No. 6,200,806, Thompson, J. A. et al. Science, 282:1145-7, 1998 and Hogan et al., 2003). A second method for creating pluripotent ES cells utilizes the technique of somatic cell nuclear transfer (SCNT). In this technique, the nucleus is removed from a normal egg, thus removing the genetic material. Next, a donor diploid somatic cell is placed next to the enucleated egg and the two cells are fused, or the nucleus is introduced directly into the oocyte by micromanipulation. The fused cell has the potential to develop into a viable embryo, which may then be sacrificed to remove that portion of the embryo containing the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is transplanted into an entirely enucleated animal oocyte of a species different from the donor cell (referred to herein as animal stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. application Ser. No. 20010012513 (2001). The resultant chimeric cells are used for the production of pluripotent ES cells, in particular human-like pluripotent ES cells. One disadvantage of this technique is that these chimeric cells may contain unknown non-human viruses and still contain the mitochondria of the animal species. Thus, there would be substantial risks of immune rejection if such cells were used in cell transplantation therapies.

2

In a fourth method, ES cells can be isolated from the primordial germ cells found in the genital ridges of post-implanted embryos.

As described above, all presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species. The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application.

There is thus a great demand for alternative methods of generating pluripotent cells.

## SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in which one or more endogenous pluripotency gene(s) is operably linked to a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene to which the marker is linked. The invention also provides transgenic mice containing these engineered somatic cells.

The present invention also provides methods for reprogramming somatic cells to a less differentiated state. In the methods, engineered somatic cells of the invention are treated with an agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state. In the methods, the engineered somatic cells described above are contacted with a candidate agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The presence of at least a subset of pluripotency characteristics indicates that the agent is capable of reprogramming somatic cells to a less-differentiated state. The agents identified by the present invention can then by used to reprogram somatic cells by contacting somatic cells with the agents.

The present invention also provides methods for identifying a gene that causes the expression of at least one endogenous pluripotency gene in somatic cells. In the methods, the engineered somatic cells are transfected with a cDNA library prepared from a pluripotent cell, such as an ES cell. The cells that express the appropriate selectable marker are then selected, and the expression of the appropriate endogenous pluripotency gene is examined. The expression of an endogenous pluripotency gene indicates that the cDNA encodes a protein whose expression in the cell results in, directly or indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating a condition in an individual in need of such treatment. In certain embodiments, somatic cells are obtained from the individual and reprogrammed by the methods of the invention under conditions suitable for the cells to develop into cells of a desired cell type. The reprogrammed cells of a desired cell type are then harvested and introduced into the individual to treat the condition. In certain further embodiments, the somatic cells obtained from the individual contains a mutation in one or more genes. In these instances, the methods are modified so that the somatic cells obtained from the individual are first treated to restore the one or more normal gene(s) to the cells such that the resulting cells carry the normal endogenous gene, which are then introduced into the

**EXHIBIT B**
**PAGE 78**

WHI_00011955

US 8,932,856 B2

3

individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such as a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an inducible Oct4 allele.

FIG. 2 shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

### DETAILED DESCRIPTION OF THE INVENTION

#### Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

4

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene gives one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluipotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. For example, multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5fl, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-.differentiation (Nichols et al., 1998, Cell 95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):793-300.

**EXHIBIT B**
**PAGE 79**

WHI_00011956

US 8,932,856 B2

5

Engineered Somatic Cells and Transgenic Mice Comprising Such Cells

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred to in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match", it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the endogenous pluripotency gene, downstream from the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

6

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The desired ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced into cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian

**EXHIBIT B**
**PAGE 80**

WHI_00011957

US 8,932,856 B2

7

cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, as used herein, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt), dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more a pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differ-

8

entiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness."

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristics that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 1 5 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152:212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595; Dah-lstrand et al., 1992, J.

Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1 998, Blood 91:2625-22626), the transcription factor Tcf-4 (Korinek et al, 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1 566-1 572), and the transcription factor Cdx1 (Duprey et al., 1 988, Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-1 8).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular

**EXHIBIT B**
**PAGE 81**

WHI_00011958

US 8,932,856 B2

9 10

signature", or "sternness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358 (1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensible for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA 26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997) The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA, the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; *Gene Expression Technology: Methods in Enzymology*, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Lee et al. P.N.A.S. USA (1988), 85, 1204-1208; (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated cDNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Thus, in one embodiment, the present invention provides mice and somatic cells carrying at least one pluripotency gene expressed as a transgene under an inducible promoter. It is possible that somatic cells with such inducible pluripotency transgene(s) are more prone to be reprogrammed.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to

**EXHIBIT B**
**PAGE 82**

WHI_00011959

US 8,932,856 B2

11

select for all the selectable markers linked to the various endogenous pluripotency genes.

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatic structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol, Chem. 277: 34521-30, 2002; and Bergman and Mostoslavsky, Biol. Chem. 1990. Thus, DNA methylation inhibitors and histone deacetylation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate agents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal

12

extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVERSet. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacetylation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, FoxD3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

Reprogrammed Somatic Cells and These Uses

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell

**EXHIBIT B**
**PAGE 83**

WHI_00011960

US 8,932,856 B2

**13**

type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condition. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferral of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell

types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-x1 might be useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and

**14**

culturing such cells under conditions which favor differentiation, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neuroectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngenic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital system, such as the bladder, clitoris, corpus cavermosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Atala, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, poly-

**EXHIBIT B**
**PAGE 84**

WHI_00011961

US 8,932,856 B2

orthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786,217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor maybe introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunningan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for Gln6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or non-neural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139:39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations in ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., hematopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the TK gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon ganocyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoeitic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

Furthermore, the RPSCs produced according to the invention maybe introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices.

Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine,

**EXHIBIT B**
**PAGE 85**

WHI_00011962

US 8,932,856 B2

17

ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,992, 5,627,059, 5,631,153, and 6,204,061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired characteristics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In the second method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The

18

expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press, Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

Example. Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5' end and a SV40 polyA tail (SV40-pA) at its 3' end. The second integration vector, tetracycline activator integration vector, contains a mutant form of tetracycline activator, M2-rtTA, which is

EXHIBIT B
PAGE 86

WHI_00011963

US 8,932,856 B2

19                                                        20

more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracycline activator integration vector are introduced into the Collagen locus and the Rosa26 locus respectively via site-specific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complementation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-inducible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expression level in fibroblasts treated with doxycycline is comparable to the Oct4 expression level in ES cells, and undetectable in fibroblasts not treated with doxycycline. The expression results demonstrate that the inducible Oct4 transgene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

|  | | In vitro development of clones derived from Oct4-induced fibroblasts | | | | |
|---|---|---|---|---|---|---|
| Expt. | Oct4 | eggs w/PN | Blastocysts (% PN) | | ES lines (% PN) | |
| #1 | − | 22 | 5 (23%) | } 19% | 0 (0%) | } 3% |
| #2 | − | 35 | 5 (14%) | | 2 (6%) | |
| #3 | + | 37 | 10 (27%) | } 24% | 2 (5%) | } 7% |
| #4 | + | 47 | 10 (21%) | | 4 (9%) | |

PN . . . ProNucleus formation

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, Nature, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

REFERENCES

Avilion, J., et al., Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells, Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 2650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. II., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci. USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger S, Baron U, Thellmann M, Hasan M T, Bujard H, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-dependent transcriptional activators: novel mutations yield expanded range and sensitivity.
William R. L., et al., Nature 336: 684-687 (1988)
Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J., Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. Am. New York Acad Sci. 580, 81-87
Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA bgeo 26 gene trap strain leads to widespread expression of b-galatosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

1. A method of making a somatic cell more susceptible to reprogramming to a pluripotent state comprising introducing at least one exogenous nucleic acid encoding Oct 4 operably linked to at least one regulatory sequence into the cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming to a pluripotent state.

2. The method of claim 1, further comprising introducing an exogenous nucleic acid encoding Nanog or Sox2 operably linked to at least one regulatory sequence.

3. The method of claim 1, further comprising introducing an exogenous nucleic acid encoding Nanog operably linked to at least one regulatory sequence.

4. The method of claim 1, wherein the somatic cell does not comprise a selectable marker integrated into the endogenous locus of the pluripotency gene.

5. The method of claim 1, wherein the somatic cell is a human cell or a mouse cell.

6. The method of claim 1, wherein the somatic cell is an adult stem cell.

7. The method of claim 6, wherein the adult stem cell is a hematopoietic stem cell, neural stem cell, or mesenchymal stem cell.

8. The method of claim 1, further comprising introducing an endogenous nucleic acid encoding Sox2 operably linked to at least one regulatory sequence.

* * * * *

**EXHIBIT B**
**PAGE 87**

Appx3048

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,932,856 B2                                  Page 1 of 1
APPLICATION NO.  : 13/646444
DATED           : January 13, 2015
INVENTOR(S)     : Rudolf Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 16 through Line 20, delete:
"GOVERNMENTAL FUNDING
This invention was made with government support under R37 CA84198 awarded by the National
Institutes of Health. The government has certain rights in the invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

# EXHIBIT B
# PAGE 88

WHI_00011965

# Appx3049

# EXHIBIT C



US008951797B2

(12) **United States Patent**     (10) **Patent No.:**   **US 8,951,797 B2**
Jaenisch et al.     (45) **Date of Patent:**   *****Feb. 10, 2015**

(54) **COMPOSITIONS FOR IDENTIFYING REPROGRAMMING FACTORS**

(71) Applicant: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

(72) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer. the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/646,411**

(22) Filed: **Oct. 5, 2012**

(65) **Prior Publication Data**

US 2013/0109089 A1   May 2, 2013

**Related U.S. Application Data**

(60) Continuation of application No. 12/703,061, filed on Feb. 9, 2010, which is a division of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530.042, filed on Dec. 15, 2003.

(51) **Int. Cl.**
| | |
|---|---|
| *C12N 5/00* | (2006.01) |
| *C12N 15/85* | (2006.01) |
| *A01K 67/027* | (2006.01) |
| *C07K 14/47* | (2006.01) |
| *C12N 15/877* | (2010.01) |
| *C12N 5/074* | (2010.01) |

(52) **U.S. Cl.**
CPC ............ *C12N 15/85* (2013.01); *A01K 67/0273* (2013.01); *A01K 67/0275* (2013.01); *C07K 14/4702* (2013.01); *C12N 15/8509* (2013.01); *C12N 15/8775* (2013.01); *C12N 5/0696* (2013.01); *A01K 2217/05* (2013.01); *A01K 2227/105* (2013.01); *C12N 2830/003* (2013.01); *C12N 2830/006* (2013.01)
USPC .......................................... **435/377**; 435/325

(58) **Field of Classification Search**
USPC .................................................. 435/377, 325
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,824,837 | A | 10/1998 | Chen et al. |
| 5,843,780 | A | 12/1998 | Thomson |
| 6,200,806 | B1 | 3/2001 | Thomson |
| 7,015,037 | B1 * | 3/2006 | Furcht et al. ................. 435/372 |

| | | | |
|---|---|---|---|
| 7,524,677 | B2 | 4/2009 | Stockman et al. |
| 7,601,699 | B2 * | 10/2009 | Eilertsen .................... 514/44 R |
| 7,682,828 | B2 | 3/2010 | Jaenisch et al. |
| 7,687,266 | B2 * | 3/2010 | Chambers et al. .......... 435/455 |
| 8,071,369 | B2 | 12/2011 | Jaenisch et al. |
| 2002/0168660 | A1 | 11/2002 | Chen et al. |
| 2004/0137460 | A1 | 7/2004 | Yamanaka et al. |
| 2006/0084172 | A1 * | 4/2006 | Muller et al. ................. 435/455 |
| 2007/0032447 | A1 | 2/2007 | Eilertsen |
| 2008/0066197 | A1 | 3/2008 | Ying et al. |
| 2008/0280362 | A1 | 11/2008 | Jaenisch et al. |
| 2009/0047263 | A1 | 2/2009 | Yamanaka et al. |
| 2009/0068742 | A1 | 3/2009 | Yamanaka |
| 2009/0227032 | A1 | 9/2009 | Yamanaka et al. |
| 2010/0062533 | A1 | 3/2010 | Yamanaka |
| 2010/0144031 | A1 | 6/2010 | Jaenisch et al. |
| 2010/0221827 | A1 | 9/2010 | Jaenisch et al. |
| 2010/0310525 | A1 | 12/2010 | Chevalier et al. |
| 2011/0076678 | A1 | 3/2011 | Jaenisch et al. |
| 2012/0028821 | A1 | 2/2012 | Jaenisch et al. |
| 2012/0034192 | A1 | 2/2012 | Young et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 101855350 | 10/2010 |
| EP | 1 970 446 | 9/2008 |
| WO | WO 99/55841 | 11/1999 |
| WO | WO 00/27995 | 5/2000 |
| WO | WO 02/097090 | 12/2002 |
| WO | WO 2005/080598 | 9/2005 |
| WO | WO 2005/090557 | 9/2005 |
| WO | WO 2007/069666 | A1 | 6/2007 |
| WO | WO 2008/001392 | A2 | 1/2008 |
| WO | WO 2008/118820 | | 10/2008 |
| WO | WO 2008/124133 | A1 | 10/2008 |
| WO | WO 2009/117439 | A2 | 9/2009 |
| WO | WO 2009/133971 | | 11/2009 |
| WO | WO 2009/152529 | A2 | 12/2009 |
| WO | WO 2010/033920 | A2 | 3/2010 |

OTHER PUBLICATIONS

"Stem Cells" (Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001. </info/scireport/2001report>. Chapter 4: The Adult Stem Cell. pp. 23-42).*
Chambers et al. Cell 113:643-655, May 2003.*
Hanna et al. Gene Dev 16:2650-2661, Jan. 2002.*
Scholer et al. Nature 344:435-438, 1990.*
Yu et al. Science 318:1917-1920, 2007.*
Takahashi and Yamanaka. Cell 126:663-676, 2006.*
Sox2 cDNA, direct from http://www.ncbi.nih.gov/nuccor/BC057574.1, pp. 1-3, Oct. 24, 2013.*

(Continued)

*Primary Examiner* — Marcia S Noble

(74) *Attorney, Agent, or Firm* — Lisa M. Warren, Esq.; Morse, Barnes-Brown & Pendleton, P.C.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**10 Claims, 2 Drawing Sheets**

EXHIBIT C
PAGE 89

WHI_00011984

Appx3051

US 8,951,797 B2

Page 2

(56) **References Cited**

OTHER PUBLICATIONS

Oct4 cDNA, printout from http://www.ncbi.nih.gov/nuccor/BC117437.1, pp. 1-10, Oct. 24, 2013.*

Palmqvist et al. Stem Cells 23:663-680, 2005.*

Laiosa, et al., "Reprogramming of Committed T Cell Progenitors to Macrophages and Dendritic Cells by C/EBPα and PU.1 Transcription Factors", *Immunity*, 25: 731-744 (2006).

Ait-Si-Ali, et al., "A Suv39h-dependent mechanism for silencing S-phase genes in differentiating but not in cycling cells", *EMBO Journal*, 23:605-615 (2004).

Maherali, et al., "Directly Reprogrammed Fibroblasts Show Global Epigenetic Remodeling and Widespread Tissue Contribution", Cell Stem Cell, 1:55-70(2007).

Sarraf, et al., "Methyl-CpG Binding Protein MBD1 Couples Histone H3 Methylation at Lysine 9 by SETDB1 to DNA Replication and Chromatin Assembly", Molecular Cell, 15:595-605 (2004).

Aoi, et al., "Generation of Pluripotent Stem Cells from Adult Mouse Liver and Stomach Cells", *Science*, 321: 699-702 (2008).

Avilion, et al., "Multipotent cell lineages in early mouse development depend on SOX2 function", *Genes & Development*, 17:126-140 (2003).

Ben-Shushan, et al., "Extinction Oct-3/4 gene expression in embryonal carcinoma x fibroblast somatic cell hybrids is accompanied by changes in the methylation status, chromatin structure, and transcriptional activity of the Oct-3/4 upstream region", *Molecular and Cellular Biology*, 13(2):891-901 (1993).

Bortvin, et al., "Incomplete Reactivation of Oct4-related in Mouse Embryos Cloned from Somatic Nuclei", *Development*, 130:1673-1680 (2003).

Boyer, et al., "Polycomb complexes repress developmental regulators in murine embryonic stem cells", *Nature*, 441(7091):349-353 (2006).

Brambrink, et al., "Sequential Expression of Pluripotency Markers During Direct Reprogramming of Mouse Somatic Cells", *Cell Stem Cell*, 2(2): 151-159 (2008).

Bronson, et al., "Single-copy transgenic mice with chosen-site integration", *Proc. Natl. Acad. Sci. USA*, 93:9067-9072 (1996).

Bru, et al., "Rapid induction of pluripotency genes after exposure of human somatic cells to mouse ES cell extracts", *Experimental Cell Research*, 314:2634-2642 (2008).

Buske, et al., "Overexpression of HOXA10 perturbs human lymphomyelopoiesis in vitro and in vivo", *Blood*, 97(8):2286-2292 (2001).

Carey, et al., "Reprogramming of murine and human somatic cells using a single polycistronic vector", *Proceedings of the National Academy of Science*, 106:157-162 (2009).

Chambers, et al., "Functional expression cloning of nanog, a pluripotency sustaining factor in embryonic stem cells", *Cell*, 113:643-655 (2003).

Chen, et al., "Establishment and Maintenance of Genomic Methylation Patterns in Mouse Embryonic Stem Cells by Dnmt3a and Dnmt3b", *Molecular and Cellular Biology*, 23(16):5594-5605 (2003).

Daniels, et al., "Analysis of Gene Transcription in Bovine Nuclear Transfer Embryos Reconstructed with Granulosa Cell Nuclei", *Biology of Reproduction*, 63:1034-1040 (2000).

Eminli, et al., "Reprogramming of Neural Progenitor Cells into iPS Cells in the Absence of Exogenous Sox2 Expression", *Stem Cells*, 26:2467-2474 (2008).

Gossen, et al., "Transcriptional activation by tetracyclines in mammalian cells", *Science*, 268(5218):1766-1769 (1995).

Greiner, et al., "Identification of a specific inhibitor of the histone methyltransferase SU(VAR)3-9", *Nature Chemical Biology*, 1:143-145 (2005).

Hanna, et al., "Direct reprogramming of terminally differentiated mature B lymphocytes to pluripotency", *Cell* 133, 250-264 (2008).

Hansis, et al., "Analysis of Oct-4 expression and ploidy in individual human blastomeres", *Molecular Human Reproduction*, 7: 155-161 (2001).

Hasegawa, et al., "Efficient multicistronic expression of a transgene in human embryonic stem cells", *Stem Cells*, 25(7): 1707-1712 (2007).

Helgason, et al., "Overexpression of HOXB4 enhances the hematopoietic potential of embryonic stem cells differentiated in vitro", *Blood*, 87(7):2740-2749 (1996).

Ho, et al., "Synthetic Protein Transduction Domains: Enhanced Transduction Potential in Vitro and in Vivo," Cancer Research. 61: 474-477 (2001).

Hochedlinger, et al., "Monoclonal mice generated by nuclear transfer from mature B donor cells", *Nature*, 415:1035-1038 (2002).

Hochedlinger, et al., "Nuclear transplantation, embryonic stem cells, and the potential for cell therapy", *The New England Journal of Medicine*, 349(3):275-286 (2003).

Ihle, et al., "STATs: Signal Transducers and Activators of Transcription", *Cell*, 84: 331-334 (1996).

Jackson-Grusby, et al., "Loss of Genomic Methylation Cases p53-Dependent Apoptosis and Epigenetic Deregulation", *Nature Genetics*, 27: 31-39 (2001).

Jaenisch, Rudolf, Abstract "In vitro *reprogramming of somatic cells into pluripotent ES-like cells*", National Institutes of Health Grant No. 5 R37 HD045022-06, Funding Date 2008.

Jaenisch, Rudolf, Abstract "*Nuclear Cloning and the Reprogramming of the Genome*" National Institutes of Health Grant No. 5 R37 HD045022-01 through 5 R37 HD045022-05, Funding Dates 2003 through 2007.

Jaenisch, Rudolf, Abstract "*Genomic Imprinting and the Cloning of Mice*" National Institutes of Health Grant No. 5 R01 CA084198-01 through 5R01 CA084198-09, Funding Dates 2000 through 2008.

Jaenisch, Rudolf, Abstract "*Epigenetics, stem cells, and cancer*" National Institutes of Health Grant Nos. 5 R01 CA087869-06 through 5 R01 CA087869-08, Funding Dates 2006 through 2008.

Jaenisch, Rudolf, Abstract "*DNA Methylation, Gene Regulation, and Cancer*" National Institutes of Health Grant Nos. 5 R01 CA087869-01 through 5 R01 CA087869-05, Funding Dates 2001 through 2005.

Jaenisch, et al., "Nuclear cloning, stem cells and genomic reprogramming", *Cloning and Stem Cells*, 4(4):389-396 (2002).

Jaenisch & Young, "Stem Cells, the Molecular Circuitry of Pluripotency and Nuclear Reprogramming", *Cell*, 132, 567-582 (2008).

Kaufman, et al., "Hematopoietic colony-forming cells derived from human embryonic stem cells", *PNAS*, 98(19):10716-10721 (2001).

Kubicek, et al., "Reversal of H3K9me2 by a small-molecule inhibitor for the G9a histone methyltransferase", *Molecular Cel*, 25(3):473-81 (2007).

Kyba et al., "HoxB4 confers definitive lymphoid-myeloid engraftment potential on embryonic stem cell and yolk sac hematopoietic progenitors", *Cell*, 109:29-37 (2002).

Lenardo et al., "Repression of the IgH Enhancer in Teratocarcinoma Cells Associated with a Novel Octamer Factor", *Science, New Series*, 243(4890):544-546 (1989).

Li, et al., "Murine embryonic stem cell differentiation is prompted by SOCS-3 and inhibited by the zinc finger transcription factor Klf4", *Blood*, 105:635-637 (2005).

Loh, et al., "The Oct4 and Nanog transcription network regulates pluripotency in mouse embryonic stem cells", *Nature Genetics*, 38(4): 431-440 (2006).

Lowry, et al. Generation of human induced pluripotent stem cells from dermal fibroblasts. "*PNAS*", 105(8):2883-2888 (2008).

Ma, et al., "G9a and Jhdm2a Regulate Embryonic Stem Cell Fusion-Induced Reprogramming of Adult Neural Stem Cells", *Stem Cells*, 26(8): 2131-2141 (2008).

Matsuoka, et al., "Generation of definitive hematopoietic stem cells from murine early yolk sac and paraaortic splanchnopleures by aorta-gonad-mesonephros region-derived stromal cells", *Blood*, 98(1):6-12 (2001).

McWhir, et al., "Selective ablation of differentiated cells permits isolation of embryonic stem cell lines from murine embryos with a non-permissive genetic background", *Nature Genetics*, 14:223-226 (1996).

Mitsui et al., "The Homeoprotein Nanog is Required for Maintenance of Pluripotency in Mouse Epiblast and ES Cells", *Cell*, 113:631-642 (2003).

**EXHIBIT C**
**PAGE 90**

WHI_00011985

**US 8,951,797 B2**

Page 3

(56)                    **References Cited**

OTHER PUBLICATIONS

Mountford, et al., "Dicistronic targeting constructs: Reports and modifiers of mammalian gene expression", *Proceedings of the National Academy of Sciences*, 91: 4303-4307 (1994).

Munsie, et al., "Transgenic strategy for demonstrating nuclear reprogramming in the mouse", *Cloning Stem Cells*, 4(2):121-130 (2002).

Naito, et al., Journal of Reproduction and Fertility 113:137-143 (1998).

Nichols. et al., "Formation of Pluripotent Stem Cells in the Mammalian Embryo Depends on the POU Transcription Factor Oct4", *Cell*, 95: 379-391 (1998).

Niwa, et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells", *Nature Genetics*, 24: 372-376 (2000).

Okita, et al., "Generation of Mouse Induced Pluripotent Stem Cells Without Viral Vectors", *Science*, 322:949-953 (2008).

Peled, et al., "Dependence of human stem cell engraftment and repopulation of NOD/SCID mice on CXCR4", *Science*, 283:845-848 (1999).

Pesce, et al., "Oct-4: Gatekeeper in the beginnings of mammalian development", *Stem Cells*, 19:271-278 (2001).

Qi, et al., "The magic of four: induction of pluripotent stem cells from somatic cells by Oct4, Sox2, Myc and Klf4", *Cell Research*, 17:578-580 (2007).

Radcliffe, et al., "Multiple gene products from a single vector: 'self-cleaving' 2A peptides", *Gene Therapy*, 11:1673-1674 (2004).

Ramalho-Santos, et al., "Stemness: Transcriptional Profiling of Embryonic and Adult Stem Cells", *Science*, 298: 597-600 (2002).

Ryan, et al., "Cleavage of foot-and-mouth disease virus polyprotein is mediated by residues located within a 19 amino acid sequence", *Journal of General Virology*, 72:2727-2732 (1991).

Savarese, et al., "Hematopoietic Precursor Cells Transiently Reestablish Permissiveness for X Inactivation", *Molecular and Cellular Biology*, 26(19): 7167-7177 (2006).

Sells, et al., "Delivery of Protein into Cells Using Polycationic Liposomes," *BioTechniques* 19(1):72-78 (1995).

Shields, et al., "Identification and Characterization of a Gene Encoding a Gut-Enriched Kruppel-like Factor Expressed during Growth Arrest", *Journal of Biological Chemistry*, 271(33):20009-20017 (1996).

Stacey, et al., "Microinjection of Transforming *ras* Protein Induces *c-fos* Expression," *Molecular and Cellular Biology*, 7(1): 523-527 (1987).

Stadfeld, et al., "Reprogramming of Pancreatic β Cells into Induced Pluripotent Stem Cells", *Current Biology*, 18:890-894 (2008).

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001, <//info/scireport/2001report>. Chapter 4: The Adult Stem Cell. pp. 23-42.

Tada, et al., "Nuclear Reprogramming of Somatic Cells by In Vitro Hybridization with ES cells", *Current Biology*, 11: 1553-1558 (2001).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Adult Human Fibroblasts by Defined Factors", *Cell*, 131, 861-872 (2007).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Mouse Embryonic and Adult Fibroblast Cultures by Defined Factors", *Cell*, 126, 663-676 (2006).

Thomson, et al., "Embryonic Stem Cell Lines Derived from Human Blastocysts", *Science*, 282, 1145-1147 (1998).

Wadia, et al., "Protein Transduction Technology," *Analytical Biotechnology*, 13: 52-56 (2002).

Wernig, et al., "A drug-inducible transgenic system for direct reprogramming of multiple somatic cell types", *Nature Biotechnology*, 26(8):916-924 (2008).

Wernig, et al., "In vitro reprogramming of fibroblasts into a pluripotent ES-cell-like state", *Nature*, 448: 318-324 (2007).

Wernig, et al., "Neurons derived from reprogrammed fibroblasts functionally integrate into the fetal brain and improve symptoms of rats with Parkinson's disease", *PNAS*, 105(15).5856-5861 (2008).

Yamanaka, et al., "Strategies and New Developments in the Generation of Patient-Specific Pluripotent Stem Cells", *Cell Stem Cell*, 1: 39-49 (2007).

Yeom et al., "Germline regulatory element of Oct-4 specific for the totipotent cycle of embryonal cells," *Development*,122:881-897 (1996).

Ying, et al., "BMP induction of Id proteins suppresses differentiation and sustains embryonic stem cell self-renewal in collaboration with STAT3", *Cell*, 115: 281-292 (2003).

Yoshimizu, et al., "Germline-specific expression of the Oct-4/green fluorescent protein (GFP) transgene in mice", *Development, Growth & Differentiation*, 41:675-684 (1999).

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells " National Institutes of Health Grant No. 5 RO1 HG002668-04A1 through 5 RO1 HG002668-05, Funding Dates 2007 through 2008.

Young, Richard, Abstract "Transcriptional Regulatory Network in Living Cells" National Institutes of Health Grant No. 5 RO1 HG002668-01 through 5 RO1 HG002668-03S1, Funding Dates 2003 through 2006.

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", *Science*. 318(5858):1917-20 (2007).

Zakhartchenko, et al, "Adult cloning in cattle: potential of nuclei from a permanent cell line and from primary cultures", *Molecular Reproduction and Development*, 54:264-272 (1999).

Zambrowicz, et al., "Disruption of overlapping transcripts in the ROSA βgeo 26 gene trap strain leads to widespread expression of β-galactosidase in mouse embryos and hematopoietic cells", *Proc. Natl. Acad. Sci. USA*, 94:3789-3794 (1987).

Zhou, et al., "Generation of Induced Pluripotent Stem Cells Using Recombinatnt Proteins", *Cell Stem Cell*, 4:381-384 (2009).

Blast Alignment SEQ ID 16 (ECAT4).

Sox2, print out from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/127140985?ordinalp . . . ntrez.Sequence.Sequence_ResultsPanel. Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Nanog. Printout from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/153791181?ordinalp . ntrez.Sequence.Sequence_ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Scholer, et al., "New type of POU domain in germ line-specific protein Oct-4", Letters to Nature, 344: 435-439 (1990).

Bilic, et al., "Concise Review: Induced Pluripotent Stem Cells Versus Embryonic Stem Cells: Close Enough or Yet Too Far Apart?", *Stem Cells*, 30:33-41(2012).

Chin, et al., "Induced Pluripotent Stem Cells and Embryonic Stem Cells are Distinguished by Gene Expression Signatures", *Cell Stem Cell*, 5:111-123(2009).

Chin, et al., "Molecular Analyses of Human Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Cell Stem Cell*, 7(2):263-269(2010).

Munoz, et al., "The Quantitative Proteomes of Human-Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Molecular Systems Biology*, 7(550): 1-13(2011).

Polouliakh, et al., "Reprogramming Resistant Genes: In-Depth Comparison of Gene-Expressions Among iPS, ES, and somatic cells", *Frontiers in Physiology*, 4(7):1-9(2013).

Meissner, et al., "Direct Reprogramming of genetically unmodified fibroblasts into pluripotent stem cells", *Nature Biotechnology*, 25(10): 1177-1181 (2007).

Strelchenko, et al "Reprogramming of human somatic cells by embryonic stem cell cytoplast", *Reprod. Biomed Online*, 12(1): 107-111 (2006).

Cowan, et al., Nuclear Reprogramming of Somatic Cells After Fusion with Human Embryonic Stem Cells, *Science*, 309:1369-1373 (2005).

International Search Report for International Application PCT/US08/04516, dated Sep. 10, 2008.

International Search Report for International Application PCT/US2009/047423, dated May 3, 2010.

International Search Report for International Application PCT/US2009/057692, dated Jun. 30, 2010.

Supplementary European Search Report for Application No. EP 08742630.0, dated Mar. 25, 2010.

**EXHIBIT C**
**PAGE 91**

WHI_00011986

(56)         **References Cited**

OTHER PUBLICATIONS

Supplementary European Search Report for Application No. EP 09763816, dated Nov. 29, 2012.
Partial European Search Report for Application No. EP12003893, dated Jun. 24, 2013.
Non-Final Office Action for U.S. Appl. No. 10/997,146, mailed Nov. 3, 2006.
Final Office Action for U.S. Appl. No. 10/997,146, mailed Aug. 14, 2007.
Non-Final Office Action for U.S. Appl. No. 10/997,146, mailed Jul. 22, 2008.
Non-Final Office Action for U.S. Appl. No. 10/997,146, mailed Apr. 9, 2009.
Non-Final Office Action for U.S. Appl. No. 12/703,015, mailed Oct. 28, 2010.
Final Office Action for U.S. Appl. No. 12/703,015, mailed Jul. 8, 2011.
Non-Final Office Action for U.S. Appl. No. 12/703,061, mailed Oct. 28, 2010.
Final Office Action for U.S. Appl. No. 12/703,061, mailed Jul. 14, 2011.
Non-Final Office Action for U.S. Appl. No. 12/703,061, mailed Sep. 19, 2011.
Notice of Allowance in U.S. Appl. No. 10/997,146, mailed Jan. 26, 2010.
Notice of Allowance in U.S. Appl. No. 12/703,015, mailed Sep. 16, 2011.
Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed May 9, 2012.
Final Office Action for U.S. Appl. No. 12/595,041, mailed Dec. 7, 2012.
Restriction Requirement for U.S. Appl. No. 13/119,891, mailed Dec. 12, 2013.
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed May 15, 2013.
Non-Final Office Action for U.S. Appl. No. 12/703,061, mailed Aug. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,444, mailed Aug. 20, 2013.
PubMed Oct4 gene, Printout from www.ncbi.nlm.nih.gov/nuccore/ NM_013633.3, pp. 1-12. Sep. 19, 2013.

Non-Final Office Action for U.S. Appl. No. 13/646,430, mailed Sep. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed Sep. 23, 2013.
Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed Oct 2, 2013.
Chinnasamy, et al., "Multicistronic lentiviral vectors containing the FMDV 2A cleavage factor demonstrate robust expression of encoded genes at limited MOI", *Virology Journal*, 3: 14-29 (2006).
Okita, et al., "Generation of germline-competent induced pluripotent stem cells", *Nature*, 448: 313-318 (2007).
Feldman, et al., "G9a-mediated irreversible epigenetic inactivation of Oct-3/4 during early embryogenesis", *Nature Cell Biology*, 455: 627-633 (2008).
Zhou, et al., "In vivo reprogramming of adult pancreatic exocrine cells to b-cells", *Nature*, 455: 627-633 (2008).
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed Jan. 2, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, mailed Jan. 3, 2014.
Final Office Action for U.S. Appl. No. 12/997,815, mailed Jul. 15, 2014.
Silva, et al., "Nanog promotes transfer of pluripotency after cell fusion", Nature, 441: 997-1001 (2006).
Shi, et al., Dynamic Regulation of Histone Lysine Methylation by Demethylases, Molecular Cell, 25: 1-14 (2007).
Final Office Action for U.S. Appl. No. 13/119,891, mailed Aug. 18, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,420, dated Sep. 17, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,444, dated Sep. 22, 2014.
Nakagawa, et al., "Generation of induced pluripotent stem cells without Myc from mouse and human fibroblasts", *Nature Biotechnology*, 26(1): 101-106 (2008).
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed May 27, 2014.
Final Office Action for U.S. Appl. No. 12/595,041, mailed May 30, 2014.
Notice of Allowance for U.S. Appl. No. 12/703,061, dated Nov. 7, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,430, dated Dec. 8, 2014.

* cited by examiner

**EXHIBIT C**
**PAGE 92**

WHI_00011987

**Appx3054**

Case 3:22-cv-00676-HSO-BWR Document 178 Filed 02/08/2024 Page 6 of 20



Figure 1. Inducible *Oct4* allele

**EXHIBIT C**
**PAGE 93**

Appx3055

WHI_00011988

Case 3:22-cv-00675-JSC Document 151-178 Filed 02/08/2024 Page 7 of 20
Case 3:22-cv-00675-JSC Document 151-178 Filed 02/08/2024 Page 232 of 323

U.S. Patent     Feb. 10, 2015     Sheet 2 of 2     US 8,951,797 B2



Figure 2. The system works...

EXHIBIT C
PAGE 94

WHI_00011989

US 8,951,797 B2

1

# COMPOSITIONS FOR IDENTIFYING REPROGRAMMING FACTORS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/703,061, filed Feb. 9, 2010, which is a divisional of U.S. application Ser. No. 10/997,146, filed Nov. 24, 2004 (U.S. Pat. No. 7,682,828), which claims the benefit of U.S. Provisional Application No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional Application No. 60/530,042, filed Dec. 15, 2003, the specifications of which are incorporated herein by reference in their entirety.

## GOVERNMENTAL FUNDING

This invention was made with government support under R37 CA84198 awarded by the National Institutes of Health. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate into the full range of daughter cells having distinctly different morphological, cytological or functional phenotypes unique to a specific tissue. By contrast, descendants of pluripotent cells are restricted progressively in their differentiation potential, with some cells having only one fate. Pluripotent cells have extraordinary scientific and therapeutic potential, as they can be differentiated along the desired differentiation pathway in a precisely controlled manner and used in cell-based therapy.

Two categories of pluripotent stem cells are known to date: embryonic stem cells and embryonic germ cells. Embryonic stem cells are pluripotent stem cells that are derived directly from an embryo. Embryonic germ cells are pluripotent stem cells that are derived directly from the fetal tissue of aborted fetuses. For purposes of simplicity, embryonic stem cells and embryonic germ cells will be collectively referred to as "ES" cells herein.

ES cells are presently obtained via several methods. In a first method, an ES cell line is derived from the inner cell mass of a normal embryos in the blastocyst stage (See U.S. Pat. No. 6,200,806, Thompson, J. A. et al. Science, 282:1145-7, 1998 and Hogan et al., 2003). A second method for creating pluripotent ES cells utilizes the technique of somatic cell nuclear transfer (SCNT). In this technique, the nucleus is removed from a normal egg, thus removing the genetic material. Next, a donor diploid somatic cell is placed next to the enucleated egg and the two cells are fused, or the nucleus is introduced directly into the oocyte by micromanipulation. The fused cell has the potential to develop into a viable embryo, which may then be sacrificed to remove that portion of the embryo containing the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is transplanted into an entirely enucleated animal oocyte of a species different from the donor cell (referred to herein as animal stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. application Ser. No. 20010012513 (2001). The resultant chimeric cells are used for the production of pluripotent ES cells, in particular human-like pluripotent ES cells. One disadvantage of this technique is that these chimeric cells may contain unknown non-human viruses and still contain the mitochondria of the animal species. Thus, there would be substantial risks of immune rejection if such cells were used in cell transplantation therapies.

2

In a fourth method, ES cells can be isolated from the primordial germ cells found in the genital ridges of post-implanted embryos.

As described above, all presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species. The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application.

There is thus a great demand for alternative methods of generating pluripotent cells.

## SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in which one or more endogenous pluripotency gene(s) is operably linked to a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene to which the marker is linked. The invention also provides transgenic mice containing these engineered somatic cells.

The present invention also provides methods for reprogramming somatic cells to a less differentiated state. In the methods, engineered somatic cells of the invention are treated with an agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state. In the methods, the engineered somatic cells described above are contacted with a candidate agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The presence of at least a subset of pluripotency characteristics indicates that the agent is capable of reprogramming somatic cells to a less-differentiated state. The agents identified by the present invention can then by used to reprogram somatic cells by contacting somatic cells with the agents.

The present invention also provides methods for identifying a gene that causes the expression of at least one endogenous pluripotency gene in somatic cells. In the methods, the engineered somatic cells are transfected with a cDNA library prepared from a pluripotent cell, such as an ES cell. The cells that express the appropriate selectable marker are then selected, and the expression of the appropriate endogenous pluripotency gene is examined. The expression of an endogenous pluripotency gene indicates that the cDNA encodes a protein whose expression in the cell results in, directly or indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating a condition in an individual in need of such treatment. In certain embodiments, somatic cells are obtained from the individual and reprogrammed by the methods of the invention under conditions suitable for the cells to develop into cells of a desired cell type. The reprogrammed cells of a desired cell type are then harvested and introduced into the individual to treat the condition. In certain further embodiments, the somatic cells obtained from the individual contains a mutation in one or more genes. In these instances, the methods are modified so that the somatic cells obtained from the individual are first treated to restore the one or more normal gene(s) to the cells such that the resulting cells carry the normal endogenous gene, which are then introduced into the

**EXHIBIT C**
**PAGE 95**

WHI_00011990

US 8,951,797 B2

3

individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such as a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an inducible Oct4 allele.
FIG. 2 shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

DETAILED DESCRIPTION OF THE INVENTION

Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

4

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene gives one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluipotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. For example, multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5fl, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-differentiation (Nichols et al., 1998, Cell 95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):293-300.

EXHIBIT C
PAGE 96

WHI_00011991

US 8,951,797 B2

**5**

Engineered Somatic Cells and Transgenic Mice Comprising Such Cells

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred to in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match," it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the desired endogenous pluripotency gene, downstream from the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

**6**

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The desired ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced into cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian

**EXHIBIT C**
**PAGE 97**

WHI_00011992

US 8,951,797 B2

7

cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, as used herein, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt), dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differ-

8

entiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness".

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristics that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 15 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J. 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152:212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595; Dah-Istrand et al., 1992, J. Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1998, Blood 91:2625-2626), the transcription factor Tcf-4 (Korinek et al., 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1566-1572), and the transcription factor Cdx1 (Duprey et al., 1988, Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-18).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular signature", or "stemness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

**EXHIBIT C**

**PAGE 98**

WHI_00011993

US 8,951,797 B2

9

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358 (1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensable for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA 26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997) The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first, strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA, the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; Gene Expression Technology: Methods in Enzymology, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control

10

sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Lee et al. P.N.A.S. USA (1988), 85, 1204-1208; (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated cDNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Thus, in one embodiment, the present invention provides mice and somatic cells carrying at least one pluripotency gene expressed as a transgene under an inducible promoter. It is possible that somatic cells with such inducible pluripotency transgene(s) are more prone to be reprogrammed.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to select for all the selectable markers linked to the various endogenous pluripotency genes.

**EXHIBIT C**
**PAGE 99**

WHI_00011994

US 8,951,797 B2

11

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatic structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol. Chem. 277: 34521-30, 2002; and Bergman and Mostoslavsky, Biol. Chem. 1990. Thus, DNA methylation inhibitors and histone deacetyation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate gents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are

12

readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVERSet. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacetylation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, Foxd3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

Reprogrammed Somatic Cells and These Uses

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condi-

EXHIBIT C
PAGE 100

WHI_00011995

US 8,951,797 B2

13

tion. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferral of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-x1 might be useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and culturing such cells under conditions which favor differentia-

14

tion, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neuroectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngenic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital system, such as the bladder, clitoris, corpus cavernosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Attila, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, poly-

**EXHIBIT C**
**PAGE 101**

WHI_00011996

US 8,951,797 B2

15

orthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786,217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor maybe introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunningan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for Gln6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or nonneural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139: 39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations in ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., heniatopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

16

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the 1K gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon gancyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoeitic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

Furthermore, the RPSCs produced according to the invention maybe introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices.

Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine,

**EXHIBIT C
PAGE 102**

WHI_00011997

US 8,951,797 B2

17

18

ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,992, 5,627,059, 5,631,153, and 6,204,061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired characteristics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In the second method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The

expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press, Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

Example

Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5' end and a SV40 polyA tail (SV40-pA) at its 3' end. The second integration vector, tetracycline activator integration vector, contains a

**EXHIBIT C**
**PAGE 103**

WHI_00011998

US 8,951,797 B2

19

mutant form of tetracycline activator, M2-rtTA, which is more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracy-cline activator integration vector are introduced into the Col-lagen locus and the Rosa26 locus respectively via site-spe-cific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complemen-tation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-induc-ible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expres-sion level in fibroblasts treated with doxycycline is compa-rable to the Oct4 expression level in ES cells, and undetect-able in fibroblasts not treated with doxycycline. The expression results demonstrate that the inducible Oct4 trans-gene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 trans-gene. Dox induction was for 24 hours prior to nuclear trans-fer. Cloned embryos were then activated and cultured to the blas-tocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as mea-sured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

| In vitro development of clones derived from Oct4-induced fibroblasts | | | | |
|---|---|---|---|---|
| Expt. | Oct4 | eggs w/PN | Blastocysts (% PN) | ES lines (% PN) |
| #1 | − | 22 | 5 (23%) | 0 (0%) |
| #2 | − | 35 | 5 (14%) }19% | 2 (6%) }3% |
| #3 | + | 37 | 10 (27%) | 2 (5%) |
| #4 | + | 47 | 10 (21%) }24% | 4 (9%) }7% |

PN . . . ProNucleus formation
Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, Nature, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

20

REFERENCES

Avilion, J., et al., Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells, Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 2650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. II., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci, USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger S, Baron U, Thellmann M, Hasan M T, Bujard II, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-de-pendent transcriptional activators: novel mutations yield expanded range and sensitivity.
William R. L., et al , Nature 336: 684-687 (1988)
Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J., Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. Am. New York Acad. Sci. 580, 81-87
Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA bgeo 26 gene trap strain leads to widespread expression of b-galatosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

1. A composition comprising an isolated primary somatic cell that comprises an exogenously introduced nucleic acid encoding Oct4, wherein the exogenously introduced nucleic acid increases Oct4 expression in the cell.

2. The composition of claim 1, wherein the isolated pri-mary somatic cell is a mammalian cell.

3. The composition of claim 1, wherein the isolated pri-mary somatic cell is a human cell or a mouse cell.

4. The composition of claim 1, wherein the isolated pri-mary somatic cell is an adult stem cell.

5. The composition of claim 4, wherein the adult stem cell is selected from the group consisting of: a hematopoietic stem cell, a neural stem cell, and a mesenchymal stem cell.

6. The composition of claim 1, further comprising a can-didate agent of interest with respect to its potential to repro-gram a somatic cell.

7. The composition of claim 6, wherein the candidate agent of interest is a DNA methylation inhibitor, a histone deacety-lase inhibitor or PD098059.

8. The composition of claim 6, wherein the candidate agent of interest is an exogenous nucleic acid encoding a pluripo-tency protein selected from the group consisting of: Nanog and Sox-2.

9. A composition comprising a cDNA encoding an Oct4 protein and a cDNA encoding a Sox2 protein, wherein the composition further comprises a DNA methylation inhibitor, a histone deacetylase inhibitor or PD098059.

EXHIBIT C
PAGE 104

WHI_00011999

Appx3066

US 8,951,797 B2

21                                                22

**10**. The composition of claim **9**, further comprising a cDNA encoding an Oct4 protein and an isolated nucleic acid encoding a Nanog protein.

\* \* \* \* \*

**EXHIBIT C**
**PAGE 105**

WHI_00012000

**Appx3067**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 8,951,797 B2                                                    Page 1 of 1
APPLICATION NO. : 13/646411
DATED : February 10, 2015
INVENTOR(S) : Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 21, Claim 10, Lines 2-3, the phrase "encoding an Oct4 protein and an isolated nucleic acid" should be removed.

Signed and Sealed this
Twenty-seventh Day of June, 2017

*Joseph  Matal*

Joseph Matal
*Performing the Functions and Duties of the
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office*

# EXHIBIT C
# PAGE 106

WHI_00012001

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 8,951,797 B2 | Page 1 of 1 |
| APPLICATION NO. | : 13/646411 | |
| DATED | : February 10, 2015 | |
| INVENTOR(S) | : Rudolf Jaenisch et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 16 through Line 20, please delete:
"GOVERNMENTAL FUNDING
This invention was made with government support under R37 CA84198 awarded by the National Institutes of Health. The government has certain rights in the invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

**EXHIBIT C
PAGE 107**

WHI_00012002

**Appx3069**

# EXHIBIT D



US008940536B2

(12) **United States Patent**
Jaenisch et al.

(10) Patent No.: **US 8,940,536 B2**
(45) Date of Patent: **\*Jan. 27, 2015**

(54) **METHODS FOR MAKING SOMATIC CELLS MORE SUSCEPTIBLE TO REPROGRAMMING**

(75) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/703,061**

(22) Filed: **Feb. 9, 2010**

(65) **Prior Publication Data**

US 2010/0144031 A1 Jun. 10, 2010

**Related U.S. Application Data**

(62) Division of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530,042, filed on Dec. 15, 2003.

(51) **Int. Cl.**

| *C12N 5/00* | (2006.01) |
| *C12N 15/85* | (2006.01) |
| *A01K 67/027* | (2006.01) |
| *C07K 14/47* | (2006.01) |
| *C12N 15/877* | (2010.01) |
| *C12N 5/074* | (2010.01) |

(52) **U.S. Cl.**
CPC ............ *C12N 15/85* (2013.01); *A01K 67/0273* (2013.01); *A01K 67/0275* (2013.01); *C07K 14/4702* (2013.01); *C12N 15/8509* (2013.01); *C12N 15/8775* (2013.01); *C12N 5/0696* (2013.01); *A01K 2217/05* (2013.01); *A01K 2227/105* (2013.01); *C12N 2830/003* (2013.01); *C12N 2830/006* (2013.01)
USPC .......................................... **435/377**; 435/325

(58) **Field of Classification Search**
USPC ................................................. 435/377, 325
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,824,837 | A | 10/1998 | Chen et al. |
| 5,843,780 | A | 12/1998 | Thomson |
| 6,200,806 | B1 | 3/2001 | Thomson |
| 7,015,037 | B1 | 3/2006 | Furcht et al. |
| 7,524,677 | B2 * | 4/2009 | Stockman Campbell et al. ........................... 435/325 |
| 7,601,699 | B2 | 10/2009 | Eilertsen |
| 7,682,828 | B2 | 3/2010 | Jaenisch et al. |

| 7,687,266 | B2 * | 3/2010 | Chambers et al. ............ 435/455 |
| 8,071,369 | B2 | 12/2011 | Jaenisch et al. |
| 2002/0168660 | A1 | 11/2002 | Chen et al. |
| 2004/0137460 | A1 | 7/2004 | Yamanaka et al. |
| 2006/0084172 | A1 * | 4/2006 | Muller et al. ................. 435/455 |
| 2007/0032447 | A1 | 2/2007 | Eilersten |
| 2008/0066197 | A1 | 3/2008 | Ying et al. |
| 2008/0280362 | A1 | 11/2008 | Jaenisch et al. |
| 2009/0047263 | A1 | 2/2009 | Yamanaka et al. |
| 2009/0068742 | A1 | 3/2009 | Yamanaka |
| 2009/0227032 | A1 | 9/2009 | Yamanaka et al. |
| 2010/0062533 | A1 | 3/2010 | Yamanaka |
| 2010/0221827 | A1 | 9/2010 | Jaenisch et al. |
| 2010/0310525 | A1 | 12/2010 | Chevalier et al. |
| 2011/0076678 | A1 | 3/2011 | Jaenisch et al. |
| 2012/0028821 | A1 | 2/2012 | Jaenisch et al. |
| 2012/0034192 | A1 | 2/2012 | Young et al. |

FOREIGN PATENT DOCUMENTS

| CN | 101855350 | 10/2010 | |
| EP | 1 970 446 | 9/2008 | |
| WO | WO 99/55841 | 11/1999 | |
| WO | WO 00/27995 | 5/2000 | |
| WO | WO 02/097090 | 12/2002 | |
| WO | WO 2005/080598 | 9/2005 | |
| WO | WO 2005/090557 | 9/2005 | |
| WO | WO 2007/069666 | A1 | 6/2007 | |
| WO | WO 2008/001391 | A2 | 1/2008 | |
| WO | WO 2008/118620 | | 10/2008 | |
| WO | WO 2008/124133 | A1 | 10/2008 | |
| WO | WO 2009/117439 | A2 * | 9/2009 | .............. C12N 5/08 |
| WO | WO 2009/133971 | | 11/2009 | |

(Continued)

OTHER PUBLICATIONS

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001. </info/scireport/2001report>. Chapter 4: The Adult Stem Cell, pp. 23-42.*

Zhou et al. Cell Stem Cell 4:381-384, 2009.*

Tada et al. Current Biology 11:1553-1558.*

Hong et al. Am J. Physiol. Heart Circ. Physiol. 305:H1363-1372, 2013.*

Ben-Shushan et al., "Extinction of Oct-3/4 gene expression in embryonal carcinoma x fibroblast somatic cell hybrids is accompanied by changes in the methylation status, chromatin structure, and transcriptional activity of the Oct-3/4 upstream region," Molecular and Cellular Biology 13(2):891-901 (1993).

Bronson et al., "Single-copy transgenic mice with chosen-site integration," Proc. Natl. Acad. Sci. USA 93:9067-9072 (1996).

(Continued)

*Primary Examiner* — Marcia S Noble

(74) *Attorney, Agent, or Firm* — Lisa M. Warren, Esq.; Morse, Barnes-Brown & Pendleton, P.C.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**17 Claims, 2 Drawing Sheets**

EXHIBIT D
PAGE 108

WHI_00011966

Appx3071

## US 8,940,536 B2
Page 2

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

WO    WO 2009/152529 A2    12/2009
WO    WO 2010/033920 A2    3/2010

OTHER PUBLICATIONS

Buske et al., "Overexpression of HOXA10 perturbs human lymphomyelopoiesis in vitro and in vivo," Blood 97(8):2286-2292 (2001).
Chambers et al., "Functional expression cloning of nanog, a pluripotency sustaining factor in embryonic stem cells," Cell 113:643-655 (2003).
Daniels et al., "Analysis of Gene Transcription in Bovine Nuclear Transfer Embryos Reconstructed with Granulosa Cell Nuclei," Biology of Reproduction 63:1034-1040 (2000).
Gossen et al., "Transcriptional activation by tetracyclines in mammalian cells," Science 268(5218):1766-1769 (1995).
Helgason et al., "Overexpression of HOXB4 enhances the hematopoietic potential of embryonic stem cells differentiated in vitro," Blood 87(7):2740-2749 (1996).
Hochedlinger et al., "Monoclonal mice generated by nuclear transfer from mature B and T donor cells," Nature 415:1035-1038 2002.
Hochedlinger et al., "Nuclear transplantation, embryonic stem cells, and the potential for cell therapy," the New England Journal of Medicine 349(3):275-286 (2003).
Jaenisch et al., "Nuclear cloning, stem cells, and genomic reprogramming," Cloning and Stem Cells 4(4):389-396 (2002).
Kaufman et al., "Hematopoietic colony-forming cells derived from human embryonic stem cells," PNAS 98(19)10716-10721 (2001).
Kyba et al., "HoxB4 confers definitive lymphoid-myeloid engraftment potential on embryonic stem cell and yolk sac hematopoietic progenitors," Cell 109:29-37 (2002).
Lenardo et al., "Repression of the IgH Enhancer in Teratocarcinoma Cells Associated with a Novel Octamer Factor," Science, New Series 243(4890):544-546 (1989).
Matsuoka et al., "Generation of definitive hematopoietic stem cells from murine early yolk sac and paraaortic splanchnopleures by aorta-gonad-mesonephros region-derived stromal cells," Blood 98(1):6-12 (2001).
McWhir et al., "Selective ablation of differentiated cells permits isolation of embryonic stem cell lines from murine embryos with a non-permissive genetic background," Nature Genetics 14:223-226 (1996).
Mitsui et al., "The homeoprotein nanog is required by maintenance of pluripotency in mouse epiblast in ES cells." Cell 113:631-642 (2003).
Mountford et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression," Proceedings of the National Academy of Sciences 91:4303-4307 (1994).
Munsie et al., "Transgenic strategy for demonstrating nuclear reprogramming in the mouse," Cloning Stem Cells 4 2 :121-130 (2002).
Naito et al., Journal of Reproduction and Fertility 113: 137-143 (1998).
Niwa et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells," Nature Genetics 24:372-376 (2000).
Peled et al., "Dependence of human stem cell engraftment and repopulation of NOD/SCID mice on CXCR4," Science 283:845-848 (1999).
Pesce et al., "Oct-4: Gatekeeper in the beginnings of mammalian development," Stem Cells 19:271-278 (2001).
Tada et al., "Nuclear reprogramming of somatic cells by in vitro hybridization with ES cells," Current Biology 11:1553-1558 (2001).
Yeom et al., "Germline regulatory element of Oct-4 specific for the totipotent cycle of embryonal cells," Development 122:881-897 (1996).
Yoshimizu et al., "Germline-specific expression of the Oct-4/green fluorescent protein (GFP) transgene in mice," Development, Growth & Differentiation 41:675-684 (1999).

Zakhartchenko et al., "Adult cloning in cattle: potential of nuclei from a permanent cell line and from primary cultures," Molecular Reproduction and Development 54:264-272 (1999).
Zambrowicz et al., "Disruption of overlapping transcripts in the ROSA βgeo 26 gene trap strain leads to widespread expression of β-galactosidase in mouse embryos and hematopoietic cells," Proc. Natl. Acad. Sci. USA 94:3789-3794 (1987).
Sox2. print out from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/127140985?ordinalp...ntrez.Sequence.Sequence_ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.
Nanog. Printout from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/153791181?ordinalp...netrez.Sequence.Sequence_ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.
Chambers et al., "Functional Expression Cloning of Nanog, a Pluripotency Sustaining Factor in Embryonic Stem Cells." Cell, 113: 643-655 (2003).
Hanis et al., "Analysis of Oct-4 expression and ploidy in individual human blastomeres," Molecular Human Reproduction, 7: 155-161 (2001).
Mitsui et al., "The Homeoprotein Nanog is Required for Maintenance of Pluripotency in Mouse Epiblast and ES Cells," Cell, 113: 631-642 (2003).
Mountford et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression," Proceedings of the National Academy of Sciences, 91: 4303-4307 (1994).
Niwa et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells," Nature Genetics, 24: 372-376 (2000).
Ramalho-Santos et al., "Stemness': Transcriptional Profiling of Embryonic and Adult Stem Cells." Science, 298: 597-600 (2002).
Tada et al., "Nuclear Reprogramming of Somatic Cells by In Vitro Hybridization with ES cells," Current Biology, 11: 1553-1558 (2001).
BLAST Alignment SEQ ID 16 (ECAT4), Apr. 28, 2011.
Final Office Action for U.S Appl. No. 12/703,015, mailed Jul. 8, 2011.
Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed May 9, 2012.
Aoi, et al., Generation of Pluripotent Stem Cells from Adult Mouse Liver and Stomach Cells. Science, 321: 699-702 (2008).
Avilion, et al., Multipotent cell lineages in early mouse development depend on SOX2 functions. Genes & Development, 17:126-140 (2003).
Bortvin, et al., Incomplete Reactivation of Oct4-related in Mouse Embryos Cloned from Somatic Nuclei. Development, 130:1673:1680 (2003).
Boyer, et al., Polycomb complexes repress developmental regulators in murine embryonic stem cells. Nature, 441(7091):349-353 (2006).
Brambrink, et al., Sequential Expression of Pluripotency Markers During Direct Reprogramming of Mouse Somatic Cells. Cell Stem Cell, 2(2): 151-159 (2008).
Bru, et al., Rapid induction of pluripotency genes after exposure of human somatic cells to mouse ES cell extracts. Experimental Cell Research, 314:2634-2642 (2008).
Carey, et al., Reprogramming of murine and human somatic cells using a single polycistronic vector. PNAS, 106:157-162 (2009).
Chen, et al., Establishment and Maintenance of Genomic Methylation Patterns in Mouse Embryonic Stem Cells by Dnmt3a abd Dnmt3b. Molecular and Cellular Biology, 23(16):5594-5605 (2003).
Eminli, et al., Reprogramming of Neural Progenitor Cells into iPS Cells in the Absence of Exogenous Sox2 Expression. Stem Cells, 26:2467-2474 (2008).
Greiner, et al., Identification of a specific inhibitor of the histone methyltransferase SU(VAR)3-9. Nature Chemical Biology, 1:143-145 (2005).
Hanna, et al. Direct reprogramming of terminally differentiated mature B lymphocytes to pluripotency. Cell, 133, 250-264 (2008).
Ihle, STATs: Signal Transducers and Activators of Transducers and Activators of Transcription. Cell, 84: 331-334 (1996).
Jackson-Grusby. et al., Loss of Genomic Methylation Cases p53-Dependent Apoptosis and Epigenetic Deregulation. Nature Genetics, 27: 31-39 (2001).

US 8,940,536 B2
Page 3

(56)    References Cited

OTHER PUBLICATIONS

Jaenisch, Rudolf, Abstract "*Nuclear Closing and the Reprogramming of the Genome*" National Institutes of Health Grant No. 5 R37 HD045022-01 through 5 R37 HD045022-02, Funding Dates 2003 through 2004.

Jaenisch, Rudolf, Abstract of "*Genomic Imprinting and the Cloning of Mice*" National Institutes of Health Grant No. 5 R01 CA084198-01 through 5R01 CA084198-05, Funding Dates 2000 through 2004.

Jaenisch, Rudolf, Abstract "*DNA Methylation, Gene Regulation, and Cancer*" National Institutes of Health Grant Nos. 5 R01 CA087869-01 through 5 R01 CA087869-04, Funding Dates 2001 through 2004.

Jaenisch & Young, Stem Cells, the Molecular Circuitry of Pluripotency and Nuclear Reprogramming. Cell, 132, 567-582 (2008).

Kubicek, et al., Reversal of H3K9me2 by a small-molecule inhibitor for the G9a histone methltransferase. Molecular Cell, 25(3):473-81 (2007).

Li, et al., Murine embryonic stem cell differentiation is prompted by SOC-3 and inhibited by the zinc finger transcription factor Klf4. Blood, 105:635-637 (2005).

Loh, et al., The Oct4 and Nanog transcription network regulates pluripotency in mouse embryonic stem cells. Nature Genetics, 38(4): 431-440 (2006).

Lowry, et al. Generation of human induced pluripotent stem cells from dermal fibroblasts. PNAS, 105(8):2883-2888 (2008).

Nichols, et al., Formation of Pluripotent Stem Cells in the Mammalian Embryo Depends on the POU Transcription Factor Oct4. Cell, 95: 379-391 (1998).

Okita, et al., Generation of Mouse Induced Pluripotent Stem Cells Without Viral Vectors. Science. 322:949-953 (2008).

Qi, et al., The magic of four: induction of pluripotent stem cells from somatic cells by Oct4, Sox2, Myc and Klf4. Cell Research, 17:578-580 (2007).

Radcliffe, et al., Multiple gene products from a single vector: 'self-cleaving' 2A peptides. Gene Therapy, 11:1673-1674 (2004).

Ryan, et al., Cleavage of foot-and-mouth disease virus polyprotein is mediated by residues located within in 19 amino acid sequence. Journal of General Virology, 72:2727-2732 (1991).

Savarese, et al., Hematopoietic Precursor Cells Transiently Reestablish Permissiveness for X Inactivation. Molecular and Cellular Biology, 26(19): 7167-7177 (2006).

Shields, et al., Identification and Characterization of a Gene Encoding a Gut-Enriched Kruppel-like Factor Expressed during Growth Arrest. Journal of Biological Chemistry, 271(33):20009-20017 (1996).

Stadfeld, et al., Reprogramming of Pancreatic β Cells into Induced Pluripotent Stem Cells. Current Biology, 18:890-894 (2008).

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001, <\info\ scireport\2001report> Chapter 4: The Adult Stem Cell, pp. 23-42.

Takahashi, et al., Induction of Pluripotent Stem Cells from Adult Human Fibroblasts by Defined Factors. Cell, 131, 861-872 (2007).

Takahashi, et al., Induction of Pluripotent Stem Cells from Mouse Embryonic and Adult Fibroblast Cultures by Defined Factors. Cell, 126: 663-676 (2006).

Thomson, et al., Embryonic Stem Cell Lines Derived from Human Blastocysts. Science, 282, 1145-1147 (1998).

Wernig, et al., A drug-inducible transgenic system for direct reprogramming of multiple somatic cell types. Nature Biotechnology, 26(8):916-924 (2008).

Wernig, et al., In vitro reprogramming of fibroblasts into a pluripotent ES-cell like state. Nature, 448: 318-324 (2007).

Wernig, et al., Neurons derived from reprogrammed fibroblasts functionally integrate into the fetal brain and improve symptoms of rats with Parkinson's disease. PNAS, 105(15):5856-5861 (2008).

Yamanaka, Strategies and New Developments in the Generation of Patient-Specific Pluripotent Stem Cells. Cell Stem Cell, 1: 39-49 (2007).

Ying, et al., BMP induction of Id proteins suppresses differentiation and sustains embryonic stem cell self-renewal in collaboration with STAT3. Cell, 115: 281-292 (2003).

Young, Richard, Abstract "Transcriptional Regulatory Network in Living Cells" National Institutes of Health Grant No. 5 RO1 HG002668-01 through 5 RO1 HG002668-02, Funding Dates 2003 through 2004.

Yu, et al., Induced pluripotent stem cell lines derived from human somatic cells. Science, 318(5858):1917-20 (2007).

Zhou, et al., Generation of Induced Pluripotent Stem Cells Using Recombinant Proteins. Cell Stem Cell, 4:381-384 (2009).

International Search Report for International Application PCT/US08/04516, dated Sep. 10, 2008.

International Search Report for International Application PCT/US2009/047423, dated May 3, 2010.

International Search Report for International Application PCT/US2009/057692, dated Jun. 30, 2010.

Office Action for U.S. Appl. No. 10/997,146, mailed Nov. 3, 2006.

Final Office Action for U.S. Appl. No. 10/997,146, mailed Aug. 14, 2007.

Office Action for U.S. Appl. No. 10/997,146, mailed Jul. 22, 2008.

Office Action for U.S. Appl. No. 10/997,146, mailed Apr. 9, 2009.

Office Action for U.S. Appl. No. 12/703,015, mailed Oct. 28, 2010.

Non-Final Office Action for U.S. Appl. No. 12/703,015, mailed Jul. 8, 2011.

Notice of Allowance in U.S. Appl. No. 10/997,146, mailed Jan. 26, 2010.

Notice of Allowance in U.S. Appl. No. 12/703,015, mailed Sep. 16, 2011.

Final Office Action for U.S. Appl. No. 12/997,615, mailed Jul. 15, 2014.

PubMed Oct4 gene, Printout from www.ncbi.nlm.nih.gov/nuccore/NM_013633.3, pp. 1-12, Sep. 19, 2013.

Palmqvist, et al., "Correlation of Murine Embryonic Stem Cell Gene Expression Profiles with Functional Measures of Pluripotency", Stem Cells, 23:663-680 (2005).

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", Science, 318:1917-1920 (2007).

Sox2 cDNA, printout from http://ncbi.nih.gov/nuccor/BC057574.1, pp. 1-13 (2013).

Oct4 cDNA, printout from http://ncbi.nih.gov/nuccor/BC117437.1, pp. 1-10 (2013).

Non-Final Office Action for U.S. Appl. No. 13/646,430, mailed Sep. 20, 2013.

Non-Final Office Action for U.S. Appl. No. 13/646,430, mailed Sep. 23, 2013.

Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed Oct. 2, 2013.

Non-Final Office Action for U.S. Appl. No. 13/646,411, mailed Oct. 31, 2013.

Ho, et al., "Synthetic Protein Transduction Domains: Enhanced Transduction Potential in Vitro and in Vivo," Cancer Research. 61: 474-477 (2001).

Sells, et al., "Delivery of Protein into Cells Using Polycationic Liposomes," Bio Techniques 19(1):72-78 (1995).

Stacey, et al., "Microinjection of Transforming ras Protein Induces c-fos Expression," Molecular and Cellular Biology, 7(1): 523-527 (1987).

Wadia, et al., "Protein Transduction Technology," Analytical Biotechnology. 13: 52-56 (2002).

Hasegawa, et al., "Efficient multicistronic expression of a transgene in human embryonic stem cells," *Stem Cells*, 25(7): 1707-1712 (2007).

Jaenisch, Rudolf, Abstract "*In vitro reprogramming of somatic cells into pluripotent ES-like cells*" National Institutes of Health Grant No. 5 R37 HD045022-06, Funding Date 2008.

Jaenisch, Rudolf, Abstract "*Epigenetics, stem cells, and cancer*" National Institutes of Health Grant No. 5 R01 CA087869-06 through 5 R01 CA087869-08, Funding Dates 2005 through 2008.

Ma, et al., "G9 and Jhdma2a Regulate Embryonic Stem Cell Fusion-Induced Reprogramming of Adult Neural Stem Cells", *Stem Cells*, 26(8): 2131-2141 (2008).

**EXHIBIT D**
**PAGE 110**

WHI_00011968

US 8,940,536 B2

Page 4

(56)  **References Cited**

OTHER PUBLICATIONS

Scholer, et al., "New type of POU domain in germ line-specific protein Oct-4", Letters to Nature, 344: 435-439 (1990).
Young, Richard, Abstract "Transcriptional Regulatory Network in Living Cells" National Institutes of Health Grant No. 5 RO1 HG002668-01 through 5 RO1 HG002668-03S1, Funding Dates 2003 through 2006.
Bilic, et al., "Concise Review: Induced Pluripotent Stem Cells Versus Embryonic Stem Cells: Close Enough or Yet Too Far Apart?", Stem Cells, 30:33-41(2012).
Chin, et al., "Induced Pluripotent Stem Cells and Embryonic Stem Cells are Distinguished by Gene Expression Signatures", Cell Stem Cell, 5:111-123(2009).
Chin, et al., "Molecular Analyses of Human Induced Pluripotent Stem Cells and Embryonic Stem Cells", Cell Stem Cell, 7(2):263-269(2010).
Munoz, et al., "The Quantitative Proteomes of Human-Induced Pluripotent Stem Cells and Embryonic Stem Cells", Molecular Systems Biology, 7(550): 1-13(2011).
Polouliakh, et al., "Reprogramming Resistant Genes: In-Depth Comparison of Gene-Expressions Among iPS, ES, and somatic cells", Frontiers in Physiology, 4(7):1-9(2013).
Meissner, et al., "Direct Reprogramming of genetically unmodified fibroblasts into pluripotent stem cells", Nature Biotechnology, 25(10): 1177-1181 (2007).
Strelchenko, et al. "Reprogramming of human somatic cells by embryonic stem cell cytoplast", Reprod. Biomed Online, 12(1): 107-111 (2006).
Cowan, et al., Nuclear Reprogramming of Somatic Cells After Fusion with Human Embryonic Stem Cells, Science, 309:1369-1373 (2005).
Laiosa, et al., "Reprogramming of Committed T Cell Progenitors to Macrophages and Dendritic Cells by C/EBPa and PU.1 Transcription Factors", Immunity, 25: 731-744 (2006).
Ait-Si-Ali, et al., "A Suv39h-dependent mechanism for silencing S-phase genes in differentiating but not in cycling cells", EMBO Journal, 23:605-615 (2004).
Maherali, et al., "Directly Reprogrammed Fibroblasts Show Global Epigenetic Remodeling and Widespread Tissue Contribution", Cell Stem Cell, 1:55-70(2007).
Sarraf, et al., "Methyl-CpG Binding Protein MBD1 Couples Histone H3 Methylation at Lysine 9 by SETDB1 to DNA Replication and Chromatin Assembly", Molecular Cell, 15:595-605 (2004).
Supplementary European Search Report for Application No. EP 08742630.0, dated Mar. 25, 2010.
Supplementary European Search Report for Application No. EP 09763816, dated Nov. 29, 2012.
Partial European Search Report for Application No. EP12003893, dated Jun. 24, 2013.
Final Office Action for U.S. Appl. No. 12/595,041, mailed Dec. 7, 2012.

Non-Final Office Action for U.S. Appl. No. 13/646,411, mailed Feb. 27, 2013.
Restriction Requirements for U.S. Appl. No. 13/119,891, mailed Dec. 12, 2013.
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed May 15, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,444, mailed Aug. 20, 2013.
Chinnasamy, et al., "Multicistronic lentiviral vectors containing the FMDV 2A cleavage factor demonstrate robust expression of encoded genes at limiting MOI", Virology Journal, 3: 14-29 (2006).
Okita, et al., "Generation of germline-competent induced pluripotent stem cells", Nature, 448: 313-318 (2007).
Feldman, et al., "G9a-mediated irreversible epigenetic inactivation of Oct-3/4 during early embryogenesis", Nature Cell Biology, 455: 627-633 (2008).
Zhou, et al., "In vivo reprogramming of adult pancreatic exocrine cells to b-cells", Nature, 455: 627-633 (2008).
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed Jan. 2, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, mailed Jan. 3, 2014.
Final Offier Action for U.S. Appl. No. 13/646,430, mailed Apr. 1, 2014.
Final Office Action for U.S. Appl. No. 13/646,420, mailed Apr. 2, 2014.
Final Office Action for U.S. Appl. No. 13/646,444, mailed Apr. 2, 2014.
Nakagawa, et al., "Generation of induced pluripotent stem cells without Myc from mouse and human fibroblasts", Nature Biotechnology, 26(1): 101-106 (2008).
Final Office Action for U.S. Appl. No. 13/646,411, mailed May 9, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed May 27, 2014.
Final Office Action for U.S. Appl. No. 12/595,041, mailed May 30, 2014.
Silva, et al., "Nanog promotes transfer of pluripotency after cell fusion", Nature, 441: 997-1001 (2006).
Shi, et al., Dynamic Regulation of Histone Lysine Methylation by Demethylases, Molecular Cell, 25: 1-14 (2007).
Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed Aug. 18, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,420 dated Sep. 17, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,444, dated Sep. 22, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,411, dated Dec. 8, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,430, dated Dec. 8, 2014.

* cited by examiner

**EXHIBIT D**
**PAGE 111**

WHI_00011969

Case 3:22-cv-00676-H-SBC Document 188 Filed 02/08/2024 Page 6 of 19

# Figure 1. Inducible *Oct4* allele



Collagen locus

Rosa26 locus

SV40-pA

Oct4

TetOP

SA-βgeo-pA

+ DOX

M2rtTA

in V6.5 ES cells

*used to make mice by tetraploid complementation*

EXHIBIT D
PAGE 112

WHI_00011970

Appx3075

# Figure 2. The system works...



Figure 2.

EXHIBIT D
PAGE 113

WHI_00011971

Appx3076

US 8,940,536 B2

1

# METHODS FOR MAKING SOMATIC CELLS MORE SUSCEPTIBLE TO REPROGRAMMING

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a divisional of U.S. application Ser. No. 10/997,146, filed Nov. 24, 2004, now U.S. Pat. No. 7,682,828 which claims the benefit of U.S. Provisional Application No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional Application No. 60/530,042, filed Dec. 15, 2003, the specifications of which are incorporated herein by reference in their entirety.

## GOVERNMENTAL FUNDING

The invention described herein was supported, in whole or in part, by Grant R37 CA84198 from the National Institutes of Health. The United States government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate into the full range of daughter cells having distinctly different morphological, cytological or functional phenotypes unique to a specific tissue. By contrast, descendants of pluripotent cells are restricted progressively in their differentiation potential, with some cells having only one fate. Pluripotent cells have extraordinary scientific and therapeutic potential, as they can be differentiated along the desired differentiation pathway in a precisely controlled manner and used in cell-based therapy.

Two categories of pluripotent stem cells are known to date: embryonic stem cells and embryonic germ cells. Embryonic stem cells are pluripotent stem cells that are derived directly from an embryo. Embryonic germ cells are pluripotent stem cells that are derived directly from the fetal tissue of aborted fetuses. For purposes of simplicity, embryonic stem cells and embryonic germ cells will be collectively referred to as "ES" cells herein.

ES cells are presently obtained via several methods. In a first method, an ES cell line is derived from the inner cell mass of a normal embryos in the blastocyst stage (See U.S. Pat. No. 6,200,806, Thompson, J. A. et al. Science, 282:1145-7, 1998 and Hogan et al., 2003). A second method for creating pluripotent ES cells utilizes the technique of somatic cell nuclear transfer (SCNT). In this technique, the nucleus is removed from a normal egg, thus removing the genetic material. Next, a donor diploid somatic cell is placed next to the enucleated egg and the two cells are fused, or the nucleus is introduced directly into the oocyte by micromanipulation. The fused cell has the potential to develop into a viable embryo, which may then be sacrificed to remove that portion of the embryo containing the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is transplanted into an entirely enucleated animal oocyte of a species different from the donor cell (referred to herein as animal stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. application Ser. No. 20010012513 (2001). The resultant chimeric cells are used for the production of pluripotent ES cells, in particular human-like pluripotent ES cells. One disadvantage of this technique is that these chimeric cells may contain unknown non-human viruses and still contain the mitochondria of the animal species. Thus, there would be substantial risks of immune rejection if such cells were used in cell transplantation therapies.

2

In a fourth method, ES cells can be isolated from the primordial germ cells found in the genital ridges of post-implanted embryos.

As described above, all presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species. The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application

There is thus a great demand for alternative methods of generating pluripotent cells.

## SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in which one or more endogenous pluripotency gene(s) is operably linked to a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene to which the marker is linked. The invention also provides transgenic mice containing these engineered somatic cells.

The present invention also provides methods for reprogramming somatic cells to a less differentiated state. In the methods, engineered somatic cells of the invention are treated with an agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state. In the methods, the engineered somatic cells described above are contacted with a candidate agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The presence of at least a subset of pluripotency characteristics indicates that the agent is capable of reprogramming somatic cells to a less-differentiated state. The agents identified by the present invention can then by used to reprogram somatic cells by contacting somatic cells with the agents.

The present invention also provides methods for identifying a gene that causes the expression of at least one endogenous pluripotency gene in somatic cells. In the methods, the engineered somatic cells are transfected with a cDNA library prepared from a pluripotent cell, such as an ES cell. The cells that express the appropriate selectable marker are then selected, and the expression of the appropriate endogenous pluripotency gene is examined. The expression of an endogenous pluripotency gene indicates that the cDNA encodes a protein whose expression in the cell results in, directly or indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating a condition in an individual in need of such treatment. In certain embodiments, somatic cells are obtained from the individual and reprogrammed by the methods of the invention under conditions suitable for the cells to develop into cells of a desired cell type. The reprogrammed cells of a desired cell type are then harvested and introduced into the individual to treat the condition. In certain further embodiments, the somatic cells obtained from the individual contains a mutation in one or more genes. In these instances, the methods are modified so that the somatic cells obtained from the individual are first treated to restore the one or more normal gene(s) to the cells such that the resulting cells carry the normal endogenous gene, which are then introduced into the

**EXHIBIT D**
**PAGE 114**

WHI_00011972

US 8,940,536 B2

3

individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such as a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an inducible Oct4 allele.
FIG. 2 shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

DETAILED DESCRIPTION OF THE INVENTION

Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

4

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene gives one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluripotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. Multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5fl, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-differentiation (Nichols et al., 1998, Cell 95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):293-300.

**EXHIBIT D**
**PAGE 115**

WHI_00011973

US 8,940,536 B2

5

Engineered Somatic Cells and Transgenic Mice Comprising Such Cells

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred to in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match", it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the desired endogenous pluripotency gene, downstream of the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

6

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The desired ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced into cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian

EXHIBIT D
PAGE 116

WHI_00011974

US 8,940,536 B2

7

cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, as used herein, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt), dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differ-

8

entiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness."

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristics that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 15 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J. 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152:212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595; Dah-Istrand et al., 1992, J. Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1998, Blood 91:2625-2626), the transcription factor Tcf-4 (Korinek et al., 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1566-1572), and the transcription factor Cdx1 (Duprey et al., 1988, Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-18).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular signature", or "stemness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

**EXHIBIT D**
**PAGE 117**

WHI_00011975

US 8,940,536 B2

9

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358 (1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensable for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA 26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997). The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA, the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; Gene Expression Technology: Methods in Enzymology, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control

10

sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Lee et al. P.N.A.S. USA (1988), 85, 1204-1208; (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated cDNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to select for all the selectable markers linked to the various endogenous pluripotency genes.

EXHIBIT D
PAGE 118

WHI_00011976

Appx3081

US 8,940,536 B2

11

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatic structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol. Chem. 277: 34521-30, 2002; and Bergman and Mostoslaysky, Biol. Chem., 1990. Thus, DNA methylation inhibitors and histone deacelyation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate agents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are

12

readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVERSet. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacelyation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, Foxl3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

Reprogrammed Somatic Cells and these Uses

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condi-

**EXHIBIT D**
**PAGE 119**

WHI_00011977

US 8,940,536 B2

13

tion. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferral of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-xl might be useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and culturing such cells under conditions which favor differentia-

14

tion, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neuroectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngeneic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital system, such as the bladder, clitoris, corpus cavernosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Atala, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, poly-

**EXHIBIT D**
**PAGE 120**

WHI_00011978

US 8,940,536 B2

15

orthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786,217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor maybe introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunningan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for Gln6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or nonneural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139: 39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations in ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., heniatopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

16

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the TK gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon ganeyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoeitic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

Furthermore, the RPSCs produced according to the invention maybe introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices.

Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine,

EXHIBIT D
PAGE 121

WHI_00011979

Appx3084

US 8,940,536 B2

17

ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,992, 5,627,059, 5,631,153, and 6,204,061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired characteristics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In the second method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The

18

expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press, Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

Example

Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5' end and a SV40 polyA tail (SV40-pA) at its 3' end. The second integration vector, tetracycline activator integration vector, contains a

**EXHIBIT D**
**PAGE 122**

WHI_00011980

US 8,940,536 B2

19

mutant form of tetracycline activator, M2-rtTA, which is more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracycline activator integration vector are introduced into the Collagen locus and the Rosa26 locus respectively via site-specific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complementation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-inducible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expression level in fibroblasts treated with doxycycline is comparable to the Oct4 expression level in ES cells, and undetectable in fibroblasts not treated with doxycycline. The expression results demonstrate that the inducible Oct4 transgene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

| In vitro development of clones derived from Oct4-induced fibroblasts | | | | | |
|---|---|---|---|---|---|
| Expt. | Oct4 | eggs w/PN | Blastocysts (% PN) | | ES lines (% PN) | |
| #1 | − | 22 | 5 (23%) | } 19% | 0 (0%) | } 3% |
| #2 | − | 35 | 5 (14%) | | 2 (6%) | |
| #3 | + | 37 | 10 (27%) | } 24% | 2 (5%) | } 7% |
| #4 | + | 47 | 10 (21%) | | 4 (9%) | |

PN . . . ProNucleus formation

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

20

REFERENCES

Avilion, J., et al., Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells, Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 2650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. II., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci. USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger S, Baron U, Thellmann M, Hasan M T, Bujard H, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-dependent transcriptional activators: novel mutations yield expanded range and sensitivity.
William R. L., et al., Nature 336: 684-687 (1988)
Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J., Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. Ann. New York Acad. Sci. 580, 81-87
Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA bgeo 26 gene trap strain leads to widespread expression of b-galatosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

1. A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced nucleic acid results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

2. The method of claim 1, wherein the somatic cell does not comprise a selectable marker.

3. The method of claim 1, wherein the somatic cell is a human cell or a mouse cell.

4. The method of claim 1, wherein the somatic cell is an adult stem cell.

5. The method of claim 4, wherein the adult stem cell is a hematopoietic stem cell, neural stem cell, or mesenchymal stem cell.

6. A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: (a) contacting the somatic cell with a candidate agent of interest with respect to its potential to reprogram a somatic cell; and (b) introducing an exogenous nucleic acid encoding an Oct4 protein operably linked to at least one regulatory sequence into the somatic cell, wherein expression of the exogenously introduced pluripotency gene results in making the somatic cell more susceptible to reprogramming to a less differentiated state.

7. The method of claim 6, wherein the somatic cell does not comprise a selectable marker.

8. The method of claim 6, wherein the somatic cell is a human cell or a mouse cell.

**EXHIBIT D**
**PAGE 123**

WHI_00011981

US 8,940,536 B2

21            22

**9**. The method of claim **6**, wherein the somatic cell is an adult stem cell.

**10**. The method of claim **9**, wherein the adult stem cell is a hematopoietic stem cell, neural stem cell, or mesenchymal stem cell.

**11**. The method of claim **6**, wherein the agent is a DNA methylation inhibitor, a histone deacetylase inhibitor or PD098059.

**12**. The method of claim **6**, wherein the agent is Sox-2.

**13**. A method of making a primary somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an Oct4 protein into the somatic cell, thereby making the somatic cell more susceptible to reprogramming to a less differentiated state.

**14**. The method of claim **13**, wherein the somatic cell does not comprise a selectable marker.

**15**. The method of claim **13**, wherein the somatic cell is a human cell or a mouse cell.

**16**. The method of claim **13**, wherein the somatic cell is an adult stem cell.

**17**. The method of claim **16**, wherein the adult stem cell is a hematopoietic stem cell, neural stem cell, or mesenchymal stem cell.

\* \* \* \* \*

**EXHIBIT D**
**PAGE 124**

WHI_00011982

**Appx3087**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,940,536 B2                                Page 1 of 1
APPLICATION NO.  : 12/703061
DATED             : January 27, 2015
INVENTOR(S)      : Rudolf Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 15 through Line 20, please delete:
"GOVERNMENTAL FUNDING
The invention described herein was supported, in whole or in part, by Grant R37 CA84198 from the National Institutes of Health. The United States government has certain rights in the invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

# EXHIBIT D
# PAGE 125

WHI_00011983

# EXHIBIT E



US009169490B2

(12) **United States Patent**
Jaenisch et al.

(10) Patent No.: **US 9,169,490 B2**
(45) Date of Patent: *Oct. 27, 2015

(54) **METHODS FOR REPROGRAMMING SOMATIC CELLS**

(71) Applicant: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

(72) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/646,430**

(22) Filed: **Oct. 5, 2012**

(65) **Prior Publication Data**

US 2013/0109090 A1 May 2, 2013

**Related U.S. Application Data**

(60) Continuation of application No. 12/703,061, filed on Feb. 9, 2010, now Pat. No. 8,940,536, which is a division of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530,042, filed on Dec. 15, 2003.

(51) **Int. Cl.**

| | |
|---|---|
| *C12N 15/85* | (2006.01) |
| *C12N 5/074* | (2010.01) |
| *A01K 67/027* | (2006.01) |
| *C07K 14/47* | (2006.01) |
| *C12N 15/877* | (2010.01) |

(52) **U.S. Cl.**

CPC ............. *C12N 15/85* (2013.01); *C12N 5/0696* (2013.01); *A01K 67/0273* (2013.01); *A01K 67/0275* (2013.01); *A01K 2217/05* (2013.01); *A01K 2227/105* (2013.01); *C07K 14/4702* (2013.01); *C12N 15/8509* (2013.01); *C12N 15/8775* (2013.01); *C12N 2830/003* (2013.01); *C12N 2830/006* (2013.01)

(58) **Field of Classification Search**

CPC ................................ C12N 5/0696; C12N 15/85
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,015,037 B1 | 3/2006 | Furcht et al. | |
| 7,601,699 B2 | 10/2009 | Eilertsen | |
| 2008/0066197 A1 | 3/2008 | Ying et al. | |
| 2010/0310525 A1 * | 12/2010 | Chevalier et al. | ........... 424/93.7 |
| 2011/0151447 A1 | 6/2011 | Park | |
| 2012/0282229 A1 | 11/2012 | Kannemeier et al. | |
| 2013/0017596 A1 | 1/2013 | Townes et al. | |
| 2013/0065311 A1 | 3/2013 | Yamanaka et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101855350 | 10/2010 |

OTHER PUBLICATIONS

PubMed Oct4 gene (Printout from www.ncbi.nlm.nih.gov/nuccore/NM_013633.3, dated Sep. 19, 2013, pp. 1-12).*
Niwa et al. Nature Genetics 24:372-376, 2000.*
Cavaleri and Scholer. Cell 113:551-557, May 2003.*
Stevanovic et al. Mammalian Genome 5:640-642, 1994.*
Chambers et al. Cell 113:643-655, May 2003.*
Palmqvist, et al., "Correlation of Murine Embryonic Stem Cell Gene Expression Profiles with Functional Measures of Pluripotency", Stem Cells, 23:663-680 (2005).
Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", Science, 318:1917-1920 (2007).
Sox2 cDNA, printout from http://ncbi.nih.gov/nuccor/BC057574.1, pp. 1-13 (2013).
OCl4 cDNA, printout from http://ncbi.nih.gov/nuccor/BC117437.1, pp. 1-10 (2013).
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed Sep. 23, 2013.
Non-Final Office Action for U.S. Appl. No. 12/595,041, mailed Oct. 2, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,411, mailed Oct. 31, 2013.
Chinnasamy, et al., "Multicistronic lentiviral vectors containing the FMDV 2A cleavage factor demonstrate robust expression of encoded genes at limiting MOI", Virology Journal, 3: 14-29 (2006).
Okita, et al., "Generation of germline-competent induced pluripotent stem cells", Nature, 448: 313-318 (2007).
Feldman, et al., "G9a-mediated irreversible epigenetic inactivation of Oct. 3-4 during early embryogensis", Nature Cell Biology, 455: 627-633 (2006).
Zhou, et al., "In vivo reprogramming of adult pancreatic exocrine cells to b-cells", Nature, 455: 627-633 (2008).

(Continued)

*Primary Examiner* — Marcia S Noble
(74) *Attorney, Agent, or Firm* — Lisa M. Warren, Esq.; Morse, Barnes-Brown & Pendleton, P.C.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**11 Claims, 2 Drawing Sheets**

## US 9,169,490 B2

Page 2

(56)        **References Cited**

OTHER PUBLICATIONS

Non-Final Office Action for U.S. Appl. No. 13/119,891, mailed Jan. 2, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, mailed Jan. 3, 2014.
Final Office Action for U.S. Appl. No. 12/997,815, mailed Jul. 15, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,420, dated Sep. 17, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,444, dated Sep. 22, 2014.
Kong, et al., "Lack of specificty of fibroblast-specific protein 1 in cardiac remodeling and fibrosis", *American Journal of Physiology Heart and Circulatory Physiology*, 305: H1363-1372 (2013).
Final Office Action for U.S. Appl. No. 13/646,420, mailed Apr. 2, 2014
Final Office Action for U.S. Appl. No. 13/646,444, mailed Apr. 2, 2014.
Final Office Action for U.S. Appl. No. 12/703,061, mailed Apr. 11, 2014.
Silva, et al., "Nanog promotes transfer of pluripotency after cell fusion", Nature, 441: 997-1001 (2006).

Shi, et al., Dynamic Regulation of Histone Lysine Methylation by Demethylases, Molecular Cell, 25: 1-14 (2007).
Final Office Action for U.S. Appl. No. 13/119,891, mailed Aug. 18, 2014.
Nakagawa, et al., "Generation of induced pluripotent stem cells without Myc from mouse and human fibroblasts", *Nature Biotechnology*, 26(1): 101-106 (2008).
Final Office Action for U.S. Appl. No. 13/646,411, mailed May 9, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,420, mailed May 27, 2014.
Final Office Action for U.S. Appl. No. 12/595,041, mailed May 30, 2014.
Non-Final Office Action for U.S. Appl. No. 12/595,041, dated Apr. 3, 2015.
Notice of Allowance for U.S. Appl. No. 12/703,061, dated Nov. 7, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,411, dated Dec. 8, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, dated May 19, 2015.
Fawell, et al., "Tat-mediated delivery of heterologous protein into cells" *Proc. Natl. Acad. Sci.*, 91: 664-668 (1994).
Non-Final Office Action for U.S. Appl. No. 14/473,250, dated Aug. 25, 2015.

* cited by examiner

**EXHIBIT E**
**PAGE  127**

WHI_00012004

# Figure 1. Inducible *Oct4* allele



WHI_00012005



Figure 2. The system works...

WHI_00012006

US 9,169,490 B2

| 1 | 2 |

# METHODS FOR REPROGRAMMING SOMATIC CELLS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/703,061, filed Feb. 9, 2010, which is a divisional of U.S. application Ser. No. 10/997,146, filed Nov. 24, 2004 (U.S. Pat. No. 7,682,828), which claims the benefit of U.S. Provisional Application No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional Application No. 60/530,042, filed Dec. 15, 2003, the specifications of which are incorporated herein by reference in their entirety.

## GOVERNMENTAL FUNDING

This invention was made with government support under R37CA84198 awarded by the National Institutes of Health. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate into the full range of daughter cells having distinctly different morphological, cytological or functional phenotypes unique to a specific tissue. By contrast, descendants of pluripotent cells are restricted progressively in their differentiation potential, with some cells having only one fate. Pluripotent cells have extraordinary scientific and therapeutic potential, as they can be differentiated along the desired differentiation pathway in a precisely controlled manner and used in cell-based therapy.

Two categories of pluripotent stem cells are known to date: embryonic stem cells and embryonic germ cells. Embryonic stem cells are pluripotent stem cells that are derived directly from an embryo. Embryonic germ cells are pluripotent stem cells that are derived directly from the fetal tissue of aborted fetuses. For purposes of simplicity, embryonic stem cells and embryonic germ cells will be collectively referred to as "ES" cells herein.

ES cells are presently obtained via several methods. In a first method, an ES cell line is derived from the inner cell mass of a normal embryos in the blastocyst stage (See U.S. Pat. No. 6,200,806, Thompson, J. A. et al. Science, 282:1145-7, 1998 and Hogan et al., 2003). A second method for creating pluripotent ES cells utilizes the technique of somatic cell nuclear transfer (SCNT). In this technique, the nucleus is removed from a normal egg, thus removing the genetic material. Next, a donor diploid somatic cell is placed next to the enucleated egg and the two cells are fused, or the nucleus is introduced directly into the oocyte by micromanipulation. The fused cell has the potential to develop into a viable embryo, which may then be sacrificed to remove that portion of the embryo containing the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is transplanted into an entirely enucleated animal oocyte of a species different from the donor cell (referred to herein as animal stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. application Ser. No. 20010012513 (2001). The resultant chimeric cells are used for the production of pluripotent ES cells, in particular human-like pluripotent ES cells. One disadvantage of this technique is that these chimeric cells may contain unknown non-human viruses and still contain the mitochondria of the animal species. Thus, there would be substantial risks of immune rejection if such cells were used in cell transplantation therapies.

In a fourth method, ES cells can be isolated from the primordial germ cells found in the genital ridges of post-implanted embryos.

As described above, all presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species. The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application

There is thus a great demand for alternative methods of generating pluripotent cells.

## SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in which one or more endogenous pluripotency gene(s) is operably linked to a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene to which the marker is linked. The invention also provides transgenic mice containing these engineered somatic cells.

The present invention provides methods for reprogramming somatic cells to a less differentiated state. In the methods, engineered somatic cells of the invention are treated with an agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state. In the methods, the engineered somatic cells described above are contacted with a candidate agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The presence of at least a subset of pluripotency characteristics indicates that the agent is capable of reprogramming somatic cells to a less-differentiated state. The agents identified by the present invention can then by used to reprogram somatic cells by contacting somatic cells with the agents.

The present invention also provides methods for identifying a gene that causes the expression of at least one endogenous pluripotency gene in somatic cells. In the methods, the engineered somatic cells are transfected with a cDNA library prepared from a pluripotent cell, such as an ES cell. The cells that express the appropriate selectable marker are then selected, and the expression of the appropriate endogenous pluripotency gene is examined. The expression of an endogenous pluripotency gene indicates that the cDNA encodes a protein whose expression in the cell results in, directly or indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating a condition in an individual in need of such treatment. In certain embodiments, somatic cells are obtained from the individual and reprogrammed by the methods of the invention under conditions suitable for the cells to develop into cells of a desired cell type. The reprogrammed cells of a desired cell type are then harvested and introduced into the individual to treat the condition. In certain further embodiments, the somatic cells obtained from the individual contains a mutation in one or more genes. In these instances, the methods are modified so that the somatic cells obtained from the individual are first treated to restore the one or more normal gene(s) to the cells such that the resulting cells carry the normal endogenous gene, which are then introduced into the

EXHIBIT E
PAGE 130

WHI_00012007

US 9,169,490 B2

3

individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such as a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an inducible Oct4 allele.

FIG. 2 shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

DETAILED DESCRIPTION OF THE INVENTION

Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

4

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene gives one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluripotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. For example, multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5fl, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-differentiation (Nichols et al., 1998, Cell 95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):293-300.

**EXHIBIT E**
**PAGE 131**

WHI_00012008

US 9,169,490 B2

5

**Engineered Somatic Cells and Transgenic Mice Comprising Such Cells**

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred to in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match," it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the desired endogenous pluripotency gene, downstream of the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

6

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The desired ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced into cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian

**EXHIBIT E**
**PAGE 132**

WHI_00012009

US 9,169,490 B2

7

cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt), dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differ-

8

entiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness."

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristics that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 1 5 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J. 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152:212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595; Dahlstrand et al., 1992, J. Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1998, Blood 91:2625-22626), the transcription factor Tcf-4 (Korinek et al, 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1 566-1 572), and the transcription factor Cdx1 (Duprey et al., 1 988. Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-1 8).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular signature", or "stemness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

US 9,169,490 B2

9

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358 (1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensable for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA 26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997) The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA, the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; Gene Expression Technology: Methods in Enzymology, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control

10

sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Lee et al. P.N.A.S. USA (1988), 85, 1204-1208; (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated cDNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Thus, in one embodiment, the present invention provides mice and somatic cells carrying at least one pluripotency gene expressed as a transgene under an inducible promoter. It is possible that somatic cells with such inducible pluripotency transgene(s) are more prone to be reprogrammed.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to select for all the selectable markers linked to the various endogenous pluripotency genes.

**EXHIBIT E**
**PAGE 134**

WHI_00012011

US 9,169,490 B2

11

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatic structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol. Chem. 277: 34521-30, 2002; and Bergman and Mostoslaysky, Biol. Chem. 1990. Thus, DNA methylation inhibitors and histone deacetyation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate agents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are

12

readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVERSet. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacetyation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, FoxD3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

Reprogrammed Somatic Cells and these Uses

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condi-

**EXHIBIT E**
**PAGE 135**

WHI_00012012

Appx3099

US 9,169,490 B2

13

tion. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferal of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-xl might be useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and culturing such cells under conditions which favor differentia-

14

tion, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neurectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngeneic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital system, such as the bladder, clitoris, corpus cavernosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Atala, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, poly-

**EXHIBIT E**
**PAGE 136**

WHI_00012013

US 9,169,490 B2

15

orthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786,217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor maybe introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunningan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for Gln6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or non-neural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139: 39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations in ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., hematopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

16

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the TK gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon ganeyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoeitic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

Furthermore, the RPSCs produced according to the invention maybe introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices.

Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine,

**EXHIBIT E**
**PAGE 137**

WHI_00012014

US 9,169,490 B2

17

ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,992, 5,627,059, 5,631,153, and 6,204,061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired characteristics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In the second method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The

18

expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press, Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

Example

Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5′ end and a SV40 polyA tail (SV40-pA) at its 3′ end. The second integration vector, tetracycline activator integration vector, contains a

**EXHIBIT E**
**PAGE 138**

WHI_00012015

US 9,169,490 B2

19

mutant form of tetracycline activator, M2-rtTA, which is more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracycline activator integration vector are introduced into the Collagen locus and the Rosa26 locus respectively via site-specific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complementation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-inducible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expression level in fibroblasts treated with doxycycline is comparable to the Oct4 expression level in ES cells, and undetectable in fibroblasts not treated with doxycycline. The expression results demonstrate that the inducible Oct4 transgene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient for Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

| | | In vitro development of clones derived from Oct4-induced fibroblasts | | |
|---|---|---|---|---|
| Expt. | Oct4 | eggs w/PN | Blastocysts (% PN) | | ES lines (% PN) | |
| #1 | – | 22 | 5 (23%) | | 0 (0%) | |
| #2 | – | 35 | 5 (14%) | 19% | 2 (6%) | 3% |
| #3 | + | 37 | 10 (27%) | | 2 (5%) | |
| #4 | + | 47 | 10 (21%) | 24% | 4 (9%) | 7% |

PN . . . ProNucleus formation

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

20

REFERENCES

Avilion, J., et al., Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells, Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 2650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. II., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci. USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger S, Baron U, Thellmann M, Hasan M T, Bujard H, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-dependent transcriptional activators: novel mutations yield expanded range and sensitivity.
William R. L., et al., Nature 336: 684-687 (1988)
Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J., Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. Ann. New York Acad. Sci. 580, 81-87
Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA beta geo 26 gene trap strain leads to widespread expression of b-galactosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

1. A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 expression comparable to the amount of Oct4 expression in an embryonic stem cell.

2. A somatic cell comprising an exogenous nucleic acid encoding Oct4 and an amount of Oct4 protein sufficient to make the cell more susceptible to reprogramming.

3. The somatic cell of any one of claims 1 to 2, wherein the somatic cell is a mammalian cell.

4. The somatic cell of any one of claims 1 to 2, wherein the somatic cell is a human cell or a mouse cell.

5. The somatic cell of any one of claims 1 to 2, wherein the cell is an adult stem cell.

6. The somatic cell of claim 5, wherein the adult stem cell is selected from the group consisting of: a hematopoietic stem cell, a neural stem cell, and a mesenchymal stem cell.

7. A composition comprising an isolated cDNA encoding an Oct4 protein operably linked to at least one regulatory sequence and DNA methylation inhibitor, a histone deacetylase inhibitor, or PD09859.

8. A composition comprising an isolated cDNA encoding an Oct4 protein operably linked to at least one regulatory sequence, an isolated cDNA encoding a Sox2 protein operably linked to at least one regulatory sequence, and an isolated adult stem cell.

9. A composition comprising an isolated cDNA encoding an Oct4 protein operably linked to at least one regulatory sequence, an isolated cDNA encoding a Nanog protein operably linked to at least one regulatory sequence, and an isolated adult stem cell.

**EXHIBIT E**
**PAGE 139**

WHI_00012016

US 9,169,490 B2

21

22

**10**. The composition of any one of claims **8** and **9**, wherein the adult stem cell is a human adult stem cell or a mouse adult stem cell.

**11**. The composition of any one of claims **8** and **9**, wherein the composition further comprises a DNA methylation inhibitor, a histone deacetylase inhibitor, or PD09859.

 * * * * *

**EXHIBIT E**
**PAGE 140**

WHI_00012017

**Appx3104**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 9,169,490 B2            Page 1 of 1
APPLICATION NO.  : 13/646430
DATED      : October 27, 2015
INVENTOR(S)   : Rudolf Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 16 through Line 20, delete:
"GOVERNMENTAL FUNDING
This invention was made with government support under R37CA84198 awarded by the National
Institutes of Health. The government has certain rights in the invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

# EXHIBIT E
# PAGE 141

# EXHIBIT F



US010457917B2

(12) **United States Patent**
Jaenisch et al.

(10) Patent No.: **US 10,457,917 B2**
(45) Date of Patent: **\*Oct. 29, 2019**

(54) **METHODS FOR REPROGRAMMING SOMATIC CELLS**

(71) Applicant: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

(72) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/030,815**

(22) Filed: **Jul. 9, 2018**

(65) **Prior Publication Data**

US 2019/0078057 A1    Mar. 14, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 15/588,062, filed on May 5, 2017, now Pat. No. 10,017,744, which is a continuation of application No. 14/923,321, filed on Oct. 26, 2015, now Pat. No. 9,670,464, which is a continuation of application No. 13/646,430, filed on Oct. 5, 2012, now Pat. No. 9,169,490, which is a continuation of application No. 12/703,061, filed on Feb. 9, 2010, now Pat. No. 8,940,536, which is a division of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530,042, filed on Dec. 15, 2003.

(51) **Int. Cl.**
| | |
|---|---|
| *C12N 5/00* | (2006.01) |
| *C12N 5/074* | (2010.01) |
| *C12N 15/85* | (2006.01) |
| *A01K 67/027* | (2006.01) |
| *C07K 14/47* | (2006.01) |
| *C12N 15/877* | (2010.01) |

(52) **U.S. Cl.**
CPC ........... *C12N 5/0696* (2013.01); *C12N 15/85* (2013.01); *A01K 67/0273* (2013.01); *A01K 67/0275* (2013.01); *A01K 2217/05* (2013.01); *A01K 2227/105* (2013.01); *C07K 14/4702* (2013.01); *C12N 15/8509* (2013.01); *C12N 15/8775* (2013.01); *C12N 2501/602* (2013.01); *C12N 2501/603* (2013.01); *C12N 2501/605* (2013.01); *C12N 2506/1307* (2013.01); *C12N 2510/00* (2013.01); *C12N 2830/003* (2013.01); *C12N 2830/006* (2013.01)

(58) **Field of Classification Search**
CPC ............................... C12N 5/0696; C12N 15/85
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,824,837 | A | 10/1998 | Chen et al. |
| 5,843,780 | A | 12/1998 | Thomson |
| 6,200,806 | B1 | 3/2001 | Thomson |
| 7,015,037 | B1 | 3/2006 | Furcht et al. |
| 7,524,677 | B2 | 4/2009 | Stockman et al. |
| 7,601,699 | B2 | 10/2009 | Eilertsen |
| 7,682,828 | B2 | 3/2010 | Jaenisch et al. |
| 7,687,266 | B2 | 3/2010 | Chambers et al. |
| 8,071,369 | B2 | 12/2011 | Jaenisch et al. |
| 8,927,279 | B2 | 1/2015 | Jaenisch |
| 8,932,856 | B2 | 1/2015 | Jaenisch |
| 8,940,536 | B2 | 1/2015 | Jaenisch |
| 8,951,797 | B2 | 2/2015 | Jaenisch |
| 9,169,490 | B2 | 10/2015 | Jaenisch |
| 9,382,515 | B2 | 7/2016 | Jaenisch |
| 9,497,943 | B2 | 11/2016 | Jaenisch |
| 9,670,464 | B2 | 6/2017 | Jaenisch |
| 9,714,414 | B2 | 7/2017 | Jaenisch |
| 10,093,904 | B2 | 10/2018 | Jaenisch et al. |
| 2002/0168660 | A1 | 11/2002 | Chen et al. |
| 2004/0137460 | A1 | 7/2004 | Yamanaka et al. |
| 2005/0130144 | A1 | 6/2005 | Nakatsuji et al. |
| 2005/0287547 | A1 | 12/2005 | Seligman |
| 2006/0041946 | A1 | 2/2006 | Fisher |
| 2006/0084172 | A1 | 4/2006 | Muller et al. |
| 2007/0032447 | A1 | 2/2007 | Eilertsen |
| 2008/0066197 | A1 | 3/2008 | Ying et al. |
| 2008/0280362 | A1 | 11/2008 | Jaenisch et al. |
| 2009/0047263 | A1 | 2/2009 | Yamanaka et al. |
| 2009/0068742 | A1 | 3/2009 | Yamanaka |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2006325975 A1 | 6/2007 |
| CN | 101855350 | 10/2010 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 10/017,744, filed Jul. 10, 2018, Jaenisch.

(Continued)

*Primary Examiner* — Marcia S Noble

(74) *Attorney, Agent, or Firm* — Lisa M. Warren, Esq.; Morse, Barnes-Brown & Pendleton, P.C.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**18 Claims, 2 Drawing Sheets**

**EXHIBIT F**
**PAGE 142**

WHI_00011915

Appx3107

## US 10,457,917 B2

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| 2009/0227032 A1 | 9/2009 | Yamanaka et al. |
| 2010/0062533 A1 | 3/2010 | Yamanaka |
| 2010/0144031 A1 | 6/2010 | Jaenisch et al. |
| 2010/0221827 A1 | 9/2010 | Jaenisch et al. |
| 2010/0310525 A1 | 12/2010 | Chevalier et al. |
| 2011/0076678 A1 | 3/2011 | Jaenisch et al. |
| 2011/0151447 A1 | 6/2011 | Park |
| 2012/0028821 A1 | 2/2012 | Jaenisch et al. |
| 2012/0034192 A1 | 2/2012 | Young et al. |
| 2012/0282229 A1 | 11/2012 | Kannemeier et al. |
| 2013/0017596 A1 | 1/2013 | Townes et al. |
| 2013/0065311 A1 | 3/2013 | Jaenisch |
| 2016/0115456 A1 | 4/2016 | Jaenisch |
| 2017/0067081 A1 | 3/2017 | Jaenisch |

FOREIGN PATENT DOCUMENTS

| EP | 1 970 446 | 9/2008 |
| WO | WO 96/22362 | 7/1996 |
| WO | WO 1999/055841 | 11/1999 |
| WO | WO 2000/027995 | 5/2000 |
| WO | WO 2002/097099 | 12/2002 |
| WO | WO 2005/001080 | 1/2005 |
| WO | WO 2005/080598 | 9/2005 |
| WO | WO 2005/090557 | 9/2005 |
| WO | WO 2006/116803 | 11/2006 |
| WO | WO 2007/069666 | 6/2007 |
| WO | WO 2008/001391 A2 | 1/2008 |
| WO | WO 2008/118820 | 10/2008 |
| WO | WO 2008/118820 A2 | 10/2008 |
| WO | WO 2008/124133 A1 | 10/2008 |
| WO | WO 2009/115295 A1 | 9/2009 |
| WO | WO 2009/117439 A2 | 9/2009 |
| WO | WO 2009/133971 | 11/2009 |
| WO | WO 2009/152529 A2 | 12/2009 |
| WO | WO 2010/033920 A2 | 3/2010 |

OTHER PUBLICATIONS

Furler, S., et al. "Recombinant AAV vectors containing the foot and mouth disease virus 2A sequence confer efficient bicistronic gene expression in cultured cells and rat substantia nigra neurons." Gene therapy 8.11 (2001): 864-873.

Holst, Jeff, et al. "Generation of T-cell receptor retrogenic mice." Nature protocols 1.1 (2006): 406-417.

Hasegawa, Kouichi, et al. "Efficient multicistronic expression of a transgene in human embryonic stem cells." Stem cells 25.7 (2007): 1707-1712.

Szymczak, Andrea L., et al. "Correction of multi-gene deficiency in vivo using a single 'self-cleaving' 2A peptide-based retroviral vector," Nature biotechnology 22.5 (2004): 589-594.

Aoi, et al., "Generation of Pluripotent Stem Cells from Adult Mouse Liver and Stomach Cells", Science, 321: 699-702 (2008).

Avilion, et al., "Multipotent cell lineages in early mouse development depend on SOX2 function", Genes & Development, 17:126-140 (2003).

Ben-Shushan, et al., "Extinction of Oct-3/4 gene expression in embryonal carcinoma x fibroblast somatic cell hybrids is accompanied by changes in the methylation status, chromatin structure, and transcriptional activity of the Oct-3/4 upstream region", Molecular and Cellular Biology, 13(2):891-901 (1993).

Borivin, et al., "Incomplete Reactivation of Oct4-related in Mouse Embryos Cloned from Somatic Nuclei", Development, 130:1673-1680 (2003).

Boyer, et al., "Polycomb complexes repress developmental regulators in murine embryonic stem cells", Nature, 441(7091):349-353 (2006).

Brambrink, et al., "Sequential Expression of Pluripotency Markers During Direct Reprogramming of Mouse Somatic Cells", Cell Stem Cell, 2(2): 151-159 (2008).

Bronson, et al., "Single-copy transgenic mice with chosen-site integration", Proc. Natl. Acad. Sci. USA, 93:9067-9072 (1996).

Bru, et al., "Rapid induction of pluripotency genes after exposure of human somatic cells to mouse ES cell extracts", Experimental Cell Research, 314:2634-2642 (2008).

Buske, et al., "Overexpression of HOXA10 perturbs human lymphomyelopoiesis in vitro and in vivo", Blood, 97(8):2286-2292 (2001).

Carey, et al., "Reprogramming of murine and human somatic cells using a single polycistronic vector", Proceedings of the National Academy of Science, 106:157-162 (2008).

Chambers, et al., "Functional expression cloning of nanog, a pluripotency sustaining factor in embryonic stem cells", Cell, 113:643-655 (2003).

Chen, et al., "Establishment and Maintenance of Genomic Methylation Patterns in Mouse Embryonic Stem Cells by Dnmt3a and Dnmt3b", Molecular and Cellular Biology, 23(16):5594-5605 (2003).

Daniels, et al., "Analysis of Gene Transcription in Bovine Nuclear Transfer Embryos Reconstructed with Granulosa Cell Nuclei", Biology of Reproduction, 63:1034-1040 (2000).

Eminli, et al., "Reprogramming of Neural Progenitor Cells into iPS Cells in the Absence of Exogenous Sox2 Expression", Stem Cells, 26:2467-2474 (2008).

Gossen, et al., "Transcriptional activation by tetracyclines in mammalian cells", Science, 268(5218):1766-1769 (1995).

Greiner, et al., "Identification of a specific inhibitor of the histone methyltransferase SU(VAR)3-9", Nature Chemical Biology, 1:143-145 (2005).

Hanna, et al. "Direct reprogramming of terminally differentiated mature B lymphocytes to pluripotency", Cell 133, 250-264 (2008).

Hansis, et al., "Analysis of Oct-4 expression and ploidy in individual human blastomeres", Molecular Human Reproduction, 7: 155-161 (2001).

Hasegawa, et al., "Efficient multicistronic expression of a transgene in human embryonic stem cells," Stem Cells, 25(7): 1707-1712 (2007).

Helgason, et al., "Overexpression of HOXB4 enhances the hematopoietic potential of embryonic stem cells differentiated in vitro", Blood, 87(7):2740-2749 (1996).

Ilo. et al., "Synthetic Protein Transduction Domains: Enhanced Transduction Potential in Vitro and in Vivo," Cancer Research, 61: 474-477 (2001).

Hochedlinger, et al., "Monoclonal mice generated by nuclear transfer from mature B and T donor cells", Nature, 415:1035-1038 (2002).

Hochedlinger, et al., "Nuclear transplantation, embryonic stem cells, and the potential for cell therapy", The New England Journal of Medicine, 349(3):275-286 (2003).

Ihle, et al., "STATs: Signal Transducers and Activators of Transcription", Cell, 84: 331-334 (1996).

Jackson-Grusby. et al., "Loss of Genomic Methylation Cases p53-Dependent Apoptosis and Epigenetic Deregulation", Nature Genetics, 27: 31-39 (2001).

Jaenisch, et al., "Nuclear cloning, stem cells, and genomic reprogramming", Cloning and Stem Cells, 4(4):389-396 (2002).

Jaenisch & Young, "Stem Cells, the Molecular Circuitry of Pluripotency and Nuclear Reprogramming", Cell, 132, 567-582 (2008).

Kaufman, et al., "Hematopoietic colony-forming cells derived from human embryonic stem cells", PNAS, 98(19):10716-10721 (2001).

Kubicek, et al., "Reversal of H3K9me2 by a small-molecule inhibitor for the G9a histone methyltransferase, Molecular Cel", 25(3):473-81 (2007).

Kyba et al., "HoxB4 confers definitive lymphoid-myeloid engraftment potential on embryonic stem cell and yolk sac hematopoietic progenitors", Cell, 109:29-37 (2002).

Lenardo et al., "Repression of the IgH Enhancer in Teratocarcinoma Cells Associated with a Novel Octamer Factor", Science, New Series, 243(4890):544-546 (1989).

Li, et al., "Murine embryonic stem cell differentiation is prompted by SOCS-3 and inhibited by the zinc finger transcription factor Klf4", Blood, 105:635-637 (2005).

Loh, et al., "The Oct4 and Nanog transcription network regulates pluripotency in mouse embryonic stem cells", Nature Genetics, 38(4): 431-440 (2006).

**EXHIBIT F**
**PAGE 143**

WHI_00011916

# US 10,457,917 B2
Page 3

(56) **References Cited**

OTHER PUBLICATIONS

Lowry, et al. Generation of human induced pluripotent stem cells from dermal fibroblasts. "*PNAS*", 105(8):2883-2888 (2008).

Ma, et al., "G9a and Jhdma2a Regulate Embryonic Stem Cell Fusion-Induced Reprogramming of Adult Neural Stem Cells", *Stem Cells*, 26)8): 2131-2141 (2008).

Matsuoka, et al., "Generation of definitive hematopoietic stem cells from murine early yolk sac and paraaortic splanchnopleures by aorta-gonad-mesonephros region-derived stromal cells", *Blood*, 98(1):6-12 (2001).

McWhir, et al., "Selective ablation of differentiated cells permits isolation of embryonic stem cell lines from murine embryos with a non-permissive genetic background", *Nature Genetics*, 14:223-226 (1996).

Mitsui et al., "The Homeoprotein Nanog is Required for Maintenance of Pluripotency in Mouse Epiblast and ES Cells", *Cell*, 113: 631-642 (2003).

Mountford, et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression", *Proceedings of the National Academy of Sciences*, 91: 4303-4307 (1994).

Munsie, et al., "Transgenic strategy for demonstrating nuclear reprogramming in the mouse", *Cloning Stem Cells*, 4(2):121-130 (2002).

Naito, et al., Journal of Reproduction and Fertility 113:137-143 (1998).

Nichols, et al., "Formation of Pluripotent Stem Cells in the Mammalian Embryo Depends on the POU Transcription Factor Oct4", *Cell*, 95: 379-391 (1998).

Niwa, et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells", *Nature Genetics*, 24: 372-376 (2000).

Okita, et al., "Generation of Mouse Induced Pluripotent Stem Cells Without Viral Vectors", *Science*, 322:949-953 (2008).

Peled, et al., "Dependence of human stem cell engraftment and repopulation of NOD/SCID mice on CXCR4", *Science*, 283:845-848 (1999).

Pesce, et al., "Oct-4: Gatekeeper in the beginnings of mammalian development", *Stem Cells*. 19:271-278 (2001).

Qi, et al., "The magic of four: induction of pluripotent stem cells from somatic cells by Oct4, Sox2, Myc and Klf4", *Cell Research*, 17:578-580 (2007).

Radcliffe, et al., "Multiple gene products from a single vector: 'self-cleaving' 2A peptides", *Gene Therapy*, 11:1673-1674 (2004).

Ramalho-Santos, et al., "Stemness: Transcriptional Profiling of Embryonic and Adult Stem Cells", *Science*, 298: 597-600 (2002).

Ryan, et al., "Cleavage of foot-and-mouth disease virus polyprotein is mediated by residues located within a 19 amino acid sequence", *Journal of General Virology*, 72:2727-2732 (1991).

Savarese, et al., "Hematopoietic Precursor Cells Transiently Reestablish Permissiveness for X Inactivation", *Molecular and Cellular Biology*, 26(19): 7167-7177 (2006).

Sells, et al., "Delivery of Protein into Cells Using Polycationic Liposomes," *BioTechniques* 19(1):72-78 (1995).

Shields, et al., "Identification and Characterization of a Gene Encoding a Gut-Enriched Kruppel-like Factor Expressed during Growth Arrest", *Journal of Biological Chemistry*, 271(33):20009-20017 (1996).

Stacey, et al., "Microinjection of Transforming ras Protein Induces c-fos Expression," *Molecular and Cellular Biology*, 7(1): 523-527 (1987).

Stadfeld, et al., "Reprogramming of Pancreatic β Cells into Induced Pluripotent Stem Cells", *Current Biology*, 18:890-894 (2008).

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001, <⁠/info/scireport/2001report>. Chapter 4: The Adult Stem Cell, pp. 23-42.

Tada, et al., "Nuclear Reprogramming of Somatic Cells by In Vitro Hybridization with ES cells", *Current Biology*, 11: 1553-1558 (2001).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Adult Human Fibroblasts by Defined Factors", *Cell*, 131, 861-872 (2007).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Mouse Embryonic and Adult Fibroblast Cultures by Defined Factors", *Cell*, 126: 663-676 (2006).

Thomson, et al., "Embryonic Stem Cell Lines Derived from Human Blastocysts", *Science*, 282, 1145-1147 (1998).

Wadia, et al., "Protein Transduction Technology," *Analytical Biotechnology*, 13: 52-56 (2002).

Wernig, et al., "A drug-inducible transgenic system for direct reprogramming of multiple somatic cell types", *997 Biotechnology*, 26(8):916-924 (2008).

Wernig, et al., "In vitro reprogramming of fibroblasts into a pluripotent ES-cell-like state", *Nature*, 448: 318-324 (2007).

Wernig, et al., "Neurons derived from reprogrammed fibroblasts functionally integrate into the fetal brain and improve symptoms of rats with Parkinson's disease", *PNAS*, 105(15):5856-5861 (2008).

Yamanaka, et al., "Strategies and New Developments in the Generation of Patient-Specific Pluripotent Stem Cells", *Cell Stem Cell*, 1: 39-49 (2007).

Yeom et al., "Germline regulatory element of Oct-4 specific for the totipotent cycle of embryonal cells," *Development*,122:881-897 (1996).

Ying, et al., "BMP induction of Id proteins suppresses differentiation and sustains embryonic stem cell self-renewal in collaboration with STAT3", *Cell*, 115: 281-292 (2003).

Yoshimizu, et al., "Germline-specific expression of the Oct-4/green fluorescent protein (GFP) transgene in mice". *Development, Growth & Differentiation*, 41:675-684 (1999).

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", *Science*, 318(5858):1917-20 (2007).

Zakhartchenko, et al., "Adult cloning in cattle: potential of nuclei from a permanent cell line and from primary cultures", *Molecular Reproduction and Development*, 54:264-272 (1999).

Zambrowicz, et al., "Disruption of overlapping transcripts in the ROSA βgeo 26 gene trap strain leads to widespread expression of β-galactosidase in mouse embryos and hematopoietic cells", *Proc. Natl. Acad. Sci. USA*, 94:3789-3794 (1987).

Zhou, et al., "Generation of Induced Pluripotent Stem Cells Using Recombinatnt Proteins", *Cell Stem Cell*, 4:381-384 (2009).

BLAST Alignment SEQ ID 16 (ECAT4).

Sox2. Print out from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/127140985?ordinalp...ntrez.Sequence.Sequence_ResultsPanel. Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Nanog. Printout from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/153791181?ordinalo...netrez.Sequence.Sequence_ResultsPanel. Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Scholer, et al., "New type of POU domain in germ line-specific protein Oct-4", Letters to Nature, 344: 435-439 (1990).

Bilic, et al., "Concise Review: Induced Pluripotent Stem Cells Versus Embryonic Stem Cells: Close Enough or Yet Too Far Apart?", *Stem Cells*, 30:33-41(2012)

Chin, et al., "Induced Pluripotent Stem Cells and Embryonic Stem Cells are Distinguished by Gene Expression Signatures", *Cell Stem Cell*, 5:111-123(2009).

Chin, et al., "Molecular Analyses of Human Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Cell Stem Cell*, 7(2):263-269(2010).

Munoz, et al., "The Quantitative Proteomes of Human-Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Molecular Systems Biology*, 7(550): 1-13(2011).

Polouliakh, et al., "Reprogramming Resistant Genes: In-Depth Comparison of Gene-Expressions Among iPS, ES. and somatic cells", *Frontiers in Physiology*, 4(7):1-9(2013).

Meissner, et al., "Direct Reprogramming of genetically unmodified fibroblasts into pluripotent stem cells", *Nature Biotechnology*, 25(10): 1177-1181 (2007).

Strelchenko, et al. "Reprogramming of human somatic cells by embryonic stem cell cytoplast", *Reprod. Biomed Online*, 12(1): 107-111 (2006).

Cowan, et al., Nuclear Reprogramming of Somatic Cells After Fusion with Human Embryonic Stem Cells, *Science*, 309:1369-1373 (2005).

# EXHIBIT F
# PAGE 144

WHI_00011917

## US 10,457,917 B2
Page 4

(56)  **References Cited**

OTHER PUBLICATIONS

Laiosa, et al., "Reprogramming of Committed T Cell Progenitors to Macrophages and Dendritic Cells by C/EBPα and PU.1 Transcription Factors", *Immunity*, 25: 731-744 (2006).

Ait-Si-Ali, et al., "A Suv39h-dependent mechanism for silencing S-phase genes in differentiating but not in cycling cells", *EMBO Journal*. 23:605-615 (2004).

Maherali, et al., "Directly Reprogrammed Fibroblasts Show Global Epigenetic Remodeling and Widespread Tissue Contribution", Cell Stem Cell, 1:55-70(2007).

Sarraf, et al., "Methyl-CpG Binding Protein MBD1 Couples Histone H3 Methylation at Lysine 9 by SETDB1 to DNA Replication and Chromatin Assembly", Molecular Cell, 15:595-605 (2004).

PubMed Oct4 gene, Printout from www.ncbi.nlm.nih.gov/nuccore/NM_013633.3, pp. 1-12, Sep. 19, 2013.

Palmqvist, et al., "Correlation of Murine Embryonic Stem Cell Gene Expression Profiles with Functional Measures of Pluripotency", Stem Cells, 23:663-680 (2005).

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", Science, 318:1917-1920 (2007).

Sox2 cDNA, printout from http://ncbi.nih.gov/nuccor/BC057574.1 , pp. 1-13 (2013).

Oct4 cDNA, printout from http://ncbi.nih.gov/nuccor/BC117437.1, pp. 1-10 (2013).

Chinnasamy, et al., "Multicistronic lentiviral vectors containing the FMDV 2A cleavage factor demonstrate robust expression of encoded genes at limiting MOI", *Virology Journal*, 3: 14-29 (2006).

Okita, et al., "Generation of germline-competent induced pluripotent stem cells", *Nature*, 448: 313-318 (2007).

Feldman, et al., "G9a-mediated irreversible epigenetic inactivation of Oct-3/4 during early embryogenesis", *Nature Cell Biology*, 455: 627-633 (2008).

Zhou, et al., "In vivo reprogramming of adult pancreatic exocrine cells to b-cells", *Nature*, 455: 627-633 (2008).

Kong, et al., "Lack of specificity of fibroblast-specific protein 1 in cardiac remodeling and fibrosis", *American Journal of Physiology Heart and Circulatory Physiology*, 305: H1363-1372 (2013).

Nakagawa, et al., "Generation of induced pluripotent stem cells without Myc from mouse and human fibroblasts", *Nature Biotechnology*, 26(1): 101-106 (2008).

Silva, et al., "Nanog promotes transfer of pluripotency after cell fusion", *Nature*, 441: 997-1001 (2006).

Shi, et al., Dynamic Regulation of Histone Lysine Methylation by Demethylases, *Molecular Cell*, 26995: 1-14 (2007).

Fawell, et al., "Tat-Mediated delivery of heterologous proteins into cells", *Proceedings of the National Academy of Science*, 91: 664-668 (1994).

Cavaleri, et al., "Nanog: A New Recruit to the Embryonic Stem Cell Orchestra", Cell 113: 551-557 (2003).

Stevanovic, et al., "The cDNA sequence and chromosomal location of the human SOX2 gene", Mammalian Genome 5: 640-642 (1994).

Grinnell, et al., "De-Differentiation of Mouse Interfollicular Keratinocytes by the Embryonic Transcription Factor Oct-4", *Journal of Investigative Dermatology*, 127; 372-380 (2007).

Kim, et al., "Oct4-Induced Pluripotency in Adult Neural Stem Cells," Cell, 136:411-419 (2009).

Patel et al., "Advances in Reprogramming Somatic Cells to Induced Pluripotent Stem Cells," NIH Public Access Author Manuscript, Jan. 1, 2011 (online) [retrieved from internet May 3, 2015] URL:http://ncbi.nih.gov/pmc/articles/PMC2924949/pdf/nihms-219126.pdf published in final edited form as: Stem Cell Reviews 6(3): 367-380 (Sep. 2010).

Jaenisch, Rudolf, Abstract "In vitro reprogramming of somatic cells into pluripotent ES-like cells", National Institutes of Health Grant No. 4R37 HD045022-11 through 4R37 HD045022-14, Funding Dates 2013 through 2016.

Jaenisch, Rudolf, Abstract "In vitro reprogramming of somatic cells into pluripotent ES-like cells", National Institutes of Health Grant No. 2R01 HD045022-06 through 4R37 HD045022-10, Funding Dates 2008 through 2012.

Jaenisch, Rudolf, Abstract "Nuclear Cloning and the Reprogramming of the Genome" National Institutes of Health Grant No. 1 R01 HD045022-01 through 5R01 HD045022-05, Funding Dates 2003 through 2007.

Jaenisch, Rudolf, Abstract "Programming and Reprogramming Human Cells" National Institutes of Health Grant No. 2R01 CA084198-10 through 5R01 CA084198-14, Funding Dates 2009 through 2013.

Jaenisch, Rudolf, Abstract "Genomic Imprinting and the Cloning of Mice" National Institutes of Health Grant No. 1 R37 CA084198-01 through 5R37 CA084198-09, Funding Dates 2000 through 2008.

Jaenisch, Rudolf, Abstract "Epigenetics, stem cells, and cancer" National Institutes of Health Grant Nos. 2RO1 CA087869-06 through 5RO1 CA087869-10, Funding Dates 2006 through 2010.

Jaenisch, Rudolf, Abstract "DNA Methylation, Gene Regulation, and Cancer" National Institutes of Health Grant Nos. 1 RO1 CA087869-01 through 5RO1 CA087869-05, Funding Dates 2001 through 2005.

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 2RO1 HG002668-11A1 through 5RO1 HG002668-13, Funding Dates 2014 through 2016.

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 2RO1 HG002668-07 through 3RO1 HG002668-10S1, Funding Dates 2010 through 2013.

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 2RO1 HG002668-04A1 through 5RO1 HG002668-06, Funding Dates 2007 through 2009.

Young, Richard, Abstract "Transcriptional Regulatory Network in Living Cells" National Institutes of Health Grant No. 1 RO1 HG002668-01 through 3RO1 HG002668-03S1, Funding Dates 2003 through 2006.

De Felipe, P., "Polycistronic Viral Vectors," Current Gene Therapy, 2002, vol. 2, No. 3, pp. 355-378.

Wernig, Marius, et al. "c-Myc is dispensable for direct reprogramming of mouse fibroblasts." *Cell stem cell* 2.1 (2008): 10-12.

Griffiths, Anthony J.F., et al., "An Introduction to Genetic Analysis," Seventh Edition, First Printing 1999, 2 pages.

Urwin, Peter, et al., "Functional characterization of the EMCV IRES in plants," The Plant journal (2000) 24(5), 583-589, Jul. 25, 2000.

Hanna, et al., "Pluripotency and Cellular Reprogramming: Facts, Hypotheses, Unresolved Issues," *Cell*, 143:4 (2010): 508-525.

Park, et al., "Reprogramming of Human Somatic Cells to Pluripotency with Defined Factors," Nature 451: 141-146.

Szymczak, "Development of 2A Peptide-Based Strategies in the Design of Multicistronic Vectors," Expert Opinion Biol Ther, 5 (5): 627-638.

International Search Report for International Application PCT/US08/04516, dated Sep. 10, 2008.

International Search Report for International Application PCT/US2009/047423, dated May 3, 2010.

International Search Report for International Application PCT/US2009/057692, dated Jun. 30, 2010.

Supplementary European Search Report for Application No. EP08742630.0, dated Mar. 25, 2010.

Supplementary European Search Report for Application No. EP09763816, dated Nov. 29, 2012.

Partial European Search Report for Application No. EP12003893, dated Jun. 24, 2013.

Corrected Notice of Allowability in U.S. Appl. No. 14/473,250, dated Jun. 6, 2017.

Notice of Allowance and Fee(s) Due in U.S. Appl. No. 14/473,250, dated May 30, 2017.

Non-Final Office Action for U.S. Appl. No. 10/997,146, dated Nov. 3, 2006.

Final Office Action for U.S. Appl. No. 10/997,146, dated Aug. 14, 2007.

Non-Final Office Action for U.S. Appl. No. 10/997,146, dated Jul. 22, 2008.

Non-Final Office Action for U.S. Appl. No. 10/997,146, dated Apr. 9, 2009.

**EXHIBIT F**
**PAGE 145**

## US 10,457,917 B2
Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Non-Final Office Action for U.S. Appl. No. 12/703,015, dated Oct. 28, 2010.
Final Office Action for U.S. Appl. No. 12/703,015, dated Jul. 8, 2011.
Non-Final Office Action for U.S. Appl. No. 12/703,061, dated Oct. 28, 2010.
Final Office Action for U.S. Appl. No. 12/703,061, dated Jul. 14, 2011.
Non-Final Office Action for U.S. Appl. No. 12/703,061, dated Sep. 19, 2011.
Notice of Allowance in U.S. Appl. No. 10/997,146, dated Jan. 26, 2010.
Notice of Allowance in U.S. Appl. No. 12/703,015, dated Sep. 16, 2011.
Non-Final Office Action for U.S. Appl. No. 12/595,041, dated May 9, 2012.
Final Office Action for U.S. Appl. No. 12/595,041, dated Dec. 7, 2012.
Non-Final Office Action for U.S. Appl. No. 13/646,411, dated Feb. 27, 2013.
Non-Final Office Action for U.S. Appl. No. 13/119,891, dated May 15, 2013.
Non-Final Office Action for U.S. Appl. No. 12/703,061, dated Aug. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,444, dated Aug. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,430, dated Sep. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,420, dated Sep. 23, 2013.
Non-Final Office Action for U.S. Appl. No. 12/595,041, dated Oct. 2, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,411, dated Oct. 31, 2013.
Non-Final Office Action for U.S. Appl. No. 13/119,891, dated Jan. 2, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, dated Jan. 3, 2014.
Final Office Action for U.S. Appl. No. 13/646,430, dated Apr. 1, 2014.
Final Office Action for U.S. Appl. No. 13/646,444, dated Apr. 2, 2014.
Final Office Action for U.S. Appl. No. 13/646,420, dated Apr. 2 2014.
Final Office Action for U.S. Appl. No. 12/703,061, dated Apr. 11, 2014.
Final Office Action for U.S. Appl. No. 13/646,411, dated May 9, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,420, dated May 27, 2014.

Final Office Action for U.S. Appl. No. 12/595,041, dated May 30, 2014.
Final Office Action for U.S. Appl. No. 12/997,815, dated Jul. 15, 2014.
Final Office Action for U.S. Appl. No. 13/119,891, dated Aug. 18, 2014.
Notice of Allowance for U.S. Appl. No. 12/703,061, dated Nov. 7, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,411, dated Dec. 8, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,420, dated Sep. 17, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,430, dated Dec. 8, 2014.
Non-Final Office Action for U.S. Appl. No. 12/595,041, dated Apr. 3, 2015.
Non-Final Office Action for U.S. Appl. No. 12/997,815, dated May 19, 2015.
Notice of Allowance for U.S. Appl. No. 13/646,430, dated Jun. 18, 2015.
Non-Final Office Action for U.S. Appl. No. 14/473,250, dated Aug. 25, 2015.
Final Office Action for U.S. Appl. No. 12/595,041, dated Oct. 30, 2015.
Final Office Action for U.S. Appl. No. 12/997,815, dated Feb. 19, 2016.
Notice of Allowance for U.S. Appl. No. 12/595,041, dated Mar. 7, 2016.
Notice of Allowance for U.S. Appl. No. 13/646,444, dated Sep. 22, 2014.
Final Office Action for U.S. Appl. No. 14/473,250, dated Apr. 26, 2016.
Notice of Allowance for U.S. Appl. No. 12/997,815, dated Jun. 30, 2016.
Non-Final Office Action for U.S. Appl. No. 15/607,028, dated Sep. 20, 2017.
Non-Final Office Action for U.S. Appl. No. 14/923,321 dated Aug. 2, 2016.
Final Office Action for U.S. Appl. No. 14/923,321 dated Jan. 4, 2017.
Notice of Allowance for U.S. Appl. No. 14/923,321 dated Mar. 24, 2017.
Notice of Allowance for U.S. Appl. No. 14/473,250, dated May 30, 2017.
Final Office Action in U.S. Appl. No. 15/607,028, dated Feb. 14, 2018.
Notice of Allowance issued in U.S. Appl. No. 15/588,062, dated Feb. 13, 2018.
Notice of Allowance issued in U.S. Appl. No. 15/607,028, dated Jun. 4, 2018.
Non-Final Office Action issued in U.S. Appl. No. 15/354,604, dated May 24, 2018.
Final Office Action issued in U.S. Appl. No. 15/354,604, dated Oct. 9, 2018.

**EXHIBIT F**
**PAGE 146**

WHI_00011919



Figure 1. Inducible *Oct4* allele

WHI_00011920



Figure 2. The system works...

WHI_00011921

US 10,457,917 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHODS FOR REPROGRAMMING SOMATIC CELLS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/588,062. filed May 5, 2017, which is a continuation of U.S. application Ser. No. 14/923,321, filed Oct. 26, 2015 (U.S. Pat. No. 9,670,464), which is a continuation of U.S. application Ser. No. 13/646,430, filed Oct. 5, 2012 (U.S. Pat. No. 9,169,490), which is a continuation of U.S. application Ser. No. 12/703,061, filed Feb. 9, 2010 (U.S. Pat. No. 8,940,536), which is a divisional of U.S. application Ser. No. 10/997,146, filed Nov. 24, 2004 (U.S. Pat. No. 7,682,828), which claims the benefit of U.S. Provisional Application No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional Application No. 60/530,042, filed Dec. 15, 2003, the specifications of which are incorporated herein by reference in their entirety.

## GOVERNMENTAL FUNDING

This invention was made with government support under R37 CA84198 awarded by the National Institutes of Health. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate into the full range of daughter cells having distinctly different morphological, cytological or functional phenotypes unique to a specific tissue. By contrast, descendants of pluripotent cells are restricted progressively in their differentiation potential, with some cells having only one fate. Pluripotent cells have extraordinary scientific and therapeutic potential, as they can be differentiated along the desired differentiation pathway in a precisely controlled manner and used in cell-based therapy.

Two categories of pluripotent stem cells are known to date: embryonic stem cells and embryonic germ cells. Embryonic stem cells are pluripotent stem cells that are derived directly from an embryo. Embryonic germ cells are pluripotent stem cells that are derived directly from the fetal tissue of aborted fetuses. For purposes of simplicity, embryonic stem cells and embryonic germ cells will be collectively referred to as "ES" cells herein.

ES cells are presently obtained via several methods. In a first method, an ES cell line is derived from the inner cell mass of a normal embryo in the blastocyst stage (See U.S. Pat. No. 6,200,806, Thomson, J. A. et al. Science, 282: 1145-7, 1998 and Hogan et al., 2003). A second method for creating pluripotent ES cells utilizes the technique of somatic cell nuclear transfer (SCNT). In this technique, the nucleus is removed from a normal egg, thus removing the genetic material. Next, a donor diploid somatic cell is placed next to the enucleated egg and the two cells are fused, or the nucleus is introduced directly into the oocyte by micromanipulation. The fused cell has the potential to develop into a viable embryo, which may then be sacrificed to remove that portion of the embryo containing the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is transplanted into an entirely enucleated animal oocyte of a species different from the donor cell (referred to herein as animal stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. Application Ser. No. 20010012513 (2001). The resultant

chimeric cells are used for the production of pluripotent ES cells, in particular human-like pluripotent ES cells. One disadvantage of this technique is that these chimeric cells may contain unknown non-human viruses and still contain the mitochondria of the animal species. Thus, there would be substantial risks of immune rejection if such cells were used in cell transplantation therapies.

In a fourth method, ES cells can be isolated from the primordial germ cells found in the genital ridges of post-implanted embryos.

As described above, all presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species. The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application.

There is thus a great demand for alternative methods of generating pluripotent cells.

## SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in which one or more endogenous pluripotency gene(s) is operably linked to a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene to which the marker is linked. The invention also provides transgenic mice containing these engineered somatic cells.

The present invention also provides methods for reprogramming somatic cells to a less differentiated state. In the methods, engineered somatic cells of the invention are treated with an agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state. In the methods, the engineered somatic cells described above are contacted with a candidate agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The presence of at least a subset of pluripotency characteristics indicates that the agent is capable of reprogramming somatic cells to a less-differentiated state. The agents identified by the present invention can then by used to reprogram somatic cells by contacting somatic cells with the agents.

The present invention also provides methods for identifying a gene that causes the expression of at least one endogenous pluripotency gene in somatic cells. In the methods, the engineered somatic cells are transfected with a cDNA library prepared from a pluripotent cell, such as an ES cell. The cells that express the appropriate selectable marker are then selected, and the expression of the appropriate endogenous pluripotency gene is examined. The expression of an endogenous pluripotency gene indicates that the cDNA encodes a protein whose expression in the cell results in, directly or indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating a condition in an individual in need of such treatment. In certain embodiments, somatic cells are obtained from the individual and reprogrammed by the methods of the invention under conditions suitable for the cells to develop into

**EXHIBIT F**
**PAGE 149**

WHI_00011922

US 10,457,917 B2

3

cells of a desired cell type. The reprogrammed cells of a desired cell type are then harvested and introduced into the individual to treat the condition. In certain further embodiments, the somatic cells obtained from the individual contains a mutation in one or more genes. In these instances, the methods are modified so that the somatic cells obtained from the individual are first treated to restore the one or more normal gene(s) to the cells such that the resulting cells carry the normal endogenous gene, which are then introduced into the individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such as a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an inducible Oct4 allele.

FIG. 2 shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

4

DETAILED DESCRIPTION OF THE
INVENTION

Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells. Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene gives one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluripotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. For example, multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem

**EXHIBIT F**
**PAGE 150**

WHI_00011923

US 10,457,917 B2

5      6

cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5f1, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-differentiation (Nichols et al., 1998, Cell 95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):293-300.

Engineered Somatic Cells and Transgenic Mice Comprising Such Cells

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match", it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first

nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the desired endogenous pluripotency gene, downstream from the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The selected ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or

**EXHIBIT F**
**PAGE 151**

WHI_00011924

US 10,457,917 B2

7

may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced in cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, as used herein, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt). dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a

8

further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differentiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness."

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristics that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 1 5 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152: 212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595;

US 10,457,917 B2

9
10

Dah-Istrand et al., 1992, J. Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1998, Blood 91:2625-22626), the transcription factor Tef-4 (Korinek et al, 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1 566-1 572), and the transcription factor Cdx1 (Duprey et al., 1 988, Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-1 8).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular signature", or "stemness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358(1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensible for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA 26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997) The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA, the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; Gene Expression Technology: Methods in Enzymology, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Le et al. PN.A.S. USA (1988), 85, 1204-1208; (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated DNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible

EXHIBIT F
PAGE 153

WHI_00011926

US 10,457,917 B2

11

promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Thus, in one embodiment, the present invention provides mice and somatic cells carrying at least one pluripotency gene expressed as a transgene under an inducible promoter. It is possible that somatic cells with such inducible pluripotency transgene(s) are more prone to be reprogrammed.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to select for all the selectable markers linked to the various endogenous pluripotency genes.

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatic structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol. Chem. 277: 34521-30, 2002; and Bergman and Mostoslavsky, Biol. Chem. 1990. Thus, DNA methylation inhibitors and histone deacetylation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

12

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including peptides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate agents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVER-Set. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacetylation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, FoxD3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic

**EXHIBIT F**
**PAGE 154**

WHI_00011927

US 10,457,917 B2

13      14

cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

Reprogrammed Somatic Cells and these Uses

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condition. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferral of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-xl might be useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and culturing such cells under conditions which favor differentiation, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neurectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngenic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For

US 10,457,917 B2

example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital system, such as the bladder, clitoris, corpus cavernosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Atala, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, polyorthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786, 217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor may be introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunnigan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for Gln6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or non-neural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139:39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations into ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., hematopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the TK gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon gancyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoietic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

EXHIBIT F
PAGE 156

WHI_00011929

US 10,457,917 B2

17

Furthermore, the RPSCs produced according to the invention may be introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices. Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine, ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,992, 5,627,059, 5,631,153, and 6,204, 061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired character-

18

istics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In the second method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory

**EXHIBIT F**
**PAGE 157**

WHI_00011930

US 10,457,917 B2

19

Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press, Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

## EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

## Example

Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5' end and a SV40 polyA tail (SV40-pA) at its 3' end. The second integration vector, tetracycline activator integration vector, contains a mutant form of tetracycline activator, M2-rtTA, which is more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracycline activator integration vector are introduced into the Collagen locus and the Rosa26 locus respectively via site-specific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complementation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-inducible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expression level in fibroblasts treated with doxycycline is comparable to the Oct4 expression level in ES cells, and undetectable in fibroblasts not treated with doxycycline. The

20

expression results demonstrate that the inducible Oct4 transgene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

| In vitro development of clones derived from Oct4-induced fibroblasts | | | | | | |
|---|---|---|---|---|---|---|
| Expt. | Oct4 | eggs w/ PN | Blastocysts (% PN) | | ES lines (% PN) | |
| #1 | − | 22 | 5 (23%) | } 19% | 0 (0%) | } 3% |
| #2 | − | 35 | 5 (14%) | | 2 (6%) | |
| #3 | + | 37 | 10 (27%) | } 24% | 2 (5%) | } 7% |
| #4 | + | 47 | 10 (21%) | | 4 (9%) | |

PN . . . ProNucleus formation
Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, Nature, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

## REFERENCES

Avilion, J., et al., Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells, Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 2650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. H., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci. USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger S, Baron U, Thellmann M, Hasan M T, Bujard H, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-

21

dependent transcriptional activators: novel mutations yield expanded range and sensitivity.

William R. L., et al., Nature 336: 684-687 (1988)

Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J., Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. *Ann. New York Acad. Sci.* 580, 81-87

Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA bgeo 26 gene trap strain leads to widespread expression of b-galatosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

**1**. A method of making a somatic cell more susceptible to reprogramming to a less differentiated state, comprising: introducing an exogenous nucleic acid encoding an Oct 4 protein operably linked to at least one regulatory sequence into the somatic cell, thereby increasing expression of Oct4 protein in the somatic cell, wherein increased expression of Oct4 protein makes the cell more susceptible to reprogramming; and wherein the exogenous nucleic acid is transiently transfected into the somatic cell.

**2**. The method of claim **1**, wherein the somatic cell does not comprise a selectable marker.

**3**. The method of claim **1**, wherein the somatic cell is a human cell or a mouse cell.

**4**. The method of claim **1**, wherein the somatic cell is an adult stem cell.

**5**. The method of claim **4**, wherein the adult stem cell is a hematopoietic stem cell, neural stem cell, or mesenchymal stem cell.

**6**. The method of claim **1**, wherein the less differentiated state comprises pluripotent state.

**7**. The method of claim **1**, further comprises: contacting the somatic cell with a candidate agent of interest with respect to its potential to reprogram a somatic cell.

22

**8**. The method of claim **7**, wherein the agent is Sox-2 or Nanog.

**9**. The method of claim **1**, wherein the somatic cell does not comprise a selectable marker integrated into an endogenous locus of a pluripotency gene.

**10**. A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising: obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein; wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state; and wherein the exogenous polynucleic acids are transiently transfected into the cell.

**11**. The method of claim **10**, the step of obtaining further comprises: introducing an exogenous polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein into the somatic cell.

**12**. The method of claim **10** or **11**, further comprising: contacting the somatic cell with a candidate agent of interest with respect to its potential to reprogram a somatic cell.

**13**. The method of claim **10**, wherein the exogenous polynucleic acids increase Oct4 expression in the somatic cell.

**14**. The method of claim **10**, wherein the somatic cell is a mammalian cell.

**15**. The method of claim **10**, wherein the somatic cell is a human cell or a mouse cell.

**16**. The method of claim **10**, wherein the somatic cell is an adult stem cell.

**17**. The method of claim **16**, wherein the adult stem cell is selected from the group consisting of: a hematopoietic stem cell, a neural stem cell, and a mesenchymal stem cell.

**18**. The method of claim **10**, wherein the less differentiated state comprises pluripotent state.

* * * * *

WHI_00011932

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 10,457,917 B2                                          Page 1 of 1
APPLICATION NO. : 16/030815
DATED : October 29, 2019
INVENTOR(S) : Rudolf Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 22 through Line 26, delete:
"GOVERNMENTAL FUNDING
This invention was made with government support under R37 CA84198 awarded by
the National Institutes of Health. The government has certain rights in the invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

**EXHIBIT F**
**PAGE 160**

WHI_00011933

# EXHIBIT G



US010017744B2

(12) **United States Patent**
Jaenisch et al.

(10) Patent No.: **US 10,017,744 B2**
(45) Date of Patent: \*Jul. 10, 2018

(54) **METHODS FOR REPROGRAMMING SOMATIC CELLS**

(71) Applicant: **Whitehead Institute for Biomedical Research**, Cambridge, MA (US)

(72) Inventors: **Rudolf Jaenisch**, Brookline, MA (US); **Konrad Hochedlinger**, Cambridge, MA (US)

(73) Assignee: **WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH**, Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/588,062**

(22) Filed: **May 5, 2017**

(65) **Prior Publication Data**

US 2017/0240865 A1    Aug. 24, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/923,321, filed on Oct. 26, 2015, now Pat. No. 9,670,464, which is a continuation of application No. 13/646,430, filed on Oct. 5, 2012, now Pat. No. 9,169,490, which is a continuation of application No. 12/703,061, filed on Feb. 9, 2010, now Pat. No. 8,940,536, which is a division of application No. 10/997,146, filed on Nov. 24, 2004, now Pat. No. 7,682,828.

(60) Provisional application No. 60/525,612, filed on Nov. 26, 2003, provisional application No. 60/530,042, filed on Dec. 15, 2003.

(51) Int. Cl.
  *C12N 5/00*    (2006.01)
  *C12N 5/074*    (2010.01)

(52) U.S. Cl.
  CPC ...... *C12N 5/0696* (2013.01); *C12N 2501/602* (2013.01); *C12N 2501/603* (2013.01); *C12N 2501/605* (2013.01); *C12N 2506/1307* (2013.01); *C12N 2510/00* (2013.01)

(58) **Field of Classification Search**
  CPC ..................... C12N 5/0696; C12N 2510/00
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,824,837 A | 10/1998 | Chen et al. | |
| 5,843,780 A | 12/1998 | Thomson | |
| 6,200,806 B1 | 3/2001 | Thomson | |
| 7,015,037 B1 | 3/2006 | Furcht et al. | |
| 7,524,677 B2 | 4/2009 | Stockman et al. | |
| 7,601,699 B2 | 10/2009 | Eliertsen | |
| 7,682,828 B2 | 3/2010 | Jaenisch et al. | |

| | | | |
|---|---|---|---|
| 7,687,266 B2 | 3/2010 | Chambers et al. |
| 8,071,369 B2 | 12/2011 | Jaenisch et al. |
| 8,927,279 B2 | 1/2015 | Jaenisch |
| 8,932,856 B2 | 1/2015 | Jaenisch |
| 8,940,536 B2 | 1/2015 | Jaenisch |
| 8,951,797 B2 | 2/2015 | Jaenisch |
| 9,169,490 B2 | 10/2015 | Jaenisch |
| 9,382,515 B2 | 7/2016 | Jaenisch |
| 9,497,943 B2 | 11/2016 | Jaenisch |
| 9,670,464 B2 | 6/2017 | Jaenisch |
| 9,714,414 B2 | 7/2017 | Jaenisch |
| 2002/0168860 A1 | 11/2002 | Chen et al. |
| 2004/0137460 A1 | 7/2004 | Yamanaka et al. |
| 2005/0130144 A1 | 6/2005 | Nakatsuji et al. |
| 2005/0287547 A1 | 12/2005 | Seligman |
| 2006/0041946 A1 | 2/2006 | Fisher |
| 2006/0084172 A1 | 4/2006 | Muller et al. |
| 2007/0032447 A1 | 2/2007 | Eilertsen |
| 2008/0066197 A1 | 3/2008 | Ying et al. |
| 2008/0280362 A1 | 11/2008 | Jaenisch et al. |
| 2009/0047263 A1 | 2/2009 | Yamanaka et al. |
| 2009/0068742 A1 | 3/2009 | Yamanaka |
| 2009/0227032 A1 | 9/2009 | Yamanaka et al. |
| 2010/0062533 A1 | 3/2010 | Yamanaka |
| 2010/0144031 A1 | 6/2010 | Jaenisch et al. |
| 2010/0221827 A1 | 9/2010 | Jaenisch et al. |
| 2010/0310525 A1 | 12/2010 | Chevalier et al. |
| 2011/0076678 A1 | 3/2011 | Jaenisch et al. |
| 2011/0151447 A1 | 6/2011 | Park |
| 2012/0028821 A1 | 2/2012 | Jaenisch et al. |
| 2012/0034192 A1 | 2/2012 | Young et al. |
| 2012/0282229 A1 | 11/2012 | Kannemeier et al. |
| 2013/0017596 A1 | 1/2013 | Townes et al. |
| 2013/0065311 A1 | 3/2013 | Yamanaka et al. |
| 2016/0115456 A1 | 4/2016 | Jaenisch |
| 2017/0067081 A1 | 3/2017 | Jaenisch |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2006325975 A1 | 6/2007 |
| CN | 101855350 | 10/2010 |
| EP | 1 970 446 | 9/2008 |
| WO | WO 96/22362 | 7/1996 |
| WO | WO 1999/055841 | 11/1999 |

(Continued)

OTHER PUBLICATIONS

Furler, S., et al. "Recombinant AAV vectors containing the foot and mouth disease virus 2A sequence confer efficient bicistronic gene expression in cultured cells and rat substantia nigra neurons." Gene therapy 8.11 (2001): 864-873.

(Continued)

*Primary Examiner* — Marcia S Noble
(74) *Attorney, Agent, or Firm* — Lisa M. Warren, Esq.; Morse, Barnes-Brown & Pendleton, P.C.

(57) **ABSTRACT**

The invention provides methods for reprogramming somatic cells to generate multipotent or pluripotent cells. Such methods are useful for a variety of purposes, including treating or preventing a medical condition in an individual. The invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state.

**9 Claims, 2 Drawing Sheets**

US 10,017,744 B2

Page 2

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | WO 2000/027995 | 5/2000 |
| WO | WO 2002/097090 | 12/2002 |
| WO | WO 2005/001080 | 1/2005 |
| WO | WO 2005/080598 | 9/2005 |
| WO | WO 2005/090557 | 9/2005 |
| WO | WO 2006/116803 | 11/2006 |
| WO | WO 2007/069666 | 6/2007 |
| WO | WO 2008/001391 A2 | 1/2008 |
| WO | WO 2008/118820 | 10/2008 |
| WO | WO 2008/118820 A2 | 10/2008 |
| WO | WO 2008/124133 A1 | 10/2008 |
| WO | WO 2009/115295 A1 | 9/2009 |
| WO | WO 2009/117439 A2 | 9/2009 |
| WO | WO 2009/133971 | 11/2009 |
| WO | WO 2009/152529 A2 | 12/2009 |
| WO | WO 2010/033920 A2 | 3/2010 |

OTHER PUBLICATIONS

Holst, Jeff, et al. "Generation of T-cell receptor retrogenic mice." Nature protocols 1.1 (2006): 406-417.

Hasegawa, Kouichi, et al. "Efficient multicistronic expression of a transgene in human embryonic stem cells." Stem cells 25.7 (2007): 1707-1712.

Szymczak, Andrea L., et al. "Correction of multi-gene deficiency in vivo using a single 'self-cleaving' 2A peptide—based retroviral vector." Nature biotechnology 22.5 (2004): 589-594.

Corrected Notice of Allowability in U.S. Appl. No. 14/473,250, dated Jun. 6, 2017.

Notice of Allowance and Fee(s) Due in U.S. Appl. No. 14/473,250, dated May 30, 2017.

Aoi, et al., "Generation of Pluripotent Stem Cells from Adult Mouse Liver and Stomach Cells", Science, 321: 699-702 (2008).

Avilion, et al., "Multipotent cell lineages in early mouse development depend on SOX2 function", Genes & Development, 17:126-140 (2003).

Ben-Shushan, et al., "Extinction of Oct-3/4 gene expression in embryonal carcinoma x fibroblast somatic cell hybrids is accompanied by changes in the methylation status, chromatin structure, and transcriptional activity of the Oct-3/4 upstream region", Molecular and Cellular Biology, 13(2):891-901 (1993).

Bortvin, et al., "Incomplete Reactivation of Oct4-related in Mouse Embryos Cloned from Somatic Nuclei", Development, 130:1673-1680 (2003).

Boyer, et al., "Polycomb complexes repress developmental regulators in murine embryonic stem cells", Nature, 441(7091):349-353 (2006).

Brambrink, et al., "Sequential Expression of Pluripotency Markers During Direct Reprogramming of Mouse Somatic Cells", Cell Stem Cell, 2(2): 151-159 (2008).

Bronson, et al., "Single-copy transgenic mice with chosen-site integration", Proc. Natl. Acad. Sci. USA, 93:9067-9072 (1996).

Bru, et al., "Rapid induction of pluripotency genes after exposure of human somatic cells to mouse ES cell extracts", Experimental Cell Research, 314:2634-2642 (2008).

Buske, et al., "Overexpression of HOXA10 perturbs human lymphomyelopoiesis in vitro and in vivo", Blood, 97(8):2286-2292 (2001).

Carey, et al., "Reprogramming of murine and human somatic cells using a single polycistronic vector", Proceedings of the National Academy of Science, 106:157-162 (2008).

Chambers, et al., "Functional expression cloning of nanog, a pluripotency sustaining factor in embryonic stem cells", Cell, 113:643-655 (2003).

Chen, et al., "Establishment and Maintenance of Genomic Methylation Patterns in Mouse Embryonic Stem Cells by Dnmt3a and Dnmt3b", Molecular and Cellular Biology, 23(16):5594-5605 (2003).

Daniels, et al., "Analysis of Gene Transcription in Bovine Nuclear Transfer Embryos Reconstructed with Granulosa Cell Nuclei", Biology of Reproduction, 63:1034-1040 (2000).

Eminli, et al., "Reprogramming of Neural Progenitor Cells into iPS Cells in the Absence of Exogenous Sox2 Expression", Stem Cells, 26:2467-2474 (2008).

Gossen, et al., "Transcriptional activation by tetracyclines in mammalian cells", Science, 268(5218):1766-1769 (1995).

Greiner, et al., "Identification of a specific inhibitor of the histone methyltransferase SU(VAR)3-9", Nature Chemical Biology, 1:143-145 (2005).

Hanna, et al. "Direct reprogramming of terminally differentiated mature B lymphocytes to pluripotency", Cell 133, 250-264 (2008).

Hansis, et al., "Analysis of Oct-4 expression and ploidy in individual human blastomeres", Molecular Human Reproduction, 7: 155-161 (2001).

Hasegawa, et al., "Efficient multicistronic expression of a transgene in human embryonic stem cells", Stem Cells, 25(7): 1707-1712 (2007).

Helgason, et al., "Overexpression of HOXB4 enhances the hematopoietic potential of embryonic stem cells differentiated in vitro", Blood, 87(7):2740-2749 (1996).

Ho, et al., "Synthetic Protein Transduction Domains: Enhanced Transduction Potential in Vitro and in Vivo", Cancer Research, 61: 474-477 (2001).

Hochedlinger, et al., "Monoclonal mice generated by nuclear transfer from mature B and T donor cells", Nature, 415:1035-1038 (2002).

Hochedlinger, et al., "Nuclear transplantation, embryonic stem cells, and the potential for cell therapy", The New England Journal of Medicine, 349(3):275-286 (2003).

Ihle, et al., "STATs: Signal Transducers and Activators of Transcription", Cell, 84: 331-334 (1996).

Jackson-Grusby, et al., "Loss of Genomic Methylation Cases p53-Dependent Apoptosis and Epigenetic Deregulation", Nature Genetics, 27: 31-39 (2001).

Jaenisch, et al., "Nuclear cloning, stem cells, and genomic reprogramming", Cloning and Stem Cells, 4(4):389-396 (2002).

Jaenisch & Young, "Stem Cells, the Molecular Circuitry of Pluripotency and Nuclear Reprogramming", Cell, 132, 567-582 (2008).

Kaufman, et al., "Hematopoietic colony-forming cells derived from human embryonic stem cells", PNAS, 98(19):10716-10721 (2001).

Kubicek, et al., "Reversal of H3K9me2 by a small-molecule inhibitor for the G9a histone methyltransferase", Molecular Cell, 25(3):473-81 (2007).

Kyba et al., "HoxB4 confers definitive lymphoid-myeloid engraftment potential on embryonic stem cell and yolk sac hematopoietic progenitors", Cell, 109:29-37 (2002).

Lenardo et al., "Repression of the IgH Enhancer in Teratocarcinoma Cells Associated with a Novel Octamer Factor", Science, New Series, 243(4890):544-546 (1989).

Li, et al., "Murine embryonic stem cell differentiation is prompted by SOCS-3 and inhibited by the zinc finger transcription factor Klf4", Blood, 105:635-637 (2005).

Loh, et al., "The Oct4 and Nanog transcription network regulates pluripotency in mouse embryonic stem cells", Nature Genetics, 38(4): 431-440 (2006).

Lowry, et al. Generation of human induced pluripotent stem cells from dermal fibroblasts. "PNAS", 105(8):2883-2888 (2008).

Ma, et al., "G9a and Jhdm2a Regulate Embryonic Stem Cell Fusion-Induced Reprogramming of Adult Neural Stem Cells", Stem Cells, 26(8): 2131-2141 (2008).

Matsuoka, et al., "Generation of definitive hematopoietic stem cells from murine early yolk sac and paraaortic splanchnopleures by aorta-gonad-mesonephros region-derived stromal cells", Blood, 104(6):1-12 (2001).

McWhir, et al., "Selective ablation of differentiated cells permits isolation of embryonic stem cell lines from murine embryos with a non-permissive genetic background", Nature Genetics, 14:223-226 (1996).

**EXHIBIT G**
**PAGE 162**

WHI_00011897

US 10,017,744 B2

Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

Mitsui et al., "The Homeoprotein Nanog is Required for Maintenance of Pluripotency in Mouse Epiblast and ES Cells", *Cell*, 113: 631-642 (2003).

Mountford, et al., "Dicistronic targeting constructs: Reporters and modifiers of mammalian gene expression", *Proceedings of the National Academy of Sciences*, 91: 4303-4307 (1994).

Munsie, et al., "Transgenic strategy for demonstrating nuclear reprogramming in the mouse", *Cloning Stem Cells*, 4(2):121-130 (2002).

Naito, et al., Journal of Reproduction and Fertility 113:137-143 (1998).

Nichols, et al., "Formation of Pluripotent Stem Cells in the Mammalian Embryo Depends on the POU Transcription Factor Oct4", *Cell*, 95: 379-391 (1998).

Niwa, et al., "Quantitative expression of Oct-3/4 defines differentiation, dedifferentiation or self-renewal of ES cells", *Nature Genetics*, 24: 372-376 (2000).

Okita, et al., "Generation of Mouse Induced Pluripotent Stem Cells Without Viral Vectors", *Science*, 322:949-953 (2008).

Peled, et al., "Dependence of human stem cell engraftment and repopulation of NOD/SCID mice on CXCR4", *Science*, 283:845-848 (1999).

Pesce, et al., "Oct-4: Gatekeeper in the beginnings of mammalian development", *Stem Cells*. 19:271-278 (2001).

Qi, et al., "The magic of four: induction of pluripotent stem cells from somatic cells by Oct4, Sox2, Myc and Klf4", *Cell Research*, 17:578-580 (2007).

Radcliffe, et al., "Multiple gene products from a single vector: 'self-cleaving' 2A peptides", *Gene Therapy*, 11:1673-1674 (2004)

Ramalho-Santos, et al., "Stemness: Transcriptional Profiling of Embryonic and Adult Stem Cells", *Science*, 298: 597-600 (2002).

Ryan, et al., "Cleavage of foot-and-mouth disease virus polyprotein is mediated by residues located within a 19 amino acid sequence", *Journal of General Virology*, 72:2727-2732 (1991).

Savarese, et al., "Hematopoietic Precursor Cells Transiently Reestablish Permissiveness for X Inactivation", *Molecular and Cellular Biology*. 26(19): 7167-7177 (2006).

Sells, et al., "Delivery of Protein into Cells Using Polycationic Liposomes", *BioTechniques* 19(1):72-78 (1995).

Shields, et al., "Identification and Characterization of a Gene Encoding a Gut-Enriched Kruppel-like Factor Expressed during Growth Arrest", *Journal of Biological Chemistry*, 271(33):20009-20017 (1996).

Stacey, et al., "Microinjection of Transforming ras Protein Induces c-fos Expression," *Molecular and Cellular Biology*, 7(1): 523-527 (1987).

Stadfeld, et al., "Reprogramming of Pancreatic β Cells into Induced Pluripotent Stem Cells", *Current Biology*, 18:890-894 (2008).

Stem Cells: Scientific Progress and Future Research Directions. Department of Health and Human Services. Jun. 2001, <//info/scireport/2001report>. Chapter 4: The Adult Stem Cell, pp. 23-42.

Tada, et al., "Nuclear Reprogramming of Somatic Cells by In Vitro Hybridization with ES cells", *Current Biology*, 11: 1553-1558 (2001).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Adult Human Fibroblasts by Defined Factors", *Cell*, 131, 861-872 (2007).

Takahashi, et al., "Induction of Pluripotent Stem Cells from Mouse Embryonic and Adult Fibroblast Cultures by Defined Factors", *Cell*, 126: 663-676 (2006).

Thomson, et al., "Embryonic Stem Cell Lines Derived from Human Blastocysts", *Science*, 282, 1145-1147 (1998).

Wadia, et al., "Protein Transduction Technology," *Analytical Biotechnology*, 13: 52-56 (2002).

Wernig, et al., "A drug-inducible transgenic system for direct reprogramming of multiple somatic cell types", *997 Biotechnology*, 26(8):916-924 (2008).

Wernig, et al., "In vitro reprogramming of fibroblasts into a pluripotent ES-cell-like state", *Nature*, 448: 318-324 (2007).

Wernig, et al., "Neurons derived from reprogrammed fibroblasts functionally integrate into the fetal brain and improve symptoms of rats with Parkinson's disease", *PNAS*, 105(15):5856-5861 (2008).

Yamanaka, et al., "Strategies and New Developments in the Generation of Patient-Specific Pluripotent Stem Cells", *Cell Stem Cell*, 1: 39-49 (2007).

Yeom et al., "Germline regulatory element of Oct-4 specific for the totipotent cycle of embryonal cells," *Development*,122:881-897 (1996).

Ying, et al., "BMP induction of Id proteins suppresses differentiation and sustains embryonic stem cell self-renewal in collaboration with STAT3", *Cell*, 115: 281-292 (2003).

Yoshimizu, et al., "Germline-specific expression of the Oct-4/green fluorescent protein (GFP) transgene in mice", *Development, Growth & Differentiation*, 41:675-684 (1999).

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", *Science*, 318(5858):1917-20 (2007).

Zakhartchenko, et al., "Adult cloning in cattle: potential of nuclei from a permanent cell line and from primary cultures", *Molecular Reproduction and Development*, 54:264-272 (1999).

Zambrowicz, et al., "Disruption of overlapping transcripts in the ROSA βgeo 26 gene trap strain leads to widespread expression of β-galactosidase in mouse embryos and hematopoietic cells", *Proc. Natl. Acad. Sci. USA*, 94:3789-3794 (1987).

Zhou, et al., "Generation of Induced Pluripotent Stem Cells Using Recombinatnt Proteins", *Cell Stem Cell*, 4:381-384 (2009).

Blast Alignment Seq Id 16 (ECAT4).

Sox2. Print out from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/127140985?ordinalp...nirez.Sequence.

Sequence_ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Nanog. Printout from Pubmed http://www.ncbi.nlm.nih.gov/nuccore/153791181?ordinalp...netrez.Sequence.

Sequence_ResultsPanel.Sequence_RVDocSum p. 1-6, printed Apr. 7, 2009.

Scholer, et al., "New type of POU domain in germ line-specific protein Oct-4", Letters to Nature, 344: 435-439 (1990).

Bilic, et al., "Concise Review: Induced Pluripotent Stem Cells Versus Embryonic Stem Cells: Close Enough or Yet Too Far Apart?", *Stem Cells*, 30:33-41(2012).

Chin, et al., "Induced Pluripotent Stem Cells and Embryonic Stem Cells are Distinguished by Gene Expression Signatures", *Cell Stem Cell*, 5:111-123(2009).

Chin, et al., "Molecular Analyses of Human Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Cell Stem Cell*, 7(2):263-269(2010).

Munoz, et al., "The Quantitative Proteomes of Human-Induced Pluripotent Stem Cells and Embryonic Stem Cells", *Molecular Systems Biology*, 7(550): 1-13(2011).

Polouliakh, et al., "Reprogramming Resistant Genes: In-Depth Comparison of Gene-Expressions Among iPS, ES, and somatic cells", *Frontiers in Physiology*, 4(7):1-9(2013).

Meissner, et al., "Direct Reprogramming of genetically unmodified fibroblasts into pluripotent stem cells", *Nature Biotechnology*, 25(10): 1177-1181 (2007).

Strelchenko, et al. "Reprogramming of human somatic cells by embryonic stem cell cytoplast", *Reprod. Biomed Online*, 12(1): 107-111 (2006).

Cowan, et al., Nuclear Reprogramming of Somatic Cells After Fusion with Human Embryonic Stem Cells, *Science*, 309:1369-1373 (2005).

Laiosa, et al., "Reprogramming of Committed T Cell Progenitors to Macrophages and Dendritic Cells by C/EBPa and PU.1 Transcription Factors", *Immunity*, 25: 731-744 (2006).

Ait-Si-Ali, et al., "A Suv39h-dependent mechanism for silencing S-phase genes in differentiating but not in cycling cells", *EMBO Journal*, 23:605-615 (2004).

Maherali, et al., "Directly Reprogrammed Fibroblasts Show Global Epigenetic Remodeling and Widespread Tissue Contribution", Cell Stem Cell, 1:55-70(2007).

Sarraf, et al., "Methyl-CpG Binding Protein MBD1 Couples Histone H3 Methylation at Lysine 9 by SETDB1 to DNA Replication and Chromatin Assembly", Molecular Cell, 15:595-605 (2004).

**EXHIBIT G**
**PAGE 163**

WHI_00011898

(56)                    **References Cited**

OTHER PUBLICATIONS

PubMed Oct4 gene, Printout from www.ncbi.nlm.nih.gov/nuccore/NM_013633.3, pp. 1-12, Sep. 19, 2013.

Palmqvist, et al., "Correlation of Murine Embryonic Stem Cell Gene Expression Profiles with Functional Measures of Pluripotency", Stem Cells, 23:663-680 (2005).

Yu, et al., "Induced pluripotent stem cell lines derived from human somatic cells", Science, 318:1917-1920 (2007).

Sox2 cDNA, printout from http://ncbi.nih.gov/nuccor/BC057574.1, pp. 1-13 (2013).

Oct4 cDNA, printout from http://ncbi.nih.gov/nuccor/BC117437.1, pp. 1-10 (2013).

Chinnasamy, et al., "Multicistronic lentiviral vectors containing the FMDV 2A cleavage factor demonstrate robust expression of encoded genes at limiting MOI", Virology Journal, 3: 14-29 (2006).

Okita, et al., "Generation of germline-competent induced pluripotent stem cells", Nature, 448: 313-318 (2007).

Feldman, et al., "G9a-mediated irreversible epigenetic inactivation of Oct-3/4 during early embryogenesis", Nature Cell Biology, 455: 627-633 (2008).

Zhou, et al., "In vivo reprogramming of adult pancreatic exocrine cells to b-cells", Nature, 455: 627-633 (2008).

Kong, et al., "Lack of specificity of fibroblast-specific protein 1 in cardiac remodeling and fibrosis", American Journal of Physiology Heart and Circulatory Physiology, 305: H1363-1372 (2013).

Nakagawa, et al., "Generation of induced pluripotent stem cells without Myc from mouse and human fibroblasts", Nature Biotechnology, 26(1): 101-106 (2008).

Silva, et al., "Nanog promotes transfer of pluripotency after cell fusion", Nature, 441: 997-1001 (2006)

Shi, et al., Dynamic Regulation of Histone Lysine Methylation by Demethylases, Molecular Cell, 26995: 1-14 (2007).

Tawell, et al., "Tat-Mediated delivery of heterologous proteins into cells", Proceedings of the National Academy of Science, 91: 664-668 (1994).

Cavaleri, et al., "Nanog: a New Recruit to the Embryonic Stem Cell Orchestra", Cell 113: 551-557 (2003).

Stevanovic, et al., "The cDNA sequence and chromosomal location of the human SOX2 gene", Mammalian Genome 5: 640-642 (1994).

Grinnell, et al., "De-Differentiation of Mouse Interfollicular Keratinocytes by the Embryonic Transcription Factor Oct-4", Journal of Investigative Dermatology, 127; 372-380 (2007).

Kim, et al., "Oct4-Induced Pluripotency in Adult Neural Stem Cells," Cell, 136:411-419 (2009).

Patel et al., "Advances in Reprogramming Somatic Cells to Induced Pluripotent Stem Cells," NIH Public Access Author Manuscript, Jan. 1, 2011 (online) [retrieved from internet May 3, 2015] URL:http://ncbi.nih.gov/pmc/articles/PMC2924949/pdf/nihms-219126.pdf published in final edited form as: Stem Cell Reviews 6(3): 367-380 (Sep. 2010).

Jaenisch, Rudolf, Abstract "In vitro reprogramming of somatic cells into pluripotent ES-like cells," National Institutes of Health Grant No. 4R37 HD045022-11 through 4R37 HD045022-14, Funding Dates 2013 through 2016.

Jaenisch, Rudolf, Abstract "In vitro reprogramming of somatic cells into pluripotent ES-like cells", National Institutes of Health Grant No. 2R01 HD045022-06 through 4R37 HD045022-10, Funding Dates 2008 through 2012.

Jaenisch, Rudolf, Abstract "Nuclear Cloning and the Reprogramming of the Genome" National Institutes of Health Grant No. 1R01 HD045022-01 through 5R01 HD045022-05, Funding Dates 2003 through 2007.

Jaenisch, Rudolf, Abstract "Programming and Reprogramming Human Cells" National Institutes of Health Grant No. 2R01 CA084198-10 through 5R01 CA084198-14, Funding Dates 2009 through 2013.

Jaenisch, Rudolf, Abstract "Genomic Imprinting and the Cloning of Mice" National Institutes of Health Grant No. 1R37 CA084198-01 through 5R37 CA084198-09, Funding Dates 2000 through 2008.

Jaenisch, Rudolf, Abstract Epigenetics, stem cells, and cancer National Institutes of Health Grant Nos. 2RO1 CA087869-06 through 5RO1 CA087869-10, Funding Dates 2006 through 2010.

Jaenisch, Rudolf, Abstract "DNA Methylation, Gene Regulation, and Cancer" National Institutes of Health Grant No. 1RO1 CA087869-01 through 5RO1 CA087869-05, Funding Dates 2001 through 2005.

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 2RO1 HG002668-11A1 through 5RO1 HG002668-13, Funding Dates 2014 through 2016.

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 2RO1 HG002668-07 through 3RO1 HG002668-10S1, Funding Dates 2010 through 2013.

Young, Richard, Abstract "Transcriptional Regulatory Networks in Living Cells" National Institutes of Health Grant No. 2RO1 HG002668-04A1 through 3RO1 HG002668-06, Funding Dates 2007 through 2009.

Young, Richard, Abstract "Transcriptional Regulatory Network in Living Cells" National Institutes of Health Grant No. 1 RO1 HG002668-01 through 3RO1 HG002668-03S1, Funding Dates 2003 through 2006.

De Felipe, P., "Polycistronic Viral Vectors," Current Gene Therapy, 2002, vol. 2, No. 3, pp. 355-378.

Wernig, Marius, et al. "c-Myc is dispensable for direct reprogramming of mouse fibroblasts." Cell stem cell 2.1 (2008): 10-12.

International Search Report for International Application PCT/US08/04516, dated Sep. 10, 2008

International Search Report for International Application PCT/US2009/047423, dated May 3, 2010.

International Search Report for International Application PCT/US2009/057692, dated Jun. 30, 2010.

Supplementary European Search Report for Application No. EP 08742630.0, dated Mar. 25, 2010.

Supplementary European Search Report for Application No. EP 09763816, dated Nov. 29, 2012.

Partial European Search Report for Application No. EP12003893, dated Jun. 24, 2013.

Non-Final Office Action for U.S. Appl. No. 10/997,146, dated Nov. 3, 2006.

Final Office Action for U.S. Appl. No. 10/997,146, dated Aug. 14, 2007.

Non-Final Office Action for U.S. Appl. No. 10/997,146, dated Jul. 22, 2008.

Non-Final Office Action for U.S. Appl. No. 10/997,146, dated Apr. 9, 2009.

Non-Final Office Action for U.S. Appl. No. 12/703,015, dated Oct. 28, 2010.

Final Office Action for U.S. Appl. No. 12/703,015, dated Jul. 8, 2011.

Non-Final Office Action for U.S. Appl. No. 12/703,061, dated Oct. 28, 2010.

Final Office Action for U.S. Appl. No. 12/703,061, dated Jul. 14, 2011.

Non-Final Office Action for U.S. Appl. No. 12/703,061, dated Sep. 19, 2011.

Notice of Allowance in U.S. Appl. No. 10/997,146, dated Jan. 26, 2010.

Notice of Allowance in U.S. Appl. No. 12/703,015, dated Sep. 16, 2011.

Non-Final Office Action for U.S. Appl. No. 12/595,041, dated May 9, 2012.

Final Office Action for U.S. Appl. No. 12/595,041, dated Dec. 7, 2012.

Non-Final Office Action for U.S. Appl. No. 13/646,411, dated Feb. 27, 2013.

Non-Final Office Action for U.S. Appl. No. 13/119,891, dated May 15, 2013.

Non-Final Office Action for U.S. Appl. No. 12/703,061, dated Aug. 20, 2013.

Non-Final Office Action for U.S. Appl. No. 13/646,444, dated Aug. 20, 2013.

**EXHIBIT G**
**PAGE 164**

WHI_00011899

US 10,017,744 B2
Page 5

(56)　　　　　References Cited

OTHER PUBLICATIONS

Non-Final Office Action for U.S. Appl. No. 13/646,430, dated Sep. 20, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,420, dated Sep. 23, 2013.
Non-Final Office Action for U.S. Appl. No. 12/595,041, dated Oct. 2, 2013.
Non-Final Office Action for U.S. Appl. No. 13/646,411, dated Oct. 31, 2013.
Non-Final Office Action for U.S. Appl. No. 13/119,891, dated Jan. 2, 2014.
Non-Final Office Action for U.S. Appl. No. 12/997,815, dated Jan. 3, 2014.
Final Office Action for U.S. Appl. No. 13/646,430, dated Apr. 1, 2014.
Final Office Action for U.S. Appl. No. 13/646,444, dated Apr. 2, 2014.
Final Office Action for U.S. Appl. No. 13/646,420, dated Apr. 2 2014.
Final Office Action for U.S. Appl. No. 12/703,061, dated Apr. 11, 2014.
Final Office Action for U.S. Appl. No. 13/646,411, dated May 9, 2014.
Non-Final Office Action for U.S. Appl. No. 13/646,420, dated May 27, 2014.
Final Office Action for U.S. Appl. No. 12/595,041, dated May 30, 2014.
Final Office Action for U.S. Appl. No. 12/997,815, dated Jul. 15, 2014.
Final Office Action for U.S. Appl. No. 13/119,891, dated Aug. 18, 2014.
Notice of Allowance for U.S. Appl. No. 12/703,061, dated Nov. 7, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,411, dated Dec. 8, 2014.
Notice of Allowance for U.S. Appl. No. 13/646,420, dated Sep. 17, 2014.

Non-Final Office Action for U.S. Appl. No. 13/646,430, dated Dec. 8, 2014.
Non-Final Office Action for U.S. Appl. No. 12/595,041, dated Apr. 3, 2015.
Non-Final Office Action for U.S. Appl. No. 12/997,815, dated May 19, 2015.
Notice of Allowance for U.S. Appl. No. 13/646,430, dated Jun. 18, 2015.
Non-Final Office Action for U.S. Appl. No. 14/473,250, dated Aug. 25, 2015.
Final Office Action for U.S. Appl. No. 12/595,041, dated Oct. 30, 2015.
Final Office Action for U.S. Appl. No. 12/997,815, dated Feb. 19, 2016.
Notice of Allowance for U.S. Appl. No. 12/595,041, dated Mar. 7, 2016.
Notice of Allowance for U.S. Appl. No. 13/646,444, dated Sep. 22, 2014.
Final Office Action for U.S. Appl. No. 14/473,250, dated Apr. 26, 2016.
Notice of Allowance for U.S. Appl. No. 12/997,815, dated Jun. 30, 2016.
Notice of Allowance for U.S. Appl. No. 14/473,250, dated May 30, 2017.
Non-Final Office Action for U.S. Appl. No. 14/923,321, dated Aug. 2, 2016.
Final Office Action for U.S. Appl. No. 14/923,321 dated Jan. 4, 2017.
Notice of Allowance for U.S. Appl. No. 14/923,321 dated Mar. 24, 2017.
Non-Final Office Action for U.S. Appl. No. 15/607,028, dated Sep. 20, 2017.
Final Office Action in U.S. Appl. No. 15/607,028, dated Feb. 14, 2018.
Griffiths, Anthony J.F., et al., "An Introduction to Genetic Analysis," Seventh Edition, First Printing 1999, 2 pages.
Urwin, Peter, et al., "Functional characterization of the EMCV IRES in plants," The Plant journal (2000) 24(5), 583-589. Jul. 25, 2000.



Figure 1. Inducible *Oct4* allele

EXHIBIT G
PAGE 166

WHI_00011901



Figure 2. The system works...

Oct-4 RNA

Oct-4 protein

EXHIBIT G
PAGE 167

WHI_00011902

US 10,017,744 B2

1

# METHODS FOR REPROGRAMMING SOMATIC CELLS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/923,321, filed Oct. 26, 2015, which is a continuation of U.S. application Ser. No. 13/646,430, filed Oct. 5, 2012 (U.S. Pat. No. 9,169,490), which is a continuation of U.S. application Ser. No. 12/703,061, filed Feb. 9, 2010 (U.S. Pat. No. 8,940,536), which is a divisional of U.S. application Ser. No. 10/997,146, filed Nov. 24, 2004 (U.S. Pat. No. 7,682, 828), which claims the benefit of U.S. Provisional Application No. 60/525,612, filed Nov. 26, 2003, and U.S. Provisional Application No. 60/530,042, filed Dec. 15, 2003, the specifications of which are incorporated herein by reference in their entirety.

## GOVERNMENTAL FUNDING

This invention was made with government support under R37 CA84198 awarded by the National Institutes of Health. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

Pluripotent stem cells have the potential to differentiate into the full range of daughter cells having distinctly different morphological, cytological or functional phenotypes unique to a specific tissue. By contrast, descendants of pluripotent cells are restricted progressively in their differentiation potential, with some cells having only one fate. Pluripotent cells have extraordinary scientific and therapeutic potential, as they can be differentiated along the desired differentiation pathway in a precisely controlled manner and used in cell-based therapy.

Two categories of pluripotent stem cells are known to date: embryonic stem cells and embryonic germ cells. Embryonic stem cells are pluripotent stem cells that are derived directly from an embryo. Embryonic germ cells are pluripotent stem cells that are derived directly from the fetal tissue of aborted fetuses. For purposes of simplicity, embryonic stem cells and embryonic germ cells will be collectively referred to as "ES" cells herein.

ES cells are presently obtained via several methods. In a first method, an ES cell line is derived from the inner cell mass of a normal embryo in the blastocyst stage (See U.S. Pat. No. 6,200,806, Thompson, J. A. et al. Science, 282: 1145-7, 1998 and Hogan et al., 2003). A second method for creating pluripotent ES cells utilizes the technique of somatic cell nuclear transfer (SCNT). In this technique, the nucleus is removed from a normal egg, thus removing the genetic material. Next, a donor diploid somatic cell is placed next to the enucleated egg and the two cells are fused, or the nucleus is introduced directly into the oocyte by micromanipulation. The fused cell has the potential to develop into a viable embryo, which may then be sacrificed to remove that portion of the embryo containing the stem cell producing inner cell mass.

In a third method, the nucleus of a human cell is transplanted into an entirely enucleated animal oocyte of a species different from the donor cell (referred to herein as animal stem cell nuclear transfer, or "ASCNT"). See U.S. Pat. Application Ser. No. 20010012513 (2001). The resultant chimeric cells are used for the production of pluripotent ES cells, in particular human-like pluripotent ES cells. One disadvantage of this technique is that these chimeric cells may contain unknown non-human viruses and still contain the mitochondria of the animal species. Thus, there would be

2

substantial risks of immune rejection if such cells were used in cell transplantation therapies.

In a fourth method, ES cells can be isolated from the primordial germ cells found in the genital ridges of post-implanted embryos.

As described above, all presently available methods depend on controversial sources—embryos (either created naturally or via cloning), fetal tissue and via the mixing of materials of multiple species. The controversy surrounding the sources for such cells, according to many leading scientists and public and private organizations including the NIH, has greatly compromised and slowed the study of such cells and their application.

There is thus a great demand for alternative methods of generating pluripotent cells.

## SUMMARY OF THE INVENTION

The present invention provides engineered somatic cells, in which one or more endogenous pluripotency gene(s) is operably linked to a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene to which the marker is linked. The invention also provides transgenic mice containing these engineered somatic cells.

The present invention also provides methods for reprogramming somatic cells to a less differentiated state. In the methods, engineered somatic cells of the invention are treated with an agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with at least one pluripotency gene, or both.

The present invention further provides methods for identifying an agent that reprograms somatic cells to a less differentiated state. In the methods, the engineered somatic cells described above are contacted with a candidate agent. Cells that express the selectable marker are then selected, and assessed for pluripotency characteristics. The presence of at least a subset of pluripotency characteristics indicates that the agent is capable of reprogramming somatic cells to a less-differentiated state. The agents identified by the present invention can then by used to reprogram somatic cells by contacting somatic cells with the agents.

The present invention also provides methods for identifying a gene that causes the expression of at least one endogenous pluripotency gene in somatic cells. In the methods, the engineered somatic cells are transfected with a cDNA library prepared from a pluripotent cell, such as an ES cell. The cells that express the appropriate selectable marker are then selected, and the expression of the appropriate endogenous pluripotency gene is examined. The expression of an endogenous pluripotency gene indicates that the cDNA encodes a protein whose expression in the cell results in, directly or indirectly, expression of the endogenous pluripotency gene.

The present invention further provides methods for treating a condition in an individual in need of such treatment. In certain embodiments, somatic cells are obtained from the individual and reprogrammed by the methods of the invention under conditions suitable for the cells to develop into cells of a desired cell type. The reprogrammed cells of a desired cell type are then harvested and introduced into the individual to treat the condition. In certain further embodiments, the somatic cells obtained from the individual contains a mutation in one or more genes. In these instances, the

## EXHIBIT G
## PAGE 168

WHI_00011903

US 10,017,744 B2

3

methods are modified so that the somatic cells obtained from the individual are first treated to restore the one or more normal gene(s) to the cells such that the resulting cells carry the normal endogenous gene, which are then introduced into the individual. In certain other embodiments, methods of the invention can be used to treat individuals in need of a functional organ. In the methods, somatic cells are obtained from an individual in need of a functional organ, and reprogrammed by the methods of the invention to produce reprogrammed somatic cells. Such reprogrammed somatic cells are then cultured under conditions suitable for development of the reprogrammed somatic cells into a desired organ, which is then introduced into the individual. The methods are useful for treating any one of the following conditions: a neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, autoimmune, inflammatory, or muscular condition.

The present invention also provides methods for producing a cloned animal. In the methods, a somatic cell is isolated from an animal having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into a recipient embryo, and the resulting embryo is cultured to produce an embryo of suitable size for implantation into a recipient female, which is then transferred into a recipient female to produce a pregnant female. The pregnant female is maintained under conditions appropriate for carrying the embryo to term to produce chimeric animal progeny, which is then bred with a wild type animal to produce a cloned animal.

In certain embodiments, the RPSCs may alternatively be cryopreserved for future cloning uses. In certain other embodiments, genetic modification, such a targeted mutation, may be introduced into the RPSCs prior to its insertion into a recipient embryo.

The present invention also provides methods for producing a cloned avian. In the methods, a somatic cell is isolated from an avian having desired characteristics, and reprogrammed using the methods of the invention to produce one or more reprogrammed pluripotent somatic cell ("RPSC"). The RPSCs are then inserted into eggs that are unable to develop into an embryo, and the resulting eggs are then incubated to produce avian offspring having the genotype of the RPSC, thereby producing a cloned avian.

It is contemplated that all embodiments described above are applicable to all different aspects of the invention. It is also contemplated that any of the above embodiments can be freely combined with one or more other such embodiments whenever appropriate.)

Specific embodiments of the invention are described in more detail below. However, these are illustrative embodiments, and should not be construed as limiting in any respect.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an inducible Oct4 allele.

FIG. 2 shows the expression of the inducible Oct4 transgene by Northern blot and Western blot analysis.

DETAILED DESCRIPTION OF THE INVENTION

Overview

Presently, human ES cells or ES-like cells can only be generated from controversial sources. It would be useful to reprogram somatic cells directly into pluripotent cells.

4

Nuclei from somatic cells retain the totopotency potential to direct development of an animal, as demonstrated by nuclear transfer technology. It would be useful to reprogram somatic cells directly into ES cells without the use of oocytes and nuclear transfer technology.

Applicants have devised novel methods of reprogramming somatic cells to generate pluripotent cells or multipotent cells. Applicants have also devised novel methods to identify agents that reprogram somatic cells. The methods take advantage of the engineered somatic cells designed by Applicants, in which an endogenous gene typically associated with pluripotency ("pluripotency gene") is engineered to be operably linked to a selectable marker in a manner that the expression the endogenous pluripotency gene substantially matches the expression of the selectable marker. Because pluripotency genes are generally expressed only in pluripotent cells and not in somatic cells, the expression of an endogenous pluripotent gene(s) is an indication of successful reprogramming. Having a selectable marker operably linked to an endogenous pluripotency gene gives one a powerful mechanism to select for potentially reprogrammed somatic cells, which likely is a rare occurrence. The resulting cells may be further assessed for pluripotency characteristics to confirm whether a somatic cell has been successfully reprogrammed to pluripotency.

Generating pluripotent or multipotent cells by somatic cell reprogramming using the methods of the present invention has at least two advantages. First, the methods of the present invention allow one to generate autologous pluripotent cells, which are cells specific to a patient. The use of autologous cells in cell therapy offers a major advantage over the use of non-autologous cells, which are likely to be subject to immunological rejection. In contrast, autologous cells are unlikely to elicit significant immunological responses (See Munsie et al, 2000). Second, the methods of the present invention allow one to generate pluripotent without using embryos, oocytes and/or nuclear transfer technology.

A pluripotent cell is a cell that has the potential to divide in vitro for a long period of time (greater than one year) and has the unique ability to differentiate into cells derived from all three embryonic germ layers—endoderm, mesoderm and ectoderm.

A multipotent cell is a cell that is able to differentiate into some but not all of the cells derived from all three germ layers. Thus, a multipotent cell is a partially differentiated cell. Adult stem cells are multipotent cells. Known adult stem cells include, for example, hematopoietic stem cells and neural stem cells. A hematopoietic stem cell is multipotent because it has the ability to differentiate into all types of specific blood cells, but it is unlikely that they can differentiate into all cells of a given animal or human. Multipotent/adult stem cells have a great deal of promise in research and in the area of therapeutic applications. For example, multipotent/adult stem cells have already been used in humans in attempts to treat certain blood, neural and cancer diseases.

The term "pluripotency gene", as used herein, refers to a gene that is associated with pluripotency. The expression of a pluripotency gene is typically restricted to pluripotent stem cells, and is crucial for the functional identity of pluripotent stem cells. The transcription factor Oct-4 (also called Pou5f1, Oct-3, Oct3/4) is an example of a pluripotency gene. Oct-4 has been shown to be required for establishing and maintaining the undifferentiated phenotype of ES cells and plays a major role in determining early events in embryogenesis and cellular-differentiation (Nichols et al., 1998, Cell

EXHIBIT G
PAGE 169

WHI_00011904

US 10,017,744 B2

95:379-391; Niwa et al., 2000, Nature Genet. 24:372-376). Oct-4 is down-regulated as stem cells differentiate into specialised cells. Other exemplary pluripotency genes include Nanog, and Stella (See Chambers et al., 2003, Cell 113: 643-655; Mitsui et al., Cell. 2003, 113(5):631-42; Bortvin et al. Development. 2003, 130(8):1673-80; Saitou et al., Nature. 2002, 418 (6895):293-300.

Engineered Somatic Cells and Transgenic Mice Comprising Such Cells

The present invention provides somatic cells comprising an endogenous pluripotency gene linked to DNA encoding a selectable marker in such a manner that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. In one embodiment, the somatic cells of the present invention comprise a first endogenous pluripotency gene linked to DNA encoding a first selectable marker in such a manner that the expression of the first selectable marker substantially matches the expression of the first endogenous pluripotency gene. The somatic cells may also be engineered to comprise any number of endogenous pluripotency genes respectively linked to a distinct selectable marker. Thus, in another embodiment, the somatic cells of the present invention comprise two endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. In a further embodiment, the somatic cells of the present invention comprise three endogenous pluripotency genes, each of which is linked to DNA encoding a distinct selectable marker. The somatic cells described above will be collectively referred in this application as "engineered somatic cells." The engineered somatic cells may be further engineered to have one or more pluripotency gene expressed as a transgene under an inducible promoter.

The selectable marker is linked to an appropriate endogenous pluripotency gene such that the expression of the selectable marker substantially matches the expression of the endogenous pluripotency gene. By "substantially match", it is meant that the expression of the selectable marker substantially reflects the expression pattern of the endogenous pluripotency gene. In other words, the selectable marker and the endogenous pluripotency gene are co-expressed. For purpose of the present invention, it is not necessary that the expression level of the endogenous gene and the selectable marker is the same or even similar. It is only necessary that the cells in which an endogenous pluripotency gene is activated will also express the selectable marker at a level sufficient to confer a selectable phenotype on the reprogrammed cells. For example, when the selectable marker is a marker that confers resistance to a lethal drug (a "drug resistance marker"), the cells are engineered in a way that allows cells in which an endogenous pluripotency gene is activated to also express the drug resistance marker at a sufficient level to confer on reprogrammed cells resistance to lethal drugs. Thus, reprogrammed cells will survive and proliferate whereas non-reprogrammed cells will die.

The DNA encoding a selectable marker may be inserted downstream from the end of the open reading frame (ORF) encoding the desired endogenous pluripotency gene, anywhere between the last nucleotide of the ORF and the first nucleotide of the polyadenylation site. An internal ribosome entry site (IRES) may be placed in front of the DNA encoding the selectable marker. Alternatively, the DNA encoding a selectable marker may be inserted anywhere within the ORF of the desired endogenous pluripotency gene, downstream from the promoter, with a termination signal. An internal ribosome entry site (IRES) may be placed in

front of the DNA encoding the selectable marker. The selectable marker may be inserted into only one allele, or both alleles, of the endogenous pluripotency gene.

The somatic cells in the invention may be primary cells or immortalized cells. Such cells may be primary cells (non-immortalized cells), such as those freshly isolated from an animal, or may be derived from a cell line (immortalized cells).

The somatic cells in the present invention are mammalian cells, such as, for example, human cells or mouse cells. They may be obtained by well-known methods, from different organs, e.g., skin, lung, pancreas, liver, stomach, intestine, heart, reproductive organs, bladder, kidney, urethra and other urinary organs, etc., generally from any organ or tissue containing live somatic cells. Mammalian somatic cells useful in the present invention include, by way of example, adult stem cells, sertoli cells, endothelial cells, granulosa epithelial, neurons, pancreatic islet cells, epidermal cells, epithelial cells, hepatocytes, hair follicle cells, keratinocytes, hematopoietic cells, melanocytes, chondrocytes, lymphocytes (B and T lymphocytes), erythrocytes, macrophages, monocytes, mononuclear cells, fibroblasts, cardiac muscle cells, and other muscle cells, etc. generally any live somatic cells. The term "somatic cells", as used herein, also includes adult stem cells. An adult stem cell is a cell that is capable of giving rise to all cell types of a particular tissue. Exemplary adult stem cells include hematopoietic stem cells, neural stem cells, and mesenchymal stem cells.

In one embodiment, the engineered somatic cells are obtained from a transgenic mouse comprising such engineered somatic cells. Such transgenic mouse can be produced using standard techniques known in the art. For example, Bronson et al. describe a technique for inserting a single copy of a transgene into a chosen chromosomal site. See Bronson et al., 1996. Briefly, a vector containing the desired integration construct (for example, a construct containing a selectable marker linked to a pluripotency gene) is introduced into ES cells by standard techniques known in the art. The resulting ES cells are screened for the desired integration event, in which the knock-in vector is integrated into the desired endogenous pluripotency gene locus such that the selectable marker is integrated into the genomic locus of the pluripotency gene and is under the control of the pluripotency gene promoter. The desired ES cell is then used to produce transgenic mouse in which all cell types contain the correct integration event. Desired types of cells may be selectively obtained from the transgenic mouse and maintained in vitro. In one embodiment, two or more transgenic mice may be created, each carrying a distinct integration construct. These mice may then be bred to generate mice that carry multiple desired integration construct. For example, one type of transgenic mouse may be created to carry an endogenous pluripotency gene linked to a selectable marker, while a second type of transgenic mouse may be created to carry a pluripotency gene expressed as a transgene under an inducible promoter. These two types of mice may then be bred to generate transgenic mice that have both a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. These two pluripotency genes may or may not be the same. Many variables are contemplated: the identity of the endogenous pluripotency gene linked to marker, the identity of the pluripotency gene expressed as a transgene, and the number of the endogenous pluripotency gene linked to a selectable marker, and the number of

**EXHIBIT G**
**PAGE 170**

WHI_00011905

7

pluripotency gene expressed as a transgene. The present invention encompasses all possible combinations of these variables.

Alternatively, engineered somatic cells of the present invention may be produced by direct introduction of the desired construct into somatic cells. DNA construct may be introduced into cells by any standard technique known in the art, such as viral transfection (eg. using an adenoviral system) or liposome-mediated transfection. Any means known in the art to generate somatic cells with targeted integration can be used to produce somatic cells of the invention. In mammalian cells, homologous recombination occurs at much lower frequency compared to non-homologous recombination. To facilitate the selection of homologous recombination events over the non-homologous recombination events, at least two enrichment methods have been developed: the positive-negative selection (PNS) method and the "promoterless" selection method (Sedivy and Dutriaux, 1999). Briefly, PNS, the first method, is in genetic terms a negative selection: it selects against recombination at the incorrect (non-homologous) loci by relying on the use of a negatively selectable gene that is placed on the flanks of a targeting vector. On the other hand, the second method, the "promoterless" selection, is a positive selection in genetic terms: it selects for recombination at the correct (homologous) locus by relying on the use of a positively selectable gene whose expression is made conditional on recombination at the homologous target site. The disclosure of Sedivy and Dutriaux is incorporated herein.

A selectable marker, as used herein, is a marker that, when expressed, confers upon recipient cells a selectable phenotype, such as antibiotic resistance, resistance to a cytotoxic agent, nutritional prototrophy or expression of a surface protein. The presence of a selectable marker linked to an endogenous pluripotency gene makes it possible to identify and select reprogrammed cells in which the endogenous pluripotency gene is expressed. A variety of selectable marker genes can be used, such as neomycin resistance gene (neo), puromycin resistance gene (puro), guanine phosphoribosyl transferase (gpt), dihydrofolate reductase (DHFR), adenosine deaminase (ada), puromycin-N-acetyltransferase (PAC), hygromycin resistance gene (hyg), multidrug resistance gene (mdr), and hisD gene.

The present invention further provides transgenic mice comprising the somatic cells of the invention.

Methods for Reprogramming Somatic Cells

The present invention further provides methods for reprogramming somatic cells to a less differentiated state. The resulting cells are termed "reprogrammed somatic cells" ("RSC") herein. A RSC may be a reprogrammed pluripotent somatic cell ("RPSC"), a reprogrammed multipotent somatic cell ("RMSC"), or a reprogrammed somatic cell of varying differentiation status.

In general, the methods comprise treating the engineered somatic cells with an agent. The treatment with an agent may be contacting the cells with an agent which alters chromatin structure, or may be transfecting the cells with one or more pluripotency gene, or both. The above two treatments may be concurrent, or may be sequential, with no particular preference for order. In a further embodiment, reprogrammed somatic cells are identified by selecting for cells that express the appropriate selectable marker. In still a further embodiment, reprogrammed somatic cells are further assessed for pluripotency characteristics. The presence of pluripotency characteristics indicates that the somatic cells have been reprogrammed to a pluripotent state.

8

Differentiation status of cells is a continuous spectrum, with terminally differentiated state at one end of this spectrum and de-differentiated state (pluripotent state) at the other end. Reprogramming, as used herein, refers to a process that alters or reverses the differentiation status of a somatic cell, which can be either partially or terminally differentiated. Reprogramming includes complete reversion, as well as partial reversion, of the differentiation status of a somatic cell. In other words, the term "reprogramming", as used herein, encompasses any movement of the differentiation status of a cell along the spectrum toward a less-differentiated state. For example, reprogramming includes reversing a multipotent cell back to a pluripotent cell, reversing a terminally differentiated cell back to either a multipotent cell or a pluripotent cell. In one embodiment, reprogramming of a somatic cell turns the somatic cell all the way back to a pluripotent state. In another embodiment, reprogramming of a somatic cell turns the somatic cell back to a multipotent state. The term "less-differentiated state", as used herein, is thus a relative term and includes a completely de-differentiated state and a partially differentiated state.

The term "pluripotency characteristics", as used herein, refers to many characteristics associated with pluripotency, including, for example, the ability to differentiate into all types of cells and an expression pattern distinct for a pluripotent cell, including expression of pluripotency genes, expression of other ES cell markers, and on a global level, a distinct expression profile known as "stem cell molecular signature" or "stemness."

Thus, to assess reprogrammed somatic cells for pluripotency characteristics, one may analyze such cells for different growth characteristics and ES cell-like morphology. Cells may be injected subcutaneously into immunocompromised SCID mice to induce teratomas (a standard assay for ES cells). ES-like cells can be differentiated into embryoid bodies (another ES specific feature). Moreover, ES-like cells can be differentiated in vitro by adding certain growth factors known to drive differentiation into specific cell types. Self-renewing capacity, marked by induction of telomerase activity, is another pluripotency characteristics that can be monitored. One may carry out functional assays of the reprogrammed somatic cells by introducing them into blastocysts and determine whether the cells are capable of giving rise to all cell types. See Hogan et al., 2003. If the reprogrammed cells are capable of forming a few cell types of the body, they are multipotent; if the reprogrammed somatic cells are capable of forming all cell types of the body including germ cells, they are pluripotent.

One may also examine the expression of an individual pluripotency gene in the reprogrammed somatic cells to assess their pluripotency characteristics. Additionally, one may assess the expression of other ES cell markers. Stage-specific embryonic 1 5 antigens-1, -3, and -4 (SSEA-1, SSEA-3, SSEA-4) are glycoproteins specifically expressed in early embryonic development and are markers for ES cells (Solter and Knowles, 1978, Proc. Natl. Acad. Sci. USA 75:5565-5569; Kannagi et al., 1983, EMBO J 2:2355-2361). Elevated expression of the enzyme Alkaline Phosphatase (AP) is another marker associated with undifferentiated embryonic stem cells (Wobus et al., 1984, Exp. Cell 152: 212-219; Pease et al., 1990, Dev. Biol. 141:322-352). Other stem/progenitor cells markers include the intermediate neurofilament nestin (Lendahl et al., 1990, Cell 60:585-595; Dah-Istrand et al., 1992, J.

Cell Sci. 103:589-597), the membrane glycoprotein prominin/AC133 (Weigmann et al., 1997, Proc. Natl. Acad. USA 94:12425-12430; Corbeil et al., 1998, Blood 91:2625-

**EXHIBIT G**
**PAGE 171**

WHI_00011906

9

22626), the transcription factor Tcf-4 (Korinek et al, 1998, Nat. Genet. 19: 379-383; Lee et al., 1999, J. Biol. Chem. 274.1 566-1 572), and the transcription factor Cdx1 (Duprey et al., 1988, Genes Dev. 2:1647-1654; Subramania'n et al., 1998, Differentiation 64:11-1 8).

One may additionally conduct expression profiling of the reprogrammed somatic cells to assess their pluripotency characteristics. Pluripotent cells, such as embryonic stem cells, and multipotent cells, such as adult stem cells, are known to have a distinct pattern of global gene expression profile. This distinct pattern is termed "stem cell molecular signature", or "stemness". See, for example, Ramalho-Santos et al., Science 298: 597-600 (2002); Ivanova et al., Science 298: 601-604.

Somatic cells may be reprogrammed to gain either a complete set of the pluripotency characteristics and are thus pluripotent. Alternatively, somatic cells may be reprogrammed to gain only a subset of the pluripotency characteristics. In another alternative, somatic cells may be reprogrammed to be multipotent.

In a further embodiment, in conjunction with contacting the somatic cells of the invention with an agent which alters chromatin structure, at least one gene that affects pluripotent state of a cell may be further introduced into the same cells. This may be carried out sequentially. For example, the somatic cells of the invention may be first contacted with an agent which alters chromatin structure. Then at least one pluripotency gene can be introduced into the same cells, or vice versa. Alternatively, the two steps may be carried out simultaneously.

Genes that affect pluripotent state of a cell includes pluripotency genes, genes involved in chromatin remodeling, and genes that are important for maintaining pluripotency, such as LIF, BMP, and PD098059 (See Cell, 115: 281-292 (2003); Philos Trans R Soc Lond B Biol Sci. 2003 Aug. 29; 358(1436):1397-402).

The exogenously introduced pluripotency gene may be carried out in several ways. In one embodiment, the exogenously introduced pluripotency gene may be expressed from a chromosomal locus different from the endogenous chromosomal locus of the pluripotency gene. Such chromosomal locus may be a locus with open chromatin structure, and contain gene(s) dispensible for a somatic cell. In other words, the desirable chromosomal locus contains gene(s) whose disruption will not cause cells to die. Exemplary chromosomal loci include, for example, the mouse ROSA 26 locus and type II collagen (Col2a1) locus (See Zambrowicz et al., 1997) The exogenously introduced pluripotency gene may be expressed from an inducible promoter such that their expression can be regulated as desired.

In an alternative embodiment, the exogenously introduced pluripotency gene may be transiently transfected into cells, either individually or as part of a cDNA expression library, prepared from pluripotent cells. Such pluripotent cells may be embryonic stem cells, oocytes, blastomeres, inner cell mass cells, embryonic germ cells, embryoid body (embryonic) cells, morula-derived cells, teratoma (teratocarcinoma) cells, and multipotent partially differentiated embryonic stem cells taken from later in the embryonic development process.

The cDNA library is prepared by conventional techniques. Briefly, mRNA is isolated from an organism of interest. An RNA-directed DNA polymerase is employed for first strand synthesis using the mRNA as template. Second strand synthesis is carried out using a DNA-directed DNA polymerase which results in the cDNA product. Following conventional processing to facilitate cloning of the cDNA,

10

the cDNA is inserted into an expression vector such that the cDNA is operably linked to at least one regulatory sequence. The choice of expression vectors for use in connection with the cDNA library is not limited to a particular vector. Any expression vector suitable for use in mouse cells is appropriate. In one embodiment, the promoter which drives expression from the cDNA expression construct is an inducible promoter. The term regulatory sequence includes promoters, enhancers and other expression control elements. Exemplary regulatory sequences are described in Goeddel; Gene Expression Technology: Methods in Enzymology, Academic Press, San Diego, Calif. (1990). For instance, any of a wide variety of expression control sequences that control the expression of a DNA sequence when operatively linked to it may be used in these vectors to express cDNAs. Such useful expression control sequences, include, for example, the early and late promoters of SV40, tet promoter, adenovirus or cytomegalovirus immediate early promoter, the lac system, the trp system, the TAC or TRC system, T7 promoter whose expression is directed by T7 RNA polymerase, the major operator and promoter regions of phage lambda, the control regions for fd coat protein, the promoter for 3-phosphoglycerate kinase or other glycolytic enzymes, the promoters of acid phosphatase, e.g., Pho5, the promoters of the yeast α-mating factors, the polyhedron promoter of the baculovirus system and other sequences known to control the expression of genes of prokaryotic or eukaryotic cells or their viruses, and various combinations thereof. It should be understood that the design of the expression vector may depend on such factors as the choice of the host cell to be transformed and/or the type of protein desired to be expressed. Moreover, the vector's copy number, the ability to control that copy number and the expression of any other protein encoded by the vector, such as antibiotic markers, should also be considered.

The exogenously introduced pluripotency gene may be expressed from an inducible promoter. The term "inducible promoter", as used herein, refers to a promoter that, in the absence of an inducer (such as a chemical and/or biological agent), does not direct expression, or directs low levels of expression of an operably linked gene (including cDNA), and, in response to an inducer, its ability to direct expression is enhanced. Exemplary inducible promoters include, for example, promoters that respond to heavy metals (CRC Boca Raton, Fla. (1991), 167-220; Brinster et al. Nature (1982), 296, 39-42), to thermal shocks, to hormones (Lee et al. P.N.A.S. USA (1988), 85, 1204-1208, (1981), 294, 228-232; Klock et al. Nature (1987), 329, 734-736; Israel and Kaufman, Nucleic Acids Res. (1989), 17, 2589-2604), promoters that respond to chemical agents, such as glucose, lactose, galactose or antibiotic.

A tetracycline-inducible promoter is an example of an inducible promoter that responds to an antibiotics. See Gossen et al., 2003. The tetracycline-inducible promoter comprises a minimal promoter linked operably to one or more tetracycline operator(s). The presence of tetracycline or one of its analogues leads to the binding of a transcription activator to the tetracycline operator sequences, which activates the minimal promoter and hence the transcription of the associated cDNA. Tetracycline analogue includes any compound that displays structural homologies with tetracycline and is capable of activating a tetracycline-inducible promoter. Exemplary tetracycline analogues includes, for example, doxycycline, chlorotetracycline and anhydrotetracycline.

Thus, in one embodiment, the present invention provides mice and somatic cells carrying at least one pluripotency

**EXHIBIT G**
**PAGE 172**

WHI_00011907

US 10,017,744 B2

11

gene expressed as a transgene under an inducible promoter. It is possible that somatic cells with such inducible pluripotency transgene(s) are more prone to be reprogrammed.

Any of the engineered somatic cells of the present invention may be used in the methods. In one embodiment, somatic cells used in the methods comprise only one endogenous pluripotency gene linked to a first selectable marker, and the selection step is carried out to select for the expression of the first selectable marker. In an alternative embodiment, the somatic cells used in the methods comprise any number of endogenous pluripotency genes, each of which is linked to a distinct selectable marker respectively, and the selection step is carried out to select for at least a subset of the selectable markers. For example, the selection step may be carried out to select for all the selectable markers linked to the various endogenous pluripotency genes.

In an alternative embodiment, somatic cells used in the method comprise a selectable marker linked to an endogenous pluripotency gene and an additional pluripotency gene expressed as a transgene under an inducible promoter. For these cells, the method of reprogramming may comprises induce the expression of the pluripotency transgene and select for the expression of the selectable marker. The method may further comprise contacting the somatic cells with an agent that alter chromatin structure.

Without wishing to be bound by theory, the agents used in the method may cause chromatin to take on a more open structure, which is more permissive for gene expression. DNA methylation and histone acetylation are two known events that alter chromatin toward a more closed structure. For example, loss of methylation by genetic deletion of DNA methylation enzyme Dnmt1 in fibroblasts results in reactivation of endogenous Oct4 gene. See J. Biol. Chem. 277: 34521-30, 2002; and Bergman and Mostoslavsky, Biol. Chem. 1990. Thus, DNA methylation inhibitors and histone deacelyation inhibitors are two classes of agents that may be used in the methods of the invention. Exemplary agents include 5-aza-cytidine, TSA and valproic acid.

In another embodiment, methods of the invention may further include repeating the steps of treating the cells with an agent. The agent used in the repeating treatment may be the same as, or different from, the one used during the first treatment.

Methods for Screening for an Agent that Reprograms Somatic Cells

The present invention also provides methods for identifying an agent that reprograms somatic cells to a less-differentiated state, as well as the agents thus identified. In one embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker. The presence of cells that express the appropriate selectable marker indicates that the agent reprograms somatic cells. Such an agent is referred as a "reprogramming agent" for purpose of this application.

In a further embodiment, the methods comprise contacting the engineered somatic cells of the invention with a candidate agent, selecting for cells that express the appropriate selectable marker, and assessing the cells so selected for pluripotency characteristics. The presence of a complete set of pluripotency characteristics indicates that the agent reprograms somatic cells to become pluripotent.

Candidate agents used in the invention encompass numerous chemical classes, though typically they are organic molecules, including small organic compounds. Candidate agents are also found among biomolecules including pep-

12

tides, saccharides, fatty acids, steroids, purines, pyrimidines, nucleic acids and derivatives, structural analogs or combinations thereof.

Candidate agents may be naturally arising, recombinant or designed in the laboratory. The candidate agents may be isolated from microorganisms, animals, or plants, or may be produced recombinantly, or synthesized by chemical methods known in the art. In some embodiments, candidate agents are isolated from libraries of synthetic or natural compounds using the methods of the present invention. For example, numerous means are available for random and directed synthesis of a wide variety of organic compounds and biomolecules, including expression of randomized oligonucleotides and oligopeptides. Alternatively, libraries of natural compounds in the form of bacterial, fungal, plant and animal extracts are available or readily produced. Additionally, natural or synthetically produced libraries and compounds are readily modified through conventional chemical, physical and biochemical means, and may be used to produce combinatorial libraries. Known pharmacological agents may be subjected to directed or random chemical modifications, including acylation, alkylation, esterification, amidification, to produce structural analogs.

There are numerous commercially available compound libraries, including, for example, the Chembridge DIVERSet. Libraries are also available from academic investigators, such as the Diversity set from the NCI developmental therapeutics program.

The screening methods mentioned above are based on assays performed on cells. These cell-based assays may be performed in a high throughput screening (HTS) format, which has been described in the art. For example, Stockwell et al. described a high-throughput screening of small molecules in miniaturized mammalian cell-based assays involving post-translational modifications (Stockwell et al., 1999). Likewise, Qian et al. described a leukemia cell-based assay for high-throughput screening for anti-cancer agents (Qian et al., 2001). Both references are incorporated herein in their entirety.

A reprogramming agent may belong to any one of many different categories. For example, a reprogramming agent may be a chromatin remodeling agent. A chromatin remodeling agent may be a protein involved in chromatin remodeling or an agent known to alter chromatin toward a more open structure, such as a DNA methylation inhibitor or a histone deacelyation inhibitor. Exemplary compounds include 5-aza-cytidine, TSA and valproic acid. For another example, such an agent may be a pluripotency protein, including, for example, Nanog, Oct-4 and Stella. Such an agent may also be a gene essential for pluripotency, including, for example, Sox2, FoxD3, and LIF, and Stat3. See Smith et al. 1988, William et al., 1988, Ihle, 1996, Avilion et al., 2003, and Hanna et al., 2002)

Methods for Reprogramming Somatic Cells with a Reprogramming Agent

The reprogramming agent identified by the methods of the present invention is useful for reprogramming somatic cells into pluripotent or multipotent cells. Accordingly, the present invention provides methods for reprogramming somatic cells to a less differentiated state, comprising contacting somatic cells with a reprogramming agent. The somatic cells used may be native somatic cells, or engineered somatic cells. It is not necessary for these cells to carry a selectable marker integrated into the endogenous locus of a pluripotency gene.

**EXHIBIT G**
**PAGE 173**

WHI_00011908

US 10,017,744 B2

13

**Reprogrammed Somatic Cells and these Uses**

The present invention also provides reprogrammed somatic cells (RSCs), including reprogrammed pluripotent somatic cells (RPSCs), produced by the methods of the invention. These methods, useful for the generation of cells of a desired cell type, have wide range of applications. For one example, these methods have applications in livestock management, involving the precise genetic manipulation of animals for economic or health purposes. For another example, these methods have medical application in treating or preventing a condition.

Accordingly, the invention provides methods for the treatment or prevention of a condition in a mammal. In one embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention to obtain RPSCs. The RPSCs are then cultured under conditions suitable for development of the RPSCs into cells of a desired cell type. The developed cells of the desired cell type are harvested and introduced into the individual to treat the condition. In an alternative embodiment, the methods start with obtaining somatic cells from the individual, reprogramming the somatic cells so obtained by methods of the present invention. The RPSCs are then cultured under conditions suitable for development of the RPSCs into a desired organ, which is harvested and introduced into the individual to treat the condition.

The RPSCs of the present invention are ES-like cells, and thus may be induced to differentiate to obtain the desired cell types according to known methods to differentiate ES cells. For example, the RPSCs may be induced to differentiate into hematopoietic stem cells, muscle cells, cardiac muscle cells, liver cells, cartilage cells, epithelial cells, urinary tract cells, etc., by culturing such cells in differentiation medium and under conditions which provide for cell differentiation. Medium and methods which result in the differentiation of embryonic stem cells are known in the art as are suitable culturing conditions.

For example, Palacios et al., Proc. Natl. Acad. Sci., USA, 92: 7530-37 (1995) teaches the production of hematopoietic stem cells from an embryonic cell line by subjecting stem cells to an induction procedure comprising initially culturing aggregates of such cells in a suspension culture medium lacking retinoic acid followed by culturing in the same medium containing retinoic acid, followed by transferal of cell aggregates to a substrate which provides for cell attachment.

Moreover, Pedersen, J. Reprod. Fertil. Dev., 6: 543-52 (1994) is a review article which references numerous articles disclosing methods for in vitro differentiation of embryonic stem cells to produce various differentiated cell types including hematopoietic cells, muscle, cardiac muscle, nerve cells, among others.

Further, Bain et al., Dev. Biol., 168:342-357 (1995) teaches in vitro differentiation of embryonic stem cells to produce neural cells which possess neuronal properties. These references are exemplary of reported methods for obtaining differentiated cells from embryonic or stem-like cells. These references and in particular the disclosures therein relating to methods for differentiating embryonic stem cells are incorporated by reference in their entirety herein.

Thus, using known methods and culture medium, one skilled in the art may culture the subject embryonic or stem-like cells to obtain desired differentiated cell types, e.g., neural cells, muscle cells, hematopoietic cells, etc. In addition, the use of inducible Bcl-2 or Bcl-x1 might be

14

useful for enhancing in vitro development of specific cell lineages. In vivo, Bcl-2 prevents many, but not all, forms of apoptotic cell death that occur during lymphoid and neural development. A thorough discussion of how Bcl-2 expression might be used to inhibit apoptosis of relevant cell lineages following transfection of donor cells is disclosed in U.S. Pat. No. 5,646,008, which is herein incorporated by reference.

The subject RPSCs may be used to obtain any desired differentiated cell type. Therapeutic usages of such differentiated human cells are unparalleled. For example, human hematopoietic stem cells may be used in medical treatments requiring bone marrow transplantation. Such procedures are used to treat many diseases, e.g., late stage cancers such as ovarian cancer and leukemia, as well as diseases that compromise the immune system, such as AIDS. Hematopoietic stem cells can be obtained, e.g., by fusing adult somatic cells of a cancer or AIDS patient, e.g., epithelial cells or lymphocytes with an enucleated oocyte, e.g., bovine oocyte, obtaining embryonic or stem-like cells as described above, and culturing such cells under conditions which favor differentiation, until hematopoietic stem cells are obtained. Such hematopoietic cells may be used in the treatment of diseases including cancer and AIDS.

The methods of the present invention can also be used to treat, prevent, or stabilize a neurological disease such as Alzheimer's disease, Parkinson's disease, Huntington's disease, or ALS, lysosomal storage diseases, multiple sclerosis, or a spinal cord injury. For example, somatic cells may be obtained from the individual in need of treatment, and reprogrammed to gain pluripotency, and cultured to derive neurectoderm cells that may be used to replace or assist the normal function of diseased or damaged tissue.

For the treatment or prevention of endocrine conditions, RPSCs that produce a hormone, such as a growth factor, thyroid hormone, thyroid-stimulating hormone, parathyroid hormone, steroid, serotonin, epinephrine, or norepinephrine may be administered to a mammal. Additionally, reprogrammed epithelial cells may be administered to repair damage to the lining of a body cavity or organ, such as a lung, gut, exocrine gland, or urogenital tract. It is also contemplated that RPSCs may be administered to a mammal to treat damage or deficiency of cells in an organ such as the bladder, brain, esophagus, fallopian tube, heart, intestines, gallbladder, kidney, liver, lung, ovaries, pancreas, prostate, spinal cord, spleen, stomach, testes, thymus, thyroid, trachea, ureter, urethra, or uterus.

The great advantage of the present invention is that it provides an essentially limitless supply of isogenic or syngenic human cells suitable for transplantation. Therefore, it will obviate the significant problem associated with current transplantation methods, i.e., rejection of the transplanted tissue which may occur because of host versus graft or graft versus host rejection. Conventionally, rejection is prevented or reduced by the administration of anti-rejection drugs such as cyclosporin. However, such drugs have significant adverse side-effects, e.g., immunosuppression, carcinogenic properties, as well as being very expensive. The present invention should eliminate, or at least greatly reduce, the need for anti-rejection drugs, such as cyclosporine, imulan, FK-506, glucocorticoids, and rapamycin, and derivatives thereof.

RPSCs may also be combined with a matrix to form a tissue or organ in vitro or in vivo that may be used to repair or replace a tissue or organ in a recipient mammal. For example, RPSCs may be cultured in vitro in the presence of a matrix to produce a tissue or organ of the urogenital

**EXHIBIT G**
**PAGE 174**

WHI_00011909

US 10,017,744 B2

15

system, such as the bladder, clitoris, corpus cavernosum, kidney, testis, ureter, uretal valve, or urethra, which may then be transplanted into a mammal (Atala, Curr. Opin. Urol. 9(6):517-526, 1999). In another transplant application, synthetic blood vessels are formed in vitro by culturing reprogrammed cells in the presence of an appropriate matrix, and then the vessels are transplanted into a mammal for the treatment or prevention of a cardiovascular or circulatory condition. For the generation of donor cartilage or bone tissue, RPSCs such as chondrocytes or osteocytes are cultured in vitro in the presence of a matrix under conditions that allow the formation of cartilage or bone, and then the matrix containing the donor tissue is administered to a mammal. Alternatively, a mixture of the cells and a matrix may be administered to a mammal for the formation of the desired tissue in vivo. Preferably, the cells are attached to the surface of the matrix or encapsulated by the matrix. Examples of matrices that may be used for the formation of donor tissues or organs include collagen matrices, carbon fibers, polyvinyl alcohol sponges, acrylateamide sponges, fibrin-thrombin gels, hyaluronic acid-based polymers, and synthetic polymer matrices containing polyanhydride, polyorthoester, polyglycolic acid, or a combination thereof (see, for example, U.S. Pat. Nos. 4,846,835; 4,642,120; 5,786,217; and 5,041,138).

The RPSCs produced according to the invention may be used to produce genetically engineered or transgenic differentiated cells. Essentially, this will be effected by introducing a desired gene or genes, or removing all or part of an endogenous gene or genes of RPSCs produced according to the invention, and allowing such cells to differentiate into the desired cell type. A preferred method for achieving such modification is by homologous recombination because such technique can be used to insert, delete or modify a gene or genes at a specific site or sites in the stem-like cell genome.

This methodology can be used to replace defective genes, e.g., defective immune system genes, cystic fibrosis genes, or to introduce genes which result in the expression of therapeutically beneficial proteins such as growth factors, lymphokines, cytokines, enzymes, etc. For example, the gene encoding brain derived growth factor maybe introduced into human embryonic or stem-like cells, the cells differentiated into neural cells and the cells transplanted into a Parkinson's patient to retard the loss of neural cells during such disease. Examples of mutations that may be rescued using these methods include mutations in the cystic fibrosis gene; mutations associated with Dunningan's disease such as the R482W, R482Q, and R584H mutations in the lamin A gene; and mutations associated with the autosomal-dominant form of Emery Deyfuss muscular dystrophy such as the R249Q, R453W, and Q6STOP mutations in the lamin A gene. In the Q6STOP mutation, the codon for Gln6 is mutated to a stop codon.

Previously, cell types transfected with BDNF varied from primary cells to immortalized cell lines, either neural or non-neural (myoblast and fibroblast) derived cells. For example, astrocytes have been transfected with BDNF gene using retroviral vectors, and the cells grafted into a rat model of Parkinson's disease (Yoshimoto et al., Brain Research, 691:25-36, (1995)). This ex vivo therapy reduced Parkinson's-like symptoms in the rats up to 45% 32 days after transfer. Also, the tyrosine hydroxylase gene has been placed into astrocytes with similar results (Lundberg et al., Develop. Neurol., 139:39-53 (1996) and references cited therein).

However, such ex vivo systems have problems. In particular, retroviral vectors currently used are down-regulated

16

in vivo and the transgene is only transiently expressed (review by Mulligan, Science, 260: 926-932 (1993)). Also, such studies used primary cells, astrocytes, which have finite life span and replicate slowly. Such properties adversely affect the rate of transfection and impede selection of stably transfected cells. Moreover, it is almost impossible to propagate a large population of gene targeted primary cells to be used in homologous recombination techniques.

By contrast, the difficulties associated with retroviral systems should be eliminated by the use of RPSCs of the present invention, which are ES-like cells. Using known methods to introduced desired genes/mutations into ES cells, RPSCs may be genetically engineered, and the resulting engineered cells differentiated into desired cell types, e.g., heniatopoietic cells, neural cells, pancreatic cells, cartilage cells, etc. Genes which may be introduced into the RPSCs include, for example, epidermal growth factor, basic fibroblast growth factor, glial derived neurotrophic growth factor, insulin-like growth factor (I and II), neurotrophin3, neurotrophin-4/5, ciliary neurotrophic factor, AFT-1, cytokine genes (interleukins, interferons, colony stimulating factors, tumor necrosis factors (alpha and beta), etc.), genes encoding therapeutic enzymes, collagen, human serum albumin, etc.

In addition, it is also possible to use one of the negative selection systems now known in the art for eliminating therapeutic cells from a patient if necessary. For example, donor cells transfected with the thymidine kinase (TK) gene will lead to the production of embryonic cells containing the TK gene. Differentiation of these cells will lead to the isolation of therapeutic cells of interest which also express the TK gene. Such cells may be selectively eliminated at any time from a patient upon gancyclovir administration. Such a negative selection system is described in U.S. Pat. No. 5,698,446, and is herein incorporated by reference.

Examples of diseases, disorders, or conditions that may be treated or prevented include neurological, endocrine, structural, skeletal, vascular, urinary, digestive, integumentary, blood, immune, auto-immune, inflammatory, endocrine, kidney, bladder, cardiovascular, cancer, circulatory, digestive, hematopoeitic, and muscular diseases, disorders, and conditions. In addition, reprogrammed cells may be used for reconstructive applications, such as for repairing or replacing tissues or organs.

With respect to the therapeutic methods of the invention, it is not intended that the administration of RPSCs to a mammal be limited to a particular mode of administration, dosage, or frequency of dosing; the present invention contemplates all modes of administration, including intramuscular, intravenous, intraarticular, intralesional, subcutaneous, or any other route sufficient to provide a dose adequate to prevent or treat a disease. The RPSCs may be administered to the mammal in a single dose or multiple doses. When multiple doses are administered, the doses may be separated from one another by, for example, one week, one month, one year, or ten years. One or more growth factors, hormones, interleukins, cytokines, or other cells may also be administered before, during, or after administration of the cells to further bias them towards a particular cell type.

The RPSCs of the present invention may be used as an in vitro model of differentiation, in particular for the study of genes which are involved in the regulation of early development. Differentiated cell tissues and organs using the RPSCs may be used in drug studies.

Furthermore, the RPSCs produced according to the invention maybe introduced into animals, e.g., SCID mice, cows, pigs, e.g., under the renal capsule or intramuscularly and

**EXHIBIT G**
**PAGE 175**

WHI_00011910

US 10,017,744 B2

17

used to produce a teratoma therein. This teratoma can be used to derive different tissue types. Also, the inner cell mass produced by X-species nuclear transfer may be introduced together with a biodegradable, biocompatible polymer matrix that provides for the formation of 3-dimensional tissues. After tissue formation, the polymer degrades, ideally just leaving the donor tissue, e.g., cardiac, pancreatic, neural, lung, liver. In some instances, it may be advantageous to include growth factors and proteins that promote angiogenesis. Alternatively, the formation of tissues can be effected totally in vitro, with appropriate culture media and conditions, growth factors, and biodegradable polymer matrices.

Applications of the Somatic Cell Reprogramming Methods and RPSCs in Animals

The reprogramming methods disclosed herein may be used to generate RPSCs for a variety of animal species. The RPSCs generated can be useful to produce desired animals. Animals include, for example, avians and mammals as well as any animal that is an endangered species. Exemplary birds include domesticated birds (e.g., quail, chickens, ducks, geese, turkeys, and guinea hens) as well as other birds such as birds of prey (e.g., hawks, falcons, ospreys, condors, etc.), endangered birds (e.g., parrots, California condor, etc.), ostriches etc. Exemplary mammals include murine, caprine, ovine, bovine, porcine, canine, feline and primate. Of these, preferred members include domesticated animals, including, for examples, cattle, buffalo, pigs, horses, cows, rabbits, guinea pigs, sheep, and goats.

RPSCs generated by the reprogramming methods of the present invention allows one, for the first time, to genetically engineer animals other than mouse and human. RPSCs are ES-like cells, and are thus amenable to genetic manipulation. To date, no ES cells are available for animals other than mouse and human. As a result, for these animals, it is currently practically impossible to create genetically modified animals having targeted mutations. The ES-cell like RPSCs can be manipulated to introduce desired targeted genetic modifications. The resulting engineered RPSCs can then be used to generate a cloned animal with the desired genetic modifications in its germ line, using methods described for ES cells in mouse. See Capecchi and Thomas, U.S. Pat. Nos. 5,487,992, 5,627,059, 5,631,153, and 6,204, 061. Genetic engineering in animals has potentially great applications in a variety of animals, especially farm animals.

The somatic cell reprogramming methods of the present invention provides at least two methods for delivering optimized farm animals. In the first, somatic cell reprogramming can be used to capture the best available phenotype for a farm animal stock. The current technologies used to deliver optimized farm animals are based on selective breeding, and expansion from preferred breeding stocks. Animals that have been selected on the basis of superior characteristics, including, for example, meat content, egg production (in the case of poultry), feed conversion ratio, are used to breed large numbers of animals that are in turn used in the human food supply. This traditional process has profound inherent inefficiencies. The phenotype observed in an individual animal is often only partially transmitted in the progeny of that animal. Therefore, traditional breeding schemes are inefficient in capturing the very best phenotype in all of the progeny animals. In contrast, the reprogramming methods of the present invention provides a controlled and efficient way to achieve the same goal, by generating RPSCs from somatic cells of an animal with the desired characteristics. The RPSCs generated may be used immediately to generate cloned animals derived from the RPSCs. Known methods for generating mice from ES cells can be used for

18

this procedure. Alternatively, the RPSCs generated may be cryopreserved and thawed in response to a grower's needs.

In another method, somatic cells from an animal with the desired characteristics are reprogrammed to produce RPSCs. The RPSCs are further genetically engineered to introduce desired genetic modification(s), before being placed into a recipient embryo to produce desired progeny.

The reprogramming methods can also be used to rescue endangered species. Somatic cell reprogramming provides an efficient method to generate RPSCs from somatic cells of an endangered animal. The resulting RPSCs can be used immediately to expand the numbers of the endangered animal. Alternatively, the RPSCs can be cryopreserved to generate a RPSC stock for the endangered species, as a safeguard measure against extinction of the endangered species.

Methods for Gene Identification

The present invention provides methods for identifying a gene that activates the expression of an endogenous pluripotency gene in somatic cells. The methods comprise: transfecting the somatic cells of the present invention with a cDNA library prepared from ES cells or oocytes, selecting for cells that express the first selectable marker, and assessing the expression of the first endogenous pluripotency gene in the transfected cells that express the first selectable marker. The expression of the first endogenous pluripotency gene indicates that the cDNA encodes a gene that activates the expression of an endogenous pluripotency gene in somatic cells.

The methods are applicable for identifying a gene that activates the expression of at least two endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a second endogenous pluripotency gene linked to a second selectable marker. The methods are modified to select for transfected cells that express both selectable markers, among which the expression of the first and the second endogenous pluripotency genes are assessed. The expression of both the first and the second endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least two pluripotency genes in somatic cells.

The methods are further applicable for identifying a gene that activates the expression of at least three endogenous pluripotency genes in somatic cells. The somatic cells used in the methods further comprise a third endogenous pluripotency gene linked to a third selectable marker. The methods are modified to select for transfected cells that express all three selectable markers, among which the expression of all three endogenous pluripotency genes are assessed. The expression of all three endogenous pluripotency genes indicates that the cDNA encodes a gene that activates the expression of at least three pluripotency genes in somatic cells.

The practice of the present invention will employ, unless otherwise indicated, conventional techniques of mouse genetics, developmental biology, cell biology, cell culture, molecular biology, transgenic biology, microbiology, recombinant DNA, and immunology, which are within the skill of the art. Such techniques are described in the literature. See, for example, Current Protocols in Cell Biology, ed. by Bonifacino, Dasso, Lippincott-Schwartz, Harford, and Yamada, John Wiley and Sons, Inc., New York, 1999; Manipulating the Mouse Embryos, A Laboratory Manual, 3rd Ed., by Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003; Gene Targeting: A Practical Approach, IRL Press at Oxford University Press, Oxford, 1993; and Gene Targeting Protocols, Human Press,

**EXHIBIT G**
**PAGE 176**

WHI_00011911

US 10,017,744 B2

19

Totowa, N.J., 2000. All patents, patent applications and references cited herein are incorporated in their entirety by reference.

EXEMPLIFICATION

The invention now being generally described, it will be more readily understood by reference to the following example, which are included merely for purposes of illustration of certain aspects and embodiments of the present invention, and are not intended to limit the invention.

Example. Oct4-Induced Fibroblasts are More Susceptible to Reprogramming than Unduced Fibroblasts as Demonstrated by Nuclear Transfer Experiment

A. Generation of Transgenic Mouse Carrying an Inducible Oct4 Transgene

An inducible Oct4 allele is constructed as the following: first, two integration vectors are constructed. The first integration vector, inducible Oct4 integration vector, contains an Oct4 gene driven by a tetracycline-inducible promoter (Tet-Op). The Tet-Op-Oct4 cassette is flanked by a splice-acceptor double poly-A signal (SA-dpA) at its 5' end and a SV40 polyA tail (SV40-pA) at its 3' end. The second integration vector, tetracycline activator integration vector, contains a mutant form of tetracycline activator, M2-rtTA, which is more responsive to doxycycline (Dox) induction than the wild type activator. (Urlinger S. et al., 2000)

The two integration vectors are introduced into V6.5 ES cells: the inducible Oct4 integration vector and the tetracycline activator integration vector are introduced into the Collagen locus and the Rosa26 locus respectively via site-specific integration, as shown in FIG. 1. The resulting ES cells are used to make Oct4-inducible mice by tetraploid complementation.

B. Expression of the Inducible Oct4 Transgene

Fibroblasts derived from tail biopsies of the Oct4-inducible mice were cultured. A fraction of the cultured fibroblasts were induced with doxycycline for 3 days (at 2 microgram/ml), and Oct4 expression was detected by Northern blot and Western blot analysis. As shown in FIG. 2, the Oct4 expression level in fibroblasts treated with doxycycline is comparable to the Oct4 expression level in ES cells, and undetectable in fibroblasts not treated with doxycycline. The expression results demonstrate that the inducible Oct4 transgene is expressed as planned.

C. Nuclear Transfer Experiment

Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4

20

transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, 2002). As shown in Table 1, on average, blastocyst formation and ES cell derivation (as measured as a fraction of eggs with pronucleus formation) is more efficient from Oct4 induced fibroblast than from uninduced fibroblasts. This result demonstrated that induced Oct4 expression in somatic cells such as fibroblasts make these cells more susceptible to reprogramming.

One skilled in the art readily appreciates that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The methods, systems and kits are representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. Modifications therein and other uses will occur to those skilled in the art. These modifications are encompassed within the spirit of the invention and are defined by the scope of the claims. It will be readily apparent to a person skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

TABLE 1

| In vitro development of clones derived from Oct4-induced fibroblasts | | | | | | | |
|---|---|---|---|---|---|---|---|
| Expt. | Oct4 | eggs w/PN | Blastocysts (% PN) | | | ES lines (% PN) | |
| #1 | – | 22 | 5 (23%) | } | 19% | 0 (0%) | } | 3% |
| #2 | – | 35 | 5 (14%) | | | 2 (6%) | |
| #3 | + | 37 | 10 (27%) | } | 24% | 2 (5%) | } | 7% |
| #4 | + | 47 | 10 (21%) | | | 4 (9%) | |

PN . . . ProNucleus formation
Nuclear transfer was performed on fibroblasts derived from tail biopsies of mice that carry the inducible Oct4 transgene. Dox induction was for 24 hours prior to nuclear transfer. Cloned embryos were then activated and cultured to the blastocyst stage to derive ES cells as described previously (Hochedlinger and Jaenisch, Nature, 2002). These preliminary results show that on average blastocyst formation and ES cell derivation is more efficient from Oct4 induced than from uninduced fibroblasts.

REFERENCES

Avilion, J., et al., Nat. Biotechnol. 20: 1240-45 (2003)
Gossen M. et al., Transcriptional activation by tetracyclines in mammalian cells,
Science 268: 1766-1769 (1995).
Hanna, L. A., et al., Genes Dev. 16: 2650-61 (2002).
Hochedlinger and Jaenisch, Nature 415: 1035-1038 (2002).
Hogan et al., Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 2003
Ihle, J. H., Cell 84: 331-334 (1996)
Munsie M. J., et al., Curr. Biol. 10: 989 (2000).
Shmblott, M. J., et al., Derivation of pluripotent stem cells from cultured human primordial germ cells. Proc. Natl. Acad. Sci. USA 95: 13726-13731 (1998)
Smith A. G., et al. Nature 336: 688-690 (1988)
Tan, D. S., Foley, M. A., Shair, M. D. & Schreiber, S. L. J. Am. Chem. Soc. 120, 8565-8566 (1998).
Thomson, J. A., et al., Embryonic stem cell lines derived from human blastocysts. Science, 282: 1145-1147 (1998).
Urlinger S, Baron U, Thellmann M, Hasan M T, Bujard H, Hillen W. Proc. Natl. Acad. Sci. USA. 97(14):7963-8 (2000). Exploring the sequence space for tetracycline-dependent transcriptional activators: novel mutations yield expanded range and sensitivity.

US 10,017,744 B2

21

William R. L., et al., Nature 336: 684-687 (1988)

Yamada, Y., Miyashita, T., Savagner, P., Horton, W., Brown, K. S., Abramczuk, J.,

Xie, H. X., Kohno, K., Bolander, M. and Bruggeman, L. (1990). Regulation of the collagen II gene in vitro and in transgenic mice. *Ann. New York Acad. Sci.* 580, 81-87

Zambrowicz B. P. et al., Disruption of overlapping transcripts in the ROSA bgeo 26 gene trap strain leads to widespread expression of b-galatosidase in mouse embryos and hematopoietic cells. Proc. Natl. Acad. Sci. USA 94: 3789-3794 (1997).

What is claimed is:

**1**. A method of making a somatic cell more susceptible to reprogramming to a cell having a less differentiated state, comprising:

obtaining a somatic cell that comprises an exogenously introduced polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein;

wherein the exogenously introduced polynucleic acids result in making the somatic cell more susceptible to reprogramming to a less differentiated state.

**2**. The method of claim **1**, the step of obtaining further comprises:

22

introducing an exogenous polynucleic acid encoding Oct4 protein, and an exogenously introduced polynucleic acid encoding Sox2 or Nanog protein into the somatic cell; wherein one or both of the polynucleic acids is operatively linked to at least one heterologous regulatory sequence.

**3**. The method of claim **1** or **2**, further comprising:

contacting the somatic cell with a candidate agent of interest with respect to its potential to reprogram a somatic cell.

**4**. The method of claim **3**, wherein the candidate agent of interest is a DNA methylation inhibitor, a histone deacetylase inhibitor or PD098059.

**5**. The method of claim **1**, wherein the exogenous polynucleic acids increase Oct4 expression in the somatic cell.

**6**. The method of claim **1**, wherein the somatic cell is a mammalian cell.

**7**. The method of claim **1**, wherein the somatic cell is a human cell or a mouse cell.

**8**. The method of claim **1**, wherein the somatic cell is an adult stem cell.

**9**. The method of claim **8**, wherein the adult stem cell is selected from the group consisting of: a hematopoietic stem cell, a neural stem cell, and a mesenchymal stem cell.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 10,017,744 B2                                     Page 1 of 1
APPLICATION NO.   : 15/588062
DATED              : July 10, 2018
INVENTOR(S)       : Rudolf Jaenisch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, Line 19 through Line 23, delete:
"GOVERNMENTAL FUNDING
This invention was made with government support under R37 CA84198 awarded by the National
Institutes of Health. The government has certain rights in the invention."

Signed and Sealed this
Third Day of January, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

**EXHIBIT G
PAGE 179**

WHI_00011914

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ *Kevin P. Martin*
Kevin P. Martin

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), it contains 12,593 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 in 14-point Times New Roman, a proportionally spaced typeface.

February 8, 2024                          /s/ *Kevin P. Martin*
                                         Kevin P. Martin